## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Symbria, Inc. et al., | |
| Plaintiffs, | |
| | Case No. 20-cv-4084 |
| v. | |
| John Callen, et al., | Judge Mary M. Rowland |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case arises from a business fallout. Plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, Alliance Rehab HVA, LLC, GreatBanc trust Company, and the Symbria, Inc. Employee Stock Ownership Trust claim that their former corporate officers and employees formed a venture to compete against them in the field of rehabilitation and wellness services to senior living and skilled nursing facilities. Did their actions amount to unlawful competition? Plaintiffs claim they do. Accordingly, they bring a sixteen-count third amended complaint alleging that Defendants violated a host of federal and state laws, including trade secret misappropriation, copyright infringement, breach of contract, breach of fiduciary duty, and tortious interference. Defendants have moved to dismiss the claims against them. [210]; [212]; [214]; [215]. For the reasons explained below, this Court grants in part and denies in part the motions.

## I. Background

This Court accepts as true the following factual allegations from the third amended complaint (TAC) [164]. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021).

### A. The Parties

Plaintiff Symbria, Inc. (Symbria) constitutes the parent company of businesses providing clinical health services for senior living and post-acute care providers. [164] ¶ 2. In 2015, Symbria's owners sold the company to an employee stock ownership plan (ESOP) trust, making Symbria an employee-owned company. *Id.* ¶ 2. Plaintiff Symbria Rehab, Inc. (Symbria Rehab) is Symbria's wholly-owned subsidiary. *Id.* ¶ 3. Symbria Rehab provides rehabilitation services for residents and patients of senior living and post-acute care providers, including health and wellness programs, by entering into exclusive contracts with those providers. *Id.*

Plaintiff Alliance Rehab of Connecticut, LLC (Alliance Connecticut) is a Connecticut limited liability company majority-owned by Symbria Rehab. *Id.* ¶ 4. Like Symbria Rehab, Alliance Connecticut provides rehabilitation services for residents and patients of senior living and post-acute care providers. *Id.* ¶ 4. Alliance Connecticut enters into exclusive contracts with providers in the state of Connecticut. *Id.* Similarly, Plaintiff Alliance HVA, LLC (Alliance HVA) is a Pennsylvania limited company, majority-owned by Symbria Rehab. *Id.* ¶ 5. Alliance HVA provides the same services as Alliance Connecticut and Symbria Rehab and does so through exclusive contracts with providers in Pennsylvania. *Id.*

2

Plaintiffs refer to Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA collectively as Symbria and Affiliates. *Id.* ¶ 8. Plaintiff GreatBanc Trust Company serves as the Trustee of the Symbria ESOP Trust. *Id.* ¶ 6. The Symbria ESOP Trust is also a named Plaintiff. *Id.* ¶ 7.

Defendant John R. Callen served as Symbria Rehab's president from 1999 to January 12, 2017. *Id.* ¶ 9.

Defendant United Methodist Homes & Services (UMHS) provides services and residences for older adults. *Id.* ¶ 10. UMHS owned Symbria until October 31, 2015. *Id.* ¶ 10. William Lowe, a non-party, is UMHS' president and served on its board of directors through at least May 2019. *Id.* ¶ 10.

Defendant Christos Dilmas worked as a Program Manager/Physical Therapist for Symbria Rehab from October 31, 2013 to October 2, 2016, when Symbria Rehab promoted Dilmas to Regional Director of Operations. *Id.* ¶ 11. Dilmas then served as Regional Director of Operations until September 25, 2019. *Id.* ¶ 11.

Christine Irvine, who the TAC named as a Defendant but has since settled, worked for Symbria Rehab as an Exercise Physiologist starting in August 2004; Symbria Rehab promoted her to Rehab and Wellness Manager in January 2007, to Client Relations Liaison in May 2011, and then to Area Director on October 3, 2016. *Id.* ¶ 12. As Area Director, Irvine reported directly to Dilmas. *Id.* When Irvine resigned from Symbria Rehab effective February 22, 2019, she went to an entity called Plymouth Place, where she remains employed. *Id.* ¶¶ 12, 14. Plymouth Place is a senior living facility and client of Symbria's subsidiary Symbria Rx Services, LLC.

*Id.* ¶ 109. In January 2019, Plymouth Place's wholly-owned subsidiary purchased minority interests in Defendants Joint & Neuro and IASN. *Id.*

Defendant MedRehab Alliance Holdings, Inc. (MedRehab Holdings) is UMHS' wholly-owned holding company. *Id.* ¶ 13. Lowe serves as president and secretary for MedRehab Holdings. *Id.*

Defendant MedRehab Alliance, LLC (MedRehab Alliance) provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies. *Id.* ¶ 14. Lowe manages MedRehab Alliance, while Callen serves as president, CEO, and managing partner. *Id.* ¶ 14. UMHS and Callen each own 25.974 percent of MedRehab Alliance. *Id.*

Defendant MedRehab Alliance Interstate, LLC (MedRehab Interstate) provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies in states outside Illinois. *Id.* ¶ 15. MedRehab Interstate is majority-owned by MedRehab Holdings and therefore by UMHS. *Id.* ¶ 15. MedRehab Interstate employs four managers, including Callen and Lowe. *Id.* ¶ 15. Through MedRehab Holdings and MedRehab Alliance, UMHS owns 60 percent of MedRehab Interstate. *Id.*

Defendant Illinois Ancillary Services Network, LLC (IASN) provides ancillary and home health care services. *Id.* ¶ 16. MedRehab Alliance owns IASN, and thus, UMHS and Callen also each own 25.974 percent of IASN. *Id.* IASN owns Defendant Pearl Health Services, Inc. (Pearl), a home healthcare agency providing nursing, physical therapy, occupational therapy, speech pathology, and other home health

4

services. *Id.* ¶¶ 16, 17. UMHS and Callen each own an indirect controlling interest in Pearl. *Id.* ¶ 17.

Defendant Chicago Rehabilitation Collective PLLC (Chicago Rehab) provides medical services through healthcare professionals including physical therapists, occupational therapists, speech therapists, and respiratory therapists. *Id.* ¶ 18. Callen manages Chicago Rehab. *Id.* Chicago Rehab hired Defendant Dilmas when he resigned from Symbria Rehab. *Id.*

Defendant MedRehab Therapy Associates of Illinois, LLC (MedRehab Therapy) provides clinical health services for senior living and post-acute care providers. *Id.* ¶ 19. Callen manages and owns, in part, MedRehab Therapy. *Id.*

Defendant Joint & Neuro Rehab Associates, LLC (Joint & Neuro) provides acute and post-acute rehabilitation staffing and management services to hospitals, health systems, outpatient physical therapy, pain management, and musculoskeletal clinics, skilled nursing facilities, home health agencies, and senior care communities. *Id.* ¶ 20. Callen manages and owns Joint & Neuro. *Id.*

Defendant MedRehab Alliance Wisconsin, LLC (MedRehab Wisconsin) provides rehabilitation management services. *Id.* ¶ 21. MedRehab Alliance owns MedRehab Wisconsin, and through MedRehab Alliance, UMHS and Callen each own a controlling interest in MedRehab Wisconsin. *Id.*

Plaintiffs refer to MedRehab Holdings, MedRehab Alliance, MedRehab Interstate, IASN, Pearl, Chicago Rehab, Joint & Neuro, MedRehab Therapy, and MedRehab Wisconsin as the MedRehab Entities. *Id.* ¶ 22. The MedRehab Entities all

5

operate out of three small office locations: (1) a small, leased office suite in Rosemont, Illinois; (2) offices with UMHS' headquarters and senior living facility in Chicago; and (3) a small, leased office in Pennsylvania. *Id.* ¶ 23. The MedRehab Entities share employees among each other, and Chicago Rehab "loans" employees, including former employees of Symbria and Affiliates, to Joint & Neuro, MedRehab Alliance, and MedRehab Interstate. *Id.* ¶ 24. An employee of UMHS serves as Busines Director of Pearl. *Id.* Callen, MedRehab Alliance, MedRehab Interstate, Pearl, and MedRehab therapy jointly maintain electronic documents in a cloud account registered to MedRehab Alliance. *Id.* ¶ 25.

## B. Sale of Symbria

On October 31, 2015, UMHS and the other twelve owners of Symbria sold their stock in Symbria. *Id.* ¶ 28. One of the owners sold its interest only for cash, but UMHS and the other eleven owners entered into a stock purchase agreement (SPA) pursuant to which they sold their stock in Symbria to an ESOP trust in exchange for cash, subordinated notes provided by Symbria, and warrants to purchase shares of stock in Symbria in the future. *Id.* Plaintiffs allege that because UMHS and the other parties to the SPA had an ongoing stake in Symbria's success, they covenanted under the SPA to: (1) not compete, directly or indirectly, or have an direct or indirect ownership in any business in Illinois that competes with Symbria and its subsidiaries; (2) not solicit Symbria's and its subsidiaries' clients and prospective clients; and (3) not solicit the employees of Symbria and its subsidiaries. *Id.* ¶ 34.

Each covenant lasts until the later of the fifth anniversary of the closing date under the SPA or until the selling owners' subordinated notes are fully paid. *Id.*

Further, all owners who were sellers, including UMHS, agreed to several restrictive covenants under the SPA. Section 5.3 provides for the maintenance of confidential information:

> **Non-Disclosure of Confidential Information.** From and after the Closing, Sellers agree not to divulge, communicate, use to the detriment of the Company Group or the ESOP Trust, for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets owned by or relating to the Company Group, including, without limitation, personnel information, secret processes, know-how, customer lists or other technical data; provided, however that the confidentiality obligations hereunder do not apply to information which has become publicly known through no wrongful act of Sellers….

