## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

SYMBRIA, INC., an Illinois corporation,
SYMBRIA REHAB, INC., an Illinois corporation,
ALLIANCE REHAB OF CONNECTICUT, LLC, a
Connecticut limited liability company, ALLIANCE
REHAB HVA, L.L.C., a Pennsylvania limited
liability company, GREATBANC TRUST
COMPANY, an Illinois corporation, in its capacity
as Trustee of the Symbria, Inc. Employee Stock
Ownership Trust, and THE SYMBRIA, INC.
EMPLOYEE STOCK OWNERSHIP TRUST,

     *Plaintiffs*,

     v.

JOHN R. CALLEN, a citizen of Illinois, UNITED
METHODIST HOMES & SERVICES, an Illinois
corporation, CHRISTOS V. DILMAS, a citizen of
Illinois, MEDREHAB ALLIANCE HOLDINGS,
INC., a Delaware corporation, MEDREHAB
ALLIANCE, LLC, an Illinois limited liability
company, MEDREHAB ALLIANCE
INTERSTATE, LLC, an Illinois limited liability
company, ILLINOIS ANCILLARY SERVICES
NETWORK, LLC, an Illinois limited liability
company, PEARL HEALTH CARE SERVICES,
INC., an Illinois corporation, d/b/a MedRehab at
Home and d/b/a Chicago Med Home Health,
CHICAGO REHABILITATION COLLECTIVE
PLLC, an Illinois professional limited liability
company, MEDREHAB THERAPY
ASSOCIATES OF ILLINOIS, LLC, an Illinois
limited liability company, JOINT & NEURO
REHAB ASSOCIATES, LLC, an Illinois limited
liability company, MEDREHAB ALLIANCE
WISCONSIN, LLC, a Delaware limited liability
company, andJOINT & NEURO REHAB
ASSOCIATES OF CHICAGO, LLC, a Delaware
limited liability company,

     *Defendants*.

Case No.  20-cv-4084

Hon. Mary M. Rowland

JURY TRIAL DEMANDED

**REDACTED VERSION FOR
PUBLIC FILING**

## FOURTH AMENDED COMPLAINT

REDACTED VERSION FOR PUBLIC FILING

Plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, Alliance Rehab HVA, L.L.C., GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust, and the Symbria, Inc. Employee Stock Ownership Trust, by their undersigned attorneys, for their Fourth Amended Complaint against John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Illinois Ancillary Services Network, LLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Chicago Rehabilitation Collective PLLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC state as follows:

## Nature of the Action

1.      This is an action for misappropriation of trade secrets, copyright infringement, breach of non-solicitation and non-competition covenants, breach of contract, breach of fiduciary duty, tortious interference with contract, tortious interference with business expectancy, and aiding and abetting breach of fiduciary duty. Plaintiffs provide rehabilitation and wellness services in senior living and skilled nursing facilities across the United States. In the course of their business, plaintiffs have invested large amounts of time and money in developing commercially-valuable, competitively-sensitive information concerning the provision of healthcare services to senior adults that gives plaintiffs an advantage over their competitors. Plaintiffs' former executive and managers have misappropriated and used this information in violation of federal and state trade secrets laws, the Copyright Act, in violation of contracts that they entered into and benefitted from, and in breach of their fiduciary duties. These persons have

REDACTED VERSION FOR PUBLIC FILING

disclosed this information to entities that compete with the plaintiffs, a number of which are owned in whole or in part by a company that was once one of plaintiff Symbria, Inc.'s owners. That former owner has now decided to compete with Symbria, Inc. and its subsidiaries despite covenants it freely undertook not to do so when it sold its interest in Symbria, Inc. for substantial consideration consisting of cash, debt, and warrants to purchase stock in Symbria, Inc. in the future.

**The Parties**

2. Plaintiff Symbria, Inc. ("Symbria") is the parent company of businesses that provide clinical health services for senior living and post-acute care providers, including therapy, pharmacy services, and wellness programs in twelve states. Symbria was founded under the name Midwest Senior Network in January 1999 as a for-profit company by a group of not-for-profit-members of Health Resource Alliance, Inc. Health Resource Alliance, Inc. was founded in 1995 by a group of not-for-profit organizations. In 2015, Symbria's owners sold the company to an employee stock ownership plan ("ESOP") trust, making Symbria an employee-owned company. Symbria is an Illinois corporation with its principal place of business in Warrenville, Illinois.

3. Plaintiff Symbria Rehab, Inc. ("Symbria Rehab"), formerly known as Alliance Rehab, Inc. is a wholly-owned subsidiary of Symbria. Symbria Rehab provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers. In the state of Ohio, Symbria Rehab is the successor in interest to certain contracts formerly entered into by Symbria Rehab, LLC, a wholly-owned subsidiary of Symbria Rehab. Symbria Rehab is an Illinois corporation with its principal place of business in Warrenville, Illinois.

REDACTED VERSION FOR PUBLIC FILING

4.     Plaintiff Alliance Rehab of Connecticut, LLC ("Alliance Connecticut") is a Connecticut limited liability company, majority-owned by Symbria Rehab, which is one of its members. Alliance Connecticut is a subsidiary of Symbria. Alliance Connecticut provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers in the state of Connecticut.

5.     Plaintiff Alliance HVA, L.L.C. ("Alliance HVA") is a Pennsylvania limited liability company, majority-owned by Symbria Rehab, which is one of its members. Alliance HVA is a subsidiary of Symbria. Alliance HVA does business as Symbria Rehab, an HVA Senior Living Alliance Partner. Alliance HVA provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers in the state of Pennsylvania.

6.     Plaintiff GreatBanc Trust Company ("GreatBanc") is the Trustee of the Symbria, Inc. Employee Stock Ownership Trust. GreatBanc is a trust company regulated by the State of Illinois, and independent fiduciary for retirement plans, specializing in employee stock ownership plans. GreatBanc is an Illinois corporation with its principle place of business in Lisle, Illinois. GreatBanc brings this action not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust.

7.     The Symbria, Inc. Employee Stock Ownership Trust (the "Symbria ESOP Trust") was formed pursuant to the Symbria, Inc. Employee Stock Ownership Plan. Shares of stock in Symbria are held in the Symbria ESOP Trust for the benefit of the participants and beneficiaries of the Symbria, Inc. Employee Stock Ownership Plan.

REDACTED VERSION FOR PUBLIC FILING

8.      Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA are referred to herein collectively as "Symbria and Affiliates." Symbria, Symbria Rehab, Alliance Connecticut, Alliance HVA, GreatBanc, and the Symbria ESOP Trust are referred to herein collectively as "Plaintiffs."

9.      Defendant John R. Callen ("Callen") was formerly employed by Symbria Rehab since 1999 as its President, until his employment duties administratively terminated on January 12, 2017. Callen is a citizen of the state of Illinois.

10.     Defendant United Methodist Homes & Services ("UMHS") is a provider of services and residences for older adults. Until October 31, 2015, UMHS was one of the owners of Symbria. William A. Lowe ("Lowe") is the President of UMHS. Callen was a member of the Board of Directors of United Methodist Homes & Services through at least May 2019, serving as its Vice Chairman. UMHS is an Illinois corporation with its principal place of business located at 1415 West Foster Avenue in Chicago, Illinois.

11.     Defendant Christos V. Dilmas ("Dilmas") was employed by Symbria Rehab starting on October 31, 2013, when he was hired as a Program Manager/Physical Therapist. On October 2, 2016, he was promoted to Regional Director of Operations. Dilmas' last day of employment by Symbria Rehab was September 25, 2019. Dilmas is a citizen of the state of Illinois.

12.     Defendant MedRehab Alliance Holdings, Inc. ("MedRehab Holdings") is a holding company that is wholly-owned by UMHS. MedRehab Holdings is a Delaware corporation that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Lowe is President and Secretary of MedRehab Holdings.

13.    Defendant MedRehab Alliance, LLC ("MedRehab Alliance") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies. MedRehab Alliance is a Delaware limited liability company that is registered to do business in Illinois and is located at 1415 West Foster Avenue in Chicago, Illinois. William Lowe is the manager of MedRehab Alliance. Callen is President, CEO, and Managing Partner of MedRehab Alliance. Through UMHS' ownership of Med Rehab Holdings, UMHS owns 25.974 percent of MedRehab Alliance. Callen owns 25.974 percent of MedRehab Alliance. PANDR Holdings LLC owns 25.974 percent of MedRehab Alliance. The manager of PANDR Holdings LLC is Rahul Sharma ("Sharma"). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████    When Irvine resigned from Symbria Rehab, she went to work for Plymouth Place, where she continues to be employed. According to a UMHS employee who is also an agent of defendant Pearl Health Care Services, Inc., Irvine was hired by Callen to work for his "Therapy company" and to be "stationed at Plymouth for now."

14.    Defendant MedRehab Alliance Interstate, LLC ("MedRehab Interstate") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies in states outside Illinois. It is an Illinois limited liability company located at 1415 West Foster Avenue in Chicago. A majority of MedRehab Interstate is owned by MedRehab Holdings and therefore by UMHS. MedRehab Interstate has four managers: Callen, Lowe, Jim Sutton, and Sharma. Sharma also is a member of the Board of Directors of UMHS. Each of them list UMHS' Foster Avenue address as their place of business.

Through MedRehab Holdings and MedRehab Alliance, UMHS owns 60 percent of MedRehab Interstate.

15.    Defendant Illinois Ancillary Services Network, LLC ("IASN"), formerly known as MedRehab Ancillary Services Illinois, LLC, is a provider of ancillary and home health care services. IASN is majority-owned by MedRehab Alliance, and through IASN, UMHS, Callen, and PANDR Holdings LLC each own 25.974 percent of IASN. Plymouth Place owns a minority interest in IASN. IASN is the sole owner of Pearl Healthcare Services, Inc. IASN is an Illinois limited liability company located at 1415 West Foster Avenue in Chicago, Illinois. Callen and Lowe are managers of IASN. IASN's managers include Callen and Lowe and they list UMHS' Foster Avenue address as their place of business.

16.    Defendant Pearl Health Care Services, Inc., doing business as MedRehab at Home and Chicago Med Home Health ("Pearl"), is a home health care agency that provides nursing, physical therapy, occupational therapy, speech pathology, and other home health services. Pearl is an Illinois corporation. Its officers are Callen, at the address of 10400 West Higgins Road in Rosemont, Illinois, and Lowe, at the address of 1415 West Foster Avenue in Chicago, Illinois. IASN owns 100 percent of Pearl. Through its ownership interests in MedRehab Alliance and MedRehab Alliance's ownership interest in IASN, UMHS, Callen, and PANDR Holding LLC own indirect controlling interests in Pearl. An employee of UMHS, Paul Spence, works for Pearl as its Business Development Director.

17.    Defendant Chicago Rehabilitation Collective PLLC ("Chicago Rehab") provides medical services through health care professionals including physical therapists, occupational therapists, speech therapists, and respiratory therapists, with offices located at 10400 West Higgins Road in Rosemont, Illinois and 315 North LaGrange Road in LaGrange Park, Illinois.

REDACTED VERSION FOR PUBLIC FILING

Callen at all times actively manages Chicago Rehab and is an agent of Chicago Rehab, and Callen was one of the owners of Chicago Rehab, together with his "partners" Sharma and Sajjad Murtaza ("Murtaza"). Dilmas became employed by Chicago Rehab at Callen's request at the time he resigned from Symbria Rehab. Chicago Rehab is an Illinois professional limited liability company. The managers of Chicago Rehab use the Higgins Road address as their business address. Chicago Rehab is the successor in interest to Chicago Rehabilitation Collective, LLC, a Delaware limited liability company that was formed on April 29, 2019, and to Chicago Rehabilitation Collective, LLC, an Illinois limited liability company into which Chicago Rehabilitation Collective, LLC, a Delaware limited liability company, was domesticated on June 20, 2019.

18.     Defendant MedRehab Therapy Associates of Illinois, LLC ("MedRehab Therapy") is a provider of clinical health services for senior living and post-acute care providers. MedRehab Therapy is an Illinois limited liability company located at 10400 West Higgins Road in Rosemont, Illinois. Callen is the manager of MedRehab Therapy and an owner of MedRehab Therapy.

19.     Defendant Joint & Neuro Rehab Associates, LLC ("Joint & Neuro") is on information and belief a provider of acute and post-acute rehabilitation staffing and management services to hospitals, health systems, outpatient physical therapy, pain management, and musculoskeletal clinics, skilled nursing facilities, home health agencies, and senior care communities. Joint & Neuro is a Delaware limited liability company that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Callen is a manager of Joint & Neuro, along with Sharma, Murtaza, and Amish Patel, its CEO, and managing partner. Callen is an owner of Joint & Neuro. The managers of Joint & Neuro list their

REDACTED VERSION FOR PUBLIC FILING

business addresses at the Higgins Road address in Rosemont. Joint & Neuro was formerly known as Joint & Neuro Rehab Associates of Chicago, LLC.

20.     Defendant MedRehab Alliance Wisconsin, LLC ("MedRehab Wisconsin") provides, on information and belief, rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies. MedRehab Wisconsin is a Delaware limited liability company that is located at 10400 Higgins Road in Rosemont, Illinois. MedRehab Wisconsin is owned by MedRehab Alliance, and through MedRehab Alliance, UMHS and Callen each own controlling interests in MedRehab Wisconsin.

21.     Defendant Joint & Neuro Rehab Associates of Chicago, LLC ("Joint & Neuro Chicago") is on information and belief a provider of acute and post-acute rehabilitation staffing and management services to hospitals, health systems, outpatient physical therapy, pain management, and musculoskeletal clinics, skilled nursing facilities, home health agencies, and senior care communities. Joint & Neuro Chicago is a Delaware limited liability company that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Callen is a manager of Joint & Neuro Chicago and its CEO, along with fellow managers Sharma, Murtaza, and Amish Patel, and the managing partner. ████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████ Through his ownership interest in Joint & Neuro, Callen is an indirect owner of Joint & Neuro Chicago. The four managers of Joint & Neuro Chicago are the same as the managers of Joint & Neuro and list their business addresses at the same Higgins Road address in Rosemont.

22.     Defendants MedRehab Holdings, MedRehab Alliance, MedRehab Interstate, IASN, Pearl, Chicago Rehab, Joint & Neuro, MedRehab Therapy, MedRehab Wisconsin, and

Joint & Neuro Chicago are referred to collectively in this Amended Complaint as the "MedRehab Entities."

23.     On information and belief, the MedRehab Entities operate out of three small office locations: (1) a small leased office suite at 10400 West Higgins Road, in Rosemont, Illinois, (2) offices located with UMHS' headquarters and senior living facility at 1415 West Foster Avenue in Chicago, and (3) a small leased office in Greenville, Pennsylvania. At their office in Rosemont, the sign in the common-area hallway on their office suite simply reads "MedRehab Alliance," as shown in this photograph:



24.     The MedRehab Entities share employees between them and have a small number of employees among them – approximately ten, excluding professionals who provide therapy

REDACTED VERSION FOR PUBLIC FILING

services. Chicago Rehab "loans" employees, including former employees of Symbria and Affiliates, to Joint & Neuro, Joint & Neuro Chicago, MedRehab Alliance, and MedRehab Interstate. MedRehab Alliance contracts employees to MedRehab Interstate. An employee of UMHS serves as Business Director of Pearl.

25.     Callen, MedRehab Alliance, MedRehab Interstate, Pearl, and MedRehab Therapy jointly maintain electronic documents in a cloud account registered to MedRehab Alliance. Information contained on that cloud account and known to one of these persons or entities is known by all of them. Pearl also maintains electronic documents on a server under the control of UMHS. Information on Pearl's server is known to UMHS.

**Jurisdiction and Venue**

26.     This Court has jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c), because this is an action against all Defendants under that act. The court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the DTSA present a federal question under the laws of the United States. The Court also has jurisdiction pursuant to 28 U.S.C. § 1338(a) because Symbria's claims arising under the Copyright Act, 17 U.S.C. § 101 *et seq.*, present a federal question under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to Plaintiffs' claims under the DTSA and the Copyright Act that they form part of the same case or controversy. In addition, defendant Callen has consented to this Court's personal jurisdiction over him ███████████████

██████████████████████████████████████

██████████████████████████████████████

REDACTED VERSION FOR PUBLIC FILING

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the state of Illinois, given that each defendant is subject to personal jurisdiction in Illinois as set forth in 28 U.S.C. § 1367(c)(2) and that each defendant that is a corporation resides in this district because their respective contacts with this district would subject them to personal jurisdiction in this district if this district were a separate state. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to claims occurred in this district. Venue is also proper as to defendant Callen because ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Venue is also proper as to UMHS because the Stock Purchase Agreement between it and Symbria, Inc. provides that venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

### The Sale of Symbria and the Creation of the ESOP

28.     On October 31, 2015, UMHS and the other twelve owners of Symbria sold their stock in Symbria. While one of the owners sold its interest only for cash, UMHS and eleven of the other owners entered into a Stock Purchase Agreement ("SPA"), pursuant to which UMHS and the other eleven owners entering into the agreement sold their stock in Symbria to an ESOP trust in exchange for cash, subordinated notes given by Symbria, and warrants to purchase shares of stock in Symbria in the future. For its interest in Symbria, UMHS received ████████████

████████████████████████████████████████████████████████████

███████████████████████████████ Each of the other owners entering into the SPA received the same consideration, except for one, which owned a greater number of shares in

REDACTED VERSION FOR PUBLIC FILING

Symbria and therefore received proportionately greater amounts of each form of consideration. The cash and debt components received for the purchase of the owners' shares, totaling approximately ████████, were financed by a senior lender to Symbria. A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit 1.

29.     Argent Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Program, was a party to the SPA. Argent Trust Company was identified in the SPA as the "ESOP Trustee." GreatBanc is now the present Trustee of the Symbria, Inc. Employee Stock Ownership Trust and in that capacity is the successor to Argent Trust Company and its rights and obligations under the SPA.

30.     UMHS and the other entities selling their stock under the SPA each received a note from Symbria, subordinated to Symbria's debt to its senior lender. Principal and interest under the subordinated notes is due over a ten-year period.

31.     UMHS and the other entities selling their stock under the SPA also received warrants that may not be exercised until the senior debt holder and subordinated debt holders are paid in full. The higher the value of Symbria's stock at the time the warrants are exercised, the higher the amount that UHMS and the other former owners will realize from exercising the warrants.

32.     At the time of the closing of the SPA on October 31, 2015, Lowe was the Vice-Chairperson of Symbria's Board of Directors.

33.     After the closing of the SPA, UMHS and the other former owners of Symbria who were parties to the SPA had a stake in Symbria's success. Because UMHS' note is subordinated debt, UMHS' note cannot be paid by Symbria until the principal debt of $26.4

million is repaid to Symbria's senior lender. In addition, the warrants held by UMHS and the other owners selling stock under the SPA cannot be exercised before the senior debt is retired.

34.     Because UMHS and the other former owners of Symbria who were parties to the SPA have an ongoing stake in Symbria's success, UMHS and the other former owners of Symbria that sold their stock under the SPA covenanted: (1) to not compete, directly or indirectly in any capacity, or have any direct or indirect ownership in any business in the state of Illinois that competes with Symbria and its subsidiaries; (2) to not solicit Symbria's and its subsidiaries' clients and prospective clients; and (3) to not solicit the employees of Symbria and its subsidiaries. Each of these covenants lasts until the later of the fifth anniversary of the closing date under the SPA or until the selling owners' subordinated notes are paid in full.