*Id.* Section 5.4 further provides:

> Each of Sellers severally covenants that, commencing on the Closing Date and ending on the later of (i) the fifth anniversary of the Closing Date or (ii) the date on which such Seller's Subordinated Note has been paid in full (the 'Noncompetition Period') he, she or it shall not engage in, directly or indirectly, in any capacity, or have any direct or indirect ownership interest in, or any business anywhere in the state of Illinois which is engaged, either directly or indirectly, in the business or developing, marketing, providing, representing, or selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by, any member of [Symbria] or its Affiliates as of the Closing Date (the 'Restricted Business'). It is recognized that the Restricted Business is expected to be conducted throughout the state of Illinois and that more narrow geographical limitations of any nature on this non-competition covenant (and the non-solicitation covenants set forth in Sections 5.4(b) and 5.4(c)) are therefore not appropriate….
>
> \*\*\*
> Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit or entice, or attempt to solicit or entice, any clients or customers of any member of [Symbria and subsidiaries] or potential clients or customers of [Symbria and

7

> subsidiaries] for purposes of diverting business or services from [Symbria and subsidiaries].
>
> ***
>
> Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit the employment or engagement of services of any person who is or was employed as an employee, contractor or consultant by [Symbria] during such period on a full- or part-time basis.

*Id.* ¶¶ 37–39.

Plaintiffs claim that UMHS undermines Symbria "by seeking legal recognition of what it alleges to be its right to solicit Symbria's and its subsidiaries' clients, prospective clients, and employees." *Id.* ¶ 41. As part of these efforts, on December 31, 2019, UMHS filed a complaint for declaratory judgment in Illinois state court. *Id.* The state court complaint sought a declaration adjudging that the SPA limits both non-solicitation covenants to the state of Illinois. *Id.* The trial court awarded UMHS its requested relief, [113-1] at 2, but Symbria appealed, and the appeal remains pending, [164] ¶ 41.

As another example of UMHS' alleged efforts to undermine Symbria, in early 2020, Symbria endeavored to finance its debt with its senior lender. *Id.* ¶ 42. The senior lender asked Symbria to obtain consents to the refinancing from all former owners who sold their interests under the SPA and who now hold subordinated notes. *Id.* All of the former owners but UMHS consented so Symbria's senior lender declined to refinance the senior debt. *Id.*

### C.    Callen's Employment With Symbria

Symbria hired Callen as its president in 1999.  *Id.* ¶ 43.  On October 31, 2015, the same date as the SPA's closing, Symbria and Callen entered into an employment agreement pursuant to which Symbria Rehab employed Callen as its president.  *Id.* In his employment agreement, Callen covenanted to safeguard Symbria Rehab's "Confidential Information," as further defined in the agreement, and trade secrets. *Id.* ¶ 45.  Section 4.1 of his employment agreement provides, in pertinent part:

> Confidentiality and Nondisclosure. [Callen] recognizes that by virtue of his employment with the Company, he will be granted otherwise prohibited access to and exposed to trade secrets and other confidential and proprietary information which is not known to the Company's competitors or within the Company's industry generally, which was developed by the Company over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to the Company.

*Id.*  Callen also agreed that: (1) he "will not, at any time during or after his employment with the Company, disclose, use, or permit others to use any Confidential Information"; and (2) he "will take all reasonable measures during and after his employment" to "protect the Confidential Information from any accidental or unauthorized disclosure, use, copying or transfer" and "ensure that any person or entity working in any capacity for the Company is permitted access . . . on a strictly 'need to know' basis."  *Id.* ¶ 46.

Additionally, pursuant to the employment agreement, Callen agreed not to solicit Symbria and Affiliates' employees and customers for two years after a termination—voluntary or involuntary—of his employment by Symbria Rehab.  *Id.* ¶¶ 47–48.  Callen additionally agreed that a breach of any of the above covenants

would extend the period of time during which those restrictions would remain in force. *Id.* ¶ 49.

After Symbria Rehab terminated Callen in January 2017, they entered into a severance and general release agreement, with a February 13, 2017 effective date. [164] ¶ 50. Callen agreed that:

> he has not divulged any proprietary or confidential information of Releasees and will continue to maintain the confidentiality of such information consistent with company policies relative to confidential and proprietary information that were in effect at the time of his employment by the Company…. [Callen] further affirms that he remains bound by, and shall comply with, the provisions of Section 4.1 of the Employment Agreement, including each of its subparts, and understands that such provisions survive the termination of [Callen's] employment and remain in full force and effect.

*Id.* ¶ 51. Callen also agreed that he understood that certain provisions from his employment agreement remained in effect, including confidentiality, nondisclosure and nonsolicitation of employees. *Id.* ¶ 52.

### D. Symbria & Affiliates' Development of Confidential and Copyrighted Information

Plaintiffs claim that Symbria and Affiliates have developed a large document library to use in their business as providers of therapy services and related training to their clients. [164] ¶ 69. Among other things, these documents include patient care checklists and related forms; materials relating to strategies for seeking reimbursement from Medicare and private insurers and for negotiating disputes with Medicare and private insurers; and formulas for measuring and evaluating financial performance of Symbria and Affiliates and their clients with respect to therapy services. *Id.* Plainitffs claim they developed their document library over

many years at great expense and that it would take a new competitor considerable time and expense to build a comparable document library. *Id.* ¶ 70.

Symbria Rehab's clients seek reimbursement of treatment costs paid through Medicaid and Medicare programs. *Id.* ¶ 71. Before July 2018, Symbria Rehab priced its treatments based upon the amount of therapy a patient received because Medicare and Medicaid determined reimbursements primarily by the amount of therapy a patient received. *Id.* In July 2018, the Center for Medicare and Medicaid Services (CMS) finalized a new reimbursement model, the Patient-Driven Payment Model (PDPM), which allowed a broader determination of reimbursement based upon patients' clinic characteristics and provided higher reimbursements to Symbria's clients for more complex patients. *Id.* The PDPM model became effective October 1, 2019. *Id.*

To prepare for CMS' implementation of PDPM, Symbria and Affiliates analyzed how to treat patients consistent with patients' clinical needs while maximizing efficiency and profitability under the PDPM regulations. *Id.* ¶ 72. According to Plaintiffs, when Symbria and Affiliates' clients obtain higher reimbursements, they do, too, aligning their economic incentives with those of their clients. *Id.*

Beginning in February 2018, Symbria built a software program comparing the reimbursement a Symbria client would receive under the old (PPS) system to the new PDPM system. *Id.* ¶ 74. Plaintiffs claim this software is confidential and proprietary; no other program like it exists on the open market. *Id.* ¶¶ 73, 82. Although Plaintiffs'

software comprises parts of software developed by CMS, Plaintiffs enhanced the CMS product which allowed them to create more sophisticated reports for clients than the CMS product. *Id.* ¶ 80. At the time Callen left Symbria Rehab, PDPM did not exist, so he possessed no knowledge of the software program, nor access to information and analysis Symbria and Affiliates later developed. *Id.* ¶ 83. Plaintiffs claim, on information and belief, that Dilmas and Irvine became conduits for Callen and Callen's affiliates entities who use that new confidential information developed after Callen's departure from Symbria Rehab. *Id.*

### E. Irvine's Employment

Symbria Rehab and Irvine entered into a contract in connection with Symbria Rehab's employment offer to Irvine to serve as a fitness specialist. *Id.* ¶ 100. Irvine agreed as following with respect to confidentiality:

> **Confidential Information.** [Irvine] shall not, during, or after employment with [Symbria] Rehab, use or disclose to others any trade secrets, patient / resident information, client lists, or any other confidential information of or about [Symbria] Rehab, or its business or affairs, unless authorized to do so in writing from [Symbria] Rehab. [Irvine] understands that this undertaking applies to information of a technical or commercial nature, or otherwise, and that any information not made to the general public is to be considered confidential. All correspondence, memoranda, notes, records, plans, and other papers and items received or made by the Specialist, as well as equipment and supplies provided to [Irvine] by [Symbria] Rehab, shall remain the property of [Symbria] Rehab. At such time the relationship of [Irvine] with [Symbria] Rehab terminates for any reason, [Irvine] shall promptly return to [Symbria] Rehab, or at the company's option, destroy all such information (including all copies of documents, notes, and materials made available to [Irvine]) and [Irvine] shall certify to [Symbria] Rehab that she has complied.

*Id.* Irvine also signed a confidentiality agreement with Symbria on October 7, 2004, pursuant to which Irvine agreed, among other things, "not to make any unauthorized transmissions, inquiries, modifications, or purgings of data in the system." *Id.* ¶ 101.

Plaintiffs assert that beginning January 9, 2019, Irvine began a campaign of misappropriating Symbria and Affiliates' trade secrets and other confidential and copyright-protected information. *Id.* ¶ 105. She did so by forwarding such information from her symbria.com email address to her personal email address in contravention of her employment terms, and she did so when planning to leave her job at Symbria Rehab to work for Plymouth Place and to perform services for the MedRehab Entities. *Id.* ¶ 105. Specifically, on January 9, Irvine forwarded PDPM client presentation slides, that Plaintiffs assert constitute copyrighted material, to her personal email address; then, she forwarded them to Dilmas, her superior and significant other. *Id.* ¶¶ 106–08.

Irvine gave her notice of resignation on January 25, 2019, with a February 22, 2019 effective date. *Id.* ¶ 110. During that intervening period, Irvine forwarded over 140 emails with attachments from her symbria.com email address to her personal email account, including confidential, copyright-protected information. *Id.* ¶ 111.