35.     In Section 5.3 of the SPA, all of the owners who were sellers, including UMHS, undertook to protect Symbria's confidential information. Section 5.3 provides in pertinent part as follows:

> **Non-Disclosure of Confidential Information.** From and after the Closing, Sellers agree not to divulge, communicate, use to the detriment of the Company Group or the ESOP Trust, for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets owned by or relating to the Company Group, including, without limitation, personnel information, secret processes, know-how, customer lists or other technical data; provided, however that the confidentiality obligations hereunder do not apply to information which has become publicly known through no wrongful act of Sellers….

36.     In section 5.4(a) of the SPA, all of the owners who were sellers, including UMHS, agreed as follows:

> Each of Sellers severally covenants that, commencing on the Closing Date and ending on the later of (i) the fifth anniversary of the Closing Date or (ii) the date on which such Seller's Subordinated Note has been paid in full (the "Noncompetition Period") he, she or it shall not engage in, directly or indirectly, in any capacity, or have any direct or indirect ownership interest in, or any business anywhere in the state of Illinois which is engaged, either directly or indirectly, in the business or developing, marketing, providing, representing, or

REDACTED VERSION FOR PUBLIC FILING

selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by, any member of [Symbria] or its Affiliates as of the Closing Date (the "Restricted Business"). It is recognized that the Restricted Business is expected to be conducted throughout the state of Illinois and that more narrow geographical limitations of any nature on this non-competition covenant (and the non-solicitation covenants set forth in Sections 5.4(b) and 5.4(c)) are therefore not appropriate….

37.     Section 5.4(b) of the SPA provides as follows:

(b) Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit or entice, or attempt to solicit or entice, any clients or customers of any member of [Symbria and subsidiaries] or potential clients or customers of [Symbria and subsidiaries] for purposes of diverting business or services from [Symbria and subsidiaries].

38.     Section 5.4(c) of the SPA provides as follows:

Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit the employment or engagement of services of any person who is or was employed as an employee, contractor or consultant by [Symbria] during such period on a full- or part-time basis.

39.     Section 5.4(e) of the SPA provides as follows:

(e)     Sellers acknowledge that the restrictions contained in this Section 5.4 are reasonable and necessary to protect the legitimate interests of the ESOP Trustee and the ESOP Trust and constitute a material inducement to the ESOP Trustee to enter into this Agreement and consummate the Transaction. Sellers  acknowledge that any violation of this Section 5.4 will result in irreparable injury to the ESOP Trustee and agrees that ESOP Trustee shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as  an equitable  accounting  of  all earnings,  profits  and  other  benefits arising from  any violation of this Section 5.4, which rights shall be cumulative and in addition to any other rights or remedies to which the ESOP Trustee may be entitled. Without limiting the generality of the foregoing, with respect to each Seller, the Noncompetition Period shall be extended for an additional period equal to any period during which such Seller is in breach of its obligations under this Section 5.4.

40.     Section 5.4(f) of the SPA provides as follows:

In the event that any covenant contained in this Section 5.4 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Laws in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or

service, or other limitations permitted by applicable Laws. The covenants contained in this Section 5.4 and each provision thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

41.     UMHS desires to undermine Symbria by seeking legal recognition of what it alleges to be its right to solicit Symbria's and its subsidiaries' clients, prospective clients, and employees. On December 31, 2019, UMHS filed a Complaint for Declaratory Judgment against Symbria in the Circuit Court of Cook County, Illinois. In that action, UMHS sought and obtained in the trial court a declaratory judgment declaring that both of the non-solicitation covenants in the SPA be limited to the state of Illinois. The Illinois Appellate Court later reversed that judgment.

42.     In early 2020, Symbria endeavored to refinance its debt with its senior lender. Symbria was unable to repay its senior debt by the scheduled April 2020 pay-off date, in significant part because of the competition and solicitations by UMHS and the MedRehab Entities. Symbria's senior lender requested Symbria obtain the consents to and acknowledgements of the refinancing from all of the former owners who sold their interests under the SPA and who now hold subordinated notes. All of those former owners who are now subordinated debt holders consented except for UMHS. As a result, Symbria's senior lender declined to refinance the senior debt as tentatively agreed between it and Symbria.

### Callen's Employment by Symbria Rehab and His Agreements with Symbria Concerning Confidential Information

43.     Callen became employed by Symbria Rehab in 1999 as its President.

44.     On October 31, 2015, the same date as the closing of the SPA, Symbria and Callen entered into an Employment Agreement pursuant to which Callen was employed as

President of Symbria Rehab. Callen's initial base salary at that time was ██████ per year. He was also eligible to receive significant bonus compensation. A true and correct copy of Callen's Employment Agreement is attached hereto as Exhibit 2.

45.     In his Employment Agreement, Callen covenanted to safeguard Symbria Rehab's confidential information and trade secrets. Under the Employment Agreement, Callen (referred to therein as the "Executive") acknowledged the following obligations with respect to Symbria Rehab and its subsidiaries (referred to as "the Company"), including Alliance Connecticut and Alliance HVA:

> 4.1     <u>Confidentiality and Nondisclosure</u>. Executive recognizes that by virtue of his employment with the Company, he will be granted otherwise prohibited access to and exposed to trade secrets and other confidential and proprietary information which is not known to the Company's competitors or within the Company's industry generally, which was developed by the Company over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to the Company. This information *("**Confidential Information**")* includes, but is not limited to, trade secrets, information relating to the Company's production practices and methods of doing business; sales, marketing, and service strategies, programs, and procedures; Business Partners, Prospective Business Partners, Confidential Customers and Prospective Customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and prior project or service histories and patterns; service, product and material costs; pricing structures; bids; responses to requests for proposals; bonus and incentive plans; vendors and sources of supply; financial position and business plans; computer programs (or portions thereof) and databases; research projects; new product and service developments; compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and any other information of the Company, its affiliates, or any of its vendors, Business Partners or Confidential Customers, which the Company informs Executive, or which Executive should know by virtue of his position or the circumstances in which [he] learned it, is to be kept confidential. Confidential Information does not include information that is publicly available or otherwise known in the industry but not as a result of Executive's violation of his obligations under this Agreement.

(Employment Agreement § 4.1) (emphasis in original).

46.     In his Employment Agreement, Callen also undertook not to use, disclose, or permit others to use Symbria Rehab's and its subsidiaries' trade secrets and confidential information:

> (a) Executive will not, at any time during or after his employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of his employment for the benefit of the Company.
> (b) Executive will take all reasonable measures during and after his employment with the Company to (i) protect the Confidential Information from any accidental or unauthorized disclosure, use, copying or transfer; and (ii) ensure that any person or entity working in any capacity for the Company is permitted access to Confidential Information on a strictly "need to know" basis.
> (c) For purposes of section 4.1 of this Agreement, "***Business Partners***" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment contracted with the Company for the Company to provide any product or service on that person or entity's behalf. "***Prospective Business Partners***" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment were solicited by the Company in an effort of which Executive had knowledge not known to the Company's competitors for the purpose of the Company providing any product or service on that person or entity's behalf. "***Confidential Customers***" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment contracted for, was billed for, or received any product or service from the Company. "***Prospective Customers***" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment were solicited by the Company for purposes of rendering services or providing products to that person or entity in an effort of which Executive had knowledge not known to the Company's competitors.

(Employment Agreement § 4.1(a)-(c)) (emphases in original).

47.     In his Employment Agreement, Callen also undertook not to solicit Symbria and Affiliates' employees after a termination of his employment by Symbria Rehab:

> Nonsolicitation of Employees. Executive agrees that, during his employment with the Company and for a period of twenty-four (24) months following the voluntary or involuntary termination of his employment with the Company for any reason (the *"Restricted Period"),* [He] will not, directly or indirectly, hire, employ, engage, or attempt to hire, employ or engage any Company Employee, or otherwise solicit, request, entice, or induce any Company Employee to terminate

his employment or engagement with the Company, for the purpose of (i) engaging in business activities that are competitive with the Company's business activities or (ii) rendering services for any Company Customer similar to the services the Company Employee has provide to the Company at any time during the prior twelve (12) months of the Company Employee's employment with the Company. The term *"**Company Employee**"* means an employee of, or independent contractor engage by, the Company with whom Executive interacted for business purposes at any time during the six (6) month period immediately preceding the termination of Executive's employment with the Company and who was employed or engaged by the Company at any time within the last sixty (60) days of Executive's employment with the Company.

(Employment Agreement § 4.6) (emphases in original).

48.     In the Employment Agreement, Callen also agreed not to solicit Symbria and Affiliates' customers during the same two-year Restricted Period after leaving employment with Symbria Rehab:

Nonsolicitation of Customers. Executive acknowledges the Company's legitimate interest in protecting its customers for a reasonable period of time following the termination of his employment. Accordingly, Executive agrees that during the Restricted Period, []he will not, directly or indirectly, solicit or accept business from, or provide products or services to, any Restricted Customer, where such business, products or services would be competitive with the Company's business, products or services. The term *"**Restricted Customer**"* means (i) a customer of the Company to whom Executive sold, rendered, or provided the Company's products or services at any time during the one (1) year period immediately preceding the termination of his employment; (ii) any entity for which Executive orchestrated, developed, supervised, coordinated or participated in marketing strategy, marketing plans and marketing campaigns; bid submissions; or responses to requests for proposals on behalf of the Company at any time during the one (I) year period immediately preceding the termination of his employment; or (iii) any entity as to which Executive acquired Confidential Information at any time during his employment with the Company.

(Employment Agreement § 4.6) (emphasis in original).

49.     Callen also agreed in his Employment Agreement that a breach of certain of his restrictive covenants would extend the period of time during which those restrictions would continue in force:

Extension for Breach. The Restricted Period for any restriction set forth in sections 4.6, 4.7, 4.8, 4.9 and 4.10 of this Agreement shall be extended by the period of Executive's breach of his obligations under those sections.

(Employment Agreement § 4.11.)

50.     After Callen's employment by Symbria Rehab administratively terminated on January 12, 2017, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ A true and correct copy of Callen's ████████████████████████ is attached hereto as Exhibit 3.

51.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████

52.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

REDACTED VERSION FOR PUBLIC FILING



53.

### The MedRehab Entities

54.     National Provider Identifier (NPI) numbers from the Center for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services are required for healthcare providers to electronically transmit information related to patient healthcare pursuant to the provisions of the Health Insurance Portability and Accountability Act (HIPAA). Without an NPI number, a healthcare provider cannot be reimbursed for healthcare services provided to beneficiaries of Medicare or Medicaid.

55.     On July 13, 2018, MedRehab Alliance registered with the Illinois Secretary of State to do business in Illinois. MedRehab Alliance does not have an NPI number.

56.     On July 13, 2018, IASN was registered with the Illinois Secretary of State to do business in Illinois. IASN does not have an NPI number.

57.     On August 2, 2018, MedRehab Holdings was registered with the Illinois Secretary of State to do business in Illinois. MedRehab Alliance Holdings does not have an NPI number.

REDACTED VERSION FOR PUBLIC FILING

58. On October 26, 2018, MedRehab Wisconsin was registered with the Wisconsin Department of Financial Institutions to do business in Wisconsin. MedRehab Wisconsin does not have an NPI number.

59. On November 27, 2018, Pearl filed updated information with the Illinois Secretary of State. Callen was reported to be its President and Lowe was reported to be its Secretary. Pearl further reported that it now had assumed names of MedRehab at Home and ChicagoMed Home Health. Pearl has its own NPI number, and the authorized official listed with CMS' National Plan & Provider Enumeration System (NPPES) is Lowe, its Vice President.

60. On April 29, 2019, Joint & Neuro was formed in the state of Delaware. On May 13, 2019, Joint & Neuro was registered with the Illinois Secretary of State to do business in Illinois. Joint & Neuro does not have an NPI number.

61. On June 20, 2019, Chicago Rehabilitation Collective LLC, a Delaware limited liability company, was domesticated into Chicago Rehabilitation Collective LLC, an Illinois limited liability company. Chicago Rehabilitation Collective LLC, an Illinois limited liability company, was then renamed Chicago Rehabilitation Collection PLLC on the same day. Chicago Rehab has an NPI number. The addresses associated with that NPI number are 10400 Higgins Road in Rosemont, Illinois and 315 North LaGrange Road in LaGrange Park, Illinois.

62. On August 1, 2019, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Chicago Rehab employees contracted to

REDACTED VERSION FOR PUBLIC FILING

Joint & Neuro include Brad Miller, Tammy Buckley, Amanda Ambrose, Vic Arellano, and Dilmas, all of whom are former employees of Symbria and Affiliates. Chicago Rehab acts as an agent for Joint & Neuro through ████████████████████.

63.     On August 1, 2019, █████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████.

64.     On August 5, 2019, Joint & Neuro Chicago was formed in the state of Delaware. On October 18, 2019, Joint & Neuro Chicago was registered with the Illinois Secretary of State to do business in Illinois.

65.     On August 19, 2019, MedRehab Interstate was registered with the Illinois Secretary of State to do business in Illinois. MedRehab Interstate does not have an NPI number.

66.     On October 25, 2019, MedRehab Interstate filed a Form D Notice of Offering of Exempt Securities with the United States Securities and Exchange Commission. MedRehab Interstate stated that Callen was its officer and director and that Lowe was one of its directors.

67.     On October 29, 2019, MedRehab Therapy was formed as an Illinois limited liability company through the Illinois Secretary of State. MedRehab Therapy does not have an NPI number.

68.     The following diagram depicts the relationships between and among Callen, UMHS, and the MedRehab Entities:



69.     The MedRehab Entities compete with Symbria and Affiliates in the business of providing clinical health services for senior living and post-acute care providers and home health services, including physical therapy, occupational therapy, speech and language pathology, respiratory therapy, and wellness programs. The MedRehab Entities are operating and competing with Symbria in multiple states, including Illinois, Pennsylvania, New Jersey, Connecticut, Wisconsin, and ▮▮▮.

REDACTED VERSION FOR PUBLIC FILING

**Symbria and Affiliates' Ongoing Development of Valuable
Confidential and Copyright-Protected Information Relating to Clinical
Best Practices, Clients, and Billing and Reimbursements**

70.     Symbria and Affiliates have generated a large library of documents to use in their

business as providers of therapy services and related training to their clients who manage post-

acute care facilities and home health and wellness services. These documents include: (1) clinical

best practices, known as clinical pathways, and disease management models, in text form and in

slide presentations; (2) client-specific information, including client contact and resource

information and financial metrics relating to therapy services provided to residents and patients

of Symbria and Affiliates' clients; (3) patient care checklists and related forms; (4) materials

relating to strategies for seeking reimbursement from Medicare and private insurers and for

negotiating disputes with Medicare and private insurers; (5) forms used by clients' nursing staff

to clinically evaluate patients for therapy services and to generate referrals for therapy; (6)

documentation used for accreditation and licensing purposes; (7) documentation used for

purposes of compliance with government, accreditation body, and other regulations and

requirements; (8) company policies and procedures; and (9) formulas for measuring and

evaluating financial performance of Symbria and Affiliates and their clients with respect to

therapy services.

71.     Symbria and Affiliates have developed their document library over many years

and at great expense. It would take a new competitor in the same industry beginning as a start-up

considerable time and expense to even begin to build a document library equivalent to Symbria's

document library.

REDACTED VERSION FOR PUBLIC FILING

**The New "Patient-Driven Payment Model" of**
**Reimbursing Healthcare Providers for Care Provided Under Medicare and Medicaid**

72.     Medicare reimbursement, among other programs, includes Part A, which applies to provider reimbursements for hospital stays, hospice, and home health care, and Part B, which applies to provider reimbursements for outpatient care. In May 2017, CMS announced a new reimbursement model initially called the Resident Classification System I (RCS-I). In July 2018, after some modifications to RCS-I, CMS finalized a new case-mix classification model, renamed the Patient-Driven Payment Model ("PDPM"), that, effective beginning October 1, 2019, would be used under its Skilled Nursing Facility (SNF) Prospective Payment System (PPS) for classifying SNF patients in a covered Medicare Part A hospital stay. PDPM was a major change in how CMS would approve reimbursements to Symbria Rehab's clients for the patients treated by Symbria Rehab clinicians at client facilities, as well as other such facilities and Symbria Rehab's competitors. Before CMS' implementation of PDPM, Symbria and its competitors developed pricing by similar methods because reimbursements were primarily set by the amount of therapy a patient received. PDPM allows for a broader determination of reimbursement based on patients' clinical characteristics rather than the amount of therapy provided. PDPM allows Symbria's clients to receive higher reimbursements for more complex patients. Before October 1, 2019, when CMS implemented PDPM, there was only very limited marketplace data in Symbria and Affiliates' industry concerning pricing that would be offered to senior living and post-acute care facilities for providing rehabilitation services to their residents.

73.     Symbria and Affiliates' derive a competitive advantage from their data analytics and customized reporting to clients. In the fall of 2018, Symbria, Symbria Rehab, and Symbria Rehab's subsidiaries began to undertake a major effort to analyze CMS' PDPM guidance so that Symbria and Affiliates could treat patients in a way that was consistent with patients' total

clinical needs and most efficient and profitable under the PDPM regulations. Through analysis of aggregate patient data, Symbria and Affiliates are able to devise better care plans for its clients' patients that are not focused on the amount of therapy provided. When Symbria's and Affiliates' clients obtain higher reimbursements from CMS or the various states for Medicare and Medicaid patients, Symbria and Affiliates do as well, aligning their economic incentives with those of their clients. Symbria and Affiliates' analysis and the related body of work that memorializes it are confidential and proprietary and were derived from significant expenditures by Symbria and Affiliates of money and the efforts of their employees.

74.     As part of its preparation for the implementation of PDPM, Symbria Rehab entered into agreements with Symbria Rehab's clients called Patient Driven Payment Model Analytics Program Participant Enrollment and License Agreements ("PDPM Analytics License Agreements"). In Symbria's PDPM Analytics Program, clients provide their patients' healthcare data to Symbria, including case mix groups used by CMS to determine how much it pays facilities for days patients spend in skilled nursing facilities. Symbria's analysis includes proprietary metrics that on information and belief are not used by competitors in its industry. Symbria collects and analyzes historical aggregated patient data to apply program-specific value-added processing, which includes comparisons of data under the PPS RUGs system and the PDPM system, and licenses the Symbria-wide program data from all participating client facilities and derivative works to the clients for their use in their facilities. Symbria provides clients with blind benchmarking data to compare their performance against historical data acquired from all participating Symbria Rehab clients. Clients acknowledge in the PDPM Analytics License Agreements that the PDPM Analytics Program gives them access to confidential trade secret

REDACTED VERSION FOR PUBLIC FILING

information that is for their use only, and clients undertake to protect that information from disclosure to others.

75.     Beginning in February 2018, Symbria's Senior Director of Data Analytics built a software program to compare the reimbursement a Symbria client would receive under the old PPS system against reimbursement under the coming PDPM system. The PDPM Analysis Software is a custom-built, proprietary, and confidential software program. There is no program like it available on the open market.

76.     CMS published the rules for PDPM in paragraph form. Symbria executives designed the PDPM Analysis Software to apply the PDPM rules to historical data from Symbria Rehab clients to help them understand how they would be reimbursed under the PDPM system for the same patients. Symbria inputted historical patient data from the clients of Symbria Rehab and its subsidiaries into the PDPM Analysis Software program, which then applied the rules of PDPM and output the level of reimbursement for those same patients. Symbria Rehab and its subsidiaries collected historical data from clients, generally for a year or a year and a half, but in some cases up to ten years. The historical data collected was unique to Symbria Rehab clients and based on actual patient information. The data included demographics, length of stay, clinical categories, diagnoses, PPS billing details, and PDPM billing details. The data was transferred to Symbria through a secure file transfer protocol and Symbria anonymized the data to protect patient confidentiality.