13

Irvine's new employer is Plymouth Place which holds an equity interest in MedRehab Alliance, a company also owned by UMHS and Callen. *Id.*

### F. Dilmas' Employment

Symbria Rehab made Dilmas an employment offer in October 2013. *Id.* ¶ 115. The offer stipulated the following with respect to confidentiality:

> You agree to not, during or after employment with [Symbria Rehab], use or disclose to others any trade secrets, patient information, facility information, client lists, this agreement, or any other confidential information of or about [Symbria] Rehab, or its business or affairs, unless authorized to do so in writing from [Symbria] Rehab. Your agreement applies to Information of a technical or commercial nature or otherwise, but not to employment terms or conditions. Any information not made to the general public is to be considered confidential. All correspondence, memoranda, notes, records, plans, and other papers and items received or made by you, as well as equipment and supplies provided to you by [Symbria] Rehab, shall remain the property of [Symbria Rehab]. Should your relationship with [Symbria] Rehab terminate for any reason, you agree to promptly return to [Symbria] Rehab, or at the company's option, destroy, all such information (including all copies of documents, notes, and materials made available to you) to certify to [Symbria] Rehab that you have complied.

*Id.* ¶ 116. Dilmas agreed to these terms and signed the offer letter. *Id.* ¶ 117. When Symbria Rehab promoted Dilmas in September 2016 to the position of Regional Director of Operations, Dilmas again agreed to the terms of an offer letter requiring him to "continue to be subject to all existing and future Company requirements, policies, and procedures." *Id.* ¶ 118.

Plaintiffs assert that, beginning in February 2019, Dilmas misappropriated Symbria and Affiliates' trade secrets and other confidential information by sending such information from his work email to his personal email. *Id.* ¶ 119. Plaintiffs claim that Dilmas did so without authorization and in violation of company policies.

*Id.* Plaintiffs allege, on information and belief, that Dilmas was planning to leave Symbria Rehab to go work for Callen and one or more of the MedRehab entities. *Id.* Among many other examples set forth in the TAC, Plaintiffs allege that on June 24, 2019, a Symbria Rehab administrative employee emailed to Dilmas a .zip file containing 43 documents prepared by Symbria Rehab concerning PDPM, including resources guides, PDPM "care guides," and Symbria's copyrighted PDPM client presentation. *Id.* ¶ 128. Dilmas forwarded the email and attachment to his personal email that night, and then forwarded the same .zip file on July 23, 2019 to Irvine. *Id.* ¶ 129. Irvine then forwarded the same .zip file to Callen at his medrehaballiance.com email. *Id.*

Plaintiffs allege, on information and belief, that each time Dilmas misappropriated trade secrets or other confidential information, he acted as an agent for UMHS, MedRehab, Alliance, IASN, MedRehab Holdings, and MedRehab Wisconsin. *Id.* ¶ 138. After April 29, 2019, Dilmas also acted as an agent for Chicago Rehab and for Joint & Neuro, and after August 19, 2019, he acted as an agent for MedRehab Interstate. *Id.* Plaintiffs claim, on information and belief, that Dilmas also disclosed the confidential information to MedRehab Therapy. *Id.* Plaintiffs claim that Dilmas, Callen, Irvine, UMHS, and the MedRehab entities acted in concert in furtherance of a scheme to use Symbria's confidential information and to solicit and compete with Symbria in violation of UHMS' covenants in the stock purchase agreement, Callen's covenants concerning confidential information and his fiduciary

obligations, and Dilmas' confidentiality and other obligations in his employment contract and his fiduciary duties. *Id.*

On September 24, 2019, Dilmas submitted his letter of resignation to Symbria Rehab. *Id.* ¶ 139. Dilmas left Symbria Rehab the next day. *Id.* ¶ 168. Symbria Rehab sent him a letter acknowledging his resignation stating: "You acknowledge that you have no company information on your home computer, cell phone, or other electronic data storage technology." *Id.* Dilmas countersigned, indicating his agreement. *Id.* Plaintiffs claim that Dilmas' agreement was false. *Id.* On Dilmas' last day, he told Symbria he was going to work for Callen. *Id.* ¶ 170.

### G. Defendants' Alleged Solicitation and Use of Symbria's Confidential Information

Plaintiffs claim that Defendants took a myriad of illegal actions to solicit business away from Symbria and Affiliates.

For instance, on January 14, 2019, while his non-solicitation covenants remained in effect, Callen emailed a number of Symbria and Affiliates' clients, inside Illinois and outside Illinois, to solicit their business. *Id.* ¶ 148.

In the spring of 2019, Symbria learned its pharmacy client Plymouth was going to terminate its existing contract with another company to provide rehabilitation services for its residents. *Id.* ¶ 149. Symbria tried to secure a contract for Symbria Rehab with Plymouth Place to provide rehabilitation services, but instead, Plymouth Place contracted with MedRehab Therapy for these services. *Id.* Plaintiffs claim, on information and belief, that Lowe and/or Callen on behalf of UMHS and the

MedRehab Entities solicited Plymouth Place to provide rehabilitation and wellness services. *Id.* ¶ 150.

Plaintiffs also allege that Callen and the MedRehab Entities have used Plaintiffs' confidential information to solicit clients. For instance, in May 2019, Callen emailed UMC's CEO to solicit UMC business away from Symbria. *Id.* ¶ 152. As part of this effort, Callen attached a "Rehab Operations Analysis" form for UMC to provide data regarding UMC's operations to Callen, so that Callen could model UMC's projected financial results if UMC terminated its contract with Symbria and worked instead with a MedRehab Entity. *Id.* The form was an excel spreadsheet containing formulas for performance metrics that Symbria Rehab created and developed. *Id.* As a result, two months later, UMC's CEO informed Symbria that UMC was going "in-house" for therapy and wellness services. *Id.* ¶ 157. Plaintiffs claim, on information and belief, that MedRehab Interstate or another one of the MedRehab Entities successfully solicited UMC's rehabilitation and wellness services away from Symbria Rehab. *Id.* ¶ 163.

In or around April 2019, MedRehab Wisconsin, among other entities, began soliciting Symbria Rehab's client Marquardt Manor. *Id.* ¶ 149. As a result, Marquardt Manor began telling Symbria Rehab it was considering an in-house model to provide therapy services with an outside consultant managing therapists, which is the model that the MedRehab Entities use, not the model Symbria Rehab typically uses. *Id.* ¶ 156. Marquardt Manor also negotiated Symbria Rehab's rate downward; Plaintiffs

suspect it did so based upon information supplied by Callen and the MedRehab entities. *Id.*

Symbria's Brad Miller, who served as Callen's successor after his termination, emailed a notice of his resignation to Symbria's CEO on July 26, 2019. *Id.* ¶¶ 122, 160. Miller then became an employee of Chicago Rehab and began working for MedRehab Alliance, Joint & Neuro, and MedRehab Interstate as Executive Vice President. *Id.* ¶ 162. He reports to Callen in those roles. *Id.*

Plaintiffs allege, on information and belief, that Lowe and/or Callen on behalf of UMHS and the MedRehab Entities have solicited other clients and prospective clients of Symbria Rehab and subsidiaries. *Id.* ¶¶ 179, 183. Plaintiffs claim that Callen, Miller, Irvine, and/or Dilmas solicited Symbria Rehab's clients while still employed by Symbria Rehab. *Id.* ¶ 184.

Plaintiffs also allege that during the "restricted period" as defined in his employment agreement, Callen solicited Irvine causing her to terminate her employment with Symbria Rehab so that she could work with a business competitive with Symbria Rehab. *Id.* ¶ 240.

Additionally, Plaintiffs assert that Defendants have used Plaintiffs' confidential and copyrighted information without authorization. For example, in fall 2019 MedRehab Alliance created a powerpoint presentation that contained pages copied out of Symbria's copyrighted "Understanding the Patient Driven Payment Model" slide presentation that Irvine emailed to Dilmas and to her own personal email address earlier that year. *Id.* ¶ 171. In another example, in May 2020, an

employee of Chicago Rehab and former employee of Symbria Rehab, circulated Symbria Rehab's copyrighted material: "Pneumonia Disease Management Model" to employees at MedRehab Alliance, Chicago Rehab, and Joint & Neuro. *Id.* ¶ 176.

### H.    Plaintiffs' Claims and Procedural History

Plaintiffs bring a sixteen-count third amended complaint, alleging: violation of the federal Defend Trade Secrets Act on behalf of Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA against all Defendants (Count I); violation of the Illinois Trade Secrets Act by Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA against all Defendants (Count II); breach of the SPA by Symbria, GreatBanc, and the Symbria ESOP trust against UMHS (Count III); breach of employment contract by Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA against Callen (Count IV); breach of contract by Symbia Rehab against Dilmas (Count V); breach of fiduciary duty by Symbria Rehab against Dilmas (Count VI); tortious interference with the SPA by Symbria against Callen and the MedRehab Entities (Count VII); aiding and abetting Dilmas' breach of fiduciary duty by Symbria Rehab against Callen, the MedRehab Entities, and UMHS (Count VIII); tortious interference with prospective business expectancy by Symbria Rehab, Alliance Connecticut, and Alliance HVA against Callen and the MedRehab Entities (Count IX); breach of fiduciary duty by Symbria Rehab against Callen (Count X); tortious interference with the Symbria Rehab-Dilmas Employment contract by Symbria Rehab against Callen, the MedRehab Entities, and UMHS (Count XI); copyright infringement by Symbria against all Defendants (Count XII); breach of contract by

Symbria Rehab against Irvine (Count XIII); tortious interference with the Symbria Rehab-Irvine employment contract by Symbria Rehab against Callen, the MedRehab Entities, and UMHS (Count XIV); breach of fiduciary duty by Symbria Rehab against Irvine (Count XV); and aiding and abetting Irvine's breach of fiduciary duty by Symbria Rehab against Callen, the MedRehab Entities, and UMHS (Count XVI). [164] ¶¶ 191–346.