77.     Using the PDPM Analysis Software, Symbria produced reports that allowed clients to see estimates of reimbursements under PDPM compared to their historical PPS reimbursements. The side-by-side comparison of reimbursements under both systems helped Symbria Rehab's and their subsidiaries' clients understand the new PDPM system and how it

applied to them. The reports produced by the PDPM Analysis Software are sophisticated and in-depth. Users are presented with a dashboard that shows high-level, side-by-side totals of PPS versus PDPM reimbursements for their facility. For clients with multiple facilities, they can view the numbers across all sites, or filter by a particular facility. Users can then drill down into the data and look at payments by component—physical therapy, occupational therapy, or speech and language pathology—and clinical category (such as cancer or cardiovascular). Within the clinical categories, a user can examine subcategories, such as particular types of cancer. Beyond that, users can look at the data of individual patients on an anonymized basis.

78.     Symbria's analytical reports also provide data on the percentage of patients with depression, clinical categories of patients receiving physical or occupational therapy, and information on claims returned to the client by CMS for incorrect bill coding. All of these are factors in maximizing reimbursements.

79.     After creating the initial reports, Symbria has designed and produced regular reports with updated data to Symbria Rehab clients to help them understand trends and to maximize their reimbursements under PDPM.

80.     In the summer of 2019, CMS published its own beta software that performed similar functions to Symbria's PDPM Analysis Software. However, the CMS beta software did not have the same level of sophistication as Symbria's PDPM Analysis Software. It could only be used by a software developer and would only show the PDPM case-mix groups for one patient at a time rather than an entire patient population. CMS' beta software also cannot provide the same granular analysis or information to Symbria and Affiliates' clients without significant modifications. The CMS beta software did not allow Symbria and Affiliates' clients to view the data in the aggregate or filter it with the same detail – whether by clinical category or down to

the level of a particular patient. The reports from the PDPM Analysis Software allowed Symbria and Affiliates' clients more flexibility in understanding the data in a detailed manner without the need of a software developer. Thus, Symbria's program gives it a competitive advantage over its competitors using the CMS beta software.

81.     In order to be consistent with the rest of its industry, Symbria transitioned to the CMS software at Symbria for obtaining the PDPM case-mix groups. Symbria utilized the core engine of the PDPM Analysis Software, the code that analyzes a patient's information and determines the case-mix group, and replaced it with the CMS beta software. However, the CMS beta software could only process a single patient's data at a time. Symbria wrote additional computer code to enhance the CMS product, which allowed Symbria to create more sophisticated reports for clients similar to the reports from the original PDPM Analysis Software. The additional code surrounding the CMS beta software is unique, proprietary, and confidential.

82.     An important difference between PPS and PDPM is that PDPM reimburses providers regardless of the amount of therapy provided because it is based on a patient's diagnoses. Thus, there could be an incentive to undertreat patients under PDPM. To make sure that Symbria and Affiliates provided the same levels of treatment to patients, Symbria's Clinical Care Team developed clinical pathways (labeled "Care Guides") based on the historical data of Symbria Rehab and its subsidiaries. Symbria used years of its data to create reports to help determine how it wanted to treat patients for best outcomes under the new PDPM rules. The data shows how Symbria and Affiliates treated patients with certain conditions historically. Symbria analyzed the amount of therapy historically provided to its clients' residents and developed the amount of therapy that was required to give patients the optimal level of care.

REDACTED VERSION FOR PUBLIC FILING

83.     Symbria's output reporting from the data analytics program is unique and highly confidential. The analyses and reports are proprietary and economically valuable. They contain confidential information obtained directly from Symbria Rehab's clients, including individual patient data, and are based on Symbria's proprietary modeling of that data. This modeling and the reports aid clients in determining clinical pathways, group and concurrent therapy mixes, pricing, reimbursements, and general PDPM coding readiness. The reports are proprietary, as are the result of a unique, custom-built program for Symbria.

84.     At the time when Callen left the employment of Symbria Rehab, PDPM did not exist, and therefore he had no knowledge of Symbria's PDPM Analysis Software program or lawful access to the information and analysis later developed by Symbria and Affiliates to profitably implement the PDPM reimbursement methodology. On information and belief, Dilmas and Irvine became conduits for Callen and all the entities with which Callen is affiliated to acquire and use that new confidential information that was developed after Callen's departure from Symbria Rehab.

**Symbria and Affiliates' Policies Concerning Confidentiality of Information**

85.     Symbria Rehab has a practice of requiring all therapists and managers to sign confidentiality agreements.

86.     Symbria Rehab has a practice of requiring all employees to agree to the Symbria Rehab Employee Handbook.

87.     In 2004, the Symbria Rehab Employee Handbook provided in pertinent part as follows with respect to company business and Symbria's trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary:

*Company Business*

Information obtained and documents produced during your employment with us are the property of [Symbria] Rehab. You may not remove documents from the premises, either physically or by transmission on the Internet or any on-line network, without authorization.

After you leave [Symbria] Rehab, you may not in any way use information that you obtained while working for us.

Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists or other confidential information. You are expected to return all confidential documents and materials to your supervisor upon your separation of employment, for any reason.

The 2004 Symbria Rehab Employee Handbook contained a letter signed by Callen stating that the Handbook reflected "our expectations of one another."

88.     On December 19, 2006, Symbria Rehab published and distributed a new Employee Handbook.  The December 2006 Symbria Rehab Employee Handbook provided the same with respect to confidential information as the Employee Handbook did in 2004. The May 2011 Handbook again contained a letter signed by Callen stating that the Handbook reflected "our expectations of one another." This version of the Handbook was in effect in February 2007.

89.     In May 2011, Symbria Rehab published and distributed a new Employee Handbook.  The May 2011 Symbria Rehab Employee Handbook provided the same with respect to confidential information as the Employee Handbook did in 2004 and 2007. The May 2011 Handbook again contained a letter signed by Callen stating that the Handbook reflected "our expectations of one another."

90.     On October 31, 2013, Symbria Rehab had an Employee Handbook concerning employment practices. The Employee Handbook contained a letter to employees signed by Callen in the front. Callen stated on behalf of Symbria Rehab: "This handbook presents the policies and procedures, which constitute the nature of our business relationship and our expectations of one another."

REDACTED VERSION FOR PUBLIC FILING

91.    On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to computer hardware and software and proprietary information:

> The company may provide computer hardware, software, and an access code for authorized use to conduct [Symbria Rehab] business. All computer hardware, software, data files and applications belong to the company and may be accessed only by authorized personnel. Any information created, transmitted or stored on a computer system is company property. You should not expect that any information on an [Symbria Rehab] or a client's computer system would be considered private.

92.    On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to confidentiality:

> Your employment with [Symbria Rehab] assumes an obligation to maintain confidentiality, even after you leave.

> Any violation of confidentiality may seriously injure [Symbria Rehab's] reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for [Symbria Rehab]. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

93.    On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to company business and Symbria's trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary:

> **Company Business**
> Information obtained and documents produced during your employment with us are the property of [Symbria Rehab]. You may not remove documents from the premises, either physically or by transmission on the Internet or any on-line network, without authorization.

> After you leave [Symbria Rehab], you may not in any way use information that you obtained while working for us.

> Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists or other confidential information. You are expected to return all confidential documents and materials to your supervisor upon your separation of employment, for any reason.

94.     As part of the Employee Handbook, Symbria Rehab had an E-Mail/Electronic Media Services Policy applicable to all employees. That policy provided at all relevant times in relevant part as follows:

> Employees are prohibited from sending e-mail or otherwise using the [Symbria] electronic communication system and electronic media services in connection with any of the following activities:
>
> - Any purpose that is illegal or contrary to [Symbria's] policies or business interests;
>
> - Engaging in illegal, fraudulent or malicious activities;
>
>   * * *
>
> - Intentionally or negligently disclosing confidential company information or knowledge about the company not intended for public disclosure without specific written authority from the company;
>
>   * * *
>
> - Attempting to test, circumvent or defeat security or auditing systems, without prior authorization….
>
> Employees using the e-mail or electronic media system for defamatory, illegal, or fraudulent purposes and employees who break into unauthorized areas of [Symbria's] computer system will also be subject to civil liability and criminal prosecution.

95.     On September 22, 2016 and on October 3, 2016, the Symbria Rehab Employee Handbook provided as follows with respect to confidentiality:

> Your employment with [Symbria] Rehab assumes an obligation to maintain confidentiality, even after you leave. This responsibility is shared by every person employed in any capacity within the company. Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists, or other confidential information.
>
> * * *
>
> Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the

premises, either physically or by transmission on the internet or any on-line network, without authorization….

Any violation of confidentiality may seriously injure the company's reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for the company. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

Upon separation of services with the company, employees must return all confidential documents and materials to management and may not in any way use information obtained while working for us.

96.    Symbria and Symbria Rehab have a company policy concerning HIPAA and General Confidentiality. The version of the policy implemented in early 2019 and applicable to all employees instructs employees as follows: "Do not make any unauthorized transmissions, inquiries, modifications, or purging of data in the system. Such unauthorized transmissions include, but are not limited to, removing and/or transferring data from the company's computer systems to unauthorized locations, e.g. home."

97.    Symbria and Symbria Rehab have a company policy concerning E-Mail, Internet, and Electronic Media Services. The version of that policy implemented in early 2019 as well as the previous version of that policy, applicable to all employees, instructs employees as follows: "Employees are prohibited from sending e-mail or otherwise using the Symbria electronic communication system and electronic media services in connection with any of the following activities: [1] Any purpose that is illegal or contrary to Symbria's policies or business interests."

98.    Symbria and Symbria Rehab have a company policy concerning Information Access Management - Access Establishment and Modification. The version of that policy implemented in October 2018 applicable to all employees instructs employees that "Workforce members must not store sensitive information (including system Passwords) on their home or mobile computers or other devices when accessing remotely."

99.     During the same time period, Symbria's Employee Handbook provided as follows:

> Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the premises, either physically or by transmission on the internet or any on-line network, without authorization.

100.    On March 27, 2019, the Symbria Rehab Employee Handbook provided as follows with respect to Company Confidentiality and Company Business:

> Our clients and other parties with whom we do business entrust the company with important information relating to their businesses. It is our policy that all information considered confidential will not be disclosed to external parties or to employees without a "need to know."

> Your employment with Symbria assumes an obligation to maintain confidentiality, even after you leave. This responsibility is shared by every person employed in any capacity within the company. Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists, or other confidential information.

> ***

> Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the premises, either physically or by transmission on the internet or any on-line network, without authorization….

> Any violation of confidentiality may seriously injure the company's reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for the company….

> Upon separation of services with the company, employees must return all confidential documents and materials to management and may not in any way use information obtained while working for us.

**Irvine's Employment by Symbria Rehab and Irvine's Theft of Trade Secrets, Copyright-Protected Information, and Other Confidential Information**

101.    Christine M. Irvine ("Irvine"), formerly known as Christine M. Lanciloti, was employed by Symbria Rehab starting in August 2004, when she was hired as an Exercise

REDACTED VERSION FOR PUBLIC FILING

Physiologist. She was promoted to Rehab and Wellness Manager in January 2007, to Client Relations Liaison in May 2011, and promoted again to Area Director on October 3, 2016. As Area Director, Irvine reported directly to Dilmas. Irvine's last day of employment by Symbria Rehab was February 22, 2019. Irvine was formerly a defendant in this action until Plaintiffs dismissed her from the case pursuant to settlement.

102. On or about January 9, 2019, Irvine began an ongoing campaign of misappropriating Symbria and Affiliates' trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary. Irvine accomplished this effort by forwarding materials containing trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary from her symbria.com email address, provided to her in connection with her employment as an Area Director of Symbria Rehab, to her personal email address. Irvine did so without authorization and in violation of Symbria and Symbria Rehab policies and the terms and conditions of her employment. On information and belief, by this time, Irvine was planning to leave her job at Symbria Rehab and to go to work for Plymouth Place and to perform services for one or more of the MedRehab Entities.

103. On January 9, 2019, Amanda Ambrose, a long-time Executive Assistant at Symbria Rehab in Illinois, emailed to Irvine Symbria Rehab's PDPM Client Presentation slides, which contained detailed information developed by Symbria Rehab for its clients' confidential use. Ambrose's email was not part of a regular internal distribution at Symbria Rehab, but rather was sent only to Irvine, with her entire cover email reading, "See attached." Irvine was not only Dilmas' subordinate reporting directly to Dilmas at Symbria Rehab but also had a personal relationship with him and was his "significant other."

REDACTED VERSION FOR PUBLIC FILING

104.     Three hours later, Irvine forwarded the email she had received from Ambrose together with Symbria's copyrighted Understanding the Patient Driven Payment Model presentation slides in Microsoft PowerPoint format that Ambrose had attached to her email to a personal email address, christine.lanciloti@gmail.com.

105.     Later that same evening, Irvine forwarded Ambrose's email and attached Symbria's "Understanding the Patient Driven Payment Model" presentation slides to Dilmas.

106.     Plymouth Place in LaGrange Park, Illinois is a senior living facility and client of Symbria's subsidiary Symbria Rx Services, LLC for pharmacy services. Plymouth Place was also a prospective client of Symbria Rehab's for rehabilitation services and for wellness services. In January 2019, a wholly-owned subsidiary of Plymouth Place purchased minority interests in two of the MedRehab Entities, Joint & Neuro and IASN. MedRehab Alliance owned 70 percent of each entity, and was in the process of offering minority ownership stakes to other senior living facilities.

107.     On January 25, 2019, Irvine gave notice of her resignation from Symbria Rehab. On February 8, 2019, Dilmas sent an email to Symbria Rehab clients announcing that Irvine was resigning to pursue a new opportunity. Irvine resigned effective February 22, 2019. Irvine's new work location was at Plymouth Place. At Plymouth Place, Irvine has the title of Senior Director of Rehab and Wellness.

108.     Between the time that Irvine announced her resignation from Symbria Rehab on January 25, 2019 and her last day of employment on February 22, 2019, Irvine forwarded over 140 emails with attached hundreds of files from her symbria.com email address to her personal email account. On her last two days of employment alone, Irvine forwarded approximately 100 emails to her personal email address. Many of these emails contained multiple attachments.

REDACTED VERSION FOR PUBLIC FILING

Irvine forwarded to herself confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary Symbria information, including financial statements and performance metrics; clinical guidance concerning best practices accumulated by Symbria managers and therapists; checklists and forms reflecting Symbria's best clinical practices; Symbria's internal strategies for negotiating with Medicare and private insurers concerning alternate dispute resolution for reimbursements and billing and payment audits; training materials designed for Symbria therapists, managers and clients; screening tools designed to promote therapy referrals from clients' nursing staffs; Symbria's policy and procedure manuals regarding therapy and business matters; materials related to obtaining periodic accreditation from various accrediting bodies; detailed materials regarding Symbria's work obtaining licensure for an outpatient therapy clinic for one of its clients located in Illinois; and detailed information regarding Symbria's respiratory therapy program. In short, Irvine absconded with a cornucopia of data, tools, and information that a new competitor would need to get a new business competing with Symbria instantly up and running. Irvine's new employer has an equity interest in precisely such a business – MedRehab Alliance – a company also owned by UMHS and Callen. Furthermore, Callen has stated that "we hired her for Plymouth Place."

109. On information and belief, while Irvine was still employed by Symbria, Callen informed Irvine that he and the MedRehab Entities were soliciting Symbria clients and prospective clients and soliciting Symbria employees and directed Irvine not to inform Symbria, and Irvine did not inform Symbria, undermining Symbria's interests.

110. Among the documents that Irvine emailed to herself in violation of Symbria and Symbria Rehab company policies and/or her implied duty of good faith and fair dealing are the following:

REDACTED VERSION FOR PUBLIC FILING

(a)     Symbria's "Understanding the Patient-Driven Payment Model" slide presentation, marked "© 2019 Symbria, Inc.";

(b)     Symbria Rehab's clinical pathways for therapists for multiple categories of diseases;

(c)     documents containing client-specific information regarding patient censuses and diagnoses, detailed client contact information, and information concerning where to find resources in client facilities;

(d)     Excel spreadsheets designed by Symbria for use in connection with client facilities containing formulas for measuring data and metrics for patient characteristics and outcomes, and financial performance, and often containing detailed historical data from clients' facilities;

(e)     the weekly Illinois Operational Variance Report for Symbria Rehab's clients in Illinois, containing detailed performance metrics for the first five weeks of 2019 and an Excel template with formulas for tracking an entire year;

(f)     a top-level summary of Symbria and Affiliates' historical number of cases by PDPM diagnostic category;

(g)     a list of Symbria Rehab's Illinois clients, the number of potential residents at each facility, and estimated weekly units based on historical data;

(h)     documents relating to dispute resolution with Medicare and other payers and Symbria Rehab's strategies and methods for handling such disputes;

(i)     slide presentations made for Symbria and Affiliates' internal use to train therapists on patients having various clinical diagnoses and problems, typically marked "© Symbria, Inc." with an accompanying year;

(j)     forms, checklists, and processes used by Symbria and Affiliates' Program Managers in client facilities;

(k)     portions of Symbria Rehab's policies and procedures manual;

(l)     a lengthy "Outpatient Therapy Policies and Procedures Manual" for Symbria Rehab's first outpatient clinic, being established for Symbria Rehab's client North Shore Senior Center, containing a legend beginning, "THE CONTENTS OF THIS PUBLICATION ARE CONFIDENTIAL AND PROPRIETARY" and containing a roadmap to the establishment of an outpatient therapy clinic;

(m)     outcomes data for patients at the North Shore Senior Center outpatient clinic;

REDACTED VERSION FOR PUBLIC FILING

(n)     a list of all of Symbria Rehab's therapists in Illinois who float from facility to facility with their personal contact information, the discipline they practice in, the state they are licensed in, and the facility they were based at;

(o)     a list of Symbria Rehab's Program Managers at all Illinois client facilities;

(p)     internal training materials used for compliance, accreditation, patient documentation, and clinical care issues;

(q)     Symbria Rehab's Disease Management Models for eight categories of disease used to train Symbria and Affiliates' therapists, and corresponding slide presentations for each disease category, all marked "© 2017 Symbria Rehab, Inc. Confidential and proprietary";

(r)     Symbria Rehab's "Survey Readiness: Guidance for the New Survey Process" used internally to train Program Managers;

(s)     Symbria Rehab's Respiratory Therapy Program Manual and Respiratory Therapy Competencies; and

(t)     Symbria Rehab's Senior FITness™ Program Manager's Resource Training Manual for training Program Manager's in the wellness business line.

111.    Irvine continues to be employed by Plymouth Place. On information and belief, in connection with that employment, Irvine provides services for the operating companies among the MedRehab Entities, specifically MedRehab Alliance, Joint & Neuro, Joint & Neuro Chicago, MedRehab Wisconsin, MedRehab Interstate, Pearl, and Chicago Rehab.