Plaintiffs and Irvine have settled the claims against Irvine. [390]. Thus Counts XII and XV have been dismissed with prejudice. The remaining Defendants move to dismiss. *See* [215]; [210]; [212]; [214].

## II. Legal Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020). A plaintiff need not plead "detailed factual allegations," but "still must provide more than mere

labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi*cago, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Bilek*, 8 F.4th at 586–87 (quoting *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016)).

## III. Analysis

The various groups of Defendants have moved on various grounds to dismiss the numerous claims against them in the TAC. Dilmas, Chicago Rehab, and UMHS each moved individually to dismiss. [210] (Dilmas); [212] (UMHS); [214] (Chicago Rehab). Callen and the "corporate Defendants"–defined as MedRehab Holdings, MedRehab Alliance, MedRehab Interstate, IASN, Pearl, MedRehab Therapy, Joint & Neuro, and MedRehab Wisconsin—moved collectively to dismiss. [215]. This Court addresses their (often-overlapping) arguments below.

### A. Group Pleading

This Court begins its analysis with Defendants' arguments regarding group pleading. Callen, the corporate Defendants, Chicago Rehab, and UMHS argue that Plaintiffs have engaged in improper collective pleading with respect to the trade

secret counts (Count I and II), tortious interference counts (Counts VII, IX, XI, and XIV), the aiding and abetting counts (Counts VIII and XVI), and copyright infringement count (Count XII). [214] at 12–14; [215] at 4–9; [212] at 16. They argue Plaintiffs bring allegations against all Defendants as a group, lumping them together without putting each on notice of the specific wrongs it committed, therein violating Rule 8(a). *See also Fulton v. Bartik*, No. 20 C 3118, 2021 WL 2712060, at *5 (N.D. Ill. July 1, 2021) (describing group pleading as "a practice of collectively defining subgroups of defendants").

There is, however, no "group pleading doctrine, *per se*, that either permits or forbids allegations against defendants collectively; group pleading does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims." *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019) (quoting *Lattimore v. Village of Streamwood*, No. 17 C 8683, 2018 WL 2183991, at *4 (N.D. Ill. May 11, 2018)). Group pleading thus survives a motion to dismiss if Plaintiffs provide notice "to each defendant of the contours" of the alleged wrong that Plaintiff allege that defendant has participated in. *Fulton*, 2021 WL 2712060, at *5; *see also Green Dolphin Cap. LLC v. JPMorgan Chase Bank, N.A.*, No. 19-CV-06940, 2020 WL 5545700, at *2 (N.D. Ill. Sept. 16, 2020).

Courts also permit collective pleading when a plaintiff directs its allegations at all of the defendants. *Jaimes v. Cook County*, No. 17 C 8291, 2019 WL 4393035, at *4 (N.D. Ill. Sept. 13, 2019); *see also ReceiverShip Mgmt., Inc. v. A.J. Corso & Assocs., Inc.*, No. 19-CV-01385, 2021 WL 1222897, at *11 (N.D. Ill. Mar. 31, 2021).

That is the case here. For instance, as part of their trade secret allegations, Plaintiffs allege that Callen, UMHS, and *all of* the MedRehab entities have used or threatened to use confidential information without consent from Symbria and Affiliates. [164] ¶ 204. Similarly, in alleging copyright infringement, Plaintiffs claim that all of the Defendants have reproduced Plaintiffs' copyrighted works without authorization. *Id.* ¶ 305. This gives fair notice to each of those Defendants as to the alleged wrongs it committed. Moreover, although Plaintiffs have not detailed each Defendant's specific misconduct, Plaintiffs have pled that the entities are interrelated through common management and employees. *Id.* ¶¶ 13–17, 21, 54–57, 59, 64, 67–68. Given these allegations of interrelated corporate structures, it remains "at least plausible that each Defendant was involved in the alleged misconduct." *Green Dolphin*, 2020 WL 5545700, at *3 (denying motion to dismiss based upon group pleading where the plaintiff lumped JPMorgan affiliates together because, based upon their corporate structure, it remained plausible that each affiliate could have been involved in the alleged wrongdoing). Plaintiffs' group pleading passes muster under Rule 12(b)(6).

## B.    Counts I and II: Trade Secret Claims

The DTSA and ITSA supply private causes of action in favor of the owner of a misappropriated trade secret. 18 U.S.C. § 1836(b)(1); 754 Ill. Comp. Stat. 1065/4. To state a cognizable trade secret claim, Plaintiffs must allege: (1) existence of a trade secret; (2) that a Defendant misappropriated—that is, stolen rather than developed independently or obtained from a third source; and (3) used in the Defendant's business. *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-CV-3375, 2020

WL 3960451, at *8 (N.D. Ill. July 13, 2020) (citing *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019)).

 A trade secret under the DTSA includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A)   the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  The ITSA's definition of "trade secret" is materially identical. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (citing 754 Ill. Comp. Stat. 1065/2(d)).

### 1.    Alleging the Existence of Trade Secrets

The Seventh Circuit has emphasized that generally, the "existence of a trade secret is a question of fact," *id.*, and that "trade secret" remains one of the "most elusive and difficult concepts in the law to define," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir. 1978)).  As such, a plaintiff need only plead "the existence of trade secrets in broad strokes."  *360 Painting, LLC v. R Sterling Enterprises, Inc.*, No. 20-CV-4919, 2021 WL 3603626, at *6 (N.D. Ill. Aug. 13,

2021) (quoting *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020)).

Dilmas and Chicago Rehab fault Plaintiffs with pleading in conclusory fashion that some of the material Dilmas sent to his personal email, PDPM Care Guides, constitute trade secrets. [210] at 7–10; [214] at 14–18. Specifically, they argue Plaintiffs fail to plead that the Care Guides were, in fact, "secret" and that Plaintiffs took reasonable measures to keep the information secret because the Care Guides were widely disseminated to a vast number of employees not subject to confidentiality agreements. *See, e.g.*, [214] at 15; *see* [164] ¶¶ 132–35. True, the law requires Plaintiffs to allege that they took reasonable efforts to maintain the secrecy of the information it claims constitutes a trade secret. *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 897 (N.D. Ill. 2019). But the law does not require Plaintiffs to guard their trade secrets by mandating confidentiality agreements with each employee; Plaintiffs can maintain secrecy by, among other things, physically securing its facilities and limiting access to its secrets to employees on a need-to-know basis. *Vendavo*, 397 F. Supp. 3d at 1136. Here, Plaintiffs have adequately alleged that they reasonably guarded their secrets by restricting access to the building with a fingerprint scanner or through a check-in with a receptionist; storing hard copy files securely; and providing employees access to digital files on a need-to-know basis. *Id*. ¶ 207. This sufficiently establishes, at the pleadings stage, that Plaintiffs took reasonable efforts to keep their information sufficiently secret. *See Vendavo*, 397 F. Supp. 3d at 1137 ("A company need not monitor its employees like a police state to

garner trade secret protection for its confidential information. Rather, it must take reasonable protective measures for its claimed trade secret under the circumstances.") (internal quotation marks omitted).

In a similar vein, UMHS argues that the TAC does not adequately allege the existence of a trade secret. [212] at 17–18. UMHS complains that Plaintiffs admit that Plaintiffs' based their alleged proprietary PDPM software largely upon the publicly-available CMS beta software. *Id.* at 17. In so arguing, UMHS correctly recognizes that whether a trade secret exists depends in part upon the "extent to which the information is known outside of the plaintiff's business." *Learning Curve*, 342 F.3d at 722. But UMHS ignores that a trade secret can exist in a combination of public characteristics and components so long as their unique combination possesses competitive value. *Life Spine*, 8 F.4th at 540–41. The fact that the PDPM software incorporates publicly-known elements, thus, does not necessarily destroy its trade secret protection.

This Court also rejects UMHS' contention that Plaintiff's practice of sharing its software and its reports with clients means that it has not taken reasonable steps to maintain secrecy. [212] at 18. The "fact that a company shares information with a customer does not mean the vendor does not attach importance to that information; rather, it reflects a reality of the business environment that some confidential information must sometimes be shared with the client who pays for it without making the necessary effort to arrange a non-disclosure agreement." *SKF USA, Inc. v.*

*Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009); *see also Moss Holding Co. v. Fuller*, No. 20-CV-01043, 2020 WL 1081730, at \*6 (N.D. Ill. Mar. 6, 2020).

### 2. Alleging Misappropriation

Dilmas, Chicago Rehab, and UMHS also all argue that Plaintiffs' have not plausibly pled misappropriation. [210] at 11–13; [214] at 18–21; [212] at 19–20.

Under the DTSA and ITSA, a plaintiff can show misappropriation in three ways: by showing unauthorized acquisition, disclosure, or use of a trade secret. *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2021 WL 963811, at \*17 (N.D. Ill. Mar. 15, 2021), *aff'd*, No. 21-1649, 2021 WL 3482921 (7th Cir. Aug. 9, 2021); *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1091 (N.D. Ill. 2018).