112.    Nearly all of the emails that Irvine forwarded from her Symbria email account to her personal email account contain information Symbria and Affiliates treated as confidential or is protected under copyright laws. On information and belief, each time when Irvine misappropriated confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary information of Symbria and Affiliates, she acted as agent for UMHS, MedRehab Alliance, IASN, MedRehab Holdings, and MedRehab Wisconsin. After April 29, 2019, on information and belief Irvine also acted as agent for Chicago Rehab and for Joint & Neuro. After August 5, 2019, on information and belief, Irvine also acted as agent for Joint &

Neuro Chicago. After August 19, 2019, on information and belief Irvine also acted as agent for MedRehab Interstate. On information and belief, Irvine disclosed some or all of the confidential information and copyright-protected materials of Symbria and Affiliates to Dilmas, Callen, UMHS, and the MedRehab Entities. On information and belief, Irvine, Dilmas, Callen, UMHS, and the MedRehab Entities were acting in concert in furtherance of a scheme to use Symbria's confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary information and to solicit and compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his ███████████ and his fiduciary obligations, Dilmas' confidentiality and other obligations in his employment contract and his fiduciary obligations, and Irvine's confidentiality and other obligations in her employment contract and her fiduciary obligations. The conduct of those persons and entities also violated the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act.

### Dilmas' Employment by Symbria Rehab and
### Dilmas' Theft of Trade Secrets and Other Confidential, Proprietary Information

113.    In October 2013, Symbria Rehab hired Dilmas as an employee at will.

114.    In September, 2016, Symbria Rehab promoted to Dilmas to the at-will employment position of Regional Director of Operations by Symbria Rehab.

115.    As Regional Director of Operations at Symbria Rehab, Dilmas was responsible for overseeing and managing the daily operations and fiscal performance of Symbria Rehab within his assigned region, the Chicago metropolitan area. Dilmas was involved in creating PDPM Site Data Workbooks, spreadsheets containing detailed data relating to each client's performance under PPS, projections for performance under PDPM, and recommended internal

pricing strategies and options, for each of the client facilities he was responsible for as Regional Director of Operations.

116.   On or about February 12, 2019, Dilmas began an ongoing campaign of misappropriating Symbria and Affiliates' trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary. Dilmas accomplished this effort by forwarding trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary from his Symbria.com email address, provided to him in connection with his employment as a manager of Symbria Rehab, to his personal email address. Dilmas did so without authorization and in violation of Symbria and Symbria Rehab policies and/or his implied duty of good faith and fair dealing. On information and belief, by this time, Dilmas was planning to leave his job at Symbria Rehab and to go to work for Callen and one or more of the MedRehab Entities.

117.   On February 12, 2019, Dilmas sent three internal and confidential Symbria documents to a personal email account controlled by him. These included a memo concerning "Selection of Alternate Modes of Therapy Service Delivery," a Fall 2017 Symbria Rehab "Modes of Therapy Training Module," and a Symbria Rehab Group Recommendation Assessment form. The memo concerning Selection of Alternate Modes of Therapy Service Delivery provided detailed guidance concerning therapists incorporating alternate modes of therapy and combining patients with specialized needs to gain labor efficiencies and offered solutions to barriers to offering group and concurrent treatment. The Modes of Therapy Training Module was designed for Symbria Rehab managers and therapists to become familiar with PDPM planning rules including the criteria for group, concurrent or individual treatment and the

acceptance of minutes billed. The assessment form was designed for Symbria Rehab therapists to implement the guidance set forth in the other two documents.

118.    On March 20, 2019, Symbria Rehab's Vice President of Clinical Operations sent Dilmas an email with the subject, "PDPM Preparedness – Tip #6." This email was sent to Symbria Rehab's clients pursuant to the confidentiality agreements contained in Rehabilitation Service Agreements provided guidance on "Understanding the Administrative Presumption of Coverage in a Skilled Nursing Facility under PDPM." This document summarized, in an easy-to-read format as compared to CMS literature, the rules for Administrative Presumption of Coverage. This email was marked "© 2019 Symbria, Inc." That same evening, Dilmas forwarded this email to his personal email account.

119.    On March 22, 2019, Dilmas sent to Symbria Rehab's Vice President of Clinical Operations and to Brad Miller, then Symbria Rehab's Vice President of Rehab Operations, an email concerning Illinois market data. Miller had succeeded to Callen's responsibilities for Symbria Rehab after Callen's termination. In his email, Dilmas wrote to Miller and the other Symbria Rehab executive about the impact of the loss of one Symbria Rehab client and the addition of a new Symbria Rehab client. Attached to this email was a detailed spreadsheet analyzing for the state of Illinois market Symbria Rehab's Medicare Part A revenue, Medicare Part B revenue, total revenue, total cost, profit, margin, cost per minute, productivity, efficiency, revenue per minute, Medicare Part B visits per resident, Medicare Part B units per visit, Medicare Part A days, Medicare Part A length of service, labor costs broken down by type of therapy (occupational, physical, and speech), and level of employee providing the service. The data included Symbria Rehab's performance in Illinois as a whole, as well as with and without the lost and new clients. Later that day, Dilmas forwarded the email he has sent to Miller and the

attached spreadsheet to his personal email account. The same day, Dilmas forwarded this email and attachment to Irvine at her personal email address.

120.    On March 26, 2019, Dilmas emailed from his Symbria.com email address a memo concerning the transition of the new Symbria Rehab client referenced in Dilmas' March 22, 2019, email to his personal email account. The memo contained a plan and timetable for the new client to start with Symbria Rehab by September 1, 2019. This document was a template on how to effectively start a new rehabilitation client developed by Symbria Rehab.

121.    On April 12, 2019, Dilmas sent Miller an email along with an attached spreadsheet concerning the financial performance of Symbria Rehab for 2019 for the year to date and an attached PDF file also concerning Symbria Rehab's financial performance. The spreadsheet contained information concerning Symbria Rehab's revenues by segment, profits, productivity, and efficiency, with details such as revenue per minute, Medicare Part A days and length of stay, and labor costs by category of therapy provided. Dilmas also attached to the email a report entitled "Contribution Margin Trend Report – Summary" for each of Symbria Rehab's clients' facilities in Illinois. For each Symbria Rehab client, the report showed gross revenues by category, direct costs by category, gross profits, and as to therapy services, total minutes, revenue per minute, cost per minute, and profit per minute. The PDF file summarized Symbria Rehab's performance for each of Symbria Rehab's clients' facilities in Illinois. Later that day, Dilmas forwarded his email to Miller and the attachments to his personal email account.

122.    On May 7, 2019 at 10:30 a.m., Dilmas sent an email to Miller with the subject, "4/30/19 Ops call." In Dilmas' email, he discussed Symbria Rehab's performance at two of its clients' facilities in Illinois. Dilmas attached four documents to the email to Miller: a Change of Therapy Review at one client and three recent Key Factor Weekly Reports for the other client.

REDACTED VERSION FOR PUBLIC FILING

The Change of Therapy Review listed patients' names at the client facility, the severity of their cases, units billed and RUGs for coding utilized by CMS, and variances relating to the RUGs. The document contained a legend: "This Report may contain privileged and confidential patient information and must not be disseminated." The Change of Therapy report contained protected health information (PHI) under HIPAA, which Symbria Rehab policy prohibited being removed from the company's computer network. The Key Factor Weekly reports showed RUGs days, ideal minutes of therapy, actual minutes of therapy, efficiency percentages, and average minutes of therapy for Medicare Part A patients at clients' facilities derived from Symbria and Affiliates' operations. For Medicare Part B patients, the reports showed units of therapy and revenue per unit. The reports showed detailed breakdowns of labor hours, productivity, and other revenue. The Key Factor Weekly Reports were generated summaries from Symbria's electronic medical records system. The Key Factor Weekly Reports are specific to particular clients and can be used to derive Symbria and Affiliates' pricing. Later, that day, Dilmas forwarded his email with attachments to his personal email account. Dilmas then used his personal email to forward his email with the four attachments to Irvine at her personal email address. Thirty minutes later, Miller replied to Dilmas, "I will want to revisit at some point in the near future." Minutes later, Dilmas replied, "Absolutely. Let me know." Dilmas then forwarded that email to his personal email.

123.    At about 11:00 a.m. on May 7, 2019, just minutes after forwarding his email and attachments from Miller to his personal email, Dilmas then sent himself five spreadsheets containing more detailed information concerning Symbria Rehab's financial performance. The first contained detailed data regarding revenues, profits, productivity, efficiency, revenue per minute, Medicare Part B visits per residents, and units per visit, Medicare Part A days and length

REDACTED VERSION FOR PUBLIC FILING

of stay, and labor costs by category of therapy for Symbria Rehab in Illinois for 2017 and 2018 at a market level, as well as revenues, productivity, revenue per minute and cost per minute at every one of Symbria Rehab's Chicago region clients on a client basis for the same time period. The second spreadsheet analyzed Symbria Rehab's recent performance as impacted by the recent loss of two Illinois clients and the recent gain of another Illinois client and contained similar level of details as the first. The third spreadsheet contained similar data as the first at an Illinois market level for all years from 2014 through 2018. The fourth spreadsheet was a Weekly Margin Operational Variance Report containing detail regarding facility revenues, facility costs, measures of overtime spent by therapists, Medicare Part A RUG distribution data, revenue per minute under Medicare Parts A and B, data regarding timeliness of documentation review, and action plans with respect to facility margin, facility productivity, overtime, RUG distribution, programming, financial metrics, and documentation completion -- for every week in 2018. The fifth spreadsheet was a Weekly Margin Operational Variance Report containing the exact same detail for every week in 2019 from the beginning of the year to the most recent completed week.

124.    On June 24, 2019, a Symbria Rehab administrative employee emailed to Dilmas at his request a .zip file named PDPM Resources containing a vast amount of information developed by Symbria Rehab in preparation for the implementation of PDPM. In the .zip file were 43 voluminous documents prepared by Symbria Rehab concerning PDPM, including 15 resources guides, 20 PDPM Care Guides, Symbria's copyrighted "Understanding the Patient Driven Payment Model slide presentation and other client presentations, and Symbria's copyrighted PDPM Preparedness Tips 1 through 7 that it had prepared and sent to clients. The Care Guides were developed based on years of historical data and experience that Symbria and Affiliates accumulated, including for each clinical diagnostic category established by PDPM, the

historical mix of each therapy discipline in that category for Symbria's clients' patients and the average treatment time per week for each therapy discipline for that type of patient. The Care Guides and other attached documents are marked "Symbria, Inc. – Confidential" on every page. Symbria's investment in developing these proprietary materials took place over a year and a half, involved thousands of senior executive-level hours, including the exclusive time of three Symbria executives for many months, and involved an expense of hundreds of thousands of dollars. That night, Dilmas promptly forwarded the email and attachment to his personal email address.

125.    On July 23, 2019, Dilmas forwarded via email, without comment, the same .zip file that he had misappropriated from Symbria and Affiliates on June 24, 2019 to Irvine. The next day, Irvine then forwarded that same .zip file to Callen at his medrehaballiance.com email address, also without any comment or explanation.

126.    Also on July 23, 2019, Symbria Rehab distributed to its management team its extensive PowerPoint presentation prepared by Symbria Rehab's Clinical Care team for Symbria and Affiliates' managers and therapists entitled "Understanding the Patient Driven Payment Model." This presentation was developed by Symbria's executive and management team as the dedicated resource utilized for training its clients and prospective clients about PDPM, as well as explaining PDPM to Symbria's therapists, program managers, and pharmacists. The document not only summarized PDPM in a clearly-understood format but also provided real examples of the financial impact for various scenarios including pharmacy, which Symbria Rehab's competitors typically lack institutional knowledge about. The presentation also used Symbria's data analytics to provide high-level insights about the impact of implementing PDPM. Dilmas

was one of the recipients of the presentation. The presentation was marked "© 2018 Symbria, Inc." Later that same day, Dilmas forwarded the presentation to his personal email address.

127.    On August 8, 2019, Dilmas emailed other Symbria managers and executives to make recommendations concerning pricing under PDPM to be offered to a Symbria Rehab client. He recommended three different pricing options. His email set forth a proposed negotiating strategy for Symbria Rehab to adopt with that client. Dilmas attached four spreadsheets to his email. The first three were detailed breakdowns for each of the client's three facilities in Illinois, showing each of the three pricing options to be offered to the client, with projections based on CMS' prior PPS payment methodology as well as the new PDPM methodology, and showed details such as minutes of therapy and projected savings to the client under each option. The fourth spreadsheet was an analysis comparing pricing under the new PDPM model to the old PPS model, summarizing PDPM changes by RUG category, average payment by component of service provided, return to provider, physical therapy and occupational therapy clinical categories measured in days, the percentage of patients with depression, and the percentage of patients by speech and language pathology end splits, which impact skilled nursing facility reimbursement based on a patient's criteria. Revenues based on historical data were projected based upon total dollars for both methodologies, number of patient days, and payments per patient days under both PPS and PPM. The fourth spreadsheet contains data that Symbria and Affiliates provided to clients pursuant to confidentiality agreements in PDPM Data Analytics Licensing Agreements. There were detailed worksheets below the summary sheet on the top of the workbook. Dilmas forwarded this email and these attachments to himself five hours later.

128.     Under CMS' new PDPM reimbursement system, concurrent and group therapy (as opposed to individual therapist-to-patient therapy) would now be allowed at full reimbursement rates for Medicare Part A patients, whereas previously these were only allowed at greatly reduced reimbursement rates. Symbria Rehab created a "Concurrent and Group Fact Sheet" for managers and therapists to use in deciding whether to use concurrent or group therapy. The fact sheet was distributed to Program Managers and other Symbria Rehab employees, including Dilmas, Kathleen Rice, and Tammy Buckley, on September 10, 2019. That night, Dilmas forwarded the email and attached fact sheet to his personal email account.

129.     Symbria Rehab's Clinical Team drafted a "Program Manager Tip Sheet for Transition to PDPM" with guidance for the weeks of September 23 and September 30, 2019, and the first week of October. Symbria Rehab's Clinical Team drafted the document to provide guidance for a smooth transition to PDPM. The tip sheet was emailed to Program Managers and other employees, including Dilmas, Rice and Buckley, on September 11, 2019. That afternoon, Dilmas forwarded the email and attached tip sheet to his personal email address.

130.     Symbria's Clinical Team also developed a PowerPoint presentation on its Restorative Nursing Program and guidance for billing for such a program under the PDPM reimbursement methodology. Symbria Rehab distributed the presentation to Regional Mangers, Area Managers, and Program Managers and other employees, including to Dilmas, Rice, and Buckley, on September 17, 2019. Later that day, Dilmas forwarded the email and attached PowerPoint file to his personal email address.

131.     On Friday, September 20, an employee of Symbria emailed to Dilmas "the care guides we discussed yesterday." Attached to the email were 18 Symbria Care Guides. The Care Guides addressed each of the ten diagnostic categories under PDPM and addenda thereto. As

explained in a cover email when the Care Guides were first distributed in July, "correlate[ing] with each of the 10 therapy clinical categories established under PDPM…. [T]hey provide category specific diagnoses, historical treatment time averages, special considerations, standardized assessment recommendations, group recommendations, and much more." Symbria's team of clinical consultants compiled the Care Guides as a set of best practices for each of the ten diagnostic categories under PDPM.

132. The PDPM Care Guides contain and are based on Symbria's historical patient care and financial data and assessments of clinical best practices over years of the company's experience. One guide concerns Section GG Scoring, a new methodology under PDPM, which differed from Section G under PPS, the old CMS reimbursement methodology. Section GG scoring determines a patient's case mix index (CMI), which in turn impacts reimbursement levels from Medicare and Medicaid. The PDPM Care Guides indicate where Symbria believes patients should range based on best practices. The PDPM Care Guides give guidance on billing and reimbursement, inclusion or exclusion from group therapy, and best practices for how to avoid CMS audits and denials. Symbria's PDPM Care Guides also discuss dovetailing and concurrent therapy approaches, which were previously not allowed under the PPS system for Medicare Part B, when therapy had to be conducted on a one-on-one basis. The PDPM Care Guides also provide a crosswalk table translating therapists' professional terminology into the terminology used in CMS' PDPM regulations and guidance. Symbria's Care Guides are a distillation of the collective experience and wisdom of Symbria Rehab's therapists and managers.

133. After receiving the Care Guides, Dilmas promptly forwarded all of these materials to himself at his personal email address on the same day, September 20, 2019.

134.    Each of the emails that Dilmas forwarded to his personal email account contain information Symbria and Affiliates treated as confidential. On information and belief, each time when Dilmas misappropriated the trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary of Symbria and Affiliates, he acted as agent for UMHS, MedRehab Alliance, IASN, MedRehab Holdings, and MedRehab Wisconsin. After April 29, 2019, on information and belief, Dilmas also acted as agent for Chicago Rehab and for Joint & Neuro. After August 5, 2019, on information and belief, Dilmas also acted as agent for Joint & Neuro Chicago. After August 19, 2019, on information and belief, Dilmas also acted as agent for MedRehab Interstate. On information and belief, Dilmas also disclosed the confidential information of Symbria and Affiliates to MedRehab Therapy. On information and belief, Dilmas, Callen, Irvine, UMHS, and the MedRehab Entities were acting in concert in furtherance of a scheme to use Symbria's confidential information and to solicit and compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his ███████████ and his fiduciary obligations, Irvine's confidentiality and other obligations under her employment contract and her fiduciary duties, and Dilmas' confidentiality and other obligations in his employment contract and his fiduciary duties. The conduct of those persons and entities also violated the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act.

135.    On September 24, 2019, Dilmas submitted a letter of resignation to Symbria Rehab. That same day, he forwarded to his personal email address a Program Manager Tip Sheet for Transition to PDPM prepared by Symbria's Clinical Team that was sent to all Regional, Area, and Program Managers the day before.

136.     Shortly after Dilmas resigned from Symbria Rehab, in October 2019, Dilmas reset the smartphone he used while a Symbria Rehab employee to factory settings, which had the result of removing user files from the device, including but not limited to text messages, web browser history, emails from his personal email account, voice messages, telephone call histories, and other information. Dilmas is still in possession of this wiped smartphone.

### Defendants' Use of Symbria and Affiliates' Trade Secrets and Copyrighted Works, Solicitation of Symbria and Affiliates' Clients, Prospective Clients, and Employees, and Competition with Symbria in Illinois

137.     Symbria Rehab and UMHS, in the name of its post-acute care residential facility Wesley Place, entered into a Rehabilitation Services Agreement effective May 31, 2012, pursuant to which Symbria Rehab provides therapy services to residents of UMHS' facility. Symbria Rehab provides physical therapy, occupational therapy, and speech and language pathology therapy to residents of UMHS' facility. Symbria Rehab also provides education and training relating to these services to UMHS' staff. The agreement between Symbria Rehab and UMHS provides in pertinent part as follows:

> 6.1 Confidential Information. Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing, and strategic information, client lists, Resident care and outcomes data ("Confidential Information"). No Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent. Upon termination of this Agreement, all Confidential Information and copies thereof will be returned at the request of the disclosing Party.

138.     Symbria Rehab and United Methodist Homes of New Jersey ("United Methodist Communities" or "UMC") entered into a Rehabilitation Services Agreement effective September 1, 2013, for five senior living facilities operated by UMC in New Jersey. Symbria Rehab agreed to provide occupational therapy, physical therapy, and speech and language therapy to residents of UMC's facilities and UMC agreed to pay rates negotiated between the two companies for

REDACTED VERSION FOR PUBLIC FILING

those services. The fee schedule was based on resource utilization groups ("RUGs") for Medicare Part A inpatient care services utilized for reimbursements by the Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services, a percentage rate for Medicare Part B outpatient and private insured outpatient care services, a per-minute rate for Medicaid Part A services and a percentage rate for Medicaid Part B services, and an hourly rate for consulting services.

139.    The Rehabilitation Services Agreement between Symbria Rehab and UMC provided that:

> Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing, and strategic information, client lists, Resident care and outcomes data ("Confidential Information"). No Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent.