Dilmas and Chicago Rehab argue that Plaintiffs have merely alleged that Dilmas acquired trade secrets through his normal course of employment and emailed the trade secrets to himself, and that such conduct cannot constitute misappropriation under an improper acquisition theory. *See* [214] at 18–19. To be sure, courts have generally held that misappropriation by improper acquisition does not occur where a defendant lawfully acquires confidential information, even if the defendant retains that information after his employment. *See Packaging Corp. of Am.*, 419 F. Supp. 3d at 1066; *Prominence Advisors, Inc. v. Dalton*, No. 17 C 4369, 2017 WL 6988661, at \*4 (N.D. Ill. Dec. 18, 2017). But Plaintiffs do not allege merely that Dilmas legally acquired trade secret information and retained it after he left Symbria Rehab. Rather, Plaintiffs allege that Dilmas took the additional step of

emailing the trade secret information to his own personal email without authorization and in violation of company policies that prohibited removing any type of information through the internet. [164] ¶¶ 86–92, 262, 264, 339, 342. Alleging the transmission of trade secrets from a work email account to a personal email account in violation of company policy and without authorization sufficiently pleads a theory of improper acquisition. *See, e.g.*, *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072, at *15 (N.D. Ill. Sept. 15, 2021) (finding that the complaint plausibly stated an improper acquisition theory where an employee emailed trade secrets to his personal email account in violation of company policy).

Dilmas also argues that Plaintiffs have alleged mere passive "possession," not misappropriation, of trade secrets. [210] at 13. This argument flies in the face of the TAC's allegations that Dilmas not only sent company secrets to his personal email address in violation of company policy, but also that he (in conjunction with Irvine and while still employed at Symbria) forwarded confidential information from Symbria and Affiliates to Callen at his medrehaballiance.com email address. [164] ¶¶ 128–29. These facts, if true, show more than mere possession; indeed, these facts plausibly allege misappropriation under an unauthorized disclosure theory. *See, e.g.*, *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819 (N.D. Ill. 2014) (holding allegations that the defendant provided, or offered to provide, confidential information to company's competitors sufficiently alleged misappropriation by unauthorized disclosure).

Dilmas also maintains that because only Symbria Rehab employed him, no other Plaintiff can assert a cognizable trade secret claim against him. [210] at 11. Yet there exists no authority for the proposition that an employment relationship constitutes a prerequisite for trade secret claim. On the contrary, the DTSA vests any "owner of a trade secret that is misappropriated" with the right to bring a civil suit. 18 U.S.C. § 1836(b). Plaintiffs have alleged trade secrets commonly owned by all of the affiliates, *see* [164] ¶¶ 70, 76, so all of the affiliates are entitled—under the statute—to sue for misappropriation.

According to Chicago Rehab, Plaintiffs have insufficiently alleged its involvement in the alleged misappropriation because they have pled, on mere information and belief, that when Dilmas misappropriated trade secrets he acted as an agent for Chicago Rehab. [214] at 19; *see* [164] ¶ 138. Although this Court agrees that these "upon information and belief" allegations are thin, they do not warrant dismissal. Elsewhere in the TAC, Plaintiffs allege that Dilmas misappropriated the trade secrets because he was planning to leave his job at Symbria Rehab and to go work for Callen "and one or more of the MedRehab Entities" including Chicago Rehab, [164] ¶ 119, and that Dilmas then became employed by Chicago Rehab at the time he resigned from Symbria Rehab, *id*. ¶ 18. These allegations permit the inferences that Dilmas acted for Chicago Rehab's interests when he took the trade secrets, and Chicago Rehab then used the secrets Dilmas stole after Dilmas became its employee. Whether Plaintiffs can prove these allegations is a question for another day.

Finally, UMHS argues that Plaintiffs have failed to plausibly allege that UMHS "hacked its system, or otherwise obtained the software improperly." [212] at 19–20. Initially, neither the ITSA nor DTSA requires "hacking"; as discussed above, a plaintiff can show misappropriation through improper acquisition, disclosure, or use. *J.S.T. Corp.*, 965 F.3d at 576. Moreover, the TAC alleges that UMHS maintains an ownership interest in five of the other Defendant companies that compete with Symbria and that all of the companies, along with Chicago Rehab, use a small number of employees operating out of three small offices including at UMHS' headquarters. [164] ¶¶ 13–17, 55–57, 59, 64, 67–68. The TAC alleges that UMHS and the MedRehab Entities acquired and used the trade secrets and have done so knowing that they were acquired by improper means. [164] at ¶¶ 215–16. Contrary to UMHS' protestations, these allegations raise the reasonable inference that UMHS has obtained the software improperly.

### C. Count XII: Copyright Infringement

This Court next considers Plaintiffs' copyright infringement claim. To state a copyright infringement claim, Plaintiffs must allege: (1) ownership of a valid copyright; and (2) unauthorized copying of the copyrighted work's original elements. *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 886 (7th Cir. 2021). As to the first element, originality remains the *sine qua non* of copyright; accordingly, copyright protection extends only to those components of a work that are original to the author. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).

In the TAC, Symbria alleges that it owns the following copyrighted works: (1) Symnbria Rehab's "Understanding the Patient Driven Payment Model" presentation slides; (2) Symbria Rehab's "PDPM Preparedness Tips" Numbers 1 through 12 and 14; and (3) Symbria Rehab's Disease Management Models and accompanying slide presentations. [164] ¶ 297.

### 1. Pleading Sufficiency

Chicago Rehab and UMHS argue Symbria's pleading of copyright ownership (the first element of copyright infringement) is deficient because Symbria has only identified the copyrighted works without further describing their original elements or identifying their authors. [214] at 25–26; [212] at 33.

The law, however, does not demand the specificity that Defendants urge. "It is well settled that in order to state a claim of copyright infringement, a complaint need allege only ownership, registration, and infringement. Other details of the claim may be obtained by discovery." *Sweet v. City of Chicago*, 953 F. Supp. 225, 227 (N.D. Ill. 1996) (internal citation omitted). Relevant here, a certificate of registration constitutes "prima facie evidence of the validity of a copyright." *Arkeyo, LLC v. Saggezza, Inc.*, No. 19-CV-08112, 2021 WL 2254959, at *8 (N.D. Ill. June 3, 2021) (quoting *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994)); *see Sullivan v. Flora, Inc.*, 936 F.3d 562, 568 (7th Cir. 2019) ("The Copyright Office's granting [of an application] results in each registered work receiving copyright protection."). Courts thus presume that registered works "are entitled to some copyright protection, i.e., they were created independently and

31

possess a modicum of creativity to satisfy the minimal originality requirement." *Design Basics*, 994 F.3d at 887. Here, because Symbria alleges it owns copyright registrations for all of the aforementioned works, [164] ¶ 300, this Court presumes its works possess the minimal originality necessary to establish ownership of a valid copyright. Symbria need not allege more at the pleadings stage to demonstrate ownership of a valid copyright. *See Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming*, No. 12 C 10275, 2013 WL 4011052, at *2 (N.D. Ill. Aug. 6, 2013) (allegation that the plaintiff "owns valid copyright registrations" survives a motion to dismiss) (quoting *Navistar, Inc. v. New Balt. Garage, Inc.*, 2012 WL 4338816, at *10 (N.D. Ill. Sept. 20, 2012)).

Dilmas emphasizes that Symbria does not put him on fair notice of his alleged wrong because it lumps him together with five other Defendants and claims these six Defendants "reproduced and distributed one or more" of the copyrighted works. [210] at 20. As discussed above, however, this Court finds collective pleading permissible in the context of this case, where the Plaintiffs allege an intertwined corporate structure with shared employees and that all Defendants have collectively engaged in trade secret theft and copyright infringement. Putting group pleading aside, Symbria details the wrongs Dilmas himself engaged in: sending copyrighted works to his personal email, then transmitting it to Irvine, who transmitted them to Callen. [164] ¶¶ 128–29. This puts Dilmas on notice of his own personal involvement in the alleged copyright infringement.

Dilmas also argues Symbria has not sufficiently pled his use of Symbria's copyrighted materials. *Contra* [210] at 21. But the TAC alleges that Dilmas and Callen have worked in concert with the corporate Defendants to reproduce and distribute the copyrighted works in marketing the companies' services. [164] ¶ 300. This sufficiently alleges Dilmas' use of the copyrighted works.

UMHS also attempts to distance itself from alleged infringement, asserting that it had no access to the alleged copyrighted material. *See* [212] at 34–35. Although Plaintiffs may not be able to prove UMHS' involvement with unauthorized copying, as stated above, Symbria plausibly alleges that all of the corporate Defendants, including UMHS, have worked in concert to reproduce and distribute the copyrighted works. [164] ¶ 300. This Court must accept this allegation as true for the purposes of a motion to dismiss.

### 2. Statutory Damages and Attorneys' Fees

Chicago Rehab, Callen, corporate Defendants, and UMHS all argue that the Copyright Act does not allow Symbria to recover statutory damages or attorneys' fees because Symbria failed to timely register its copyright. [214] at 26–31; [215] at 15–16; [212] at 37. On this point, this Court agrees.

The Copyright Act permits a plaintiff to elect recovering either statutory damages or actual damages; the choice must come before the entry of final judgment. *Sullivan*, 936 F.3d at 566 (first citing 17 U.S.C. § 504(a); then citing 17 U.S.C. § 403(c)(1)). The Act, however, does not allow statutory damages or attorney's fees "when the alleged infringement commenced before the effective date of the

33

copyright registration." *Cassetica Software, Inc. v. Computer Scis. Corp.*, No. 09 C 0003, 2009 WL 1703015, at *2 (N.D. Ill. June 18, 2009); *see Intercom Ventures*, 2013 WL 4011052, at *5 ("§ 412 provides that a copyright plaintiff seeking statutory damages or attorney fees must complete copyright registration before infringement occurs (or, for published works, within three months of first publication) regardless of the work's place of origin."); *Budget Cinema, Inc. v. Watertower Assocs.*, 81 F.3d 729, 733 (7th Cir. 1996) ("[Plaintiff] was not entitled to statutory damages or attorney's fees because the alleged infringement commenced before the effective date of [Plaintiff]'s copyright registration."); *see also* 17 U.S.C. § 412.