140.    Callen signed the Rehabilitation Services Agreement with UMC on behalf of Symbria Rehab as its President.

141.    Symbria Rehab and Lions Gate entered into a Rehabilitation Services Agreement effective October 1, 2016 for its senior living facilities operated by Lions Gate in New Jersey. Symbria Rehab agreed to provide occupational therapy, physical therapy, and speech and language therapy to residents of Lions Gate's facilities and Lions Gate agreed to pay rates negotiated between the two companies for those services. The fee schedule was based on RUGs for Medicare Part A inpatient care services utilized for reimbursements by the CMS of the United States Department of Health and Human Services, a percentage rate for Medicare Part B outpatient and private insured outpatient care services, and an hourly rate for consulting services.

142.    The Rehabilitation Services Agreement between Symbria Rehab and Lions Gate provided as follows:

> Confidential information. Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing and strategic information, client lists, and Resident care and outcomes data ("Confidential Information"). Neither Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent.

Callen signed the Rehabilitation Services Agreement on behalf of Symbria Rehab as its President.

143.     In November 2018, Symbria's Business Development Director, Rob Watts, left his employment at Symbria. In that position at Symbria, Watts maintained a list of prospective clients and their key contacts for Symbria's sales staff to use in their sales and marketing efforts. Before Watts left Symbria, he ceased maintaining Symbria's prospect list. In January 2019, Watts became Senior Vice President for Business Development at MedRehab Alliance. Watts also performs work for MedRehab Interstate.

144.     By December 13, 2018, long before Callen's customer non-solicitation provision in his Severance Agreement expired, and in contravention of the restrictive covenants in the SPA given to Symbria by UHMS, Callen solicited Symbria client Otterbein Senior Life to join his rehabilitation services company and asked UMHS' president Bill Lowe to provide guidance on questions posed by Otterbein Senior Life about it.

145.     On January 14, 2019, while the Severance Agreement and the non-solicitation covenants contained in them were still in effect, Callen emailed a number of clients of Symbria and Affiliates, both inside Illinois and outside Illinois, to solicit their business. Among Symbria and Affiliates' clients that Callen solicited were UMC, Norwood Crossing, and Management Performance Associates, the company that manages the DeKalb County Rehab & Nursing Center, which is a Symbria Rehab client. Callen solicited these Symbria and Affiliates' clients from his medrehaballiance.com email account, using a "MedRehab Alliance" logo and a

REDACTED VERSION FOR PUBLIC FILING

signature block stating that Callen was President/CEO of MedRehab Alliance, LLC. On each email, Callen copied Sharma of Chicago Rehab.

146.    In the spring of 2019, Symbria became aware that its pharmacy client Plymouth Place was going to terminate its existing contract with another company to provide rehabilitation services for its residents. Symbria made efforts to secure a contract for Symbria Rehab with Plymouth Place to provide rehabilitation services. However, despite the existing pharmacy services relationship between Symbria and Plymouth Place, Plymouth Place subsequently informed Symbria it would not be awarding it a contract to provide rehabilitation services to its residents. On May 1, 2019, Irvine announced a "partnership/joint venture" between Plymouth Place and "MedRehab Alliance" for "MedRehab Alliance" to start providing therapy services to Plymouth Place's residents. According to Irvine and Plymouth Place, "MedRehab Alliance" would provide therapy services on site as well as pain management, clinic integration and outpatient therapy, home health services, and wellness services. Plymouth Place entered into a contract with MedRehab Therapy to provide these services. Subsequently, MedRehab Therapy transferred its contract with Plymouth Place to Joint & Neuro Chicago.

147.    On information and belief, Lowe and/or Callen on behalf of UMHS and the MedRehab Entities, solicited Plymouth Place's rehabilitation and wellness services.

148.    In or around April 2019, ███████████████, MedRehab Wisconsin, and ███████████████ began to solicit Symbria Rehab's client Marquardt Manor in Watertown, Wisconsin. ███████████████████████████████████████████████████ ███████████████████████████████ a slide presentation about MedRehab Interstate that stated that "[t]ime is of the essence due to the impending rollout of PDPM."

149.    On May 3, 2019, Callen emailed UMC's CEO in connection with MedRehab Alliance's efforts to solicit UMC's business away from Symbria. Callen attached a "Rehab Operations Analysis" form for UMC to provide data regarding UMC's operations to Callen, so that Callen could model UMC's projected financial results if UMC terminated its contract with Symbria and instead contracted with one of the MedRehab Entities. The attached file was an Excel spreadsheet containing formulas for performance metrics created at Symbria Rehab by Symbria Rehab employees for Symbria and Affiliates' use in analyzing clients' operations and performance metrics, which Callen or MedRehab Alliance modified slightly and rebranded for their own purposes. Callen also attached a slide presentation about MedRehab Interstate's business model, which included the statement, "[t]ime is of the essence due to the impending rollout of PDPM." The signature block of Callen's cover email showed that Callen was President/CEO of MedRehab Alliance. Callen copied Lowe of UMHS and Sharma of Chicago Rehab on his email. On information and belief, Callen sent this email not only as an agent of MedRehab Alliance, MedRehab Interstate, UMHS, and Chicago Rehab, but also as an agent of the other MedRehab Entities.

150.    On June 10, 2019, Ambrose resigned from Symbria Rehab. Ambrose went to work for Chicago Rehab, Joint & Neuro, Joint & Neuro Chicago, MedRehab Alliance, and MedRehab Interstate. Ambrose was solicited to leave Symbria Rehab by Callen, who was acting as an agent for the MedRehab Entities and UMHS when he did so.

151.    On June 27, 2019, Miller received an email from a Symbria Rehab employee about home health projections under PDGM (a CMS reimbursement model for home healthcare services similar to PDPM) and projected changes for two of Symbria Rehab's clients. Miller then forwarded that email to his personal email address.

152.    In June 2019, Callen emailed the CEO of Duncaster Callen's slide presentation concerning MedRehab Interstate. Callen also attached a "Rehabilitation Operations Analysis" form in Excel format, asking the CEO to complete it with Duncaster data so that Callen could run a "conversion analysis report" showing the ostensible financial impact of Duncaster terminating Symbria and engaging MedRehab Interstate. The attached Excel template contained formulas for analyzing facility data and bore a "MedRehab Alliance" logo, but it was modified from a Symbria Rehab form created by a Symbria Rehab Program Manager. The attached slide presentation stated that "[t]ime is of the essence due to the impending rollout of PDPM. Callen's cover email came from his medrehaballiance.com email address. Callen's email signature block stated that he was the President and CEO of MedRehab Alliance, MedRehab Therapy, and Joint & Neuro.

153.    As a result of the solicitation of Marquardt Manor, Marquardt Manor began telling Symbria Rehab that it was considering an in-house model for providing therapy services with an outside consultant managing therapists, which is the model that the MedRehab Entities promote and use, and is not the model typically used by Symbria Rehab. Marquardt Manor also negotiated Symbria Rehab's rate downward, on information and belief based upon bids and information supplied by Callen and the MedRehab Entities.

154.    On July 25, 2019, Symbria's CEO emailed Miller and Symbria's Executive Vice President of Operations to say that UMC's CEO had just informed her that UMC was going to go "in-house" for therapy and wellness services. Symbria's Executive Vice-President of Operations asked Miller if Miller had offered new PDPM pricing to UMC yet and, if so, at what price. Miller did not respond. Symbria then learned from discussions that a Symbria Rehab executive had with Miller that Miller was already aware of UMC's decision before Symbria's

CEO received the email from UMC's CEO. Miller stated that there were "more surprises to come."

155.    The next day, on July 26, 2019, in the early afternoon, the administrator for another Symbria Rehab client, Duncaster, located in Bloomfield, Connecticut, requested Symbria Rehab's proposed new contract that very day. A Symbria Rehab executive forwarded the email to Miller and said, "I've got a bad feeling about this... I don't understand the urgency to this. John [Callen] and Mike [a Duncaster administrator] have a very long good relationship." Miller did not respond.

156.    Also on July 26, 2019, UMC's CEO called Symbria's CEO to inform her that UMC was terminating its contract with Symbria Rehab. Miller was already aware that UMC was going to terminate its contract with Symbria Rehab. UMC's CEO then sent to Symbria's CEO written notice that UMC was terminating its contract with Symbria Rehab effective September 30, 2019, so that it could bring therapy services in-house.

157.    On July 26, 2019, Miller emailed a notice of his resignation to Symbria's CEO.

158.    On July 30, 2019, Symbria sent Miller a letter acknowledging his resignation. Symbria wrote: "as a key employee of Symbria, you are subject to federal, Illinois and Pennsylvania trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business Including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Miller acknowledged this in a telephone conversation concerning his separation in a telephone conference with a Symbria Human Resources officer. Miller also acknowledged that he executed a receipt of the Symbria Rehab Employee Handbook on March 28, 2019, and

that he had no company information on his home computer, iPad, cell phone or other electronic data storage technology.

159.    After he resigned from Symbria, Miller became an employee of Chicago Rehab and began working for MedRehab Alliance, Joint & Neuro, Joint & Neuro Chicago, and MedRehab Interstate as Executive Vice President in a similar role as he was engaged in at Symbria. In those roles, Miller reports to Callen. These MedRehab Entities were able to hire Miller because they had won the contract to provide rehabilitation services to UMC.

160.    On information and belief, MedRehab Interstate or another one of the MedRehab Entities successfully solicited away from Symbria Rehab UMC's rehabilitation and wellness services.

161.    On September 11, 2019, Kathleen Rice, a Regional Director of Symbria Rehab gave notice of her resignation. That day was Rice's last day as an employee of Symbria Rehab. Rice informed others at Symbria that she was going to work for Callen. After she resigned from Symbria, Rice went to work for MedRehab Alliance in a similar role as she was engaged in at Symbria. Rice also performs similar services for MedRehab Interstate.

162.    On September 13, 2019, Symbria Rehab sent Rice a letter acknowledging her resignation. Symbria Rehab wrote: "as a key employee of Symbria, you are subject to federal, Illinois and Pennsylvania trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business Including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Rice acknowledged this in a telephone conversation concerning her separation in a telephone conference with a Symbria Human Resources officer. Rice also acknowledged that she executed a receipt of the Symbria Rehab Employee Handbook on March

27, 2019, and that she had no company information on her home computer, iPad, cell phone or other electronic data storage technology.

163.    On September 16, 2019, Tammy Buckley, a Therapy Technician employed by Alliance HVA in Pennsylvania, gave notice that she was resigning her employment. Buckley then became employed by Chicago Rehab, MedRehab Alliance, and MedRehab Interstate in a similar position as she held at Alliance HVA.

164.    On September 23, 2019, Symbria's electronic medical record provider notified Symbria that the request by UMC in New Jersey to transfer its residents' medical records from Symbria Rehab to its new provider of therapy services, Joint & Neuro, was underway. The electronic medical record provider notified the designated representatives of both Symbria Rehab and Joint & Neuro of the data transfer. Joint & Neuro's designated representative was Irvine, whose place of work is at Plymouth Place in LaGrange Park, Illinois. On information and belief, Irvine is employed by or is an agent of Joint & Neuro and was solicited to join that company by Callen and Joint & Neuro and/or one of the other MedRehab Entities.

165.    September 25, 2019 was Dilmas' last day of employment at Symbria Rehab. Symbria Rehab sent Dilmas a resignation agreement. A true and correct copy of Symbria Rehab's September 25, 2019  resignation agreement with  Dilmas is attached hereto as Exhibit 4. It acknowledged his resignation and also stated: "You acknowledge that you have no company information on your home computer, cell phone, or other electronic data storage technology." Dilmas countersigned the agreementon the same day, above a statement reading, "I have read and agree to the statements noticed above." Dilmas' statement concerning company information was false.

166.    In the same agreementacknowledging Dilmas' resignation, Symbria Rehab wrote: "as a key employee of Symbria, you are subject to federal [and] Illinois trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Dilmas' countersignature acknowledged that he agreed with these statements.

167.    In consideration of Dilmas' agreement that he possessed none of Symbria Rehab's information in electronic format and his acknowledgement that he was bound not to interfere with Symbria Rehab's business and an ongoing fiduciary duty of loyalty, among other consideration, Symbria agreed to pay two weeks' base salary to Dilmas as severance pay and to waive his non-compete and non-solicitation covenants.

168.    On information and belief, while Dilmas was still employed by Symbria, Callen informed Dilmas that he and the MedRehab Entities, including Chicago Rehab, were soliciting Symbria clients and prospective clients and soliciting Symbria employees and directed Dilmas not to inform Symbria, and Dilmas did not inform Symbria, undermining Symbria's interests.

169.    On Dilmas' last date of employment by Symbria Rehab, Dilmas informed Symbria that he was going to work for Callen. ██████████████████████████████ ████████████. Dilmas then became employed by Chicago Rehab or another of the MedRehab Entities in a similar position as he held at Symbria Rehab. Dilmas, who is now employed by Chicago Rehab and who performs work for Joint & Neuro, MedRehab Alliance, and MedRehab Interstate as VP of Hospital and Outpatient Services, is able to access his personal email account, cdilmas@icloud.com, from his work computer.

170.    In the fall of 2019, Rice created a PowerPoint presentation branded with the "MedRehab Alliance" name and logo on the subject of "Respiratory Therapy: Impact on Reimbursement under PDPM." Included in this slide presentation were pages and portions of pages copied out of Symbria's copyrighted "Understanding the Patient Driven Payment Model" slide presentation that Ambrose had emailed to Irvine on January 9, 2019, which Irvine emailed to Dilmas and to her personal email address, and that Dilmas emailed to his personal email address on July 23, 2019. Rice listed herself on the cover page as a presenter, and the document bears the legend "Confidential: MedRehab Alliance, LLC."

171.    Also in the fall of 2019, shortly after Rice began working for MedRehab Interstate and MedRehab Alliance, Rice emailed another employee of MedRehab Alliance a "PDPM Tool" in Excel format. That Excel file contained a "PDPM Predictor Worksheet" with a flow chart of medical diagnoses and conditions to generate nursing case mix indicators, a Section GG functional score calculator, a flow chart demonstrating case mixes for physical therapy and occupational therapy, and a separate flow chart indicating speech and language pathology case mix groups and indices. The Excel document was created at Symbria Rehab in December 2018 in connection with its planning for the implementation of PDPM and last modified in January 2019, when Rice was a Symbria Rehab Regional Director. Rice and another Symbria Rehab director who was heavily involved in Symbria Rehab's PDPM efforts collaborated at Symbria Rehab to create this trade secret document.

172.    MedRehab Interstate or one of the other MedRehab Entities successfully solicited away Symbria Rehab's client Lions Gate. On November 1, 2019, Lions Gate's CEO wrote to Symbria's CEO to say that Lions Gate was terminating its contract with Symbria Rehab as of December 31, 2019. Lions Gate informed Symbria that Lions Gate wished to employ employees

and contractors based on an in-house model. On information and belief, MedRehab Alliance or one of the other MedRehab Entities then entered into a contract with Lions Gate to provide manage Lions Gate's in-house employed therapists.

173.    On January 10, 2020, Rice sent an email to another MedRehab Alliance employee attaching the "MedRehab Alliance"-branded slides concerning "Respiratory Therapy: Impact on Reimbursement under PDPM." Rice also attached Symbria's copyrighted "Understanding the Patient Driven Payment Model" slide presentation. Rice wrote in her cover email, "the initial [MedRehab Alliance-branded] slides you can use, I 'redid' those ones to be MRA appropriate. I also included another [PowerPoint] I had." That other attached PowerPoint was Symbria's slide presentation.

174.    On May 4, 2020, Rice sent Miller, from her medrehaballiance.com email account, using a "MedRehab Alliance, LLC" signature block, an email with the subject "Resource ideas," and attached a number of files to her email. One attachment was a draft orientation manual for "MedRehab Alliance" Program Managers at client facilities, which copied nearly verbatim many parts of Symbria Rehab's "Symbria Program Manager Orientation" dated April 2019 and marked "Symbria, Inc. – Confidential." Rice also attached a "Transition Plan," which she commented was "an old version." That document was created by Symbria Rehab. Rice told Miller he might "want Tammy [Buckley] to recreate what would be relevant to our current transition plan."

175.    In May 2020, Vic Arellano, an employee of Chicago Rehab and a former employee of Symbria Rehab, sent an email to Miller and Rice at their MedRehab Alliance email addresses, to Ambrose at Chicago Rehab, and to Dilmas at a Joint & Neuro email address on the subject of "Disease Management Models." Arellano used a signature block showing that he was a Vice President of Joint & Neuro. Attached was Symbria Rehab's Pneumonia Disease

REDACTED VERSION FOR PUBLIC FILING

Management Model with a © copyright legend showing that Symbria Rehab asserted a copyright in the document. The document also bears the following warning on its cover page:

All rights reserved. THE CONTENTS OF THIS PUBLICATION ARE CONFIDENTIAL AND PROPRIETARY. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, scanning, or any information storage and retrieval system, without permission from [Symbria] Rehab, Inc.

176. On June 4, 2020, Arellano emailed the CEO of Plymouth Place



Arellano wrote to Plymouth Place's CEO that

Attached was the same

That document was authored for Symbria by Symbria Rehab's former Medical Director.

177. Lowe and UMHS have solicited other organizations providing senior living facilities to form "a new Symbria," that is, a new organization owned by not-for-profit organizations in the same business as Symbria's former owners. The trade name "MedRehab Alliance" is deliberately suggestive of Symbria's former name, Alliance Rehab. Lowe approached Symbria Rehab's client Norwood Crossing in Illinois to promote the concept of "a

new Symbria." In addition to Plymouth Place, ████████████████████████████
████████████████████████████████████████████████████████.

178.    On information and belief, Lowe and/or Callen on behalf of UMHS and the
MedRehab Entities have solicited other clients of Symbria Rehab and its subsidiaries. These
include Lancaster Health Group in Chicago, Smith Crossing in Orland Park, Illinois, Bethesda
Home in Chicago, Illinois, Marquardt Manor in Watertown, Wisconsin, Avon Health Center in
Hartford, Connecticut, West Hartford Health & Rehab in Hartford, Connecticut, Otterbein Senior
Life in Lebanon, Ohio, Duncaster in Bloomfield, Connecticut, and Management Performance
Associates, the company that manages DeKalb County Rehab & Nursing Center in DeKalb,
Illinois.

179.    In June 2020, Symbria Rehab solicited Lions Gate to provide respiratory therapy
services to Lions Gate and provided a PDPM-based pricing analysis to Lions Gate for that
purpose. Lions Gate, █████████████████████████████, provided Symbria Rehab's
proposal to an employee of MedRehab Alliance.

180.    On or about December 7, 2020, Bethesda Home, a Symbria Rehab client in
Illinois, informed Symbria Rehab that Bethesda Home was terminating the parties'
Rehabilitation Services Agreement so that it could enter in a contract with one of the MedRehab
Entities associated with Callen to provide management of therapy services. Before Bethesda
Home terminated Symbria Rehab's contract, Callen requested Symbria Rehab's current PDPM
pricing effective October 1, 2019 from Bethesda Home, which Bethesda Home provided to him,
and Callen then underbid Symbria's pricing. Bethesda subsequently entered into a Rehabilitation
Services Agreement with Joint & Neuro Chicago effective April 1, 2021 with prices below those
of Symbria Rehab.