Symbria acknowledges it registered its copyrights on January 23, 2021, well after the alleged infringement commenced between January 9 and July 23, 2019. [164] ¶¶ 105, 129; *see* [238] at 40. Because statutory damages and attorneys' fees "are not available where the alleged infringement commenced before the effective date of the copyright registration." *Fox Controls, Inc. v. Honeywell, Inc.*, No. 02 C 346, 2005 WL 1705832, at *7 (N.D. Ill. July 14, 2005), this Court grants Defendants' request to strike Plaintiffs' request for statutory damages and attorneys' fees. [164] following ¶ 317 WHEREFORE Clause ¶¶ (e) & (g).

### 3. Preemption

Chicago Rehab argues that the Copyright Act preempts Plaintiffs' state-law claims for tortious interference and aiding and abetting in Counts VII, VIII, IX, XI, XIV, and XVI. [214] at 27–29.

The Copyright Act preempts "all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106" and are "in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. § 301(a). This means that the Copyright Act preempts a state-law claim if the following two elements are present: (1) "the work in which the right is asserted must be fixed in tangible form and come within the subject matter of the copyright as specified in § 102," and (2) the rights in the state-law claims "must be equivalent to the exclusive rights under the Copyright Act." *Life After Hate, Inc. v. Free Radicals Project, Inc.*, No. 18 C 6967, 2020 WL 1903956, at *3 (N.D. Ill. Apr. 16, 2020) (quoting *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 500-01 (7th Cir. 2011)). As to the second prong, a state-law claim may be equivalent to a federal copyright claim even if it requires additional elements, as long as the additional elements do not differ in kind from those necessary for the copyright claim. *Berg for Wiesner v. CI Invs., Inc.*, No. 15 C 11534, 2017 WL 1304082, at *9 (N.D. Ill. Apr. 7, 2017) (citing *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 677–78 (7th Cir. 1986)). Generally, to avoid preemption, a state law "must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law—i.e., conduct other than reproduction, adaptation, publication, performance, and display." *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005).

This Court finds that the Copyright Act does not preempt Plaintiffs' state-law claims against Chicago Rehab, because the state-law claims allege wrongful conduct

other than the authorized copying prohibited under the Copyright Act. For instance, in the tortious interference claim (Count VII), Plaintiffs allege that Chicago Rehab tortiously interfered with the contract between Symbria and UMHS, [164] ¶¶ 254–60, and that it did so by soliciting Symbria's clients, prospective clients and employees in violation of the SPA, *id.* ¶¶ 141–90, 257–58. These allegations concerning interference with a contract prohibiting solicitation are qualitatively different than unauthorized copying.

So too are allegations relevant to Counts XI and XIV, where Plaintiffs claim that Chicago Rehab tortiously interfered with the Dilmas and Irvine employment contracts mandating confidentiality. [164] ¶¶ 119–24, 126–39, 119, 325–27. Again, these allegations rest upon Symbria Rehab's right against improper interference with its contractual arrangements with employees and thus remain qualitatively different than Plaintiffs' claim for unauthorized copying. *See, e.g., Seattlehaunts, LLC v. Thomas Fam. Farm, LLC*, No. C19-1937JLR, 2020 WL 5500373, at *5 (W.D. Wash. Sept. 11, 2020) (Copyright Act did not preempt state-law tortious interference with contract claim because the claim rested upon the counterclaim-plaintiff's right against improper interference with its contractual arrangement); *see also, e.g., MedSoftSys, Inc. v. CoolMoon Corp.*, No. 21-CV-60017, 2021 WL 494037, at *6 (S.D. Fla. Feb. 10, 2021) (declining to preempt a tortious interference claim that "merely alleges that EFS interfered with the independent-contractor relationship between MSS and the Bay Defendants by poaching the Bay Defendants—a claim that's, by its terms, entirely disconnected from any assertion of copyright ownership").

In Count IX, tortious interference with business expectancy, Plaintiffs allege that Chicago Rehab purposefully interfered with Symbria Rehab's business expectancies with Dilmas, Irvine, and other employees, leading to the termination of those employment relationships. [164] ¶ 281. This theory of relief—intentionally interfering and poaching employees—is again different than the unauthorized copying regulated by the Copyright Act.

Similarly, the Copyright Act does not preempt Count VIII's claim for aiding and abetting Dilmas' breach of fiduciary duty, nor Count XVI's claim for aiding and abetting Irvine's breach of fiduciary duty. Plaintiffs bring these claims to "redress violations of the duty owed to a [company] by those who control it. In other words, the fact that these claims require a finding that there was a breach of fiduciary duty to begin with adds an extra element that makes the claims qualitatively different from a claim of copyright infringement." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 307 (2d Cir. 2004); *see also Act II Jewelry, LLC v. Wooten*, No. 15 C 6950, 2016 WL 3671451, at *8 (N.D. Ill. July 11, 2016) (concluding that the Copyright Act did not preempt the plaintiffs' breach of fiduciary duty claim based upon the defendant's actions in developing and operating a directly competitive business while still employed at the company).

The Copyright Act does not preempt the common law claims against Chicago Rehab.

### D. Counts VI, VIII, X, XVI: Breach of Fiduciary Duty Claims

#### 1. ITSA Preemption

This Court next considers whether the ITSA preempts the breach of fiduciary claims in the TAC. Dilmas argues that the ITSA preempts the breach of fiduciary claim against him in Count VI, [210] at 15–16, and Chicago Rehab, Callen and the corporate Defendants, and UMHS similarly argue that the ITSA preempts the common law claims of aiding and abetting breach of fiduciary duty against them in Counts VIII and XVI, [214] at 14–22; [215] at 13–14; [212] at 29–30.

The ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 Ill. Comp. Stat. 1065/8(a). It does not, however, displace "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." 765 Ill. Comp. Stat. 1065/8(b)(1)–(2).

As a general rule, a claim for "breach of a fiduciary duty is not preempted by the trade secret statute where more is alleged than just the taking of trade secret information." *Bankers Life & Cas. Co. v. Miller*, No. 14 CV 3165, 2015 WL 515965, at *8 (N.D. Ill. Feb. 6, 2015); *see also Walgreens Co. v. Peters*, No. 21 C 2522, 2021 WL 4502125, at *3 (N.D. Ill. Oct. 1, 2021); *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005) ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record.").

This case is no exception to the general rule. The ITSA does not preempt the breach of fiduciary claims because they are "not premised entirely on

misappropriating trade secrets." *Walgreens*, 2021 WL 4502125, at *3. While, to be sure, Symbria Rehab predicates portions of those claims upon Dilmas' and Irvine's transmission of trade secrets to Callen and the MedRehab Entities, Symbria Rehab also claims that they took non-confidential information in violation of their employment agreements and company policies, to help Callen and the MedRehab entities compete with Symbria and Affiliates in violation of their duties of loyalty. *See, e.g.*, [164] ¶¶ 250, 252, 263, 332, 340–42. Because the conduct underlying this claim is "the act of competing" while the Defendants "still owed a duty of loyalty" to Symbria Rehab, this Court finds that the ITSA does not preempt the breach of fiduciary duty claims. *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, No. 14 C 8160, 2015 WL 5693594, at *5 (N.D. Ill. Sept. 24, 2015).

### 2. Count VI: Breach of Fiduciary Duty Against Dilmas

Taking next Dilmas' individual arguments, Dilmas maintains that Plaintiffs fail to allege any action that rise to the level of a breach of fiduciary duty to Symbria Rehab. [210] at 17–18. This Court disagrees. Under Illinois law, employees owe a duty of loyalty to their employers, *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 433 (Ill. 2012), and downloading and copying an employer's data for the purposes of competing with that employer later constitutes a breach of that duty, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001); *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 838 (C.D. Ill. 2014). The TAC alleges that Dilmas engaged in just that conduct. [164] ¶ 119.

### 3. Count X: Breach of Fiduciary Duty Against Callen

Callen brings a short, undeveloped argument positing that Plaintiffs have conclusorily alleged his breach of fiduciary duty, making it difficult for him to understanding the facts underlying the claim. [215] at 15. Of course, this Court deems perfunctory, undeveloped arguments waived. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). Regardless, the TAC contains abundant allegations amounting to Callen's breach of fiduciary duty such as, for example, the claim that Callen solicited employees and customers before the expiry of his non-solicitation covenants. [164] ¶ 148; *see Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *12 (N.D. Ill. Jan. 26, 2010) (noting that the defendant could be found to have breached his fiduciary duty of loyalty if he solicited employees to join a new company while they were both still employed by the plaintiff). This allegation more than sufficiently puts Callen on notice of his alleged breach of fiduciary duty.

### 4. Counts VIII and XVI: Aiding and Abetting Liability

Chicago Rehab, Callen, the corporate Defendants, and UMHS argue that Symbria Rehab has failed to state a claim for aiding and abetting Dilmas' and Irvine's breach of fiduciary duties. More specifically, Defendants point out that Symbria Rehab has not alleged that they provided substantial assistance to Dilmas or Irvine when they stole company information. [214] at 22; [215] at 14; [212] at 28–29. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege the following three elements: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the

assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Diamond v. Nicholls*, 483 F. Supp. 3d 577, 595 (N.D. Ill. 2020); *Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*, No. 17-CV-9161, 2019 WL 4601742, at *8 (N.D. Ill. Sept. 23, 2019).