181.    On or about December 21, 2020, Norwood Crossing, a Symbria Rehab client in Illinois, informed Symbria Rehab that it was terminating the parties' Rehabilitation Services Agreement so that Norwood Crossing could enter into a contract with one of the MedRehab Entities associated with Callen to provide management of therapy services. Norwood Crossing indicated to Symbria that the reason for the change was price, because "we have always been happy with quality/service/people, etc." Before Norwood Crossing terminated Symbria Rehab's contract, Callen requested Symbria Rehab's current PDPM pricing effective October 1, 2019 from Bethesda Home, which Bethesda Home provided to him, and Callen then underbid Symbria Rehab's pricing. Norwood Crossing subsequently entered into a Rehabilitation Services Agreement with Joint & Neuro Chicago effective April 1, 2021 with prices below those of Symbria Rehab.

182.    On information and belief, Lowe and/or Callen on behalf of UMHS and the MedRehab Entities have also solicited prospective clients of Symbria Rehab and its subsidiaries using Symbria's prospect list. These include:

(a)    Burgess Square in Westmont, Illinois, where an administrator informed a Symbria sales person that the administrator had a business relationship with Callen and that Burgess Square had decided to use an in-house consulting model of providing rehabilitation therapy services;

(b)    Tabor Hill in Naperville, Illinois, where an administrator informed a Symbria sales person that there was another organization that could manage rehabilitation therapy services in-house for Tabor Hill in a manner similar to Symbria Rehab;

(c)    Lions Gate in New Jersey, which Symbria Rehab was soliciting to provide respiratory therapy services at the same time as one of the MedRehab Entities, Joint &

Neuro, was also soliciting that business, and while MedRehab Alliance or another one of the MedRehab Entities manages rehabilitation therapy services there;

(d)     Masonic Care in Wallingford, Connecticut, which is a member facility of an organization that is a joint venture partner of Symbria Rehab in Alliance Connecticut;

(e)     LECOM Health in Erie, Pennsylvania, where Callen and Miller traveled to meet with a hospital that refers patients to that facility;

(f)     iCare Health Network in Manchester, Connecticut, where Symbria's former sales leader had made a contact while employed by Symbria before he went to work for one of the MedRehab Entities as a sales executive, and the MedRehab Entities then solicited iCare Health Network after his departure from Symbria;

(g)     Landis Homes in Lititz, Pennsylvania, where an administrator reported to Symbria's sales team that Landis Homes was considering an in-house consulting model of providing rehabilitation therapy services; and

(h)     Lutheran Community at Telford in Telford, Pennsylvania, where an administrator reported to a member of Symbria's sales team that Lutheran Community at Telford was considering an in-house consulting model of providing rehabilitation therapy services.

183.     Callen, Miller, Rice, Irvine and/or Dilmas all made contacts with these post-acute care communities while employed by Symbria Rehab. ▮▮▮▮▮▮ of the above-listed solicitations was successful. On information and belief, there are no other companies in the markets where the above post-acute care communities are located that promote an in-house consulting model of providing rehabilitation therapy services managed by an outside consulting firm other than the MedRehab Entities.

REDACTED VERSION FOR PUBLIC FILING

**Defendants' Collective Operation as a Single Enterpise and Alter-Ego of Each Other**

184.     Chicago Rehab employees contracted to MedRehab Alliance include Miller, Buckley, Ambrose, and Dilmas. Chicago Rehab also contracts the services of its employees to MedRehab Interstate, including those of Miller, Buckley, Dilmas, and Ambrose. Chicago Rehab acts as an agent for MedRehab Alliance and MedRehab Interstate ██████████████. ████████████████ MedRehab Alliance and Callen make key personnel decisions such as hiring and firing for Chicago Rehab.

185.     MedRehab Alliance contracts the services of its employees to MedRehab Interstate, including those of Rice and Watts. MedRehab Interstate has no employees of its own.

186.     Chicago Rehab also contracts the services of its employees, including former Symbria Rehab employees Dilmas, Buckley, Miller, and Ambrose, to Joint & Neuro and Joint & Neuro Chicago. Joint & Neuro and Joint & Neuro Chicago have no employees of their own.

187.     Irvine, an employee of Plymouth Place, which owns an interest in MedRehab Alliance, performs services for Joint & Neuro and, on information and belief, the other MedRehab Entities. Irvine has a Joint & Neuro email address and uses an email signature block describing her role as "Transition Operations" for Joint & Neuro at the Higgins Road address in Rosemont.

188.     MedRehab Holdings, MedRehab Therapy, MedRehab Wisconsin, and IASN have no employees.

189.     The MedRehab Entities have common and overlapping members, managers, and directors: namely Callen, Lowe, Sharma, Murtaza, and Patel. Despite this, the MedRehab Entities are a mere façade and are dominated by Callen to the exclusion of the other managers and directors. Callen makes hiring and firing decisions for all of the MedRehab Entities. Callen

also makes decisions regarding benefits and retirement packages for the MedRehab Entities' employees, including for Chicago Rehab. Callen makes virtually all of the decisions for the MedRehab Entities, with minimal or no input from Lowe, Sharma, Murtaza, and Patel.

190. Nor do the MedRehab Entities maintain arms-length relationships among themselves. Callen, as the dominant stockholder and manager, controls the MedRehab Entities as a single enterprise. For example, Chicago Rehab "hired" Callen through MedRehab Therapy of Illinois to manage Chicago Rehab employees who are leased to MedRehab Alliance and MedRehab Alliance Interstate, of which Callen is the CEO. Callen is paid a "management fee" by one of the MedRehab Entities through another entity to manage yet another entity.

191. The MedRehab Entities do not maintain corporate formalities. Minority members are not invited to member meetings, not asked to participate in member votes, do not receive minutes from such meetings, or annual reports.

192. Defendants have created this interlocking corporate structure in a deliberate attempt to evade UMHS' contractual covenants in the SPA.

193. The following diagram depicts the relationships among all of the Defendants once UMHS and the MedRehab Entities successfully solicited away Symbria and Affiliates' employees:

REDACTED VERSION FOR PUBLIC FILING



## COUNT I
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* – Symbria, Symbria Rehab, Alliance Connecticut and Alliance HVA Against All Defendants

194.    Plaintiffs Symbria and Affiliates incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

195.    Symbria and Affiliates are owners of trade secrets that have been misappropriated that relate to products and services used in, and intended for use in interstate commerce.

196.    Symbria and Affiliates' (a) financial information concerning profits, revenues, costs, margins, efficiencies, productivity, units of patient care, pricing and other financial and patient care metrics used to manage their businesses, (b) PDPM materials, including PDPM Care Guides and other materials that synthesize Symbria, CMS, and industry information for ease of

use by Symbria and Affiliates' staff and clients, and (c) PDPM Analysis Software, (d) client-specific information, including client contact and program information, historical patient census data and patient outcomes, and financial details concerning client facilities, (e) roadmap materials for the establishment of an outpatient clinic associated with an in-patient post-acute care facility and associated data, and (f) materials relating to Symbria's unique seven-days-per-week respiratory therapy program for post-acute care facilities (collectively, the "Symbria Information") are trade secrets.

197.    Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret. At Symbria's headquarters, access is restricted only to those who have stored a fingerprint and whose fingerprint is registered on a reader allowing them access to the company's offices, or to those who are allowed into the offices by a receptionist at the main door. Symbria and Affiliates store digital information on a shared company drive to which employees have access only on need-to-know basis specific to an employee's position. Symbria and Affiliates assign log-in and password credentials to employees that are required to access the company's computer network and that are available only during the term of their employment. Symbria and Affiliates' employee computers are programmed so that their displays turn off when employees do not actively use their computers, and employees must enter their log-in credentials to return to network access. Employees are required to log off the Symbria computer network when their computer will be unattended. Hard copy files containing confidential information are stored in secured areas and/or locked cabinets or offices.

198.    Symbria and Affiliates have written policies prohibiting the disclosure of confidential information to others, including the Symbria Information, which prohibit its use other than for Symbria and Affiliates, and forbid its misappropriation, both in their Employee

REDACTED VERSION FOR PUBLIC FILING

Handbook and Code of Conduct. Employees are required to acknowledge that they are aware of these policies when they are offered employment, when they are promoted, and when they leave the employment of Symbria and Affiliates. Executives such as Callen who have employment agreements have the same provisions in those agreements. Certain of the Symbria Information is designated on its face "Confidential – Symbria, Inc.," "Confidential and Proprietary," or "© Symbria."

199.    The Symbria Information is not shared with the public, or disclosed to the competitors of Symbria and Affiliates.

200.    When Symbria and Affiliates share any confidential information with a client, they do so pursuant to written agreements with the clients prohibiting the clients from disclosing the confidential information to third parties and requiring the clients to return that information to Symbria if the agreement terminates.

201.    The Symbria Information is commercially valuable and gives Symbria and Affiliates advantages over their competitors. Even persons experienced in the business of providing rehabilitation services in senior living communities who wish to compete with Symbria and Affiliates would benefit greatly from having unauthorized access to the Symbria Information. Persons in the business of providing rehabilitation services in senior living communities who do not have access to the Symbria Information are at a competitive disadvantage to Symbria and Affiliates. The Symbria Information has independent economic value, actual and potential, from being kept secret.

202.    Symbria and Affiliates are the owners of the Symbria Information because they have rightful legal or equitable title to the Symbria Information.

203. The Symbria Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by other persons from the disclosure or use of the Symbria Information.

204. Dilmas, Irvine, and Callen used improper means to acquire knowledge of the Symbria Information when Dilmas and Irvine sent that information to their personal email addresses and forwarded that information to Callen in violation of Symbria Rehab's policies and/or their implied duties of good faith and fair dealing. Dilmas', Irvine's, and Callen's conduct constituted theft and breach of a duty to Symbria and Affiliates to maintain secrecy.

205. The relationships between and among UMHS and the MedRehab Entities as set forth above have resulted in the Symbria Information being shared and distributed to and among all of the MedRehab Entities and UMHS. Any Symbria Information that was shared with UMHS as a Symbria Rehab client was shared pursuant to the terms of contracts restricting UMHS from divulging the information to others, including the MedRehab Entities, for their own use.

206. Callen, UMHS, and the MedRehab Entities have acquired the Symbria Information knowing or having reason to know that the Symbria Information was acquired by improper means. In particular, Callen, who is an agent of UMHS and all of the MedRehab Entities, has a contractual obligation not to use the confidential information of Symbria and Affiliates. Callen also knows that Symbria Rehab's clients and former clients have contractual obligations not to disclose Symbria and Affiliates' confidential information to third parties, since Callen signed contracts on behalf of Symbria Rehab containing this restriction. UMHS and the MedRehab Entities directly affiliated with it know or have reason to know that they have acquired the Symbria Information by improper means by virtue of Lowe's former position as Vice Chairperson of Symbria's Board of Directors. Callen and Lowe both know or have reason

to know that Dilmas' and Irvine's acquisition of the Symbria Information by Dilmas and Irvine and retention of it following their terminations from Symbria Rehab was improper.

207.    Callen, UMHS, and the MedRehab entities have used or threaten to use the Symbria Information without the express or implied consent of Symbria and Affiliates. Callen, UMHS and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, persons who used improper means to acquire it. Callen, UMHS, and the MedRehab Entities also knew or had reason to know that the Symbria Information was acquired by them under circumstances giving rise to a duty to maintain its secrecy. Callen, UMHS, and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, who each owed a duty to Symbria and Affiliates to maintain its secrecy.

WHEREFORE, plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, and Alliance Rehab HVA, L.L.C. request that the Court enter judgment in their favor and against defendants John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award plaintiffs the following remedies:

(a)    a preliminary and a permanent injunction preventing the Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with them from misappropriating, disclosing, or using and from threatening

to misappropriate, disclose, or use Symbria and Affiliates' trade secrets, and ordering Defendants to return the Symbria Information to Symbria and Affiliates forthwith;

(b)       damages for actual loss caused by misappropriation of Symbia and Affiliates' trade secrets;

(c)       damages for unjust enrichment of caused by the misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets not addressed in computing damages for actual loss;

(d)       alternatively, in lieu of damages measured by any other methods, damages caused by misappropriation, disclosure, and use measured by imposing a reasonable royalty for the Defendants' unauthorized disclosure or use of Symbria and Affiliates' trade secrets;

(e)       exemplary damages in an amount two times the amount of actual damages for Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets;

(f)       award Symbria and Affiliates their reasonable attorneys' fees for Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets;

(g)       award Symbria and Affiliates their costs in bringing this action; and

(h)       such other relief as is just and appropriate in the circumstances.

REDACTED VERSION FOR PUBLIC FILING

## COUNT II
### Violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* – Symbria, Symbria Rehab, Alliance Connecticut and Alliance HVA Against All Defendants

208.    Plaintiffs Symbria and Affiliates incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

209.    Symbria and Affiliates' (a) financial information concerning profits, revenues, costs, margins, efficiencies, productivity, units of patient care, pricing and other financial and patient care metrics used to manage their businesses, (b) PDPM materials, including PDPM Care Guides and other materials that synthesize Symbria, CMS, and industry information for ease of use by Symbria and Affiliates' staff and clients, and (c) PDPM Analysis Software, (d) client-specific information, including client contact and program information, historical patient census data and patient outcomes, and financial details concerning client facilities, (e) roadmap materials for the establishment of an outpatient clinic associated with an in-patient post-acute care facility and associated data, and (f) materials relating to Symbria's unique seven-days-per-week respiratory therapy program for post-acute care facilities (collectively, the "Symbria Information") are trade secrets.

210.    Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret. At Symbria's headquarters, access is restricted only to those who have stored a fingerprint and whose fingerprint is registered on a reader allowing them access to the company's offices, or to those who are allowed into the offices by a receptionist at the main door. Symbria and Affiliates store digital information on a shared company drive to which employees have access only on need-to-know basis specific to an employee's position. Symbria and Affiliates assign log-in and password credentials to employees that are required to access the company's computer network and that are available only during the term of their employment.

Symbria and Affiliates' employee computers are programmed so that their displays turn off when employees do not actively use their computers, and employees must enter their log-in credentials to return to network access. Employees are required to log off the Symbria computer network when their computer will be unattended. Hard copy files containing confidential information are stored in secured areas and/or locked cabinets or offices.

211.    Symbria and Affiliates have written policies prohibiting the disclosure of confidential information to others, including the Symbria Information, which prohibit its use other than for Symbria and Affiliates, and forbid its misappropriation, both in their Employee Handbook and Code of Conduct. Employees are required to acknowledge that they are aware of these policies when they are offered employment, when they are promoted, and when they leave the employment of Symbria and Affiliates. Executives such as Callen who have employment agreements have the same provisions in those agreements. Certain of the Symbria Information is designated on its face "Confidential – Symbria, Inc.," "Confidential and Proprietary," or "© Symbria."

212.    The Symbria Information is not shared with the public, or disclosed to the competitors of Symbria and Affiliates.

213.    When Symbria and Affiliates share any confidential information with a client, they do so pursuant to written agreements with the clients prohibiting the clients from disclosing the confidential information to third parties and requiring the clients to return that information to Symbria if the agreement terminates.

214.    The Symbria Information is commercially valuable and gives Symbria and Affiliates advantages over their competitors. Even persons experienced in the business of providing rehabilitation services in senior living communities who wish to compete with

REDACTED VERSION FOR PUBLIC FILING

Symbria and Affiliates would benefit greatly from having unauthorized access to the Symbria Information. Persons in the business of providing rehabilitation services in senior living communities who do not have access to the Symbria Information are at a competitive disadvantage to Symbria and Affiliates. The Symbria Information has independent economic value, actual and potential, from being kept secret.

215. Symbria and Affiliates are the owners of the Symbria Information because they have rightful legal or equitable title to the Symbria Information.

216. The Symbria Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by other persons from the disclosure or use of the Symbria Information.

217. Dilmas, Irvine, and Callen used improper means to acquire knowledge of the Symbria Information when Dilmas and Irvine sent that information to their personal email addresses and forwarded that information to Callen in violation of Symbria Rehab's policies and/or their implied duties of good faith and fair dealing. Dilmas', Irvine's, and Callen's conduct constituted theft and breach of a duty to Symbria and Affiliates to maintain secrecy.

218. The relationships between and among UMHS and the MedRehab Entities as set forth above have resulted in the Symbria Information being shared and distributed to and among all of the MedRehab Entities and UMHS. Any Symbria Information that was shared with UMHS as a Symbria Rehab client was shared pursuant to the terms of contracts restricting UMHS from divulging the information to others, including the MedRehab Entities, for their own use.

219. Callen, UMHS, and the MedRehab Entities have acquired the Symbria Information knowing or having reason to know that the Symbria Information was acquired by improper means. In particular, Callen, who is an agent of UMHS and all of the MedRehab

REDACTED VERSION FOR PUBLIC FILING

Entities, has a contractual obligation not to use the confidential information of Symbria and Affiliates. Callen also knows that Symbria Rehab's clients and former clients have contractual obligations not to disclose Symbria and Affiliates' confidential information to third parties, since Callen signed contracts on behalf of Symbria Rehab containing this restriction. UMHS and the MedRehab Entities directly affiliated with it know or have reason to know that they have acquired the Symbria Information by improper means by virtue of Lowe's former position as Chairman of Symbria's Board of Directors. Callen and Lowe both know or have reason to know that Dilmas' and Irvine's acquisition of the Symbria Information by Dilmas and Irvine and retention of it following their terminations from Symbria Rehab was improper.

220.     Callen, UMHS, and the MedRehab entities have used or threaten to use the Symbria Information without the express or implied consent of Symbria and Affiliates. Callen, UMHS and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, persons who used improper means to acquire it. Callen, UMHS, and the MedRehab Entities also knew or had reason to know that the Symbria Information was acquired by them under circumstances giving rise to a duty to maintain its secrecy. Callen, UMHS, and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, who each owed a duty to Symbria and Affiliates to maintain its secrecy.

WHEREFORE, plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, and Alliance Rehab HVA, L.L.C. request that the Court enter judgment in their favor and request that the Court enter judgment in their favor and against John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint

REDACTED VERSION FOR PUBLIC FILING

& Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award plaintiffs award them the following remedies:

(a)     a preliminary and a permanent injunction preventing the Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with them from misappropriating, disclosing, or using and from threatening to misappropriate, disclose, or use Symbria and Affiliates' trade secrets and ordering Defendants to return the Symbria Information to Symbria and Affiliates forthwith;

(b)     damages for actual loss caused by misappropriation of Symbia and Affiliates' trade secrets;

(c)     damages for unjust enrichment of caused by the misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets not addressed in computing damages for actual loss;

(d)     alternatively, in lieu of damages measured by any other methods, damages caused by misappropriation, disclosure, and use, measured by imposing a reasonable royalty for the Defendants' unauthorized disclosure or use of Symbria and Affiliates' trade secrets;

(e)     exemplary damages in an amount two times the amount of actual damages for Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets;

REDACTED VERSION FOR PUBLIC FILING

(f)     award Symbria and Affiliates their reasonable attorneys' fees for Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and Affiliates' trade secrets;

(g)     award Symbria and Affiliates their costs in bringing this action; and

(h)     such other relief as is just and appropriate in the circumstances.

**COUNT III**
**Breach of the Stock Purchase Agreement –**
**Symbria, GreatBanc, and the Symbria ESOP Trust Against UMHS**

221.    Plaintiffs Symbria, GreatBanc, and the Symbria ESOP Trust incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

222.    Symbria, GreatBanc, and UMHS are among the parties to the SPA. UMHS is one of the "Sellers" as defined in the SPA. (SPA at 1 (Preamble).) GreatBanc holds as trustee the assets of the Symbria ESOP Trust.

223.    Symbria, GreatBanc, and the Symbria ESOP Trust have substantially complied with all of the material terms of the SPA.

224.    UMHS agreed to restrictive covenants concerning competition, solicitation of clients or potential clients, and solicitation of employees, contractors or consultants (the "Restrictive Covenants"). (SPA §§ 5.4(a), (b), (c).) UMHS also agreed to a covenant restricting its use of confidential information. (SPA § 5.3.)