This Court agrees the TAC falls short in alleging the third element: knowing and substantial assistance. The TAC alleges that Dilmas emailed company information to his personal account and transmitted that information, via Irvine, to Callen while Dilmas remained employed at Symbria Rehab. [164] ¶¶ 128–29, 261, 338. It also alleges that one of the MedRehab Entities altered and used portions of a document that Dilmas and Irvine misappropriated. *Id.* ¶ 171. While these allegations raise the inferences that Dilmas and Irvine themselves breached their fiduciary duties to Symbria Rehab by stealing company information and that the MedRehab Entities then used the information Dilmas and Irvine allegedly stole, the TAC does not ultimately explain how Callen and any of the other Defendants *substantially assisted* Dilmas and Irvine with their thefts. Indeed, the TAC is devoid of allegations that any of the Defendants directed Dilmas or Irvine to send the information or provided resources to help them pull off the theft. Without this factual proffer, the aiding and abetting count remains implausible. *See, e.g.*, *Glob. Cash Network, Inc. v. Worldpay, US, Inc.*, 148 F. Supp. 3d 716, 724 (N.D. Ill. 2015) (dismissing a claim for aiding and abetting breach of fiduciary duty because the complaint contained no allegation that the defendant "helped [the principal] pull it off"); *cf. Overwell Harvest Ltd. v. Widerhorn*, No. 17 C 6086, 2019 WL 398700, at *6 (N.D. Ill. Jan. 31, 2019)

(holding that a complaint sufficiently alleged "substantial assistance" due to the "active participation and facilitation" of others' breaches of fiduciary duty that went beyond "passive and indirect conduct"). Even allegations that Defendants solicited these employees to work for them do not suffice; at most, that demonstrates encouragement or incitement, but not substantial assistance. *See In re Settlers' Hous. Serv., Inc.*, 520 B.R. 253, 266 (Bankr. N.D. Ill. 2014) (noting in the context of an aiding and abetting claim that encouragement falls "far short" of substantial assistance). Because the TAC has not sufficiently alleged facts demonstrating substantial assistance to Dilmas and Irvine, this Court dismisses the aiding and abetting claims in Counts VIII (aiding Dilmas) and XVI (aiding Irvine). As this is Plaintiffs' third amended complaint, the court dismisses these counts with prejudice.

### E.  Count V: Breach of Contract against Dilmas

In Count V, Symbria Rehab claims that Dilmas breached portions of his employment agreement. Dilmas contends that Symbria Rehab fails to state a plausible breach of contract claim against him because Symbria Rehab included "explicit language" in its employment letter and other employment-related documents negating any notion that the parties into an employment contract. [210] at 13–15. The Court agrees. Dilmas relies on language from the employee handbook which states:

> The purpose of this Employee Handbook is to provide brief, general information on Company benefits and employment practices. The content of this Employee Handbook is subject to change without prior notice to employees. As such, I understand that the Company does not intent [*sic*] to create a contract of employment by placing these matters in writing.

> I understand and agree my employment with [Symbria Rehab] is for no definite period of time and that [Symbria Rehab] may elect to discontinue my employment relationship for whatever reason it considers proper and at any time. I, likewise, may leave the Company for whatever reason I consider proper and at any time.

[164-10] at 2.  The employment offer letters to Dilmas (from 2013 and 2016) stated:

> While it is our sincere hope that our relationship will be lasting and mutually beneficial, you should understand that we are considered an employer at-will. This means our offer does not create a binding contractual commitment and does not provide any guarantee or assurance of continued employment.
>
> ***
> This letter or any other company document does not constitute a contract of employment other than employment 'at will'.

[164-9] at 9; [164-11] at 2.  Dilmas argues that since he was an employee at-will, there exists no contract on which Symbria Rehab can sue.  Symbria Rehab counters that the language in the offer letter simply provides that Symbria does not intend to create an employment contract of *definite duration*, only a contract for an employment at-will. *Id.*

The Seventh Circuit has found that "[u]nder the law of many states, … a[n employee] handbook can create a binding contract if it contains clear promissory language that makes the handbook an offer that the employee accepts by continuing to work after receiving it." *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000).  Illinois is one of those states.  *See, Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318 (1987). However, the *Workman* court also found that the "plaintiff's contractual claim is extinguished by the statement in the handbook that 'this Policy Book is not a contract of

employment ….' Such a disclaimer, if clear and forthright, … is a complete defense to a suit for breach of contract based on an employee handbook." 234 F.3d at 1000. The language in the documents relied upon by Symbria Rehab is clear and forthright by stating (1) it did "not create"; and (2) it did "not constitute" a contract of employment. [164-9] at 9; [164-11] at 2. Symbria Rehab's breach of an employment contract claim against Dilmas is not well-taken. Count V is dismissed.

### F.    Counts III and VII: The SPA Counts

In Count III, Symbria, GreatBanc, and the Symbria ESOP Trust sue UMHS for breach of the SPA; and in Count VII, Symbria alleges that Callen and the MedRehab Entities tortiously interfered with the SPA. Those Defendants move to dismiss those claims on various grounds. [214] at 23–24; [215] at 11–13; [212] at 20–28.

#### 1.    State Court Lawsuit

Initially, Defendants argue that a pending state court suit precludes this Court's consideration of the SPA counts. In the TAC, Plaintiffs reference the fact that UMHS filed a complaint against Symbria in Cook County Circuit Court in December 2019. [164] ¶ 41. The lawsuit sought a declaration that the SPA limits the scope of non-solicitation covenants to the state of Illinois. *Id.* In October 2020, the state court awarded UMHS that relief, after which Symbria subsequently appealed. *Id.*; *see* [113-1] at 2. That appeal remains pending. [171] ¶ 45. Callen, the corporate Defendants, and UMHS urge this Court to stay the SPA-related counts because Plaintiffs seek relief based upon UMHS' breaches of the non-solicitation covenants

44

both within and outside of the state of Illinois, and the state court has already ruled that the covenants apply only to the state of Illinois.

UMHS suggests that the abstention principles explained in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), warrant a dismissal or stay of Count III. [212] at 24–25. The *Colorado River* abstention doctrine allows a federal court to "abstain and stay or dismiss a suit in deference to parallel state proceedings in exceptional circumstances where abstention would promote 'wise judicial administration.'" *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 526 (7th Cir. 2021) (quoting *Colo. River*, 424 U.S. at 818), *reh'g denied* (Nov. 16, 2021). The "critical question is whether there is a 'substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 646 (7th Cir. 2011) (quoting *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 499 (7th Cir. 2011)); *see also Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 647 (7th Cir. 2021). The answer is clearly "no". The state court suit seeks a narrow declaration about the scope of the non-solicitation covenants in the SPA, while Counts III and VII in this case seek damages for breach of the non-solicitation *and* non-competition covenants in the SPA, and tortious interference with the SPA against other Defendants. Accordingly, there is no likelihood that the state court proceeding will dispose of even the SPA claims in this lawsuit.

UMHS and Callen and the corporate Defendants also request that this Court dismiss or stay the SPA-related counts on *res judicata* principles. [212] at 26–28; [215] at 3–4. The doctrine of *res judicata*—also called claim preclusion—protects the

finality of a judgment and prevents parties from undermining the judgment by relitigating a claim. *McDonald v. Adamson*, 840 F.3d 343, 346 (7th Cir. 2016). In Illinois, if "judgment is still subject to the appeal process, it cannot be given *res judicata* effect." *People v. Anderson*, 48 N.E.3d 1134, 1141 (Ill. App. Ct. 2015); *see also Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. Ct. 1994) ("Because the judgment in *Pelon v. Copley Press* was on appeal at the time defendants here moved to dismiss pursuant to section 2–619(a)(4), it was not a final judgment, and the trial court erred in granting the motion to dismiss.") (citing *Ballweg v. City of Springfield*, 499 N.E.2d 1373 (Ill. 1986)). In light of this jurisprudence, this Court cannot apply *res judicata* at this point. Should the state court appeal resolve at a later point in this lawsuit, this Court can assess the applicability of the doctrine at that time.

Having ruled that neither the *Colorado River* abstention doctrine nor claim preclusion principles apply at this time, this Court moves on to consider the merits of the SPA counts.

### 2. UMHS

UMHS argues that the breach of SPA allegations contained in Count III are too conclusory to withstand a Rule 12(b)(6) motion. [212] at 20–23. Under Illinois law, a breach of contract claim requires a plaintiff to establish the following elements: (1) a contract existed, (2) the plaintiff performed the conditions precedent required by the contract, (3) the defendant breached the contract, and (4) damages. *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020), *reh'g denied* (Sept. 4, 2020).

Cherry-picking from the TAC, UMHS contends that Plaintiffs have only alleged breach of the SPA in general terms, pointing to paragraph 225 where Plaintiffs allege that UMHS solicited clients or customers and to paragraph 227 where they allege generally that UMHS divulged confidential information or trade secrets. [212] at 21. UMHS complains that Plaintiffs fail to provide detail about who UMHS solicited and how it competed against Plaintiffs. *Id.* at 22. This argument ignores that Plaintiffs have pled copious other facts supporting their breach of SPA claim, including that (1) Symbria employees like Dilmas left Symbria and went to work for UMHS-owned entities and for Callen, UMHS' former vice chair, in breach of the SPA; (2) UMHS was involved in soliciting Symbria clients expressly named in the TAC; and (3) UMHS has competed with Symbria in violation of the SPA by using Symbria's confidential information. *E.g.*, [164] ¶¶ 156, 163, 178–79, 183, 201–03. Taken together, these are plausible allegations that UMHS breached the SPA.