225.    The Restrictive Covenants are in full force and effect during the Noncompetition Period. At all times material herein and continuing to date, and into the foreseeable future, the Noncompetition Period is and will be in effect because each of the Sellers' subordinated notes have not been paid in full. (SPA § 5.4(a).) The confidentiality covenant has no expiration and remains in full force and effect.

226. UMHS' Restrictive Covenants prohibit competition and solicitation with respect to the "Company Group." (SPA §§ 5.4(a), (b), (c).) The "Company Group" means Symbria and its subsidiaries. (SPA Art. I, at 3.) Symbria Rehab, Alliance Connecticut and Alliance HVA are each subsidiaries of Symbria.

227. UMHS has engaged in, directly or indirectly, and has direct or indirect ownership interests in businesses in the state of Illinois that are engaged, directly or indirectly, in the business of developing, marketing, providing, representing, or selling products or services which are competitive with products or services developed, marketed, provided, sold or under development by Symbria and Affiliates, in violation of Section 5.4(a) of the SPA.

228. UMHS has solicited or enticed, or attempted to solicit or entice, directly or indirectly, and through direct or indirect ownership interests in other businesses, clients or customers and potential clients or customers of Symbria and Affiliates for purposes of diverting their business or services from Symbria and Affiliates, in violation of Section 5.4(b) of the SPA.

229. UMHS has solicited, directly or indirectly, and through direct or indirect ownership interests in other businesses, the employment or engagement of services of persons who were employed as an employee, contractor on consultant by Symbria and Affiliates on either a full-time or part-time basis, in violation of Section 5.4(c) of the SPA.

230. UMHS has divulged, communicated, used to the detriment of Symbria and Affiliates and the Symbria ESOP Trust, for the benefit of companies it has an interest in, or misused confidential information or trade secrets owned by or relating to Symbria and Affiliates, in violation of Section 5.3 of the SPA.

231. UMHS' breaches of the SPA have caused Symbria and Affiliates to be damaged.

232.     UMHS has express indemnification obligations to Symbria under the SPA. With

regard to UMHS' breaches of the SPA, the SPA provides as follows:

> From and after the Closing, each Seller shall severally indemnify, defend, and
> hold harmless the ESOP Trust and the Company against and from all Damages
> sustained or incurred by the ESOP Trust or the Company Group resulting from or
> arising out of or by virtue of . . . (ii) such Seller's breach of any of such Seller's
> covenants or agreements contained in this Agreement or any Transaction
> Document for the benefit of the ESOP Trust or the Company, even if such
> Damages are caused in whole or in part by the negligence (whether sole, joint, or
> concurrent), strict liability, or other legal fault of any Indemnified Person (other
> than the ESOP Trustee), but excepting in each case Damages caused by the gross
> negligence, willful misconduct or fraud of the Indemnified Person.

(SPA § 7.1(a).)

233.     The SPA has a notice provision concerning claims of indemnification against a

Seller such as UMHS, which provides in pertinent part as follows:

> To make a claim for indemnification under Section 7.1(a) or 7.2, an
> Indemnified Person shall notify the Indemnifying Person of its claim under this
> Section 7.6 in writing, including the specific details of and specific basis under
> this Agreement for its claim (the "Claim Notice").… In the event that the claim
> for indemnification is based upon an inaccuracy or breach of a representation,
> warranty, covenant, or agreement, the Claim Notice shall specify the
> representation, warranty, covenant, or agreement which was inaccurate or
> breached and a description of the pertinent facts and circumstances associated
> with the breach.

(SPA § 7.1(a).)

234.     The SPA also provides a set off procedure as one form of relief available to

Symbria for breach of the SPA. The SPA provides as follows:

> Each Seller agrees that the Company and the ESOP Trust by the ESOP Trustee
> shall have the right, pursuant to the terms hereof, to set off against the Company's
> payment of amounts due under this Agreement and under the Subordinated Notes
> any amounts due to the Company or the ESOP Trust by Sellers under Section 7.1.
> With respect to any proposed set off, the applicable Indemnified Person shall
> deliver to the applicable Seller a written notice describing the amount of the
> proposed set off and the reasons therefor (which notice may be included with a
> Claim Notice) (a "Set Off Notice"). If a Seller who received such Set Off Notice
> (the "Notice Recipient") fails to respond, or accepts in writing such Set Off
> Notice, within thirty (30) days of receipt of the Set Off Notice, the set off amount

included in the Set Off Notice shall be binding and conclusive upon the Notice Recipient. In order to dispute a Set Off Notice, the Notice Recipient must deliver written notice to the sender of the Set Off Notice, within thirty (30) days of receipt of such notice, of its disagreement with either its indemnification obligations or the amount of claimed Damages.

(SPA § 7.7(a).)

235.   The Warrant granted by Symbria to UMHS pursuant to the SPA (the "Warrant") provides for a set off in the event that UMHS is in default of its obligations to Symbria. The Warrant provides in pertinent part as follows:

**Right of Set Off.** [Symbria] shall have a right of setoff or recoupment of past due debts, liabilities or other amounts which are undisputed or determined to be owing by a court of competent jurisdiction by [UMHS] or its Affiliates to [Symbria] (whether such amounts arise pursuant to the Stock Purchase Agreement, under various service agreements between [Symbria] and [UMHS] or its Affiliates, or otherwise) against amounts owing from [Symbria] to [UMHS] under this Warrant which are undisputed or determined to be owing by a court of competent jurisdiction.

(Warrant § 20.)

236.   Symbria sent UMHS a Claim Notice and Setoff Notice on December 6, 2019. A true and correct copy of the Claim Notice and Setoff Notice is attached hereto as Exhibit 6. UMHS subsequently notified Symbria that it disagrees with Symbria concerning its indemnification obligations.

WHEREFORE, plaintiffs Symbria, Inc., GreatBanc Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust, and the Symbria, Inc. Employee Stock Ownership Trust request that the Court enter judgment in its favor and against defendant UMHS and award them the following remedies:

(a)      a preliminary and a permanent injunction preventing UMHS, its officers, agents, servants, employees and attorneys and those in active concert or participation with it from: (i) competing, directly or indirectly, in any capacity, or from having any direct or

indirect ownership interest in any business anywhere in the state of Illinois that is engaged, either directly or indirectly, in the business of developing, marketing, providing, representing, or selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period; (ii) from soliciting or enticing or attempting to solicit or entice any clients of Symbria and Affiliates and other Symbria subsidiaries for purposes of diverting their business or services from Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period; (iii) from soliciting or enticing or attempting to solicit the employment or engagement of services of any person employed as an employee, contractor or consultant by Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period; and (iv) from using Symbria and Affiliates' confidential information or trade secrets;

(b)      a preliminary and a permanent injunction preventing UMHS, its officers, agents, servants, employees and attorneys and those in active concert or participation with it from from divulging, communicating, using to the detriment of Symbria and Affiliates for UMHS' benefit or the benefit of any other person, or misusing in any way Symbria and Affiliates' confidential information and trade secrets or relating in any way to Symbria and Affiliates;

(c)      award Symbria a set off effective as of December 6, 2019 of all amounts due by Symbria to UMHS under UMHS' Subordinated Note in the amount of ████████████

████████████████████████████████████

REDACTED VERSION FOR PUBLIC FILING

(d)     an equitable accounting of all earnings, profits and other benefits arising from UMHS' violation of Section 5.4 of the SPA;

(e)     actual damages for UHMS' breaches of the SPA;

(f)     award Symbria its costs in bringing this action; and

(g)     such other relief as is just and appropriate in the circumstances.

## COUNT IV

███████████████████████████████████ –

### Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA Against Callen

237.    Plaintiffs incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

238.    The Symbria Information is "Confidential Information" within the meaning of the Employment Agreement and ██████████████████████████████.

239.    UMC, Lions Gate, Lancaster Health Group, Smith Crossing, Norwood Crossing, Marquardt Manor, Avon Health Center, West Hartford Health & Rehab, Otterbein Senior Life, Duncaster, Management Performance Associates/DeKalb County Rehab & Nursing Center  are each "Business Partners" and "Confidential Customers" of Symbria Rehab within the meaning of the Employment Agreement and ███████████████████. Callen has relied on his knowledge of these Business Partners and Confidential Customers on information and belief to solicit their business.

240.    Plymouth Place, Burgess Square, Tabor Hill, Lions Gate, Masonic Care, LECOM Health, iCare Health Network, Landis Home, and Lutheran Community at Telford are each a "Prospective Customer" of Symbria Rehab or its Affiliates within the meaning of the Employment Agreement and ██████████████████. Callen has relied

on his knowledge of these Prospective Customers on information and belief to solicit their business.

241.    UMC, Norwood Crossing, and Management Performance Associates/DeKalb Rehab & Nursing Center are each "Restricted Customers" as defined within the meaning of the Employment Agreement and ███████████████████████████.

242.    Irvine was a "Company Employee" of Symbria Rehab within the meaning of the Employment Agreement.

243.    On information and belief, during the Restricted Period as defined in the Employment Agreement, Callen directly or indirectly hired, employed, or engaged Irvine, and/or otherwise solicited, requested, enticed, or induced Irvine to terminate her employment with Symbria Rehab for the purpose of engaging in business activities that are competitive with the business activities of Symbria and Affiliates, or for rendering services for a Company Customer similar to services that Irvine provided to Symbria Rehab during the twelve months prior to her termination of employment by Symbria Rehab.

244.    By his actions set forth herein, Callen has breached Sections 4.1, 4.6, and 4.7 of the Employment Agreement, the provisions of which are incorporated into ████████████ ███████████████████████████████████████████████.

245.    Symbria and Affiliates have substantially complied with all of the material terms of ███████████████████████.

246.    Callen's conduct as set forth herein has caused Symbria Rehab to be damaged.

WHEREFORE, plaintiff Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, and Alliance Rehab HVA, LLC request that the Court enter judgment in its favor and against defendant John R. Callen and award it the following remedies:

(a)     a preliminary and a permanent injunction preventing Callen, his agents, servants, employees and attorneys and those in active concert or participation with him from misappropriating, disclosing, or using and from threatening to misappropriate, disclose, or use any of Symbria Rehab's Confidential Information as defined in Callen's Employment Agreement with Symbria Rehab;

(b)     extending the Restricted Period for Callen's breaches of Sections 4.6 and 4.7 of the Employment Agreement incorporated into ████████████████████ ██████ pursuant to Section 4.11, by the period of Callen's breaches of his obligations under Sections 4.6 and 4.7 of the Employment Agreement;

(c)     actual damages for Callen's ████████████████████████ ██████;

(d)     award Symbria Rehab its reasonable attorneys' fees and expenses ████ ██████████;

(e)     award its costs in bringing this action; and

(f)     such other relief as is just and appropriate in the circumstances.

**COUNT V**
**Breach of Fiduciary Duty –**
**Symbria Rehab Against Dilmas**

247.    Plaintiff Symbria Rehab incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

248.    At all times relevant herein up to the time Dilmas' employment by Symbria Rehab terminated, Dilmas as a managerial employee of Symbria Rehab owed Symbria Rehab a duty of loyalty.

249.    Pleading in the alternative, to the extent that any information that Dilmas removed from Symbria by downloading it to his personal email account without authorization is not a

REDACTED VERSION FOR PUBLIC FILING

trade secret, that Symbria Information still is confidential, and belongs to Symbria, and by his conduct described herein, Dilmas breached his fiduciary duty by taking the Symbria Information without authorization and in violation of company policy and by disclosing to others outside of Symbria Rehab who did not have lawful access to it.

250.    Pleading further in the alternative, to the extent that any information that Dilmas removed from Symbria by downloading it to his personal email account without authorization is not a trade secret and is not confidential, that Symbria Information still is commercially-valuable, competitively-sensitive, and/or proprietary, and belongs to Symbria, and by his conduct described herein, Dilmas breached his fiduciary duty by taking the Symbria Information without authorization and in violation of company policy and by disclosing to others outside of Symbria Rehab who did not have lawful access to it.

251.    Dilmas' breaches of fiduciary duty have caused Symbria Rehab to be damaged.

WHEREFORE, plaintiff Symbria Rehab, Inc. requests that the Court enter judgment in its favor and against defendant Christos V. Dilmas and award it the following remedies:

(a)    actual damages for Dilmas' breaches of his fiduciary duties to Symbria Rehab;

(b)    an equitable accounting of all property misappropriated by Dilmas and disclosed by Dilmas to others;

(c)    an equitable accounting of all revenues and profits received by Dilmas and his principals as a result of Dilmas' breaches of his fiduciary duty;

(d)    disgorgement of all amounts received by Dilmas as a result of his breaches of his fiduciary duty and of all amounts received as compensation during the period Dilmas was in breach of his fiduciary duty;

(e)    awarding punitive damages;

(f)     award its costs in bringing this action; and

(g)     such other relief as is just and appropriate in the circumstances.

**COUNT VI**
**Tortious Interference with the SPA**
**<u>Symbria Against Callen and the MedRehab Entities</u>**

252.    Plaintiff Symbria incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

253.    The SPA is a valid and enforceable contract between Symbria and UMHS.

254.    Callen was at all times material herein aware of the contractual relation between Symbria and UMHS in the SPA.

255.    On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, were at all times material herein aware of the contractual relation between Symbria and UMHS in the SPA.

256.    Callen and the MedRehab Entities by the conduct set forth herein intentionally and unjustifiably induced a breach by UMHS of the SPA.

257.    Subsequently, UMHS breached the SPA, caused by Callen's and the MedRehab Entities' wrongful conduct.

258.    Symbria has been damaged by Callen's and the MedRehab Entities' wrongful inducement of UMHS' breaches of the SPA.

WHEREFORE, plaintiff Symbria, Inc. requests that the Court enter judgment in its favor and against defendants John R. Callen, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois

REDACTED VERSION FOR PUBLIC FILING

Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC and award Symbria the following remedies:

(a)  actual damages;

(b)  punitive damages;

(c)  award its costs in bringing this action; and

(d)  such other relief as is just and appropriate in the circumstances.

### COUNT VII
### Tortious Interference with Prospective Business Expectancy
### Symbria Rehab, Alliance Connecticut and Alliance HVA
### Against Callen and the MedRehab Entities

259.  Plaintiffs Symbria Rehab, Alliance Connecticut and Alliance HVA incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

260.  Once a company becomes a client of Symbria Rehab, Alliance Connecticut, or Alliance HVA, it tends to remain a client for a long period of time, generally ten years or more. Symbria Rehab, Alliance Connecticut, and Alliance HVA enter into written agreements with their clients that have "evergreen" automatic annual renewal provisions unless either party gives notice of termination.

261.  Symbria Rehab had a valid business expectancy to provide rehabilitation and wellness services to Plymouth Place, Burgess Square, and Tabor Hill, and to provide respiratory therapy services to Lions Gate.

262.  Alliance HVA had a valid business expectancy to provide rehabilitation and wellness services to LECOM Health, Landis Home, and Lutheran Community at Telford.

263.  Alliance Connecticut had a valid business expectancy to provide rehabilitation and wellness services to Masonic Care and iCare Health Network.

264.     Symbria Rehab had valid business expectancies in the continued employment of Irvine, Ambrose, Miller, Rice, and Dilmas.

265.     Alliance HVA had a valid business expectancy in the continued employment of Buckley.

266.     Callen had knowledge of the above business expectancies of Symbria Rehab, Alliance Connecticut, and Alliance HVA.

267.     On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, were at all times material herein aware of the above business expectancies of Symbria Rehab, Alliance Connecticut, and Alliance HVA.

268.     Callen and the MedRehab Entities purposely interfered with Symbria Rehab's business expectancies with Plymouth Place, Burgess Square, Tabor Hill, and Lions Gate, preventing Symbria Rehab's legitimate expectancy of business with those companies from ripening into a valid business relationship with those companies for the provision of rehabilitation and wellness services.

269.     Callen and the MedRehab Entities purposely interfered with Alliance HVA's business expectancies with LECOM Health, Landis Home, and Lutheran Community at Telford, preventing Alliance HVA's legitimate expectancy of business with those companies from ripening into a valid business relationship with those companies for the provision of rehabilitation and wellness services.

270.     Callen and the MedRehab Entities purposely interfered with Alliance Connecticut's business expectancies with Masonic Care and iCare Health Network, preventing Alliance HVA's legitimate expectancy of business with those companies from ripening into a

valid business relationship with those companies for the provision of rehabilitation and wellness services.

271.    Callen and the MedRehab Entities purposely interfered with Symbria Rehab's business expectancies with Irvine, Ambrose, Miller, Rice, and Dilmas, thereby terminating Symbria Rehab's business relationships with each of them.

272.    Callen and the MedRehab Entities purposely interfered with Alliance HVA's business expectancy with Buckley, thereby terminating Alliance HVA's business relationship with Buckley.

273.    Symbria Rehab and Alliance HVA have been damaged by Callen's and the MedRehab Entities' purposeful interference with their business expectancies as set forth herein.

WHEREFORE, plaintiff Symbria Rehab, Alliance Connecticut, and Alliance HVA request that the Court enter judgment in their favor and against defendants John R. Callen, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC and award Symbria Rehab and Alliance HVA the following remedies:

(a)    actual damages;

(b)    punitive damages;

(c)    award their costs in bringing this action; and

(d)    such other relief as is just and appropriate in the circumstances.

## COUNT VIII
### Breach of Fiduciary Duty
### Symbria Rehab Against Callen

274.     Plaintiff Symbria Rehab incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

275.     At all times relevant herein up to the present time, Callen as an officer and former officer of Symbria Rehab owed and owes Symbria Rehab a fiduciary duty of loyalty to safeguard its confidential information.

276.     Pleading in the alternative, to the extent that any information that Callen either removed from Symbria or now has possession of without authorization is not a trade secret, that Symbria Information still is confidential, and belongs to Symbria, and by his conduct described herein, Callen breached his fiduciary duty by taking the Symbria Information without authorization and by using it and disclosing it to others outside of Symbria Rehab who did not have lawful access to it.

277.     Pleading further in the alternative, to the extent that any information that Callen either removed from Symbria or now has possession of without authorization is not a trade secret and is not confidential, that Symbria Information still is commercially-valuable, competitively-sensitive, and/or proprietary, and belongs to Symbria, and by his conduct described herein, Callen breached his fiduciary duty by taking the Symbria Information without authorization and by using it and disclosing it to others outside of Symbria Rehab who did not have lawful access to it.

278.     Callen's breaches of fiduciary duty have caused Symbria Rehab to be damaged.

WHEREFORE, plaintiff Symbria Rehab, Inc. requests that the Court enter judgment in its favor and against defendant John R. Callen and award it the following remedies:

REDACTED VERSION FOR PUBLIC FILING

(a)     actual damages for Callen's breaches of his fiduciary duties to Symbria Rehab;

(b)     forfeiture and disgorgement of Callen's ███████████████████████

█████████ obtained after he ceased working for Symbria Rehab;

(c)     an equitable accounting of all property misappropriated by Callen and disclosed by Callen to others;

(d)     an equitable accounting of all revenues and profits received by Callen and his principals as a result of Callen's breaches of his fiduciary duty;

(e)     forfeiture and disgorgement of all amounts received by Callen as a result of his breaches of his fiduciary duty including his ███████████████████████ ████████ obtained after he ceased working for Symbria Rehab;

(f)     awarding punitive damages;

(g)     awarding its costs in bringing this action; and

(h)     such other relief as is just and appropriate in the circumstances.