UMHS also argues that Plaintiffs' damages allegations are insufficiently vague. [212] at 22. This Court disagrees. Illinois law simply requires a plaintiff to plead some "actual economic damage," *Moyer v. Michaels Stores, Inc.*, No. 14 C 561, 2014 WL 3511500, at *7 (N.D. Ill. July 14, 2014), not its damages amount, *Ho-Chunk Nation v. J.C. Penney Co.*, No. 98 C 3924, 1999 WL 495899, at *11 (N.D. Ill. July 2, 1999). Here, Plaintiffs claim that UMHS' competition allowed a client to negotiate lower rates, [164] ¶ 156, and that a senior lender has declined to refinance Symbria's debt, *id.* ¶ 42. These allegations clearly identify economic damage flowing from UMHS' alleged breach of the SPA's non-competition provisions. Moreover, to the

extent Plaintiffs can later prove that UMHS did, in fact, engage in unlawful solicitation, they can attempt to demonstrate economic damages flowing from that loss of business.

### 3. The Other Defendants

Callen, the corporate Defendants, and Chicago Rehab challenge the sufficiency of the allegations in Count VII—tortious interference with the SPA. To state a tortious interference with contract claim under Illinois law, Plaintiffs must plausibly allege the following five elements: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018).

Defendants argue that Plaintiffs have failed to adequately allege the third element of intentional inducement which means active persuasion, encouragement, or incitement that goes beyond merely providing information in a passive way. *Webb*, 906 F.3d at 579. True, the TAC contains no particular allegation that these Defendants actively induced UMHS to breach the SPA. The TAC does, however, "allege that Defendants were aware of the [SPA] and worked together to form a competing venture that aimed to take business away from [the Plaintiffs] and funnel it toward [Defendants]," causing UMHS to breach the SPA. *Aon plc*, 2021 WL 4034068, at *18; *see, e.g.*, [164] ¶¶ 256–57, 114, 138, 178. This Court reasonably infers, based upon these allegations, that these Defendants encouraged or persuaded UMHS to breach the SPA. *See id.*; *see also Wells Lamont Indus. Grp. LLC v. Richard*

*Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *4 (N.D. Ill. July 31, 2017) ("A complaint that alleges the interferer had knowledge of a contract and then placed a contracting party in a position to breach sufficiently pleads intentional inducement.").

Callen additionally argues that, as President and CEO of MedRehab Alliance, he cannot be liable individually pursuant to the corporate privilege available to corporate officers. [215] at 12. This corporate privilege that Callen has invoked allows corporate officers to "interfere with a contract where they use business judgment to act on behalf of their corporation." *Webb*, 906 F.3d at 577. But the privilege is unavailable to Callen under the facts alleged in the TAC. The privilege applies only to situations involving a corporate officer's interference with its own corporation's contractual relationship. *Beverly v. Abbott Labs.*, No. 17 C 5590, 2019 WL 3003352, at *14 (N.D. Ill. July 10, 2019); *see also, e.g.*, *Parise v. Integrated Shipping Sols., Inc.*, 292 F. Supp. 3d 801, 809 (N.D. Ill. 2017) (recognizing that the privilege applies in the context where a complaint alleges a corporate officer's interference "with the contracts *to which their corporations are a party*") (emphasis added). The alleged interference here does not concern a MedRehab Alliance contract, it concerns a UMHS contract. Callen thus cannot avail himself of the corporate privilege as an officer of MedRehab Alliance.

### G. Count IV: Breach of Contract Against Callen

Callen moves for this Court to dismiss the breach of contract claim against him in Count IV. [215] at 9–11. Callen complains that the TAC remains too conclusory

to establish that Callen solicited Irvine away from Symbria while the non-solicitation provisions in his employment agreement remained in effect. *Id.* at 9–10. In the TAC, Plaintiffs allege, on information and belief, that during the "restricted period" in his employment agreement, Callen solicited Irvine to terminate her employment with Symbria Rehab to engage in activities competitive with Symbria and Affiliates. [164] ¶ 240. While Callen is right that Plaintiffs have left these allegations somewhat vague, this Court also recognizes that the facts underlying the claim are solely in possession of Defendants, and thus, Plaintiffs are unable to allege more without the benefit of full discovery. *See O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2021 WL 4866353, at *6 (N.D. Ill. Oct. 19, 2021).

For the same reasons, this Court rejects Callen's complaints that the allegations concerning his breach of confidentiality provisions are too conclusory to withstand a motion to dismiss. [215] at 10. The TAC alleges that Callen "has relied on his knowledge" of Plaintiffs' business partners and confidential customers to solicit their business, and that Callen did so while employed by Symbria Rehab. [164] ¶¶ 184, 236. The specific "knowledge" that Callen relied upon cannot be known to Plaintiffs without the benefit of discovery. For now, it suffices for Plaintiffs to plead that Callen, by virtue of his former position at Symbria, would have had access to Symbria's confidential information and used that confidential information when he left to work for a competitive venture.

Callen also argues that he could not have breached the non-solicitation provisions because Irvine, who he supposedly solicited, went to work for Plymouth

Place which Callen does not own. [215] at 10. Although Callen does not spell it out, the implication is that it would be implausible for Callen to solicit Irvine to work for a company in which he holds no financial interest. The TAC, however, contradicts Callen's contention that he was not financially incentivized to solicit Irvine to work at Plymouth Place. The TAC alleges that Plymouth Place, like Callen, owns an interest in MedRehab Alliance; that Callen specially hired Irvine to be stationed at Plymouth Place; and that Plymouth Place provides services for the MedRehab Entities. [164] ¶¶ 14, 109, 188. These allegations raise an inference that Callen had a financial interest in soliciting Irvine away from Symbria Rehab.

### H.    Count IX: Tortious Interference with Business Expectancy

This Court next addresses Count IX, where Plaintiffs allege that Callen and the MedRehab Entities have tortiously interfered with their business expectancy. That claim requires Plaintiffs to allege: (1) a reasonable expectation of continuing (or entering into) a valid business relationship; (2) the defendant's knowledge of the expectation; (3) purposeful "interference" by the defendant that prevents the plaintiff's legitimate expectation from ripening; and (4) damages caused by the first three elements. *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015). On the third element, the law only recognizes liability for improper inference, not for lawful competition, *Webb*, 906 F.3d at 577, because competition "is not a tort," *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999).

Callen and the corporate Defendants assert that they engaged in lawful competition, not illegal interference, because the TAC has not alleged any

interference pre-dating January 12, 2019, when Callen's restrictive covenants expired. [215] at 14–15. Any competition post-dating January 12, 2019, they argue, was done lawfully. *Id.* Chicago Rehab similarly argues that it engaged only in lawful competition. [214] at 24–25. These arguments fail for two reasons.

First, Defendants ignore that the TAC *does* allege that Callen at least contravened his employment agreement by soliciting an employee—Irvine—during the "restricted period" in his employment agreement. [164] ¶¶ 14, 109–10, 240. Accordingly, Callen and the corporate Defendants' premise that they only competed after the expiry of the restrictive covenants is wrong, at least based upon this Court's review of the TAC's allegations. Second, whether competition is lawful or unlawful depends upon a host of factual determinations, such as whether the competitive activity involved fraud, intimidation, or disparagement. *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 645 (N.D. Ill. 2020). The assertion of "lawful competition" is an affirmative defense that Plaintiffs need not anticipate in pleading the TAC. *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*, 78 F. Supp. 3d 852, 869 (N.D. Ill. 2015). The TAC does not affirmatively establish that Defendants can prevail on a "lawful competition" affirmative defense, so this Court assumes, for pleading purposes, that Defendants engaged in unlawful competition, as Plaintiffs have alleged in the TAC. Whether these allegations pan out is a question for another day.

## I.      Counts XI and XIV: Tortious Interference With Contracts

UMHS moves to dismiss Counts XI and XIV in which Plaintiffs allege that it has tortiously interfered with Dilmas' and Irvine's employment contracts. [212] at 30–31. The Court finds UMHS' arguments unpersuasive. UMHS argues that Plaintiffs plead only on information and belief that UMHS knew that those contracts contained confidentiality provisions, *see* [212] at 31, but given that the TAC alleges Callen's role as a senior executive for Symbria Rehab and then later as a board member for UMHS [164] ¶¶ 10, 43, this Court can infer that UMHS had knowledge, through Callen, of the employment agreements Symbria Rehab offers its employees.

UMHS also contends that the TAC fails to plead active persuasion or incitement by UMHS that induced Dilmas and/or Irvine to breach their contracts. [212] at 30. But the TAC *does* allege that UMHS (and other Defendants) knew about their confidentiality covenants and worked "together to form a competing venture that aimed to take business away from [the Plaintiffs] and funnel it toward [Defendants]," causing Irvine and Dilmas to breach their contracts. *Aon plc*, 2021 WL 4034068, at *18. This "competing venture" theory suffices to demonstrate the active persuasion or incitement necessary to satisfy the element of intentional inducement. *Id.*

## IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part Defendants' motions to dismiss the TAC [164]. *See* [210]; [212]; [214]; [215]. As a result of this Court rulings, Plaintiffs' request for statutory damages and attorney's fees in Count XII (copyright infringement) are hereby stricken. The Court also

dismisses Counts V, VIII and XVI with prejudice. Counts XIII and XV are dismissed based on settlement. The motions to dismiss are otherwise denied.

This Court additionally denies Callen and the corporate Defendants' motion to strike [253]. Although they argue discovery has irrefutably established that certain allegations in the TAC are inaccurate, the fact "that an allegation may later end up being irrelevant, inadmissible, or even untruthful does not mean that it must be stricken from the pleadings." *Conner v. Bd. of Trustees for Univ. of Ill.*, No. 19 CV 846, 2019 WL 5179625, at *10 (N.D. Ill. Oct. 15, 2019). This Court declines to strike any of the TAC's allegations. To the extent Defendants wish to attack the truthfulness of Plaintiff's allegations, summary judgment remains the appropriate vehicle to do so.

Defendants are ordered to answer the TAC by February 2, 2022.

E N T E R :

Dated: January 6, 2022

_____
MARY M. ROWLAND
United States District Judge