## COUNT IX
### Tortious Interference with the Symbria Rehab-Dilmas At-Will Employment Contract and with the Symbria Rehab – Dilmas Resignation Contract
### <u>Against Callen, the MedRehab Entities, and UMHS</u>

279.    Plaintiff Symbria Rehab incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

280.    The Symbria Rehab-Dilmas at-will employment contract is a valid and enforceable contract between Symbria Rehab and Dilmas.

281.    Callen was at all times material herein aware of the at-will employment contractual relation between Symbria Rehab and Dilmas, including Dilmas' implied duty of good faith and fair dealing under that contract, including Dilmas' obligations not to divulge Symbria and Affiliates' confidential information and not to undermine their interests by failing

to inform Symbria Rehab that Callen, MedRehab Entities, and UHMS were soliciting Symbria clients, prospects and employees.

282.     On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, and UMHS, through Callen acting within the scope of his agency of his board of directors position at UHMS, were at all times material herein aware of the at-will contractual relation between Symbria Rehab and Dilmas, including Dilmas' implied duty of good faith and fair dealing under that contract, and Dilmas' obligations not to divulge Symbria and Affiliates' confidential information and not to undermine their interests by failing to inform Symbria Rehab that Callen, MedRehab Entities, and UHMS were soliciting Symbria clients, prospects and employees.

283.     Callen, the MedRehab Entities, and UMHS, by the conduct set forth herein, including working together to form competing ventures that aimed to take business away from Plaintiffs and funnel it towards them, intentionally and unjustifiably induced a breach by Dilmas of the at-will employment contract between him and Symbria Rehab.

284.     Subsequently, Dilmas breached his at-will employment contract with Symbria Rehab, caused by Callen's and the MedRehab Entities' wrongful conduct.

285.     Symbria Rehab has been damaged by Callen's, the MedRehab Entities', and UMHS' wrongful inducement of Dilmas's breaches of his at-will employment contract with Symbria Rehab.

286.     The Symbria Rehab-Dilmas resignation agreement is a valid and enforceable contract between Symbria Rehab and Dilmas.

287.    Callen was at all times material herein aware of this contractual relation between Symbria Rehab and Dilmas because of his knowledge as the former President of Symbria Rehab of similar contracts and, on information and belief, from information received from Dilmas.

288.    On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, and UMHS, through Callen acting within the scope of his agency of his board of directors position at UHMS, were at all times material herein aware of this contractual relation between Symbria Rehab and Dilmas.

289.    Callen, the MedRehab Entities, and UMHS, by the conduct set forth herein, including working together to form competing ventures that aimed to take business away from Plaintiffs and funnel it towards them, intentionally and unjustifiably induced a breach by Dilmas of the resignation contract between him and Symbria Rehab.

290.    Subsequently, Dilmas breached his resignation contract with Symbria Rehab, caused by Callen's and the MedRehab Entities' wrongful conduct.

291.    Symbria Rehab has been damaged by Callen's, the MedRehab Entities', and UMHS' wrongful inducement of Dilmas's breaches of his resignation contract with Symbria Rehab.

WHEREFORE, plaintiff Symbria, Inc. requests that the Court enter judgment in its favor and against defendants John R. Callen, United Methodist Homes & Services, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab

REDACTED VERSION FOR PUBLIC FILING

Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award Symbria the following remedies:

(a)     actual damages;

(b)     punitive damages;

(c)     award its costs in bringing this action; and

(d)     such other relief as is just and appropriate in the circumstances.

**COUNT X**
**Copyright Infringement**
**Symbria Against All Defendants**

292.    Plaintiff Symbria incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

293.    Symbria is the exclusive owner of copyrights as set forth in 17 U.S.C. § 106  that are registered with the United States Copyright Office for the following literary works: (a) Symbria Rehab's "Understanding the Patient Driven Payment Model" presentation slides, (b) Symbria Rehab's "PDPM Preparedness Tips" Numbers 1 through 12 and 14 (c) Symbria Rehab's Disease Management Models, and accompanying educational slide presentations accompanying each of its Disease Management Models (the "Registered Copyrighted Works"). A true and correct copy of the unofficial previews of the Certificates of Registration issued by the U.S. Copyright Office for the Registered Copyrighted Works is attached hereto as Group Exhibit 5.[1]

294.    The Registered Copyrighted Works are literary works and/or pictorial or graphical works within the meaning of 17 U.S.C. §§ 102(a)(1) and (5).

---

1 Due to the large number of pages in the Registered Copyrighted Works, Plaintiffs do not attach them here.

REDACTED VERSION FOR PUBLIC FILING

295. The Registered Copyrighted Works are original, creative works of authorship fixed in a tangible medium from which they can be perceived, and are subject to full protection under the Copyright Act.

296. Symbria is the exclusive owner of all rights, title, and interest in and to the copyrights in the Registered Copyrighted Works, and owns copyright registrations for the Registered Copyrighted Works.

297. Defendants Irvine, Dilmas, Joint & Neuro, MedRehab Alliance, MedRehab Interstate, and Chicago Rehab have reproduced and distributed one or more of the Registered Copyrighted Works in connection with the marketing and sale of these companies' services. On information and belief, defendants Callen, UMHS, MedRehab Holdings, MedRehab Wisconsin, IASN, Pearl, MedRehab Therapy, and Joint & Neuro Chicago have also reproduced and distributed one or more of the Registered Copyrighted Works in connection with the sale of these companies' services or those of entities that they control. On information and belief, Defendants have also made documents that are identical and/or substantially similar to the Registered Copyrighted Works.

298. Defendants have reproduced the Registered Copyrighted Works and/or created derivative works thereof and have displayed, distributed, offered for sale, and/or sold those reproductions and/or derivative works in the United States.

299. Symbria did not authorize the Defendants to reproduce, prepare derivative works based upon, distribute copies of, publicly perform, publicly display, advertise, promote, market, sell or otherwise use the Registered Copyrighted Works. Symbria has suffered, and will continue to suffer, substantial losses, including but not limited to lost profits and damage to its business reputation and goodwill.

300.    Defendants committed all of the acts alleged herein without Symbria's permission, license, or consent.

301.    Defendants knew of, or should have known that, Symbria owned the Registered Copyrighted Works and that Defendants did not have permission to reproduce, prepare derivative works based upon, distribute copies of, publicly perform, publicly display, advertise, promote, market, sell or otherwise use the Registered Copyrighted Works, or portions thereof, and did not have permission to use copyrightable content from the Registered Copyrighted Works.

302.    Upon information and belief, Defendants have benefited from the infringement of the Registered Copyrighted Works through the profits generated from providing those works and services using those works to customers.

303.    Defendants' wrongful actions continue to deprive Symbria of its rights and benefits in the Registered Copyrighted Works, which include the exclusive right to use, reproduced, distribute, sell, and create derivative works of the Registered Copyrighted Works.

304.    As a result of their wrongful conduct, Defendants are liable to Symbria for copyright infringement pursuant to 17 U.S.C. § 501.

305.    Upon information and belief, unless enjoined by the Court, Defendants will continue to wrongfully use and infringe on the Registered Copyrighted Works by continuing to use, distribute, and profit from the infringement of those works.

306.    As a direct and proximate result of Defendants' infringement of the Registered Copyrighted Works, Symbria has suffered, and will continue to suffer, monetary damages, and irreparable injury to its businesses, reputation, and goodwill.

REDACTED VERSION FOR PUBLIC FILING

307.     Symbria is entitled to injunctive relief and an award of statutory damages for Defendants' infringement, or, in the alternative, Symbria is entitled to recover, its actual damages under 17 U.S.C. § 505 whether measured by actual damages or profits direct or indirectly attributable to Defendants' infringement.

308.     Defendants' acts as alleged herein are intentional and willful and will, unless enjoined, damage Symbria, which has no adequate remedy at law.

309.     Defendants have infringed Symbria's copyrights in the Registered Copyrighted Works.

310.     Defendants knew their acts constituted copyright infringement.

311.     Defendants' conduct was and continues to be willful within the meaning of the Copyright Act.

312.     Because Defendants' infringement was willful, any award(s) of statutory damages should be enhanced in accordance with 17 U.S.C. § 504(c)(2).

313.     As a direct and proximate result of the violations of the Copyright Act, Symbria has sustained, and will continue to sustain, substantial, immediate and irreparable injury for which there is no adequate remedy at law

WHEREFORE, plaintiff Symbria, Inc. requests that the Court enter judgment in their favor and request that the Court enter judgment in their favor and against John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois

REDACTED VERSION FOR PUBLIC FILING

Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award plaintiffs the following remedies:

(a)     a preliminary and a permanent injunction preventing the Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with them from infringing the Registered Copyrighted Works, pursuant to 17 U.S.C. § 503;

(b)     impoundment during the pendency of this action of all copies of the Registered Copyrighted Works made or used by the Defendants and of records documenting the manufacture, sale, or receipt of things involved in any such violation by the Defendants, pursuant to 17 U.S.C. § 503(a);

(c)     upon the entry of final judgment, ordering the destruction or other reasonable disposition of all copies found to have been made or used in violation of Symbria's exclusive rights, and of all other articles by means of which such copies may be reproduced, pursuant to 17 U.S.C. § 503(b);

(d)     actual damages for loss caused by infringement of Symbria's Registered Copyrighted Works and any additional profits of the infringing Defendants, pursuant to 17 U.S.C. § 504;


(e)     judgment against Defendants for their infringement under the Copyright Act, 17 U.S.C. §§ 106 and 501, and for the willful, intentional and purposeful disregard and indifference to Symbria's rights;

(f)     Symbria's reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

(g)     Symbria's costs in bringing this action; and

(h)     such other relief as is just and appropriate in the circumstances.

**COUNT XI**
**Tortious Interference with the Symbria Rehab-Irvine At-Will Employment Contract**
**Symbria Rehab Against Callen, the MedRehab Entities, and UMHS**

314.     Plaintiff Symbria Rehab incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

315.     The Symbria Rehab-Irvine at-will employment contract is a valid and enforceable contract between Symbria Rehab and Irvine.

316.     Callen was at all times material herein aware of the at-will contractual relation between Symbria Rehab and Irvine, implied duty of good faith and fair dealing under that contract, including Irvine's obligations not to divulge Symbria and Affiliates' confidential information and not to undermine their interests by failing to inform Symbria Rehab that Callen, MedRehab Entities, and UHMS were soliciting Symbria clients, prospects and employees.

317.     Certain of the information belonging to Symbria Rehab and misappropriated by Irvine, such as forms and checklists, documents relating to strategies for obtaining reimbursements and resolving disputes concerning reimbursements, and company policies and procedures, are proprietary and commercially valuable even if the information does not amount to confidential trade secrets.

318.     On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, and UMHS, through Callen acting within the scope of his agency of his board of directors position for UHMS, were at all times material herein aware of the at-will contractual relation between Symbria Rehab and Irvine, including its implied duty of good faith and fair dealing under that contract, and Irvine's obligations not to divulge Symbria and Affiliates' confidential information and not to undermine their interests by

failing to inform Symbria Rehab that Callen, MedRehab Entities, and UHMS were soliciting Symbria clients, prospects and employees.

319. Callen, the MedRehab Entities, and UMHS, by the conduct set forth herein, including working together to form a competing venture that aimed to take business away from Plaintiffs and funnel it towards them, intentionally and unjustifiably induced a breach by Irvine of the at-will employment contract between her and Symbria Rehab.

320. Subsequently, Irvine breached her at-will employment contract with Symbria Rehab, caused by Callen's and the MedRehab Entities' wrongful conduct.

321. Symbria Rehab has been damaged by Callen's, the MedRehab Entities', and UMHS' wrongful inducement of Irvine's breaches of her at-will employment contract with Symbria Rehab.

WHEREFORE, plaintiff Symbria Rehab, Inc. requests that the Court enter judgment in its favor and against defendants John R. Callen, United Methodist Homes & Services, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Associates of Chicago, LLC and award Symbria the following remedies:

(a) actual damages;

(b) punitive damages;

(c) award its costs in bringing this action; and

(d) such other relief as is just and appropriate in the circumstances.

## COUNT XII
**Tortious Interference with Callen's Severance and General Release Agreement
Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA
Against the MedRehab Entities and UMHS**

322.     Plaintiffs Symbria and Affiliates incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

323.     The Severance and General Release Agreement between Symbria and Affiliates and Callen in effect as of February 13, 2017 is a valid and enforceable contract between Symbria and Affiliates and Callen.

324.     The MedRehab Entities and UMHS were at all times material herein aware of the contractual relation between Symbria Rehab and Callen as a result of Callen acting as an agent of the MedRehab Entities, Callen's membership on UMHS' board of directors, Sharma's membership on UMHS' board of directors, and the direct or indirect co-ownership and common management by Callen, Sharma, and Murtaza of Joint & Neuro and Joint & Neuro Chicago.

325.     Certain of the information belonging to Symbria and Affiliates and misappropriated by Irvine, Dilmas, Rice, and others such as forms and checklists, documents relating to strategies for obtaining reimbursements and resolving disputes concerning reimbursements, and company policies and procedures, are proprietary and commercially valuable even if the information does not amount to confidential trade secrets.

326.     On information and belief, each of the MedRehab Entities, through Callen acting within the scope of his agency for each entity, and UMHS, through Callen acting within the scope of his agency of his board of directors position for UHMS, were at all times material herein aware of the contractual relation between Symbria and Affiliates and Callen, including its obligations relating to Confidential Information as defined therein.

327. The MedRehab Entities and UMHS, by the conduct set forth herein, including working together to form a competing venture that aimed to take business away from Plaintiffs and funnel it towards them, intentionally and unjustifiably induced a breach by Callen of the contract between him and Symbria and Affiliates.

328. Subsequently, Callen breached his Severance and General Release Agreement with Symbria and Affiliates, caused by UMHS' and the MedRehab Entities' wrongful conduct.

329. Symbria and Affiliates have been damaged by the MedRehab Entities' and UMHS' wrongful inducement of Callen's breaches of his Severance and General Release Agreement with Symbria and Affiliates.

WHEREFORE, plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC and Alliance Rehab HVA, L.L.C. request that the Court enter judgment in its favor and against defendants United Methodist Homes & Services, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Associates of Chicago, LLC and award Symbria the following remedies:

(a)     actual damages;

(b)     punitive damages;

(c)     award its costs in bringing this action; and

(d)     such other relief as is just and appropriate in the circumstances.

## COUNT XIII

**Aiding and Abetting Callen's Breach of Fiduciary Duty**
**Symbria Rehab Against the MedRehab Entities and UMHS**

330.     Plaintiff Symbria Rehab incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

331.     At all times relevant herein up to the present time, Callen as an officer and former officer of Symbria Rehab owed and owes Symbria Rehab a fiduciary duty of loyalty to safeguard its confidential information.

332.     Certain of the information belonging to Symbria Rehab and misappropriated by Irvine, such as forms and checklists, documents relating to strategies for obtaining reimbursements and resolving disputes concerning reimbursements, and company policies and procedures, are proprietary and commercially valuable even if the information does not amount to confidential trade secrets.

333.     Pleading further in the alternative, to the extent that any information that Callen either removed from Symbria or now has possession of without authorization is not a trade secret and is not confidential, that Symbria Information still is commercially-valuable, competitively-sensitive, and/or proprietary, and belongs to Symbria, and by his conduct described herein, Callen breached his fiduciary duty by taking the Symbria Information without authorization and by using it and disclosing it to others outside of Symbria Rehab who did not have lawful access to it.

334.     By the conduct set forth above, Callen performed wrongful acts that caused an injury to Symbria Rehab.

335.     MedRehab Therapy, Joint & Neuro, Joint & Neuro Chicago, MedRehab Alliance, MedRehab Alliance Interstate, Pearl, IASN, and MedRehab Wisconsin were at all times material

herein aware of Callen's duty of loyalty to Symbria Rehab and aware of their role as part of Callen's breaches of fiduciary duty at the times that they provided Callen assistance in breaching Callen's fiduciary duty of loyalty to Symbria Rehab by virtue of Callen's direct or indirect ownership of each of them and Callen's direction of their activities.

336.    UMHS and MedRehab Holdings were at all times material herein aware of Callen's duty of loyalty to Symbria Rehab and aware of their role as part of Callen's breaches of fiduciary duty at the times they provided Callen assistance in breaching Callen's fiduciary duty of loyalty to Symbria Rehab by virtue of Callen's membership on UMHS' board of directors.

337.    Chicago Rehab was at all times material hereing aware of Callen's duty of loyalty to Symbria Rehab and aware of its role as part of Callen's breaches of fiduciary duty at the times it provided Callen assistance in breaching Callen's fiduciary duty of loyalty to Symbria Rehab by virtue of Callen, Sharma, and Murtaza co-owning, directly or indirectly, Joint & Neuro and Joint & Neuro Chicago and co-managing those companies, and by virtue of Sharma's membership on UMHS' board of directors.

338.    UMHS and the MedRehab Entities knowing and substantially assisted Callen in breaching his fiduciary duty to Symbria Rehab by providing resources to Callen, such as computers, network servers, email addresses, email signature blocks, office space, and payment of travel and entertainment expenses to solicit and service Symbria Rehab's clients. Chicago Rehab hired and employed Ambrose, Dilmas, Miller, and Buckley at Callen's request or direction, and then leased them to perform services for the MedRehab Entities with respect to Symbria Rehab clients in exchange for payments to Chicago Rehab. In addition, UMHS provided resources to solicit and service Symbria Rehab clients by virtue of its direct or indirect ownership of MedRehab Holdings, MedRehab Alliance, MedRehab Interstate., IASN, and Pearl.

339.     Symbria Rehab has been damaged by the MedRehab Entities' and UMHS' wrongful inducement of Callen's breaches of fiduciary duty to Symbria Rehab.

WHEREFORE, plaintiff Symbria Rehab, Inc. requests that the Court enter judgment in its favor and against defendants United Methodist Homes and Services, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC and Joint & Neuro Rehab Associates of Chicago, LLC and award Symbria the following remedies:

(a)     actual damages;

(b)     disgorgement of all amounts received by each defendant as a result of Callen's breaches of his fiduciary duty;

(c)     punitive damages;

(d)     award its costs in bringing this action; and

(e)     such other relief as is just and appropriate in the circumstances.

## JURY DEMAND

Plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, Alliance Rehab HVA, L.L.C., GreatBanc Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust, and the Symbria, Inc. Employee Stock Ownership Trust hereby demand a jury on all issues in this Complaint that are triable to a jury.

DATED: November 17, 2022

REDACTED VERSION FOR PUBLIC FILING

Respectfully submitted,

SYMBRIA, INC., SYMBRIA REHAB, INC., ALLIANCE REHAB OF CONNECTICUT, LLC, ALLIANCE REHAB HVA, L.L.C., GREATBANC TRUST COMPANY, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust, and THE SYMBRIA INC. EMPLOYEE STOCK OWNERSHIP TRUST


By: /s/ *Matthew J. O'Hara*
One of Their Attorneys


Matthew J. O'Hara (Ill. ARDC No. 6237795)
Terrence J. Sheahan (Ill. ARDC No. 6257646)
Gia F. Colunga (Ill. ARDC No. 6282679) Katie
D. Krysan (Ill. ARDC No. 6323797) Lillian G.
Lamphere (Ill. ARDC No. 6340044) Freeborn
& Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
mohara@freeborn.com
tsheahan@freeborn.com
gcolunga@freeborn.com
kkrysan@freeborn.com
llamphere@freeborn.com


Jason P. Stearns (Fla. Bar No. 059550)
Freeborn & Peters LLP
201 North Franklin Street, Suite 3550 Tampa,
Florida 33602
(813) 488-2920
jstearns@freeborn.com