CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SYMBRIA, INC., *et. al.* ) | |
| ) | No.:    20-cv-04084 |
| Plaintiffs, ) | |
| ) | Judge Mary M. Rowland |
| v. ) | |
| ) | |
| JOHN R. CALLEN, *et. al,* ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT UNITED METHODIST HOME & SERVICES ANSWER AND**
**AFFIRMATIVE DEFENSES TO PLAINTIFFS' FOURTH AMENDED COMPLAINT**

NOW COMES Defendant, UNITED METHODIST HOME & SERVICES, an Illinois

Corporation, ("UMHS" and "Defendant"), by and through its attorneys, O'Hagan Meyer, LLC, and

for its Answer to Plaintiffs' Fourth Amended Complaint ("TAC") [Dkt. # 604] states as follows:

**Nature of the Action**

1.        This is an action for misappropriation of trade secrets, copyright infringement,

breach of non-solicitation and non-competition covenants, breach of contract, breach of fiduciary

duty, tortious interference with contract, tortious interference with business expectancy, and aiding

and abetting breach of fiduciary duty. Plaintiffs provide rehabilitation and wellness services in senior

living and skilled nursing facilities across the United States. In the course of their business, plaintiffs

have invested large amounts of time and money in developing commercially-valuable, competitively-

sensitive information concerning the provision of healthcare services to senior adults that gives

plaintiffs an advantage over their competitors. Plaintiffs' former executive and managers have

misappropriated and used this information in violation of federal and state trade secrets laws, the

Copyright Act, in violation of contracts that they entered into and benefitted from, and in breach of

their fiduciary duties. These persons have disclosed this information to entities that compete with the

plaintiffs, a number of which are owned in whole or in part by a company that was once one of

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

plaintiff Symbria, Inc.'s owners. That former owner has now decided to compete with Symbria, Inc.

and its subsidiaries despite covenants it freely undertook not to do so when it sold its interest in

Symbria, Inc. for substantial consideration consisting of cash, debt, and warrants to purchase stock

in Symbria, Inc. in the future.

**ANSWER:** **Defendant admits that Plaintiffs purport to bring this action for misappropriation of trade secrets, copyright infringement, breach of non-solicitation and non-competition covenants, breach of contract, breach of fiduciary duty, tortious interference with contract, tortious interference with business expectancy, and aiding and abetting breach of fiduciary duty. Defendant further admits that Plaintiffs provide rehabilitation and wellness services in senior living and skilled nursing facilities, but Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations that the aforementioned services are provided across the United States. Further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations that in the course of their business, Plaintiffs have invested large amounts of time and money in developing commercially-valuable, competitively-sensitive information concerning the provision of healthcare services to senior adults that gives Plaintiffs an advantage over their competitors. Finally, Defendant denies all the remaining allegations in Paragraph 1.**

## The Parties

2.     Plaintiff Symbria, Inc. ("Symbria") is the parent company of businesses that provide

clinical health services for senior living and post-acute care providers, including therapy, pharmacy

services, and wellness programs in twelve states. Symbria was founded under the  name Midwest

Senior Network in January 1999 as a for-profit company by a group of not-for profit-members of

Health Resource Alliance, Inc. Health Resource Alliance, Inc. was founded in 1995 by a group of

not-for-profit organizations. In 2015, Symbria's owners sold the company to an employee stock

ownership plan ("ESOP") trust, making Symbria an employee-owned company. Symbria is an

Illinois corporation with its principal place of business in Warrenville, Illinois.

**ANSWER:     Defendant is without information or knowledge sufficient to form a belief as to whether Plaintiff Symbria, Inc. is the parent company of businesses that provide clinical health services for senior living and post-acute care providers, including therapy, pharmacy services, and wellness programs in twelve states. Defendant admits the remaining allegations in Paragraph 2.**

3.     Plaintiff Symbria Rehab, Inc. ("Symbria Rehab"), formerly known as Alliance Rehab,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Inc. is a wholly-owned subsidiary of Symbria. Symbria Rehab provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers. In the state of Ohio, Symbria Rehab is the successor in interest to certain contracts formerly entered into by Symbria Rehab, LLC, a wholly-owned subsidiary of Symbria Rehab. Symbria Rehab is an Illinois corporation with its principal place of business in Warrenville, Illinois..

**ANSWER:** Defendant denies that Symbria Rehab provides home health as that term is commonly used in the industry. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4.      Plaintiff Alliance Rehab of Connecticut, LLC ("Alliance Connecticut") is a Connecticut limited liability company, majority-owned by Symbria Rehab, which is one of its members. Alliance Connecticut is a subsidiary of Symbria. Alliance Connecticut provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers in the state of Connecticut.

**ANSWER:**    Defendant denies that Plaintiff Alliance Connecticut provides home health as that term is commonly used in industry.  Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 4.

5.      Plaintiff Alliance HVA, L.L.C. ("Alliance HVA") is a Pennsylvania limited liability company, majority-owned by Symbria Rehab, which is one of its members. Alliance HVA is a subsidiary of Symbria. Alliance HVA does business as Symbria Rehab, an HVA  Senior Living Alliance Partner. Alliance HVA provides rehabilitation services for the residents and patients of senior living and post-acute care providers, including home health and wellness programs, by entering into exclusive contracts with those providers in the state of Pennsylvania.

**ANSWER:**    Defendant denies that Plaintiff Alliance HVA provides home health as that term is commonly used in industry.  Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 5.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

6.     Plaintiff GreatBanc Trust Company ("GreatBanc") is the Trustee of the Symbria, Inc. Employee Stock Ownership Trust. GreatBanc is a trust company regulated by the State of Illinois, and independent fiduciary for retirement plans, specializing in employee stock ownership plans. GreatBanc is an Illinois corporation with its principle place of business in Lisle, Illinois. GreatBanc brings this action not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust.

**ANSWER:    Defendant admits that Great Banc purports to brings this action not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust. Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 6.**

7.     The Symbria, Inc. Employee Stock Ownership Trust (the "Symbria ESOP Trust") was formed pursuant to the Symbria, Inc. Employee Stock Ownership Plan. Shares of stock in Symbria are held in the Symbria ESOP Trust for the benefit of the participants and beneficiaries of the Symbria, Inc. Employee Stock Ownership Plan.

**ANSWER:    Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 7.**

8.     Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA are referred to herein collectively as "Symbria and Affiliates." Symbria, Symbria Rehab, Alliance Connecticut, Alliance HVA, GreatBanc, and the Symbria ESOP Trust are referred to herein collectively as "Plaintiffs."

**ANSWER:    No allegation of fact is made in paragraph 8 of the Complaint so no answer is required by Defendant. To the extent that an answer is required, Defendant admits that the Complaint asserts that Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA are referred to herein collectively as "Symbria and Affiliates." Symbria, Symbria Rehab, Alliance Connecticut, Alliance HVA, GreatBanc, and the Symbria ESOP Trust are referred to herein collectively as "Plaintiffs."**

9.     Defendant John R. Callen ("Callen") was formerly employed by Symbria Rehab since 1999 as its President, until his employment duties administratively terminated on January 12,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

2017. Callen is a citizen of the state of Illinois.

**ANSWER:** **Defendant admits the allegations in Paragraph 9.**

10.　　Defendant United Methodist Homes & Services ("UMHS") is a provider of services and residences for older adults. Until October 31, 2015, UMHS was one of the owners of Symbria. William A. Lowe ("Lowe") is the President of UMHS. Callen was a member of the Board of Directors of United Methodist Homes & Services through at least May 2019, serving as its Vice Chairman. UMHS is an Illinois corporation with its principal place of business located at 1415 West Foster Avenue in Chicago, Illinois.

**ANSWER:** **Defendant admits the allegations in Paragraph 10.**

11.　　Defendant Christos V. Dilmas ("Dilmas") was employed by Symbria Rehab starting on October 31, 2013, when he was hired as a Program Manager/Physical Therapist. On October 2, 2016, he was promoted to Regional Director of Operations. Dilmas' last day of employment by Symbria Rehab was September 25, 2019. Dilmas is a citizen of the state of Illinois.

**ANSWER:** **Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 11.**

12.　　Defendant MedRehab Alliance Holdings, Inc. ("MedRehab Holdings") is a holding company that is wholly-owned by UMHS. MedRehab Holdings is a Delaware corporation that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Lowe is President and Secretary of MedRehab Holdings.

**ANSWER:** **Defendant admits MedRehab Alliance Holdings, Inc, ("MedRehab Holdings") is a holding company that is wholly-owned by UMHS, that MedRehab Holding is a Delaware corporation that is registered to do business in Illinois, and Lowe is President and Secretary of MedRehab Holdings. Defendant denies the remaining allegations of paragraph 12 of the Complaint.**

13.　　Defendant MedRehab Alliance, LLC ("MedRehab Alliance") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

home health agencies. MedRehab Alliance is a Delaware limited liability company that is registered to do business in Illinois and is located at 1415 West Foster Avenue in Chicago, Illinois. William Lowe is the manager of MedRehab Alliance. Callen is President, CEO, and Managing Partner of MedRehab Alliance. Through UMHS' ownership of Med Rehab Holdings, UMHS owns 25.974 percent of MedRehab Alliance. Callen owns 25.974 percent of MedRehab Alliance. PANDR Holdings LLC owns 25.974 percent of MedRehab Alliance. The manager of PANDR Holdings LLC is Rahul Sharma ("Sharma"). ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ When Irvine resigned from Symbria Rehab, she went to work for Plymouth Place, where she continues to be employed. According to a UMHS employee who is also an agent of defendant Pearl Health Care Services, Inc., Irvine was hired by Callen to work for his "Therapy company" and to be "stationed at Plymouth for now."

**ANSWER:** **Defendant admits that Defendant MedRehab Alliance, LLC ("MedRehab Alliance") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies. MedRehab Alliance is a Delaware limited liability company that is registered to do business in Illinois and is located at 1415 West Foster Avenue in Chicago, Illinois. William Lowe is the manager of MedRehab Alliance. Defendant admits that Callen is the President, CEO and Managing Partner of MedRehab Alliance. Defendant admits that through UMHS' ownership of Med Rehab Holdings, UMHS owns 25.974 percent of MedRehab Alliance. Defendant admits that Callen owns 25.974 percent of MedRehab Alliance, that PANDR Holdings LLC owns 25.974 percent of MedRehab Alliance, and that the manager of PANDR Holdings LLC is Rahul Sharma. Defendant denies that a UMHS employee who is also an agent of Defendant Pearl Health Care Services Inc. intended to convey or suggest, "Irvine was hired by Callen to work for his "Therapy company" and to be "stationed at Plymouth for now." Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13.**

14. Defendant MedRehab Alliance Interstate, LLC ("MedRehab Interstate") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies in states outside Illinois. It is an Illinois limited liability company

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

located at 1415 West Foster Avenue in Chicago. A majority of MedRehab Interstate is owned by MedRehab Holdings and therefore by UMHS. MedRehab Interstate has four managers: Callen, Lowe, Jim Sutton, and Sharma. Sharma also is a member of the Board of Directors of UMHS. Each of them list UMHS' Foster Avenue address as their place of business. Through MedRehab Holdings and MedRehab Alliance, UMHS owns 60 percent of MedRehab Interstate.

**ANSWER:** **Defendant admits only that Defendant MedRehab Alliance Interstate, LLC ("MedRehab Interstate"), an Illinois limited liability company, provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics in states outside Illinois, and that its managers are Callen, Lowe and Rahul Sharma. Answering further, UMHS denies the remaining allegations in Paragraph 14.**

15. Defendant Illinois Ancillary Services Network, LLC ("IASN"), formerly known as MedRehab Ancillary Services Illinois, LLC, is a provider of ancillary and home health care services. IASN is majority-owned by MedRehab Alliance, and through IASN, UMHS, Callen, and PANDR Holdings LLC each own 25.974 percent of IASN. Plymouth Place owns a minority interest in IASN. IASN is the sole owner of Pearl Healthcare Services, Inc. IASN is an Illinois limited liability company located at 1415 West Foster Avenue in Chicago, Illinois. Callen and Lowe are managers of IASN. IASN's managers include Callen and Lowe and they list UMHS' Foster Avenue address as their place of business.

**ANSWER:** **Defendant admits IASN is owned by MedRehab Alliance and through IASN, UMHS, and Callen each own 25.974 percent of IASN, IASN is the sole owner of Pearl Healthcare Services, Inc., IASN is an Illinois limited liability company located at 1415 West Foster Avenue in Chicago, Illinois, Callen and Lowe are managers of IASN. Defendant denies the remaining allegations in paragraph 15 of the Complaint.**

16. Defendant Pearl Health Care Services, Inc., doing business as MedRehab at Home and Chicago Med Home Health ("Pearl"), is a home health care agency that provides nursing, physical therapy, occupational therapy, speech pathology, and other home health services. Pearl is an Illinois corporation. Its officers are Callen, at the address of 10400 West Higgins Road in Rosemont, Illinois, and Lowe, at the address of 1415 West Foster Avenue in Chicago, Illinois. IASN

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

owns 100 percent of Pearl. Through its ownership interests in MedRehab Alliance and MedRehab

Alliance's ownership interest in IASN, UMHS, Callen, and PANDR Holding LLC own indirect

controlling interests in Pearl. An employee of UMHS, Paul Spence, works for Pearl as its Business

Development Director.

**ANSWER:** **Defendant admits only that Pearl Health Care Services, Inc. is registered to do business as Chicago Med Home Health, that it is an Illinois corporation and that its officers are Callen, at the address of 10400 West Higgins Road in Rosemont, Illinois, and Lowe, at the address of 1415 West Foster Avenue in Chicago, Illinois. UMHS denies the remaining allegations in Paragraph 16.**

17. Defendant Chicago Rehabilitation Collective PLLC ("Chicago Rehab") provides

medical services through health care professionals including physical therapists, occupational

therapists, speech therapists, and respiratory therapists, with offices located at 10400 West Higgins

Road in Rosemont, Illinois and 315 North LaGrange Road in LaGrange Park, Illinois. Callen at all

times actively manages Chicago Rehab and is an agent of Chicago Rehab, and Callen was one of the

owners of Chicago Rehab, together with his "partners" Sharma and Sajjad Murtaza ("Murtaza").

Dilmas became employed by Chicago Rehab at Callen's request at the time he resigned from

Symbria Rehab. Chicago Rehab is an Illinois professional limited liability company. The managers

of Chicago Rehab use the Higgins Road address as their business address. Chicago Rehab is the

successor in interest to Chicago Rehabilitation Collective, LLC, a Delaware limited liability company

that was formed on April 29, 2019, and to Chicago Rehabilitation Collective, LLC, an Illinois limited

liability company into which Chicago Rehabilitation Collective, LLC, a Delaware limited liability

company, was domesticated on June 20, 2019.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17.**

18. Defendant MedRehab Therapy Associates of Illinois, LLC ("MedRehab Therapy")

is a provider of clinical health services for senior living and post-acute care providers. MedRehab

Therapy is an Illinois limited liability company located at 10400 West Higgins Road in Rosemont,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Illinois. Callen is the manager of MedRehab Therapy and an owner of MedRehab Therapy.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18.**

19.     Defendant Joint & Neuro Rehab Associates, LLC ("Joint & Neuro") is on information and belief a provider of acute and post-acute rehabilitation staffing and management services to hospitals, health systems, outpatient physical therapy, pain management, and musculoskeletal clinics, skilled nursing facilities, home health agencies, and senior care communities. Joint & Neuro is a Delaware limited liability company that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Callen is a manager of Joint & Neuro, along with Sharma, Murtaza, and Amish Patel, its CEO, and managing partner. Callen is an owner of Joint & Neuro. The managers of Joint & Neuro list their business addresses at the Higgins Road address in Rosemont. Joint & Neuro was formerly known as Joint & Neuro Rehab Associates of Chicago, LLC.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19.**

20.     Defendant MedRehab Alliance Wisconsin, LLC ("MedRehab Wisconsin") provides, on information and belief, rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies. MedRehab Wisconsin is a Delaware limited liability company that is located at 10400 Higgins Road in Rosemont, Illinois. MedRehab Wisconsin is owned by MedRehab Alliance, and through MedRehab Alliance, UMHS and Callen each own controlling interests in MedRehab Wisconsin.

**ANSWER:** **Defendant denies MedRehab Alliance Wisconsin, LLC ("MedRehab Wisconsin") provides rehabilitation management services to hospitals, health systems, skilled nursing facilities, outpatient clinics, and home health agencies, MedRehab Wisconsin is owned by MedRehab Alliance and through MedRehab Alliance, UMHS, and Callen each own controlling interests in MedRehab Wisconsin. Defendant admits the remaining allegations in paragraph 20 of the Complaint.**

21.     Defendant Joint & Neuro Rehab Associates of Chicago, LLC ("Joint & Neuro

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Chicago") is on information and belief a provider of acute and post-acute rehabilitation staffing and management services to hospitals, health systems, outpatient physical therapy, pain management, and musculoskeletal clinics, skilled nursing facilities, home health agencies, and senior care communities. Joint & Neuro Chicago is a Delaware limited liability company that is registered to do business in Illinois and is located at 10400 West Higgins Road in Rosemont, Illinois. Callen is a manager of Joint & Neuro Chicago and its CEO, along with fellow managers Sharma, Murtaza, and Amish Patel, and the managing partner. ███████████████████████████ ████████████████████████████████████████████████████████████ Through his ownership interest in Joint & Neuro, Callen is an indirect owner of Joint & Neuro Chicago. The four managers of Joint & Neuro Chicago are the same as the managers of Joint & Neuro and list their business addresses at the same Higgins Road address in Rosemont.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 21.**

22.     Defendants MedRehab Holdings, MedRehab Alliance, MedRehab Interstate, IASN, Pearl, Chicago Rehab, Joint & Neuro, MedRehab Therapy, MedRehab Wisconsin, and Joint & Neuro Chicago are referred to collectively in this Amended Complaint as the "MedRehab Entities."

**ANSWER:** **Defendant denies that Chicago Rehab, Joint & Neuro and Joint & Neuro Chicago are MedRehab Entities. Answering further, Defendant denies that Pearl or IASN are operational. Answering further, Defendant admits that Plaintiff purports to allege that Defendants MedRehab Holdings, MedRehab Alliance, MedRehab Interstate, IASN, Pearl, Chicago Rehab, Joint & Neuro, Joint & Neuro Chicago, MedRehab Therapy and MedRehab Wisconsin are referred to as the MedRehab Entities, but denies that they are all MedRehab entities.**

23.     On information and belief, the MedRehab Entities operate out of three small office locations: (1) a small leased office suite at 10400 West Higgins Road, in Rosemont, Illinois, (2) offices located with UMHS' headquarters and senior living facility at 1415 West Foster Avenue in Chicago, and (3) a small leased office in Greenville, Pennsylvania. At their office in Rosemont, the sign in the common-area hallway on their office suite simply reads "MedRehab Alliance," as shown

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

in this photograph:



**ANSWER:** **Defendant denies the allegations in Paragraph 23.**

24. The MedRehab Entities share employees between them and have a small number of employees among them – approximately ten, excluding professionals who provide therapy services. Chicago Rehab "loans" employees, including former employees of Symbria and Affiliates, to Joint & Neuro, Joint & Neuro Chicago, MedRehab Alliance, and MedRehab Interstate. MedRehab Alliance contracts employees to MedRehab Interstate. An employee of UMHS serves as Business Director of Pearl.

**ANSWER:** **UMHS denies that an employee of UMHS currently serves as Business Director of Pearl. Answering further, Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 24.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

25.     Callen, MedRehab Alliance, MedRehab Interstate, Pearl, and MedRehab Therapy jointly maintain electronic documents in a cloud account registered to MedRehab Alliance. Information contained on that cloud account and known to one of these persons or entities is known by all of them. Pearl also maintains electronic documents on a server under the control of UMHS. Information on Pearl's server is known to UMHS.

**ANSWER:     Defendant admits that Pearl maintains electronic documents on a server under the control of UMHS.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 25.**

<u>**Jurisdiction and Venue**</u>

26.     This Court has jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c), because this is an action against all Defendants under that act. The court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the DTSA present a federal question under the laws of the United States. The Court also has jurisdiction pursuant to 28 U.S.C. § 1338(a) because Symbria's claims arising under the Copyright Act, 17 U.S.C. § 101 *et seq.*, present a federal question under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to Plaintiffs' claims under the DTSA and the Copyright Act that they form part of the same case or controversy. In addition, defendant Callen has consented to this Court's personal jurisdiction over him ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

**ANSWER:     Defendant admits that this Court has jurisdiction over this case.  UMHS denies the remaining allegations in Paragraph 26.**

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the state of Illinois, given that each defendant is subject to personal

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

jurisdiction in Illinois as set forth in 28 U.S.C. § 1367(c)(2) and that each defendant that is a corporation resides in this district because their respective contacts with this district would subject them to personal jurisdiction in this district if this district were a separate state. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to claims occurred in this district. Venue is also proper as to defendant Callen because █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Venue is also proper as to UMHS because the Stock Purchase Agreement between it and Symbria, Inc. provides that venue is proper in this Court.

**ANSWER:** **Defendant admits that venue is proper in the Northern District of Illinois, Eastern Division. UMHS denies the remaining allegations in Paragraph 27.**

### FACTS COMMON TO ALL COUNTS
### The Sale of Symbria and the Creation fo the ESOP

28. On October 31, 2015, UMHS and the other twelve owners of Symbria sold their stock in Symbria. While one of the owners sold its interest only for cash, UMHS and eleven of the other owners entered into a Stock Purchase Agreement ("SPA"), pursuant to which UMHS and the other eleven owners entering into the agreement sold their stock in Symbria to an ESOP trust in exchange for cash, subordinated notes given by Symbria, and warrants to purchase shares of stock in Symbria in the future. For its interest in Symbria, UMHS received cash in excess of $1.5 million, a note in an amount greater than $3.1 million, and a warrant to purchase over 32,000 shares of Symbria stock in the future. Each of the other owners entering into the SPA received the same consideration, except for one, which owned a greater number of shares in Symbria and therefore received proportionately greater amounts of each form of consideration. The cash and debt components received for the purchase of the owners' shares, totaling approximately $60 million, were financed by a senior lender to Symbria. A true and correct copy of the Stock Purchase

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Agreement is attached hereto as Exhibit 1.

**ANSWER: UMHS admits that it entered in the Stock Purchase Agreement on October 31, 2015. Further, UMHS admits only that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 28 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 28. UMHS denies that Plaintiffs have fulfilled its obligations in the Stock Purchase Agreement. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28.**

29.     Argent Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Program, was a party to the SPA. Argent Trust Company was identified in the SPA as the "ESOP Trustee." GreatBanc is now the present Trustee of the Symbria, Inc. Employee Stock Ownership Trust and in that capacity is the successor to Argent Trust Company and its rights and obligations under the SPA.

**ANSWER: UMHS admits that Argent Trust Company, was identified in the Stock Purchase Agreement as the ESOP Trustee, not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust. Further, UMHS admits only that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 29 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 29. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29.**

30.     UMHS and the other entities selling their stock under the SPA each received a note from Symbria, subordinated to Symbria's debt to its senior lender. Principal and interest under the subordinated notes is due over a ten-year period.

**ANSWER:     UMHS admits that it received a note from Symbria, subordinated to Symbria's debt to its senior lender, with principal and interest under the note due to UMHS pursuant to the terms of the executed Stock Purchase Agreement. Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 30 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 30. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

31.     UMHS and the other entities selling their stock under the SPA also received warrants that may not be exercised until the senior debt holder and subordinated debt holders are paid in full. The higher the value of Symbria's stock at the time the warrants are exercised, the higher the amount that UHMS and the other former owners will realize from exercising the warrants.

**ANSWER:    UMHS admits that it is promised to receive warrants from Symbria due to UMHS pursuant to the terms of the executed Stock Purchase Agreement. UMHS admits that it has not been able to exercise any warrants, and also admits that the higher the value of Symbria's stock at the time the warrants are exercised, the higher the amount that UHMS will realize from exercising the warrants. Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 31 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 31. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31.**

32.     At the time of the closing of the SPA on October 31, 2015, Lowe was the Vice-Chairperson of Symbria's Board of Directors.

**ANSWER:    Defendant admits the allegations in Paragraph 32.**

33.     After the closing of the SPA, UMHS and the other former owners of Symbria who were parties to the SPA had a stake in Symbria's success. Because UMHS' note is subordinated debt, UMHS' note cannot be paid by Symbria until the principal debt of $26.4 million is repaid to Symbria's senior lender. In addition, the warrants held by UMHS and the other owners selling stock under the SPA cannot be exercised before the senior debt is retired.

**ANSWER:    UMHS admits that it will benefit from Symbria's success. UMHS admits that it has not been able to exercise any warrants and that Symbria has not paid UMHS monies owed under the note. Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document, and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 33 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 33. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

34.     Because UMHS and the other former owners of Symbria who were parties to the SPA have an ongoing stake in Symbria's success, UMHS and the other former owners of Symbria that sold their stock under the SPA covenanted: (1) to not compete, directly or indirectly in any capacity, or have any direct or indirect ownership in any business in the state of Illinois that competes with Symbria and its subsidiaries; (2) to not solicit Symbria's and its subsidiaries' clients and prospective clients; and (3) to not solicit the employees of Symbria and its subsidiaries. Each of these covenants lasts until the later of the fifth anniversary of the closing date under the SPA or until the selling owners' subordinated notes are paid in full.

**ANSWER: UMHS admits that it is a party to the Stock Purchase Agreement.  Further, UMHS admits that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document, and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 34 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 34. Additionally, UMHS denies that it has breached the terms of the Stock Purchase Agreement. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34.**

35.     In Section 5.3 of the SPA, all of the owners who were sellers, including UMHS, undertook to protect Symbria's confidential information. Section 5.3 provides in pertinent part as follows:

> **Non-Disclosure of Confidential Information**. From and after the Closing, Sellers agree not to divulge, communicate, use to the detriment of the Company Group or the ESOP Trust, for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets owned by or relating to the Company Group, including, without limitation, personnel information, secret processes, know-how, customer lists or other technical data; provided, however that the confidentiality obligations hereunder do not apply to information which has become publicly known through no wrongful act of Sellers….

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 35 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 35.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.3 of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**Agreement.**

36.     In section 5.4(a) of the SPA, all of the owners who were sellers, including UMHS,

agreed as follows:

> Each of Sellers severally covenants that, commencing on the Closing Date and
> ending on the later of (i) the fifth anniversary of the Closing Date or (ii) the date on
> which such Seller's Subordinated Note has been paid in full (the "Noncompetition
> Period") he, she or it shall not engage in, directly or indirectly, in any capacity, or
> have any direct or indirect ownership interest in, or any business anywhere in the
> state of Illinois which is engaged, either directly or indirectly, in the business or
> developing, marketing, providing, representing, or selling any products or services
> which are competitive with products or services developed, marketed, provided,
> sold or under development by, any member of [Symbria] or its Affiliates as of the
> Closing Date (the "Restricted Business"). It is recognized that the Restricted
> Business is expected to be conducted throughout the state of Illinois and that more
> narrow geographical limitations of any nature on this non-competition covenant
> (and the non-solicitation covenants set forth in Sections 5.4(b) and 5.4(c) are
> therefore not appropriate….

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase
Agreement ("SPA"), is a written document and the document is the best evidence of its terms
and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of
the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 36 are
inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in
Paragraph 36. Additionally, Defendant admits that Plaintiffs have properly quoted a portion
of Section 5.4 (a) of the SPA, but UMHS denies that it has breached the terms of the Stock
Purchase Agreement.**

37.     Section 5.4(b) of the SPA provides as follows:

> (b) Each of Sellers severally covenants that, during the Noncompetition Period, he,
> she or it shall not solicit or entice, or attempt to solicit or entice, any clients or
> customers of any member of [Symbria and subsidiaries] or potential clients or
> customers of [Symbria and subsidiaries] for purposes of diverting business or
> services from [Symbria and subsidiaries].

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase
Agreement ("SPA"), is a written document and the document is the best evidence of its terms
and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of
the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 37 are
inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in
Paragraph 37. Additionally, Defendant admits that Plaintiffs have properly quoted a portion
of Section 5.4(b) of the SPA, but UMHS denies that it has breached the terms of the Stock
Purchase Agreement.**

38.     Section 5.4(c) of the SPA provides as follows:

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit the employment or engagement of services of any person who is or was employed as an employee, contractor or consultant by [Symbria] during such period on a full- or part-time basis.

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 38 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 38. Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(c) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

39.    Section 5.4(e) of the SPA provides as follows:

(e)    Sellers acknowledge that the restrictions contained in this Section 5.4 are reasonable and necessary to protect the legitimate interests of the ESOP Trustee and the ESOP Trust and constitute a material inducement to the ESOP Trustee to enter into this Agreement and consummate the Transaction. Sellers acknowledge that any violation of this Section 5.4 will result in irreparable injury to the ESOP Trustee and agrees that ESOP Trustee shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of this Section 5.4, which rights shall be cumulative and in addition to any other rights or remedies to which the ESOP Trustee may be entitled. Without limiting the generality of the foregoing, with respect to each Seller, the Noncompetition Period shall be extended for an additional period equal to any period during which such Seller is in breach of its obligations under this Section 5.4.

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 39 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 39. Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(e) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

40.    Section 5.4(f) of the SPA provides as follows:

In the event that any covenant contained in this Section 5.4 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Laws in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

service, or other limitations permitted by applicable Laws. The covenants contained in this Section 5.4 and each provision thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 40 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 40. Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(f) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

41. UMHS desires to undermine Symbria by seeking legal recognition of what it alleges to be its right to solicit Symbria's and its subsidiaries' clients, prospective clients, and employees. On December 31, 2019, UMHS filed a Complaint for Declaratory Judgment against Symbria in the Circuit Court of Cook County, Illinois. In that action, UMHS sought and obtained in the trial court a declaratory judgment declaring that both of the non-solicitation covenants in the SPA be limited to the state of Illinois. The Illinois Appellate Court later reversed that judgment.

**ANSWER: Defendant admits that on December 31, 2019, it filed a Complaint for Declaratory Judgment against Symbria in the Circuit Court of Cook County, Illinois. Answering further The Complaint for Declaratory Judgment is a written document and the document provides the best evidence of its contents. Defendant admits that the Circuit Court of Cook County determined and issued ruling that both of the non-solicitation covenants in the SPA be limited to the state of Illinois. UMHS further admits that Plaintiffs filed an appeal of the Circuit Court decision to the Illinois Appellate Court and that the Appellate Court issued an Order reversing and remanding the matter. The written Order issued by the Illinois Appellate Court (2022 IL App (1st) 201181-U) is the best evidence of its contents. Answering further, UMHS denies the remaining allegations in Paragraph 41.**

42. In early 2020, Symbria endeavored to refinance its debt with its senior lender. Symbria was unable to repay its senior debt by the scheduled April 2020 pay-off date, in significant part because of the competition and solicitations by UMHS and the MedRehab Entities. Symbria's senior lender requested Symbria obtain the consents to and acknowledgements of the refinancing

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

from all of the former owners who sold their interests under the SPA and who now hold subordinated notes. All of those former owners who are now subordinated debt holders consented except for UMHS. As a result, Symbria's senior lender declined to refinance the senior debt as tentatively agreed between it and Symbria.

**ANSWER:** **Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 42.**

28. On October 31, 2015, UMHS and the other twelve owners of Symbria sold their stock in Symbria. While one of the owners sold its interest only for cash, UMHS and eleven of the other owners entered into a Stock Purchase Agreement ("SPA"), pursuant to which UMHS and the other eleven owners entering into the agreement sold their stock in Symbria to an ESOP trust in exchange for cash, subordinated notes given by Symbria, and warrants to purchase shares of stock in Symbria in the future. For its interest in Symbria, UMHS received ███████████████ ████████████████████████████████████████████████████████ ████████████████████ Each of the other owners entering into the SPA received the same consideration, except for one, which owned a greater number of shares in Symbria and therefore received proportionately greater amounts of each form of consideration. The cash and debt components received for the purchase of the owners' shares, totaling approximately ~~$60 million,~~ were financed by a senior lender to Symbria. A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit 1.

**ANSWER: UMHS admits that it entered in the Stock Purchase Agreement on October 31, 2015. Further, UMHS admits only that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 28 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 28. UMHS denies that Plaintiffs have fulfilled its obligations in the Stock Purchase Agreement. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

29.     Argent Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee

Stock Ownership Program, was a party to the SPA. Argent Trust Company was identified in the SPA

as the "ESOP Trustee." GreatBanc is now the present Trustee of the Symbria, Inc. Employee Stock

Ownership Trust and in that capacity is the successor to Argent Trust Company and its rights and

obligations under the SPA.

**ANSWER: UMHS admits that Argent Trust Company, was identified in the Stock Purchase Agreement as the ESOP Trustee, not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust. Further, UMHS admits only that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement. To the extent Plaintiffs' allegations within Paragraph 29 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 29. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29.**

30.     UMHS and the other entities selling their stock under the SPA each received a note

from Symbria, subordinated to Symbria's debt to its senior lender. Principal and interest under the

subordinated notes is due over a ten-year period.

**ANSWER:     UMHS admits that it received a note from Symbria, subordinated to Symbria's debt to its senior lender, with principal and interest under the note due to UMHS pursuant to the terms of the executed Stock Purchase Agreement. Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 30 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 30. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30.**

31.     UMHS and the other entities selling their stock under the SPA also received warrants

that may not be exercised until the senior debt holder and subordinated debt holders are paid in full.

The higher the value of Symbria's stock at the time the warrants are exercised, the higher the amount

that UHMS and the other former owners will realize from exercising the warrants.

**ANSWER:     UMHS admits that it is promised to receive warrants from Symbria due to UMHS pursuant to the terms of the executed Stock Purchase Agreement. UMHS admits that it has not been able to exercise any warrants, and also admits that the higher the value of**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**Symbria's stock at the time the warrants are exercised, the higher the amount that UHMS will realize from exercising the warrants. Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 31 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 31. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31.**

32.     At the time of the closing of the SPA on October 31, 2015, Lowe was the Vice-Chairperson of Symbria's Board of Directors.

**ANSWER:     Defendant admits the allegations in Paragraph 32.**

33.     After the closing of the SPA, UMHS and the other former owners of Symbria who were parties to the SPA had a stake in Symbria's success. Because UMHS' note is subordinated debt, UMHS' note cannot be paid by Symbria until the principal debt of $26.4 million is repaid to Symbria's senior lender. In addition, the warrants held by UMHS and the other owners selling stock under the SPA cannot be exercised before the senior debt is retired.

**ANSWER:     UMHS admits that it will benefit from Symbria's success.  UMHS admits that it has not been able to exercise any warrants and that Symbria has not paid UMHS monies owed under the note.  Answering further, UMHS denies that Symbria has fulfilled its obligations pursuant to the Stock Purchase Agreement. The Stock Purchase Agreement, is a written document, and the document is the best evidence of its terms and contents.  To the extent Plaintiffs' allegations within Paragraph 33 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 33.  UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33.**

34.     Because UMHS and the other former owners of Symbria who were parties to the SPA have an ongoing stake in Symbria's success, UMHS and the other former owners of Symbria that sold their stock under the SPA covenanted: (1) to not compete, directly or indirectly in any capacity, or have any direct or indirect ownership in any business in the state of Illinois that competes with Symbria and its subsidiaries; (2) to not solicit Symbria's and its subsidiaries' clients and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

prospective clients; and (3) to not solicit the employees of Symbria and its subsidiaries. Each of these

covenants lasts until the later of the fifth anniversary of the closing date under the SPA or until the

selling owners' subordinated notes are paid in full.

**ANSWER: UMHS admits that it is a party to the Stock Purchase Agreement.  Further, UMHS admits that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document, and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 34 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 34. Additionally, UMHS denies that it has breached the terms of the Stock Purchase Agreement. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34.**

35.      In Section 5.3 of the SPA, all of the owners who were sellers, including UMHS,

undertook to protect Symbria's confidential information. Section 5.3 provides in pertinent part as

follows:

> **Non-Disclosure of Confidential Information**. From and after the Closing, Sellers agree not to divulge, communicate, use to the detriment of the Company Group or the ESOP Trust, for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets owned by or relating to the Company Group, including, without limitation, personnel information, secret processes, know-how, customer lists or other technical data; provided, however that the confidentiality obligations hereunder do not apply to information which has become publicly known through no wrongful act of Sellers….

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 35 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 35.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.3 of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

36.      In section 5.4(a) of the SPA, all of the owners who were sellers, including UMHS,

agreed as follows:

> Each of Sellers severally covenants that, commencing on the Closing Date and ending on the later of (i) the fifth anniversary of the Closing Date or (ii) the date on which such Seller's Subordinated Note has been paid in full (the "Noncompetition Period") he, she or it shall not engage in, directly or indirectly, in any capacity, or have any direct or indirect ownership interest in, or any business anywhere in the state of Illinois which is engaged, either directly

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

or indirectly, in the business or developing, marketing, providing, representing, or selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by, any member of [Symbria] or its Affiliates as of the Closing Date (the "<u>Restricted Business</u>"). It is recognized that the Restricted Business is expected to be conducted throughout the state of Illinois and that more narrow geographical limitations of any nature  on this non-competition covenant (and the non-solicitation covenants set forth in Sections 5.4(b) and 5.4(c)) are therefore not appropriate….

**ANSWER:** **UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 36 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 36.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4 (a) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

37.     Section 5.4(b) of the SPA provides as follows:

(b) Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit or entice, or attempt to solicit or entice, any clients or customers of any member of [Symbria and subsidiaries] or potential clients or customers of [Symbria and subsidiaries] for purposes of diverting business or services from [Symbria and subsidiaries].

**ANSWER:** **UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 37 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 37.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(b) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

38.     Section 5.4(c) of the SPA provides as follows:

Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit the employment or engagement of services of any person who is or was employed as an employee, contractor or consultant by [Symbria] during such period on a full- or part-time basis.

**ANSWER:** **UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 38 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 38.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(c) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

39.     Section 5.4(e) of the SPA provides as follows:

(e)   Sellers acknowledge that the restrictions contained in this Section 5.4 are reasonable and necessary to protect the legitimate interests of the ESOP Trustee and the ESOP Trust and constitute a material inducement to the ESOP Trustee to enter into this Agreement and consummate the Transaction. Sellers  acknowledge that any violation of this Section 5.4 will result in irreparable injury to the ESOP Trustee and agrees that ESOP Trustee shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of this Section 5.4, which rights shall be cumulative and in addition to any other rights or remedies to which the ESOP Trustee may be entitled. Without limiting the generality of the foregoing, with respect to each Seller, the Noncompetition Period shall be extended for an additional period equal to any period during which such Seller is in breach of its obligations under this Section 5.4.

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 39 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 39.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(e) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

40.     Section 5.4(f) of the SPA provides as follows:

In the event that any covenant contained in this Section 5.4 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Laws in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product  or service, or other limitations permitted by applicable Laws. The covenants contained in this Section 5.4 and each provision thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**ANSWER: UMHS admits that that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS denies that the document identified as Exhibit 1 includes the entirety of the Stock Purchase Agreement.  To the extent Plaintiffs' allegations within Paragraph 40 are inconsistent with the Stock Purchase Agreement, Defendant denies the allegations contained in Paragraph 40.  Additionally, Defendant admits that Plaintiffs have properly quoted a portion of Section 5.4(f) of the SPA, but UMHS denies that it has breached the terms of the Stock Purchase Agreement.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

41.     UMHS desires to undermine Symbria by seeking legal recognition of what it alleges to be its right to solicit Symbria's and its subsidiaries' clients, prospective clients, and employees. On December 31, 2019, UMHS filed a Complaint for Declaratory Judgment against Symbria in the Circuit Court of Cook County, Illinois. In that action, UMHS sought and obtained in the trial court a declaratory judgment declaring that both of the non-solicitation covenants in the SPA be limited to the state of Illinois. The Illinois Appellate Court later reversed that judgment.

**ANSWER:     Defendant admits that on December 31, 2019, it filed a Complaint for Declaratory Judgment against Symbria in the Circuit Court of Cook County, Illinois. Answering further The Complaint for Declaratory Judgment is a written document and the document provides the best evidence of its contents. Defendant admits that the Circuit Court of Cook County determined and issued ruling that both of the non-solicitation covenants in the SPA be limited to the state of Illinois. UMHS further admits that Plaintiffs filed an appeal of the Circuit Court decision to the Illinois Appellate Court and that the Appellate Court issued an Order reversing and remanding the matter. The written Order issued by the Illinois Appellate Court (2022 IL App (1st) 201181-U) is the best evidence of its contents. Answering further, UMHS denies the remaining allegations in Paragraph 41.**

42.     In early 2020, Symbria endeavored to refinance its debt with its senior lender. Symbria was unable to repay its senior debt by the scheduled April 2020 pay-off date, in significant part because of the competition and solicitations by UMHS and the MedRehab Entities. Symbria's senior lender requested Symbria obtain the consents to and acknowledgements of the refinancing from all of the former owners who sold their interests under the SPA and who now hold subordinated notes. All of those former owners who are now subordinated debt holders consented except for UMHS. As a result, Symbria's senior lender declined to refinance the senior debt as tentatively agreed between it and Symbria.

**ANSWER:     Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 42.**

**Callen's Employment by Symbria Rehab and**
**His Agreements with Symbria Concerning Confidential Information**

43.     Callen became employed by Symbria Rehab in 1999 as its President.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER:** **UMHS admits only that Callen previously became employed by Symbria Rehab as President. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 43.**

44.     On October 31, 2015, the same date as the closing of the SPA, Symbria and Callen entered into an Employment Agreement pursuant to which Callen was employed as President of Symbria Rehab. Callen's initial base salary at that time was ~~$300,000~~ per year. He was also eligible to receive significant bonus compensation. A true and correct copy of Callen's Employment Agreement is attached hereto as Exhibit 2.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 44.**

45.     In his Employment Agreement, Callen covenanted to safeguard Symbria Rehab's confidential information and trade secrets. Under the Employment Agreement, Callen (referred to therein as the "Executive") acknowledged the following obligations with respect to Symbria Rehab and its subsidiaries (referred to as "the Company"), including Alliance Connecticut and Alliance HVA:

> 4.1     Confidentiality and Nondisclosure. Executive recognizes that by virtue of his employment with the Company, he will be granted otherwise prohibited access to and exposed to trade secrets and other confidential and proprietary information which is not known to the Company's competitors or within the Company's industry generally, which was developed by the Company over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to the Company. This information *("Confidential Information")* includes, but is not limited to, trade secrets, information relating to the Company's production practices and methods of doing business; sales, marketing, and service strategies, programs, and procedures; Business Partners, Prospective Business Partners, Confidential Customers and Prospective Customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and prior project or service histories and patterns; service, product and material costs; pricing structures; bids; responses to requests for proposals; bonus and incentive plans; vendors and sources of supply; financial position and business plans; computer programs (or portions thereof) and databases; research projects; new product and service developments; compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and any other information of the Company, its affiliates, or any of its vendors, Business Partners or Confidential Customers, which the Company informs

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Executive, or which Executive should know by virtue of his position or the circumstances in which [he] learned it, is to be kept confidential. Confidential Information does not include information that is publicly available or otherwise known in the industry but not as a result of Executive's violation of his obligations under this Agreement.

(Employment Agreement § 4.1) (emphasis in original).

**ANSWER:** **UMHS admits only that Exhibit 2, identified by Plaintiffs as Callen's Employment Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 45 are inconsistent with the Employment Agreement, Defendant denies the allegations contained in Paragraph 45. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 45.**

46.     In his Employment Agreement, Callen also undertook not to use, disclose, or permit

others to use Symbria Rehab's and its subsidiaries' trade secrets and confidential information:

(a)     Executive will not, at any time during or after his employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of his employment for the benefit of the Company.

(b)     Executive will take all reasonable measures during and after his employment with the Company to (i) protect the Confidential Information from any accidental or unauthorized disclosure, use, copying or transfer; and (ii) ensure that any person or entity working in any capacity for the Company is permitted access to Confidential Information on a strictly "need to know" basis.

(c)     For purposes of section 4.1 of this Agreement, "*Business Partners*" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment contracted with the Company for the Company to provide any product or service on that person or entity's behalf. "*Prospective Business Partners*" are any person or entity who at any time during the two
(2) years prior to termination of Executive's employment were solicited by the Company in an effort of which Executive had knowledge not known to the Company's competitors for the purpose of the Company providing any product or service on that person or entity's behalf. "*Confidential Customers*" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment contracted for, was billed for, or received any product or service from the Company. "*Prospective Customers*" are any person or entity who at any time during the two (2) years prior to termination of Executive's employment were solicited by the Company for purposes of rendering services or providing products to that person or entity in an effort of which Executive had knowledge not known to the Company's competitors.

(Employment Agreement § 4.1(a)-(c)) (emphases in original).

**ANSWER:** **UMHS admits only that Exhibit 2, identified by Plaintiffs as Callen's Employment Agreement, is a written document and the document is the best evidence of its**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**terms and contents. To the extent Plaintiffs' allegations within Paragraph 46 are inconsistent with the Employment Agreement, Defendant denies the allegations contained in Paragraph 46. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 46.**

47.     In his Employment Agreement, Callen also undertook not to solicit Symbria and

Affiliates' employees after a termination of his employment by Symbria Rehab:

> Nonsolicitation of Employees. Executive agrees that, during his employment with the Company and for a period of twenty-four (24) months following the voluntary or involuntary termination of his employment with the Company for any reason (the *"Restricted Period"),* [He] will not, directly or indirectly, hire, employ, engage, or attempt to hire, employ or engage any Company Employee, or otherwise solicit, request, entice, or induce any Company Employee to terminate his employment or engagement with the Company, for the purpose of (i) engaging in business activities that are competitive with the Company's business activities or (ii) rendering services for any Company Customer similar to the services the Company Employee has provide to the Company at any time during the prior twelve (12) months of the Company Employee's employment with the Company. The term *"Company Employee"* means an employee of, or independent contractor engage by, the Company with whom Executive interacted for business purposes at any time during the six (6) month period immediately preceding the termination of Executive's employment with the Company and who was employed or engaged by the Company at any time within the last sixty (60) days of Executive's employment with the Company.

(Employment Agreement § 4.6) (emphases in original).

**ANSWER:     UMHS admits only that Exhibit 2, identified by Plaintiffs as Callen's Employment Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 47 are inconsistent with the Employment Agreement, Defendant denies the allegations contained in Paragraph 47. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 47.**

48.     In the Employment Agreement, Callen also agreed not to solicit Symbria and

Affiliates' customers during the same two-year Restricted Period after leaving employment with

Symbria Rehab:

> Nonsolicitation of Customers. Executive acknowledges the Company's legitimate interest in protecting its customers for a reasonable period of time following the termination of his employment. Accordingly, Executive agrees that during the Restricted Period, []he will not, directly or indirectly, solicit or accept business from, or provide products or services to, any Restricted Customer, where such business, products or services would be competitive with the Company's business, products or services. The term *"Restricted Customer"* means (i) a customer of  the Company to whom Executive sold, rendered, or provided the Company's

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

products or services at any time during the one (1) year period immediately preceding the termination of his employment; (ii) any entity for which Executive orchestrated, developed, supervised, coordinated or participated in marketing strategy, marketing plans and marketing campaigns; bid submissions; or responses to requests for proposals on behalf of the Company at any time during the one (I) year period immediately preceding the termination of his employment; or (iii) any entity as to which Executive acquired Confidential Information at any time during his employment with the Company.

(Employment Agreement § 4.6) (emphasis in original).

**ANSWER: UMHS admits only that Exhibit 2, identified by Plaintiffs as Callen's Employment Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 48 are inconsistent with the Employment Agreement, Defendant denies the allegations contained in Paragraph 48. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 48.**

49.     Callen also agreed in his Employment Agreement that a breach of certain of his restrictive covenants would extend the period of time during which those restrictions would continue in force:

Extension for Breach. The Restricted Period for any restriction set forth in sections 4.6, 4.7, 4.8, 4.9 and 4.10 of this Agreement shall be extended by the period of Executive's breach of his obligations under those sections.

(Employment Agreement § 4.11.)

**ANSWER: UMHS admits only that Exhibit 2, identified by Plaintiffs as Callen's Employment Agreement, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 49 are inconsistent with the Employment Agreement, Defendant denies the allegations contained in Paragraph 49. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 49.**

50.     After Callen's employment by Symbria Rehab administratively terminated on January 12, 2017, ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ is attached hereto as Exhibit 3.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 50.

**ANSWER:** UMHS admits only that Exhibit 3, identified by Plaintiffs as Callen's ███████ ███████████████████ is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 51 are inconsistent with the ████████████████████████, Defendant denies the allegations contained in Paragraph 51. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 51.

**ANSWER:** UMHS admits only that Exhibit 3, identified by Plaintiffs as Callen's ███████ ████████████████████, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 52 are

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**inconsistent with** ███████████████████████████**t, Defendant denies the allegations contained in Paragraph 52. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 52.**



**ANSWER:** **UMHS admits only that Exhibit 3, identified by Plaintiffs as Callen's** ███████████ ██████████████**, is a written document and the document is the best evidence of its terms and contents. To the extent Plaintiffs' allegations within Paragraph 53 are inconsistent with** ██████████████████████ **Defendant denies the allegations contained in Paragraph 53. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 53.**

### The MedRehab Entities

54.     National Provider Identifier (NPI) numbers from the Center for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services are required for healthcare providers to electronically transmit information related to patient healthcare pursuant to the provisions of the Health Insurance Portability and Accountability Act (HIPAA). Without an NPI number, a healthcare provider cannot be reimbursed for healthcare services provided to beneficiaries of Medicare or Medicaid.

**ANSWER:** **Defendant admits the allegations in Paragraph 54.**

55.     On July 13, 2018, MedRehab Alliance registered with the Illinois Secretary of State to do business in Illinois. MedRehab Alliance does not have an NPI number.

**ANSWER:** **Defendant admits the allegations in Paragraph 55.**

56.     On July 13, 2018, IASN was registered with the Illinois Secretary of State to do

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

business in Illinois. IASN does not have an NPI number.

**ANSWER:** **Defendant admits the allegations in Paragraph 56.**

57.      On August 2, 2018, MedRehab Holdings was registered with the Illinois  Secretary of State to do business in Illinois. MedRehab Alliance Holdings does not have an NPI number.

**ANSWER:** **Defendant admits the allegations in Paragraph 57.**

58.      On October 26, 2018, MedRehab Wisconsin was registered with the Wisconsin Department of Financial Institutions to do business in Wisconsin. MedRehab Wisconsin does not have an NPI number.

**ANSWER:** **Defendant admits the allegations in Paragraph 58.**

59.      On November 27, 2018, Pearl filed updated information with the Illinois  Secretary of State. Callen was reported to be its President and Lowe was reported to be its Secretary. Pearl further reported that it now had assumed names of MedRehab at Home and ChicagoMed Home Health. Pearl has its own NPI number, and the authorized official listed with CMS' National Plan & Provider Enumeration System (NPPES) is Lowe, its Vice President.

**ANSWER:** **UMHS denies that Pearl has an active assumed name of MedRehab at Home. Defendant admits the remaining allegations in Paragraph 59.**

60.      On April 29, 2019, Joint & Neuro was formed in the state of Delaware. On May 13, 2019, Joint & Neuro was registered with the Illinois Secretary of State to do business in Illinois. Joint & Neuro does not have an NPI number.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 60.**

61.      On June 20, 2019, Chicago Rehabilitation Collective LLC, a Delaware limited liability company, was domesticated into Chicago Rehabilitation Collective LLC, an Illinois limited

Page **33** of **153**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

liability company. Chicago Rehabilitation Collective LLC, an Illinois limited liability company, was then renamed Chicago Rehabilitation Collection PLLC on the same day. Chicago Rehab has an NPI number. The addresses associated with that NPI number are 10400 Higgins Road in Rosemont, Illinois and 315 North LaGrange Road in LaGrange Park, Illinois.

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 61.

62.     On August 1, 2019, █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Chicago Rehab employees contracted to Joint & Neuro include Brad Miller, Tammy Buckley, Amanda Ambrose, Vic Arellano, and Dilmas, all of whom are former employees of Symbria and Affiliates. Chicago Rehab acts as an agent for Joint & Neuro through ██

██████████████████

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 62.

63.     On August 1, 2019, █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 63.

64.     On August 5, 2019, Joint & Neuro Chicago was formed in the state of Delaware. On October 18, 2019, Joint & Neuro Chicago was registered with the Illinois Secretary of State to do business in Illinois.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 64.**

65. On August 19, 2019, MedRehab Interstate was registered with the Illinois Secretary of State to do business in Illinois. MedRehab Interstate does not have an NPI number.

**ANSWER: UMHS admits the allegations in Paragraph 65.**

66. On October 25, 2019, MedRehab Interstate filed a Form D Notice of Offering of Exempt Securities with the United States Securities and Exchange Commission. MedRehab Interstate stated that Callen was its officer and director and that Lowe was one of its directors.

**ANSWER: UMHS admits the allegations in Paragraph 66.**

67. On October 29, 2019, MedRehab Therapy was formed as an Illinois limited liability company through the Illinois Secretary of State. MedRehab Therapy does not have an NPI number.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 67.**

68. The following diagram depicts the relationships between and among Callen, UMHS, and the MedRehab Entities:

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER



**ANSWER: Defendant denies that the allegations in Paragraph 68, and denies that the diagram accurately depicts the relationships between and among Callen, UMHS, and the MedRehab Entities.**

69.     The MedRehab Entities compete with Symbria and Affiliates in the business of providing clinical health services for senior living and post-acute care providers and home health services, including physical therapy, occupational therapy, speech and language pathology, respiratory therapy, and wellness programs. The MedRehab Entities are operating and competing with Symbria in multiple states, including Illinois, Pennsylvania, New Jersey, Connecticut, Wisconsin, and ███.

**ANSWER: Defendant denies that MedRehab Alliance competes in Illinois. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

in Paragraph 69.

### Symbria and Affiliates' Ongoing Development of Valuable Confidential and Copyright-Protected Information Relating to Clinical Best Practices, Clients, and Billing and Reimbursements

70.     Symbria and Affiliates have generated a large library of documents to use in their business as providers of therapy services and related training to their clients who manage post- acute care facilities and home health and wellness services. These documents include: (1) clinical best practices, known as clinical pathways, and disease management models, in text form and in slide presentations; (2) client-specific information, including client contact and resource information and financial metrics relating to therapy services provided to residents and patients of Symbria and Affiliates' clients; (3) patient care checklists and related forms; (4) materials relating to strategies for seeking reimbursement from Medicare and private insurers and for negotiating disputes with Medicare and private insurers; (5) forms used by clients' nursing staff to clinically evaluate patients for therapy services and to generate referrals for therapy; (6) documentation used for accreditation and licensing purposes; (7) documentation used for purposes of compliance with government, accreditation body, and other regulations and requirements; (8) company policies and procedures; and (9) formulas for measuring and evaluating financial performance of Symbria and Affiliates and their clients with respect to therapy services.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 70. To the extent an answer is required, UMHS denies the allegations in Paragraph 70 or that any claims have been alleged or exist against Defendant.**

71.     Symbria and Affiliates have developed their document library over many years and at great expense. It would take a new competitor in the same industry beginning as a start-up considerable time and expense to even begin to build a document library equivalent to Symbria's document library.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 71. To the extent an answer is required, UMHS denies the allegations in Paragraph 71 or that any claims have been alleged or exist against Defendant.**

### The New "Patient-Driven Payment Model" of
### Reimbursing Healthcare Providers for Care Provided Under Medicare and Medicaid

72.     Medicare reimbursement, among other programs, includes Part A, which applies to provider reimbursements for hospital stays, hospice, and home health care, and Part B, which applies to provider reimbursements for outpatient care. In May 2017, CMS announced a new reimbursement model initially called the Resident Classification System I (RCS-I). In July 2018, after some modifications to RCS-I, CMS finalized a new case-mix classification model, renamed the Patient-Driven Payment Model ("PDPM"), that, effective beginning October 1, 2019, would be used under its Skilled Nursing Facility (SNF) Prospective Payment System (PPS) for classifying SNF patients in a covered Medicare Part A hospital stay. PDPM was a major change in how CMS would approve reimbursements to Symbria Rehab's clients for the patients treated by Symbria Rehab clinicians at client facilities, as well as other such facilities and Symbria Rehab's competitors. Before CMS' implementation of PDPM, Symbria and its competitors developed pricing by similar methods because reimbursements were primarily set by the amount of therapy a patient received. PDPM allows for a broader determination of reimbursement based on patients' clinical characteristics rather than the amount of therapy provided. PDPM allows Symbria's clients to receive higher reimbursements for more complex patients. Before October 1, 2019, when CMS implemented PDPM, there was only very limited marketplace data in Symbria and Affiliates' industry concerning pricing that would be offered to senior living and post-acute care facilities for providing rehabilitation services to their residents.

**ANSWER: UMHS admits that Medicare reimbursement, among other programs, includes Part A, which applies to provider reimbursements for hospital stays, hospice, and home health care, and Part B, which applies to provider reimbursements for outpatient care. Defendant further admits that CMS announced a new reimbursement model initially called the Resident Classification System I (RCS-I), and that CMS finalized a new case-mix classification model,**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**renamed the Patient-Driven Payment Model ("PDPM"), that, effective beginning October 1, 2019, would be used under its Skilled Nursing Facility (SNF) Prospective Payment System (PPS) for classifying SNF patients in a covered Medicare Part A hospital stay. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72.**

73. Symbria and Affiliates' derive a competitive advantage from their data analytics and customized reporting to clients. In the fall of 2018, Symbria, Symbria Rehab, and Symbria Rehab's subsidiaries began to undertake a major effort to analyze CMS' PDPM guidance so that Symbria and Affiliates could treat patients in a way that was consistent with patients' total clinical needs and most efficient and profitable under the PDPM regulations. Through analysis of aggregate patient data, Symbria and Affiliates are able to devise better care plans for its clients' patients that are not focused on the amount of therapy provided. When Symbria's and Affiliates' clients obtain higher reimbursements from CMS or the various states for Medicare and Medicaid patients, Symbria and Affiliates do as well, aligning their economic incentives with those of their clients. Symbria and Affiliates' analysis and the related body of work that memorializes it are confidential and proprietary and were derived from significant expenditures by Symbria and Affiliates of money and the efforts of their employees.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 73.**

74. As part of its preparation for the implementation of PDPM, Symbria Rehab entered into agreements with Symbria Rehab's clients called Patient Driven Payment Model Analytics Program Participant Enrollment and License Agreements ("PDPM Analytics License Agreements"). In Symbria's PDPM Analytics Program, clients provide their patients' healthcare data to Symbria, including case mix groups used by CMS to determine how much it pays facilities for days patients spend in skilled nursing facilities. Symbria's analysis includes proprietary metrics that on information and belief are not used by competitors in its industry. Symbria collects and analyzes historical

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

aggregated patient data to apply program-specific value- added processing, which includes comparisons of data under the PPS RUGs system and the PDPM system, and licenses the Symbria-wide program data from all participating client facilities and derivative works to the clients for their use in their facilities. Symbria provides clients with blind benchmarking data to compare their performance against historical data acquired from all participating Symbria Rehab clients. Clients acknowledge in the PDPM Analytics License Agreements that the PDPM Analytics Program gives them access to confidential trade secret

information that is for their use only, and clients undertake to protect that information from disclosure to others.

**ANSWER: UMHS denies it entered into a Patient Driven Payment Model Analytics Program Participant Enrollment and License Agreements ("PDPM Analytics License Agreements") with Plaintiff. Further, UMHS denies that it acknowledged that the PDPM Analytics Program gave them access to confidential trade secret information that was/is for their use only, or that Symbria ever identified its PDPM Analytics Program as confidential, proprietary, a trade secret and/or that Plaintiffs undertook to protect the information from disclosure to others. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 74.**

75.     Beginning in February 2018, Symbria's Senior Director of Data Analytics built a software program to compare the reimbursement a Symbria client would receive under the old PPS system against reimbursement under the coming PDPM system. The PDPM Analysis Software is a custom-built, proprietary, and confidential software program. There is no program like it available on the open market.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 75.**

76.     CMS published the rules for PDPM in paragraph form. Symbria executives designed the PDPM Analysis Software to apply the PDPM rules to historical data from Symbria Rehab clients to help them understand how they would be reimbursed under the PDPM system for the same

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

patients. Symbria inputed historical patient data from the clients of Symbria Rehab and its subsidiaries into the PDPM Analysis Software program, which then applied the rules of PDPM and output the level of reimbursement for those same patients. Symbria Rehab and its subsidiaries collected historical data from clients, generally for a year or a year and a half, but in some cases up to ten years. The historical data collected was unique to Symbria Rehab clients and based on actual patient information. The data included demographics, length of stay, clinical categories, diagnoses, PPS billing details, and PDPM billing details. The data was transferred to Symbria through a secure file transfer protocol and Symbria anonymized the data to protect patient confidentiality.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 76.**


77.     Using the PDPM Analysis Software, Symbria produced reports that allowed clients to see estimates of reimbursements under PDPM compared to their historical PPS reimbursements. The side-by-side comparison of reimbursements under both systems helped Symbria Rehab's and their subsidiaries' clients understand the new PDPM system and how it applied to them. The reports produced by the PDPM Analysis Software are sophisticated and in-depth. Users are presented with a dashboard that shows high-level, side-by-side totals of PPS versus PDPM reimbursements for their facility. For clients with multiple facilities, they can view the numbers across all sites, or filter by a particular facility. Users can then drill down into the data and look at payments by component— physical therapy, occupational therapy, or speech and language pathology—and clinical category (such as cancer or cardiovascular). Within the clinical categories, a user can examine subcategories, such as particular types of cancer. Beyond that, users can look at the data of individual patients on an anonymized basis.

**ANSWER: Defendant denies that the reports produced by the PDPM Analysis Software are sophisticated, high level and in-depth, or that they provided any data or information that was not already available to the client or easily obtainable through other PDPM software. The content of the reports are a written document and the best evidence of its terms and contents.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations related to how "users" are presented the reports or use the said reports and without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77.**

78.     Symbria's analytical reports also provide data on the percentage of patients with depression, clinical categories of patients receiving physical or occupational therapy, and information on claims returned to the client by CMS for incorrect bill coding. All of these are factors in maximizing reimbursements.

**ANSWER: Defendant denies that the reports produced by the PDPM Analysis Software are sophisticated, high level and in- depth, or that they provided any data or information that was not already available to the client or easily obtainable through other PDPM software.  The content of the reports are a written document and the best evidence of its terms and contents.**

79.     After creating the initial reports, Symbria has designed and produced regular reports with updated data to Symbria Rehab clients to help them understand trends and to maximize their reimbursements under PDPM.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 79.**

80.     In the summer of 2019, CMS published its own beta software that performed similar functions to Symbria's PDPM Analysis Software. However, the CMS beta software did not have the same level of sophistication as Symbria's PDPM Analysis Software. It could only  be used by a software developer and would only show the PDPM case-mix groups for one  patient at a time rather than an entire patient population. CMS' beta software also cannot provide the same granular analysis or information to Symbria and Affiliates' clients without significant modifications. The CMS beta software did not allow Symbria and Affiliates' clients to view the data in the aggregate or filter it with the same detail – whether by clinical category or down to the level of a particular patient. The reports from the PDPM Analysis Software allowed Symbria and Affiliates' clients more flexibility

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

in understanding the data in a detailed manner without the need of a software developer. Thus, Symbria's program gives it a competitive advantage over its competitors using the CMS beta software.

**ANSWER: Defendant denies that Plaintiffs' PDPM Analytics Program is confidential, proprietary, or a trade secret. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80.**

81.     In order to be consistent with the rest of its industry, Symbria transitioned to the CMS software at Symbria for obtaining the PDPM case-mix groups. Symbria utilized the core engine of the PDPM Analysis Software, the code that analyzes a patient's information and determines the case-mix group, and replaced it with the CMS beta software. However, the CMS beta software could only process a single patient's data at a time. Symbria wrote additional computer code to enhance the CMS product, which allowed Symbria to create more sophisticated reports for clients similar to the reports from the original PDPM Analysis Software. The additional code surrounding the CMS beta software is unique, proprietary, and confidential.

**ANSWER: UMHS denies that Plaintiff's client reports, code or PDPM Analysis Software surrounding the CMS beta software are unique, proprietary, and confidential. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 81.**

82.     An important difference between PPS and PDPM is that PDPM reimburses providers regardless of the amount of therapy provided because it is based on a patient's diagnoses. Thus, there could be an incentive to undertreat patients under PDPM. To make sure that Symbria and Affiliates provided the same levels of treatment to patients, Symbria's Clinical Care Team developed clinical pathways (labeled "Care Guides") based on the historical data of Symbria Rehab and its subsidiaries. Symbria used years of its data to create reports to help determine how it wanted to treat patients for best outcomes under the new PDPM rules. The data shows how Symbria and Affiliates treated patients with certain conditions historically. Symbria analyzed the amount of therapy historically

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

provided to its clients' residents and developed the amount of therapy that was required to give patients the optimal level of care.

**ANSWER: Defendant admits an important difference between PPS and PDPM is that PDPM reimburses providers regardless of the amount of therapy provided because it is based on a patient's diagnoses. UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 82.**

83.     Symbria's output reporting from the data analytics program is unique and highly confidential. The analyses and reports are proprietary and economically valuable. They contain confidential information obtained directly from Symbria Rehab's clients, including individual patient data, and are based on Symbria's proprietary modeling of that data. This modeling and the reports aid clients in determining clinical pathways, group and concurrent therapy mixes, pricing, reimbursements, and general PDPM coding readiness. The reports are proprietary, as are the result of a unique, custom-built program for Symbria.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 83.**

84.     At the time when Callen left the employment of Symbria Rehab, PDPM did not exist, and therefore he had no knowledge of Symbria's PDPM Analysis Software program or lawful access to the information and analysis later developed by Symbria and Affiliates to profitably implement the PDPM reimbursement methodology. On information and belief, Dilmas and Irvine became conduits for Callen and all the entities with which Callen is affiliated to acquire and use that new confidential information that was developed after Callen's departure from Symbria Rehab.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 84.**

## Symbria and Affiliates' Policies Concerning Confidentiality of Information

85.     Symbria Rehab has a practice of requiring all therapists and managers to sign

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

confidentiality agreements.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 85.**

86.     Symbria Rehab has a practice of requiring all employees to agree to the Symbria Rehab Employee Handbook.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 86.**

87.     In 2004, the Symbria Rehab Employee Handbook provided in pertinent part as follows with respect to company business and Symbria's trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary:

> *Company Business*
>
> Information obtained and documents produced during your employment with us are the property of [Symbria] Rehab. You may not remove documents from the premises, either physically or by transmission on the Internet or any on- line network, without authorization.
> After you leave [Symbria] Rehab, you may not in any way use information that you obtained while working for us.
> Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists or other confidential information. You are expected to return all confidential documents and materials to your supervisor upon your separation of employment, for any reason.

The 2004 Symbria Rehab Employee Handbook contained a letter signed by Callen stating that the Handbook reflected "our expectations of one another."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 87.**

88.     On December 19, 2006, Symbria Rehab published and distributed a new Employee Handbook. The December 2006 Symbria Rehab Employee Handbook provided the same with respect to confidential information as the Employee Handbook did in 2004. The May 2011 Handbook again contained a letter signed by Callen stating that the Handbook reflected "our expectations of

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

one another." This version of the Handbook was in effect in February 2007.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 88.**

89.    In May 2011, Symbria Rehab published and distributed a new Employee Handbook. The May 2011 Symbria Rehab Employee Handbook provided the same with respect to confidential information as the Employee Handbook did in 2004 and 2007. The May 2011 Handbook again contained a letter signed by Callen stating that the Handbook reflected "our expectations of one another."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 89.**

90.    On October 31, 2013, Symbria Rehab had an Employee Handbook concerning employment practices. The Employee Handbook contained a letter to employees signed by Callen in the front. Callen stated on behalf of Symbria Rehab: "This handbook presents the policies and procedures, which constitute the nature of our business relationship and our expectations of one another."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 90.**

91.    On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to computer hardware and software and proprietary information:

> The company may provide computer hardware, software, and an access code for authorized use to conduct [Symbria Rehab] business. All computer hardware, software, data files and applications belong to the company and may be accessed only by authorized personnel. Any information created, transmitted or stored on a computer system is company property. You should not expect that any information on an [Symbria Rehab] or a client's computer system would be considered private.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 91.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

92.     On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to confidentiality:

> Your employment with [Symbria Rehab] assumes an obligation to maintain confidentiality, even after you leave.
>
> Any violation of confidentiality may seriously injure [Symbria Rehab's] reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for [Symbria Rehab]. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 92.**

93.     On October 31, 2013, the Symbria Rehab Employee Handbook provided as follows with respect to company business and Symbria's trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary:

> ### Company Business
> Information obtained and documents produced during your employment with us are the property of [Symbria Rehab]. You may not remove documents from the premises, either physically or by transmission on the Internet or any on-line network, without authorization.
>
> After you leave [Symbria Rehab], you may not in any way use information that you obtained while working for us.
>
> Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists or other confidential information. You are expected to return all confidential documents and materials to your supervisor upon your separation of employment, for any reason.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 93.**

94.     As part of the Employee Handbook, Symbria Rehab had an E-Mail/Electronic Media Services Policy applicable to all employees. That policy provided at all relevant times in relevant part as follows:

> Employees are prohibited from sending e-mail or otherwise using the [Symbria] electronic

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

communication system and electronic media services in connection with any of the following activities:

- Any purpose that is illegal or contrary to [Symbria's] policies or business interests;

- Engaging in illegal, fraudulent or malicious activities;

    * * *

- Intentionally or negligently disclosing confidential company information or knowledge about the company not intended for public disclosure without specific written authority from the company;

    * * *

- Attempting to test, circumvent or defeat security or auditing systems, without prior authorization….

Employees using the e-mail or electronic media system for defamatory, illegal, or fraudulent purposes and employees who break into unauthorized areas of [Symbria's] computer system will also be subject to civil liability and criminal prosecution.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 94.**

95.     On September 22, 2016 and on October 3, 2016, the Symbria Rehab Employee Handbook provided as follows with respect to confidentiality:

Your employment with [Symbria] Rehab assumes an obligation to maintain confidentiality, even after you leave. This responsibility is shared by every person employed in any capacity within the company. Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists, or other confidential information.

    * * *

Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the premises, either physically or by transmission on the internet or any on-line network, without authorization….

Any violation of confidentiality may seriously injure the company's reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for the company. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

Upon separation of services with the company, employees must return all confidential

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

documents and materials to management and may not in any way use information obtained while working for us.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 95.**

96.     Symbria and Symbria Rehab have a company policy concerning HIPAA and General Confidentiality. The version of the policy implemented in early 2019 and applicable to all employees instructs employees as follows: "Do not make any unauthorized transmissions, inquiries, modifications, or purging of data in the system. Such unauthorized transmissions include, but are not limited to, removing and/or transferring data from the company's computer systems to unauthorized locations, e.g. home."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 96.**

97.     Symbria and Symbria Rehab have a company policy concerning E-Mail, Internet, and Electronic Media Services. The version of that policy implemented in early 2019 as well as the previous version of that policy, applicable to all employees, instructs employees as follows: "Employees are prohibited from sending e-mail or otherwise using the Symbria electronic communication system and electronic media services in connection with any of the following activities: [1] Any purpose that is illegal or contrary to Symbria's policies or business interests."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 97.**

98.     Symbria and Symbria Rehab have a company policy concerning Information Access Management - Access Establishment and Modification. The version of that policy implemented in October 2018 applicable to all employees instructs employees that "Workforce members must not store sensitive information (including system Passwords) on their home or mobile computers or other devices when accessing remotely."

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 98.**

99.     During the same time period, Symbria's Employee Handbook provided as follows:

Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the premises, either physically or by transmission on the internet or any on-line network, without authorization.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 99.**

100.     On March 27, 2019, the Symbria Rehab Employee Handbook provided as follows

with respect to Company Confidentiality and Company Business:

Our clients and other parties with whom we do business entrust the company with important information relating to their businesses. It is our policy that all information considered confidential will not be disclosed to external parties or to employees without a "need to know."

Your employment with Symbria assumes an obligation to maintain confidentiality, even after you leave. This responsibility is shared by every person employed in any capacity within the company. Confidential and proprietary information includes, but is not limited to: business strategies; operating procedures; clinical programs; company manuals; trade secrets; client lists; price lists, or other confidential information.

***

Information obtained and documents produced during employment with us are the property of the company. Employees may not remove documents from the premises, either physically or by transmission on the internet or any on-line network, without authorization….

Any violation of confidentiality may seriously injure the company's reputation and effectiveness. Therefore, please do not discuss our business or any client information with anyone who does not work for the company….

Upon separation of services with the company, employees must return all confidential documents and materials to management and may not in any way use information obtained while working for us.

**ANSWER:     UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 100.**

**Irvine's Employment by Symbria Rehab and Irvine's Theft of Trade Secrets,**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**Copyright-Protected Information, and Other Confidential Information**

101.     Christine M. Irvine ("Irvine"), formerly known as Christine M. Lanciloti, was employed by Symbria Rehab starting in August 2004, when she was hired as an Exercise Physiologist. She was promoted to Rehab and Wellness Manager in January 2007, to Client Relations Liaison in May 2011, and promoted again to Area Director on October 3, 2016. As Area Director, Irvine reported directly to Dilmas. Irvine's last day of employment by Symbria Rehab was February 22, 2019. Irvine was formerly a defendant in this action until Plaintiffs dismissed her from the case pursuant to settlement.

**ANSWER: UMHS admits only that Irvine was formerly named a defendant in this action until Plaintiffs dismissed her from the case.  Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 101.**

102.     On or about January 9, 2019, Irvine began an ongoing campaign of misappropriating Symbria and Affiliates' trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary. Irvine accomplished this effort by forwarding materials containing trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary from her symbria.com email address, provided to her in connection with her employment as an Area Director of Symbria Rehab, to her personal email address. Irvine did so without authorization and in violation of Symbria and Symbria Rehab policies and the terms and conditions of her employment. On information and belief, by this time, Irvine was planning to leave her job at Symbria Rehab and to go to work for Plymouth Place and to perform services for one or more of the MedRehab Entities.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 102.**

103.     On January 9, 2019, Amanda Ambrose, a long-time Executive Assistant at Symbria

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Rehab in Illinois, emailed to Irvine Symbria Rehab's PDPM Client Presentation slides, which contained detailed information developed by Symbria Rehab for its clients' confidential use. Ambrose's email was not part of a regular internal distribution at Symbria Rehab, but rather was sent only to Irvine, with her entire cover email reading, "See attached." Irvine was not only Dilmas' subordinate reporting directly to Dilmas at Symbria Rehab but also had a personal relationship with him and was his "significant other."

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 103.**

104.     Three hours later, Irvine forwarded the email she had received from Ambrose together with Symbria's copyrighted Understanding the Patient Driven Payment Model presentation slides in Microsoft PowerPoint format that Ambrose had attached to her email to a personal email address, christine.lanciloti@gmail.com.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 104.**

105.     Later that same evening, Irvine forwarded Ambrose's email and attached Symbria's "Understanding the Patient Driven Payment Model" presentation slides to Dilmas.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 105.**

106.     Plymouth Place in LaGrange Park, Illinois is a senior living facility and client of Symbria's subsidiary Symbria Rx Services, LLC for pharmacy services. Plymouth Place was also a prospective client of Symbria Rehab's for rehabilitation services and for wellness services. In January 2019, a wholly-owned subsidiary of Plymouth Place purchased minority interests in two of the MedRehab Entities, Joint & Neuro and IASN. MedRehab Alliance owned 70 percent of each entity, and was in the process of offering minority ownership stakes to other senior living facilities.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: UMHS admits only that a wholly-owned subsidiary of Plymouth Place in LaGrange Park, Illinois, a senior living facility, purchased a minority interest in IASN. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth regarding whether Plymouth Place is a client of Symbria's subsidiary Symbria Rx Services, LLC for pharmacy services or a prospective client of Symbria Rehab for rehabilitation services and for wellness services. UMHS denies the remaining allegations in Paragraph 106.**

107.　On January 25, 2019, Irvine gave notice of her resignation from Symbria Rehab. On February 8, 2019, Dilmas sent an email to Symbria Rehab clients announcing that Irvine was resigning to pursue a new opportunity. Irvine resigned effective February 22, 2019. Irvine's new work location was at Plymouth Place. At Plymouth Place, Irvine has the title of Senior Director of Rehab and Wellness.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 107.**

108.　Between the time that Irvine announced her resignation from Symbria Rehab on January 25, 2019 and her last day of employment on February 22, 2019, Irvine forwarded over 140 emails with attached hundreds of files from her symbria.com email address to her personal email account. On her last two days of employment alone, Irvine forwarded approximately 100 emails to her personal email address. Many of these emails contained multiple attachments. Irvine forwarded to herself confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary Symbria information, including financial statements and performance metrics; clinical guidance concerning best practices accumulated by Symbria managers and therapists; checklists and forms reflecting Symbria's best clinical practices; Symbria's internal strategies for negotiating with Medicare and private insurers concerning alternate dispute resolution for reimbursements and billing and payment audits; training materials designed for Symbria therapists, managers and clients; screening tools designed to promote therapy referrals from clients' nursing staffs; Symbria's policy and procedure manuals regarding therapy and business matters;

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

materials related to obtaining periodic accreditation from various accrediting bodies; detailed materials regarding Symbria's work obtaining licensure for an outpatient therapy clinic for one of its clients located in Illinois; and detailed information regarding Symbria's respiratory therapy program. In short, Irvine absconded with a cornucopia of data, tools, and information that a new competitor would need to get a new business competing with Symbria instantly up and running. Irvine's new employer has an equity interest in precisely such a business – MedRehab Alliance – a company also owned by UMHS and Callen. Furthermore, Callen has stated that "we hired her for Plymouth Place."

**ANSWER: UMHS admits only that it has an investment interest in MedRehab Alliance. UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 108.**

109.    On information and belief, while Irvine was still employed by Symbria, Callen informed Irvine that he and the MedRehab Entities were soliciting Symbria clients and prospective clients and soliciting Symbria employees and directed Irvine not to inform Symbria, and Irvine did not inform Symbria, undermining Symbria's interests.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 109.**

110.    Among the documents that Irvine emailed to herself in violation of Symbria and Symbria Rehab company policies and/or her implied duty of good faith and fair dealing are the following:

(a)    Symbria's "Understanding the Patient-Driven Payment Model" slide presentation, marked "© 2019 Symbria, Inc.";

(b)    Symbria Rehab's clinical pathways for therapists for multiple categories of diseases;

(c)    documents containing client-specific information regarding patient censuses and diagnoses, detailed client contact information, and information concerning where to find resources in client facilities;

(d)    Excel spreadsheets designed by Symbria for use in connection with client facilities containing formulas for measuring data and metrics for patient characteristics and outcomes, and financial performance, and often containing detailed historical data from clients' facilities;

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

(e)    the weekly Illinois Operational Variance Report for Symbria Rehab's clients in Illinois, containing detailed performance metrics for the first five weeks of 2019 and an Excel template with formulas for tracking an entire year;

(f)    a top-level summary of Symbria and Affiliates' historical number of cases by PDPM diagnostic category;

(g)    a list of Symbria Rehab's Illinois clients, the number of potential residents at each facility, and estimated weekly units based on historical data;

(h)    documents relating to dispute resolution with Medicare and other payers and Symbria Rehab's strategies and methods for handling such disputes;

(i)    slide presentations made for Symbria and Affiliates' internal use to train therapists on patients having various clinical diagnoses and problems, typically marked "© Symbria, Inc." with an accompanying year;

(j)    forms, checklists, and processes used by Symbria and Affiliates' Program Managers in client facilities;

(k)    portions of Symbria Rehab's policies and procedures manual;

(l)    a lengthy "Outpatient Therapy Policies and Procedures Manual" for Symbria Rehab's first outpatient clinic, being established for Symbria Rehab's client North Shore Senior Center, containing a legend beginning, "THE CONTENTS OF THIS PUBLICATION ARE CONFIDENTIAL AND PROPRIETARY" and containing a roadmap to the establishment of an outpatient therapy clinic;

(m)    outcomes data for patients at the North Shore Senior Center outpatient clinic;

(n)    a list of all of Symbria Rehab's therapists in Illinois who float from facility to facility with their personal contact information, the discipline they practice in, the state they are licensed in, and the facility they were based at;

(o)    a list of Symbria Rehab's Program Managers at all Illinois client facilities;

(p)    internal training materials used for compliance, accreditation, patient documentation, and clinical care issues;

(q)    Symbria Rehab's Disease Management Models for eight categories of disease used to train Symbria and Affiliates' therapists, and corresponding slide presentations for each disease category, all marked "© 2017 Symbria Rehab, Inc. Confidential and proprietary";

(r)    Symbria Rehab's "Survey Readiness: Guidance for the New Survey Process" used internally to train Program Managers;

(s)    Symbria Rehab's Respiratory Therapy Program Manual and Respiratory Therapy Competencies; and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

(t)     Symbria Rehab's Senior FITness™ Program Manager's Resource Training Manual for training Program Manager's in the wellness business line.

**ANSWER:    UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 110, including all of its subparts.**

111.    Irvine continues to be employed by Plymouth Place. On information and belief, in connection with that employment, Irvine provides services for the operating companies among the MedRehab Entities, specifically MedRehab Alliance, Joint & Neuro, Joint & Neuro Chicago, MedRehab Wisconsin, MedRehab Interstate, Pearl, and Chicago Rehab.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 111.**

112.    Nearly all of the emails that Irvine forwarded from her Symbria email account to her personal email account contain information Symbria and Affiliates treated as confidential or is protected under copyright laws. On information and belief, each time when Irvine misappropriated confidential, copyright-protected, commercially-valuable, competitively- sensitive and/or proprietary information of Symbria and Affiliates, she acted as agent for UMHS, MedRehab Alliance, IASN, MedRehab Holdings, and MedRehab Wisconsin. After April 29, 2019, on information and belief Irvine also acted as agent for Chicago Rehab and for Joint & Neuro. After August 5, 2019, on information and belief, Irvine also acted as agent for Joint & Neuro Chicago. After August 19, 2019, on information and belief Irvine also acted as agent for MedRehab Interstate. On information and belief, Irvine disclosed some or all of the confidential information and copyright-protected materials of Symbria and Affiliates to Dilmas, Callen, UMHS, and the MedRehab Entities. On information and belief, Irvine, Dilmas, Callen, UMHS, and the MedRehab Entities were acting in concert in furtherance of a scheme to use Symbria's confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary information and to solicit and compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his ███████████ and his fiduciary

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

obligations, Dilmas' confidentiality and other obligations in his employment contract and his fiduciary obligations, and Irvine's confidentiality and other obligations in her employment contract and her fiduciary obligations. The conduct of those persons and entities also violated the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act.

**ANSWER:** **UMHS denies that Irvine was ever at any time an agent for UMHS, MedRehab Alliance or IASN and further denies that Irvine disclosed some or all or any confidential information and copyright-protected materials of Symbria and Affiliates to UMHS. Further, UMHS denies that it ever acted in concert in furtherance of a scheme to use Symbria's confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary information to solicit and/or compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his Severance Agreement and his fiduciary obligations, Dilmas' confidentiality and other obligations in his employment contract and his fiduciary obligations, and Irvine's confidentiality and other obligations in her employment contract and her fiduciary obligations, or any other reason. UMHS denies any contact in violation the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 114.**

### Dilmas' Employment by Symbria Rehab and
### Dilmas' Theft of Trade Secrets and Other Confidential, Proprietary Information

113.     In October 2013, Symbria Rehab hired Dilmas as an employee at will.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 113.**

114.     In September, 2016, Symbria Rehab promoted to Dilmas to the at-will employment position of Regional Director of Operations by Symbria Rehab.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 114.**

115.     As Regional Director of Operations at Symbria Rehab, Dilmas was responsible for overseeing and managing the daily operations and fiscal performance of Symbria Rehab within his assigned region, the Chicago metropolitan area. Dilmas was involved in creating PDPM Site Data Workbooks, spreadsheets containing detailed data relating to each client's performance under PPS,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

projections for performance under PDPM, and recommended internal pricing strategies and options, for each of the client facilities he was responsible for as Regional Director of Operations.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 115.**

116. On or about February 12, 2019, Dilmas began an ongoing campaign of misappropriating Symbria and Affiliates' trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary. Dilmas accomplished this effort by forwarding trade secrets and other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary from his Symbria.com email address, provided to him in connection with his employment as a manager of Symbria Rehab, to his personal email address. Dilmas did so without authorization and in violation of Symbria and Symbria Rehab policies and/or his implied duty of good faith and fair dealing. On information and belief, by this time, Dilmas was planning to leave his job at Symbria Rehab and to go to work for Callen and one or more of the MedRehab Entities.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 116.**

117. On February 12, 2019, Dilmas sent three internal and confidential Symbria documents to a personal email account controlled by him. These included a memo concerning "Selection of Alternate Modes of Therapy Service Delivery," a Fall 2017 Symbria Rehab "Modes of Therapy Training Module," and a Symbria Rehab Group Recommendation Assessment form. The memo concerning Selection of Alternate Modes of Therapy Service Delivery provided detailed guidance concerning therapists incorporating alternate modes of therapy and combining patients with specialized needs to gain labor efficiencies and offered solutions to barriers to offering group and concurrent treatment. The Modes of Therapy Training Module was designed for Symbria Rehab managers and therapists to become familiar with PDPM planning rules including the criteria for

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

group, concurrent or individual treatment and the acceptance of minutes billed. The assessment form was designed for Symbria Rehab therapists to implement the guidance set forth in the other two documents.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 117.**

118.     On March 20, 2019, Symbria Rehab's Vice President of Clinical Operations sent Dilmas an email with the subject, "PDPM Preparedness – Tip #6." This email was sent to Symbria Rehab's clients pursuant to the confidentiality agreements contained in Rehabilitation Service Agreements provided guidance on "Understanding the Administrative Presumption of Coverage in a Skilled Nursing Facility under PDPM." This document summarized, in an easy-to- read format as compared to CMS literature, the rules for Administrative Presumption of Coverage. This email was marked "© 2019 Symbria, Inc." That same evening, Dilmas forwarded this email to his personal email account.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 118.**

119.     On March 22, 2019, Dilmas sent to Symbria Rehab's Vice President of Clinical Operations and to Brad Miller, then Symbria Rehab's Vice President of Rehab Operations, an email concerning Illinois market data. Miller had succeeded to Callen's responsibilities for Symbria Rehab after Callen's termination. In his email, Dilmas wrote to Miller and the other Symbria Rehab executive about the impact of the loss of one Symbria Rehab client and the addition of a new Symbria Rehab client. Attached to this email was a detailed spreadsheet analyzing for the state of Illinois market Symbria Rehab's Medicare Part A revenue, Medicare Part B revenue, total revenue, total cost, profit, margin, cost per minute, productivity, efficiency, revenue per minute, Medicare Part B visits per resident, Medicare Part B units per visit,  Medicare Part A days, Medicare Part A length of service, labor costs broken down by type of therapy (occupational, physical, and speech), and level

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

of employee providing the service. The data included Symbria Rehab's performance in Illinois as a whole, as well as with and without the lost and new clients. Later that day, Dilmas forwarded the email he has sent to Miller and the attached spreadsheet to his personal email account. The same day, Dilmas forwarded this email and attachment to Irvine at her personal email address.

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 119.

120.    On March 26, 2019, Dilmas emailed from his Symbria.com email address a  memo concerning the transition of the new Symbria Rehab client referenced in Dilmas' March 22, 2019, email to his personal email account. The memo contained a plan and timetable for the new client to start with Symbria Rehab by September 1, 2019. This document was a template on how to effectively start a new rehabilitation client developed by Symbria Rehab.

**ANSWER:** UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 120.

121.    On April 12, 2019, Dilmas sent Miller an email along with an attached  spreadsheet concerning the financial performance of Symbria Rehab for 2019 for the year to date and an attached PDF file also concerning Symbria Rehab's financial performance. The spreadsheet contained information concerning Symbria Rehab's revenues by segment, profits, productivity, and efficiency, with details such as revenue per minute, Medicare Part A days and length of stay, and labor costs by category of therapy provided. Dilmas also attached to the email a report entitled "Contribution Margin Trend Report – Summary" for each of Symbria Rehab's clients' facilities in Illinois. For each Symbria Rehab client, the report showed gross revenues by category, direct costs by category, gross profits, and as to therapy services, total minutes,  revenue per minute, cost per minute, and profit per minute. The PDF file summarized Symbria Rehab's performance for each of Symbria Rehab's clients' facilities in Illinois. Later that day, Dilmas forwarded his email to Miller and the attachments to his personal email account.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 121.**

122.     On May 7, 2019 at 10:30 a.m., Dilmas sent an email to Miller with the subject, "4/30/19 Ops call." In Dilmas' email, he discussed Symbria Rehab's performance at two of its clients' facilities in Illinois. Dilmas attached four documents to the email to Miller: a Change of Therapy Review at one client and three recent Key Factor Weekly Reports for the other client. The Change of Therapy Review listed patients' names at the client facility, the severity of their cases, units billed and RUGs for coding utilized by CMS, and variances relating to the RUGs. The document contained a legend: "This Report may contain privileged and confidential patient information and must not be disseminated." The Change of Therapy report contained protected health information (PHI) under HIPAA, which Symbria Rehab policy prohibited being removed from the company's computer network. The Key Factor Weekly reports showed RUGs days, ideal minutes of therapy, actual minutes of therapy, efficiency percentages, and average minutes of therapy for Medicare Part A patients at clients' facilities derived from Symbria and Affiliates' operations. For Medicare Part B patients, the reports showed units of therapy and revenue per unit. The reports showed detailed breakdowns of labor hours, productivity, and other revenue. The Key Factor Weekly Reports were generated summaries from Symbria's electronic medical records system. The Key Factor Weekly Reports are specific to particular clients and can be used to derive Symbria and Affiliates' pricing. Later, that day, Dilmas forwarded his email with attachments to his personal email account. Dilmas then used his personal email to forward his email with the four attachments to Irvine at her personal email address. Thirty minutes later, Miller replied to Dilmas, "I will want to revisit at some point in the near future." Minutes later, Dilmas replied, "Absolutely. Let me know." Dilmas then forwarded that email to his personal email.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 122.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

123.     At about 11:00 a.m. on May 7, 2019, just minutes after forwarding his email and attachments from Miller to his personal email, Dilmas then sent himself five spreadsheets containing more detailed information concerning Symbria Rehab's financial performance. The first contained detailed data regarding revenues, profits, productivity, efficiency, revenue per minute, Medicare Part B visits per residents, and units per visit, Medicare Part A days and length of stay, and labor costs by category of therapy for Symbria Rehab in Illinois for 2017 and 2018  at a market level, as well as revenues, productivity, revenue per minute and cost per minute at every one of Symbria Rehab's Chicago region clients on a client basis for the same time period. The second spreadsheet analyzed Symbria Rehab's recent performance as impacted by the recent loss of two Illinois clients and the recent gain of another Illinois client and contained similar  level of details as the first. The third spreadsheet contained similar data as the first at an Illinois market level for all years from 2014 through 2018. The fourth spreadsheet was a Weekly Margin Operational Variance Report containing detail regarding facility revenues, facility costs, measures of overtime spent by therapists, Medicare Part A RUG distribution data, revenue per minute under Medicare Parts A and B, data regarding timeliness of documentation review, and action plans with respect to facility margin, facility productivity, overtime, RUG distribution, programming, financial metrics, and documentation completion -- for every week in 2018. The fifth spreadsheet was a Weekly Margin Operational Variance Report containing the exact same detail for every week in 2019 from the beginning of the year to the most recent completed week.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 123.**


124.     On June 24, 2019, a Symbria Rehab administrative employee emailed to Dilmas  at his request a .zip file named PDPM Resources containing a vast amount of information developed by Symbria Rehab in preparation for the implementation of PDPM. In the .zip file were 43

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

voluminous documents prepared by Symbria Rehab concerning PDPM, including 15 resources guides, 20 PDPM Care Guides, Symbria's copyrighted "Understanding the Patient Driven Payment Model slide presentation and other client presentations, and Symbria's copyrighted PDPM Preparedness Tips 1 through 7 that it had prepared and sent to clients. The Care Guides were developed based on years of historical data and experience that Symbria and Affiliates accumulated, including for each clinical diagnostic category established by PDPM, the historical mix of each therapy discipline in that category for Symbria's clients' patients and the average treatment time per week for each therapy discipline for that type of patient. The Care Guides and other attached documents are marked "Symbria, Inc. – Confidential" on every page. Symbria's investment in developing these proprietary materials took place over a year and a half, involved thousands of senior executive-level hours, including the exclusive time of three  Symbria executives for many months, and involved an expense of hundreds of thousands of dollars. That night, Dilmas promptly forwarded the email and attachment to his personal email address.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 124.**

125.     On July 23, 2019, Dilmas forwarded via email, without comment, the same .zip file that he had misappropriated from Symbria and Affiliates on June 24, 2019 to Irvine. The  next day, Irvine then forwarded that same .zip file to Callen at his medrehaballiance.com email address, also without any comment or explanation.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 125.**

126.     Also on July 23, 2019, Symbria Rehab distributed to its management team its extensive PowerPoint presentation prepared by Symbria Rehab's Clinical Care team for Symbria and Affiliates' managers and therapists entitled "Understanding the Patient Driven Payment Model." This presentation was developed by Symbria's executive and management team as the dedicated resource

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

utilized for training its clients and prospective clients about PDPM, as well as explaining PDPM to Symbria's therapists, program managers, and pharmacists. The document not only summarized PDPM in a clearly-understood format but also provided real examples of the financial impact for various scenarios including pharmacy, which Symbria Rehab's competitors typically lack institutional knowledge about. The presentation also used Symbria's data analytics to provide high-level insights about the impact of implementing PDPM. Dilmas was one of the recipients of the presentation. The presentation was marked "© 2018 Symbria, Inc." Later that same day, Dilmas forwarded the presentation to his personal email address.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 126.**

127.     On August 8, 2019, Dilmas emailed other Symbria managers and executives to make recommendations concerning pricing under PDPM to be offered to a Symbria Rehab client. He recommended three different pricing options. His email set forth a proposed negotiating strategy for Symbria Rehab to adopt with that client. Dilmas attached four spreadsheets to his email. The first three were detailed breakdowns for each of the client's three facilities in Illinois, showing each of the three pricing options to be offered to the client, with projections based on CMS' prior PPS payment methodology as well as the new PDPM methodology, and showed details such as minutes of therapy and projected savings to the client under each option. The fourth spreadsheet was an analysis comparing pricing under the new PDPM model to the old PPS model, summarizing PDPM changes by RUG category, average payment by component of service provided, return to provider, physical therapy and occupational therapy clinical categories measured in days, the percentage of patients with depression, and the percentage of patients by speech and language pathology end splits, which impact skilled nursing facility reimbursement based on a patient's criteria. Revenues based on historical data were projected based upon total dollars for both methodologies, number of patient days, and payments per patient days under both PPS and PPM. The fourth spreadsheet contains data

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

that Symbria and Affiliates provided to clients pursuant to confidentiality agreements in PDPM Data

Analytics Licensing Agreements. There were detailed worksheets below the summary sheet on the

top of the workbook. Dilmas forwarded this email and these attachments to himself five hours later.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 127.**

128.    Under CMS' new PDPM reimbursement system, concurrent and group therapy (as

opposed to individual therapist-to-patient therapy) would now be allowed at full reimbursement rates

for Medicare Part A patients, whereas previously these were only allowed at greatly reduced

reimbursement rates. Symbria Rehab created a "Concurrent and Group Fact Sheet" for managers and

therapists to use in deciding whether to use concurrent or group therapy. The fact sheet was

distributed to Program Managers and other Symbria Rehab employees, including Dilmas, Kathleen

Rice, and Tammy Buckley, on September 10, 2019. That night, Dilmas forwarded the email and

attached fact sheet to his personal email account.

**ANSWER: UMHS admits that under CMS' new PDPM reimbursement system, concurrent and group therapy (as opposed to individual therapist-to-patient therapy) would now be allowed at full reimbursement rates for Medicare Part A patients, whereas previously these were only allowed at greatly reduced reimbursement rates. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 128.**

129.    Symbria Rehab's Clinical Team drafted a "Program Manager Tip Sheet for

Transition to PDPM" with guidance for the weeks of September 23 and September 30, 2019, and the

first week of October. Symbria Rehab's Clinical Team drafted the document to provide guidance for

a smooth transition to PDPM. The tip sheet was emailed to Program Managers and other employees,

including Dilmas, Rice and Buckley, on September 11, 2019. That afternoon, Dilmas forwarded the

email and attached tip sheet to his personal email address.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 129.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

130.     Symbria's Clinical Team also developed a PowerPoint presentation on its Restorative Nursing Program and guidance for billing for such a program under the PDPM reimbursement methodology. Symbria Rehab distributed the presentation to Regional Mangers, Area Managers, and Program Managers and other employees, including to Dilmas, Rice, and Buckley, on September 17, 2019. Later that day, Dilmas forwarded the email and attached PowerPoint file to his personal email address.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 132.**

131.     On Friday, September 20, an employee of Symbria emailed to Dilmas "the care guides we discussed yesterday." Attached to the email were 18 Symbria Care Guides. The Care Guides addressed each of the ten diagnostic categories under PDPM and addenda thereto. As explained in a cover email when the Care Guides were first distributed in July, "correlate[ing] with each of the 10 therapy clinical categories established under PDPM…. [T]hey provide category specific diagnoses, historical treatment time averages, special considerations, standardized assessment recommendations, group recommendations, and much more." Symbria's team of clinical consultants compiled the Care Guides as a set of best practices for each of the ten diagnostic categories under PDPM.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 131.**

132.     The PDPM Care Guides contain and are based on Symbria's historical patient care and financial data and assessments of clinical best practices over years of the company's experience. One guide concerns Section GG Scoring, a new methodology under PDPM, which differed from Section G under PPS, the old CMS reimbursement methodology. Section GG scoring determines a patient's case mix index (CMI), which in turn impacts reimbursement levels from Medicare and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Medicaid. The PDPM Care Guides indicate where Symbria believes patients should range based on best practices. The PDPM Care Guides give guidance on billing and reimbursement, inclusion or exclusion from group therapy, and best practices for how to avoid CMS audits and denials. Symbria's PDPM Care Guides also discuss dovetailing and concurrent therapy approaches, which were previously not allowed under the PPS system for Medicare Part B, when therapy had to be conducted on a one-on-one basis. The PDPM Care Guides also provide a crosswalk table translating therapists' professional terminology into the terminology used in CMS' PDPM regulations and guidance. Symbria's Care Guides are a distillation of the collective experience and wisdom of Symbria Rehab's therapists and managers.

**ANSWER:** **UMHS denies that it received any documents, guides or reports that related to PDPM that were identified as confidential, proprietary by Plaintiffs, or that were copyright protected, commercially-valuable, competitively-sensitive and/or proprietary. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the remaining truth of the allegations in Paragraph 132.**

133. After receiving the Care Guides, Dilmas promptly forwarded all of these materials to himself at his personal email address on the same day, September 20, 2019.

**ANSWER:** **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 133.**

134. Each of the emails that Dilmas forwarded to his personal email account contain information Symbria and Affiliates treated as confidential. On information and belief, each time when Dilmas misappropriated the trade secrets or other information that is confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary of Symbria and Affiliates, he acted as agent for UMHS, MedRehab Alliance, IASN, MedRehab Holdings, and MedRehab Wisconsin. After April 29, 2019, on information and belief, Dilmas also acted as agent for Chicago Rehab and for Joint & Neuro. After August 5, 2019, on information and belief, Dilmas also acted as agent for Joint & Neuro Chicago. After August 19, 2019, on information and belief,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Dilmas also acted as agent for MedRehab Interstate. On information and belief, Dilmas also disclosed the confidential information of Symbria and Affiliates to MedRehab Therapy. On information and belief, Dilmas, Callen, Irvine, UMHS, and the MedRehab Entities were acting in concert in furtherance of a scheme to use Symbria's confidential information and to solicit and compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his ███████████ and his fiduciary obligations, Irvine's confidentiality and other obligations under her employment contract and her fiduciary duties, and Dilmas' confidentiality and other obligations in his employment contract and his fiduciary duties. The conduct of those persons and entities also violated the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act.

**ANSWER: UMHS denies that it received any documents, guides or reports that related to PDPM that were identified as confidential, proprietary by Plaintiffs, or that were copyright protected, commercially-valuable, competitively-sensitive and/or proprietary. UMHS denies that Dilmas was ever at any time an agent for UMHS, MedRehab Alliance or IASN, and UMHS further denies that Dilmas disclosed some or all or any confidential information and copyright-protected materials of Symbria and Affiliates to UMHS. Further, UMHS denies that it ever acted in concert in furtherance of a scheme to use Symbria's confidential, copyright-protected, commercially-valuable, competitively-sensitive and/or proprietary information to solicit and/or compete with Symbria in violation of UHMS' covenants in the Stock Purchase Agreement, Callen's covenants concerning Confidential Information in his Severance Agreement and his fiduciary obligations, Dilmas' confidentiality and other obligations in his employment contract and his fiduciary obligations, and Dilmas' confidentiality and other obligations in his employment contract and his fiduciary obligations, or any other reason. UMHS denies any contact in violation the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and the Copyright Act. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the remaining truth of the allegations in Paragraph 134.**

135. On September 24, 2019, Dilmas submitted a letter of resignation to Symbria Rehab. That same day, he forwarded to his personal email address a Program Manager Tip Sheet for Transition to PDPM prepared by Symbria's Clinical Team that was sent to all Regional, Area, and Program Managers the day before.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 135.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

136.     Shortly after Dilmas resigned from Symbria Rehab, in October 2019, Dilmas reset the smartphone he used while a Symbria Rehab employee to factory settings, which had the result of removing user files from the device, including but not limited to text messages, web browser history, emails from his personal email account, voice messages, telephone call histories, and other information. Dilmas is still in possession of this wiped smartphone.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 136.**

### Defendants' Use of Symbria and Affiliates' Trade Secrets and Copyrighted Works, Solicitation of Symbria and Affiliates' Clients, Prospective Clients, and Employees, and Competition with Symbria in Illinois

137.     Symbria Rehab and UMHS, in the name of its post-acute care residential facility Wesley Place, entered into a Rehabilitation Services Agreement effective May 31, 2012, pursuant to which Symbria Rehab provides therapy services to residents of UMHS' facility. Symbria Rehab provides physical therapy, occupational therapy, and speech and language pathology therapy to residents of UMHS' facility. Symbria Rehab also provides education and training relating to these services to UMHS' staff. The agreement between Symbria Rehab and UMHS provides in pertinent part as follows:

6.1 Confidential Information. Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing, and strategic information, client lists, Resident care and outcomes data ("Confidential Information"). No Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent. Upon termination of this Agreement, all Confidential Information and copies thereof will be returned at the request of the disclosing Party.

**ANSWER: UMHS denies the allegations in Paragraph 137.**

138.     Symbria Rehab and United Methodist Homes of New Jersey ("United Methodist

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Communities" or "UMC") entered into a Rehabilitation Services Agreement effective September 1, 2013, for five senior living facilities operated by UMC in New Jersey. Symbria Rehab agreed to provide occupational therapy, physical therapy, and speech and language therapy to residents of UMC's facilities and UMC agreed to pay rates negotiated between the two companies for those services. The fee schedule was based on resource utilization groups ("RUGs") for Medicare Part A inpatient care services utilized for reimbursements by the Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services, a percentage rate for Medicare Part B outpatient and private insured outpatient care services, a per-minute rate for Medicaid Part A services and a percentage rate for Medicaid Part B services, and an hourly rate for consulting services.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 138.**

139. The Rehabilitation Services Agreement between Symbria Rehab and UMC provided that:

> Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing, and strategic information, client lists, Resident care and outcomes data ("Confidential Information"). No Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 139.**

140. Callen signed the Rehabilitation Services Agreement with UMC on behalf of Symbria Rehab as its President.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 140.**

141. Symbria Rehab and Lions Gate entered into a Rehabilitation Services Agreement effective October 1, 2016 for its senior living facilities operated by Lions Gate in New Jersey. Symbria Rehab agreed to provide occupational therapy, physical therapy, and speech and language

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

therapy to residents of Lions Gate's facilities and Lions Gate agreed to pay rates negotiated between

the two companies for those services. The fee schedule was based on RUGs for Medicare Part A

inpatient care services utilized for reimbursements by the CMS of the United States Department of

Health and Human Services, a percentage rate for Medicare Part B outpatient and private insured

outpatient care services, and an hourly rate for consulting services.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 141.**

142.     The Rehabilitation Services Agreement between Symbria Rehab and Lions Gate

provided as follows:

> Confidential information. Each Party will use its best efforts to preserve the confidentiality of all nonpublic financial information, manuals, protocols, marketing and strategic information, client lists, and Resident care and outcomes data ("Confidential Information"). Neither Party will use for its own benefit or disclose to third-parties any other Party's Confidential Information without prior written consent.

Callen signed the Rehabilitation Services Agreement on behalf of Symbria Rehab as its President.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 142.**

143.     In November 2018, Symbria's Business Development Director, Rob Watts, left his

employment at Symbria. In that position at Symbria, Watts maintained a list of prospective clients

and their key contacts for Symbria's sales staff to use in their sales and marketing efforts. Before

Watts left Symbria, he ceased maintaining Symbria's prospect list. In January 2019, Watts became

Senior Vice President for Business Development at MedRehab Alliance. Watts also performs work

for MedRehab Interstate.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 143.**

144.     By December 13, 2018, long before Callen's customer non-solicitation provision in

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

his Severance Agreement expired, and in contravention of the restrictive covenants in the SPA given to Symbria by UHMS, Callen solicited Symbria client Otterbein Senior Life to join his rehabilitation services company and asked UMHS' president Bill Lowe to provide guidance on questions posed by Otterbein Senior Life about it.

**ANSWER:** **Defendant denies the allegations in Paragraph 144.**

145.     On January 14, 2019, while the Severance Agreement and the non-solicitation covenants contained in them were still in effect, Callen emailed a number of clients of Symbria and Affiliates, both inside Illinois and outside Illinois, to solicit their business. Among Symbria and Affiliates' clients that Callen solicited were UMC, Norwood Crossing, and Management Performance Associates, the company that manages the DeKalb County Rehab & Nursing Center, which is a Symbria Rehab client. Callen solicited these Symbria and Affiliates' clients from his medrehaballiance.com email account, using a "MedRehab Alliance" logo and a signature block stating that Callen was President/CEO of MedRehab Alliance, LLC. On each email, Callen copied Sharma of Chicago Rehab.

**ANSWER:**     **UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 145.**

146.     In the spring of 2019, Symbria became aware that its pharmacy client Plymouth Place was going to terminate its existing contract with another company to provide rehabilitation services for its residents. Symbria made efforts to secure a contract for Symbria Rehab with Plymouth Place to provide rehabilitation services. However, despite the existing pharmacy services relationship between Symbria and Plymouth Place, Plymouth Place subsequently informed Symbria it would not be awarding it a contract to provide rehabilitation services to its residents. On May 1, 2019, Irvine announced a "partnership/joint venture" between Plymouth Place and "MedRehab Alliance" for "MedRehab Alliance" to start providing therapy services to Plymouth Place's residents. According to Irvine and Plymouth Place, "MedRehab Alliance" would provide therapy services on site as well

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

as pain management, clinic integration and outpatient therapy, home health services, and wellness services. Plymouth Place entered into a contract with MedRehab Therapy to provide these services. Subsequently, MedRehab Therapy transferred its contract with Plymouth Place to Joint & Neuro Chicago.

**ANSWER:** **Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 146.**

147.     On information and belief, Lowe and/or Callen on behalf of UMHS and the MedRehab Entities, solicited Plymouth Place's rehabilitation and wellness services.

**ANSWER:** **Defendant denies the remaining allegations in Paragraph 147.**

148.     In or around April 2019, ▮▮▮▮▮▮▮▮▮▮▮, MedRehab Wisconsin, and ▮▮▮▮▮▮▮

 began to solicit Symbria Rehab's client Marquardt Manor in Watertown, Wisconsin. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a slide presentation about MedRehab Interstate that stated that "[t]ime is of the essence due to the impending rollout of PDPM."

**ANSWER:** **UMHS admits that the that the information communicated by the email is set forth in a written document and the document provides the best evidence of the contents.  UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegation related to any attachments to the email or statements contained within the attachment. Answering further, Defendant denies that UMHS or MedRehab Alliance was involved in the solicitation of Marquardt Manor and all other remaining allegations in this Paragraph.**

149.     On May 3, 2019, Callen emailed UMC's CEO in connection with MedRehab Alliance's efforts to solicit UMC's business away from Symbria. Callen attached a "Rehab Operations Analysis" form for UMC to provide data regarding UMC's operations to Callen, so that Callen could model UMC's projected financial results if UMC terminated its contract with Symbria and instead contracted with one of the MedRehab Entities. The attached file was an Excel spreadsheet containing formulas for performance metrics created at Symbria Rehab by Symbria Rehab employees

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

for Symbria and Affiliates' use in analyzing clients' operations and performance metrics, which Callen or MedRehab Alliance modified slightly and rebranded for their own purposes. Callen also attached a slide presentation about MedRehab Interstate's business model, which included the statement, "[t]ime is of the essence due to the impending rollout of PDPM." The signature block of Callen's cover email showed that Callen was President/CEO of MedRehab Alliance. Callen copied Lowe of UMHS and Sharma of Chicago Rehab on his email. On information and belief, Callen sent this email not only as an agent of MedRehab Alliance, MedRehab Interstate, UMHS, and Chicago Rehab, but also as an agent of the other MedRehab Entities.

**ANSWER: Defendant denies that Callen was acting as an agent of UMHS, MedRehab Alliance or IASN as alleged in in Paragraph 149. Defendant admits Callen emailed UMC's CEO, and further admits that the information communicated by the email is set forth in a written document and the document provides the best evidence of the contents. Defendant admits that the signature block of Callen's cover email showed that Callen was President/CEO of MedRehab Alliance, and that Callen copied Lowe of UMHS and Sharma of Chicago Rehab on his email. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 149.**

150.     On June 10, 2019, Ambrose resigned from Symbria Rehab. Ambrose went to work for Chicago Rehab, Joint & Neuro, Joint & Neuro Chicago, MedRehab Alliance, and MedRehab Interstate. Ambrose was solicited to leave Symbria Rehab by Callen, who was acting as an agent for the MedRehab Entities and UMHS when he did so.

**ANSWER: Defendant denies that Callen was acting as an agent for UMHS or MedRehab Holdings. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 150.**

151.     On June 27, 2019, Miller received an email from a Symbria Rehab employee about home health projections under PDGM (a CMS reimbursement model for home healthcare services similar to PDPM) and projected changes for two of Symbria Rehab's clients. Miller then forwarded that email to his personal email address.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 151.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

152.     In June 2019, Callen emailed the CEO of Duncaster Callen's slide presentation concerning MedRehab Interstate. Callen also attached a "Rehabilitation Operations Analysis" form in Excel format, asking the CEO to complete it with Duncaster data so that Callen could run a "conversion analysis report" showing the ostensible financial impact of Duncaster terminating Symbria and engaging MedRehab Interstate. The attached Excel template contained formulas for analyzing facility data and bore a "MedRehab Alliance" logo, but it was modified from a Symbria Rehab form created by a Symbria Rehab Program Manager. The attached slide presentation stated that "[t]ime is of the essence due to the impending rollout of PDPM. Callen's cover email came from his medrehaballiance.com email address. Callen's email signature block stated that he was the President and CEO of MedRehab Alliance, MedRehab Therapy, and Joint & Neuro.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 152.**

153.     As a result of the solicitation of Marquardt Manor, Marquardt Manor began telling Symbria Rehab that it was considering an in-house model for providing therapy services with an outside consultant managing therapists, which is the model that the MedRehab Entities promote and use, and is not the model typically used by Symbria Rehab. Marquardt Manor also negotiated Symbria Rehab's rate downward, on information and belief based upon bids and information supplied by Callen and the MedRehab Entities.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 153.**

154.     On July 25, 2019, Symbria's CEO emailed Miller and Symbria's Executive Vice President of Operations to say that UMC's CEO had just informed her that UMC was going to go "in-house" for therapy and wellness services. Symbria's Executive Vice-President of Operations asked Miller if Miller had offered new PDPM pricing to UMC yet and, if so, at what price. Miller did not respond. Symbria then learned from discussions that a Symbria Rehab executive had with

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Miller that Miller was already aware of UMC's decision before Symbria's CEO received the email

from UMC's CEO. Miller stated that there were "more surprises to come."

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 154.**


155.     The next day, on July 26, 2019, in the early afternoon, the administrator for another

Symbria Rehab client, Duncaster, located in Bloomfield, Connecticut, requested Symbria Rehab's

proposed new contract that very day. A Symbria Rehab executive forwarded the email to Miller and

said, "I've got a bad feeling about this... I don't understand the urgency to this. John [Callen] and

Mike [a Duncaster administrator] have a very long good relationship." Miller did not respond.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 155.**


156.     Also on July 26, 2019, UMC's CEO called Symbria's CEO to inform her that UMC

was terminating its contract with Symbria Rehab. Miller was already aware that UMC was going to

terminate its contract with Symbria Rehab. UMC's CEO then sent to Symbria's CEO written notice

that UMC was terminating its contract with Symbria Rehab effective September 30, 2019, so that it

could bring therapy services in-house.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 156.**


157.     On July 26, 2019, Miller emailed a notice of his resignation to Symbria's CEO.


**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 157.**


158.     On July 30, 2019, Symbria sent Miller a letter acknowledging his resignation

Symbria wrote: "as a key employee of Symbria, you are subject to federal, Illinois and Pennsylvania

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business Including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Miller acknowledged this in a telephone conversation concerning his separation in a telephone conference with a Symbria Human Resources officer. Miller also acknowledged that he executed a receipt of the Symbria Rehab Employee Handbook on March 28, 2019, and that he had no company information on his home computer, iPad, cell phone or other electronic data storage technology.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 158.

159.     After he resigned from Symbria, Miller became an employee of Chicago Rehab and began working for MedRehab Alliance, Joint & Neuro, Joint & Neuro Chicago, and MedRehab Interstate as Executive Vice President in a similar role as he was engaged in at Symbria. In those roles, Miller reports to Callen. These MedRehab Entities were able to hire Miller because they had won the contract to provide rehabilitation services to UMC.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 159.

160.     On information and belief, MedRehab Interstate or another one of the MedRehab Entities successfully solicited away from Symbria Rehab UMC's rehabilitation and wellness services.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 160.

161.     On September 11, 2019, Kathleen Rice, a Regional Director of Symbria Rehab gave notice of her resignation. That day was Rice's last day as an employee of Symbria Rehab. Rice informed others at Symbria that she was going to work for Callen. After she resigned from Symbria, Rice went to work for MedRehab Alliance in a similar role as she was engaged in at Symbria. Rice

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

also performs similar services for MedRehab Interstate.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 161.**

162.     On September 13, 2019, Symbria Rehab sent Rice a letter acknowledging her resignation. Symbria Rehab wrote: "as a key employee of Symbria, you are subject to federal, Illinois and Pennsylvania trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business Including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Rice acknowledged this in a telephone conversation concerning her separation in a telephone conference with a Symbria Human Resources officer. Rice also acknowledged that she executed a receipt of the Symbria Rehab Employee Handbook on March 27, 2019, and that she had no company information on her home computer, iPad, cell phone or other electronic data storage technology.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 162.**

163.     On September 16, 2019, Tammy Buckley, a Therapy Technician employed by Alliance HVA in Pennsylvania, gave notice that she was resigning her employment. Buckley then became employed by Chicago Rehab, MedRehab Alliance, and MedRehab Interstate in a similar position as she held at Alliance HVA.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 163.**

164.     On September 23, 2019, Symbria's electronic medical record provider notified Symbria that the request by UMC in New Jersey to transfer its residents' medical records from Symbria Rehab to its new provider of therapy services, Joint & Neuro, was underway. The electronic medical record provider notified the designated representatives of both Symbria Rehab and Joint & Neuro of the data transfer. Joint & Neuro's designated representative was Irvine, whose place of

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

work is at Plymouth Place in LaGrange Park, Illinois. On information and belief, Irvine is employed by or is an agent of Joint & Neuro and was solicited to join that company by Callen and Joint & Neuro and/or one of the other MedRehab Entities.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 164.**

165.     September 25, 2019 was Dilmas' last day of employment at Symbria Rehab.Symbria Rehab sent Dilmas a resignation agreement. A true and correct copy of Symbria Rehab's September 25, 2019 resignation agreement with Dilmas is attached hereto as Exhibit 4. It acknowledged his resignation and also stated: "You acknowledge that you have no company information on your home computer, cell phone, or other electronic data storage technology." Dilmas countersigned the agreement on the same day, above a statement reading, "I have read and agree to the statements noticed above." Dilmas' statement concerning company information was false.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 165.**

166.     In the same agreement acknowledging Dilmas' resignation, Symbria Rehab wrote: "as a key employee of Symbria, you are subject to federal [and] Illinois trade secret laws. Accordingly, you have an ongoing obligation not to interfere with Symbria's business including its clients, vendors, employees and suppliers. You also have an ongoing fiduciary obligation in addition to the obligation of loyalty and fidelity under common law." Dilmas' countersignature acknowledged that he agreed with these statements.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 166.**

167.     In consideration of Dilmas' agreement that he possessed none of Symbria Rehab's information in electronic format and his acknowledgement that he was bound not to interfere with Symbria Rehab's business and an ongoing fiduciary duty of loyalty, among other consideration,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Symbria agreed to pay two weeks' base salary to Dilmas as severance pay and to waive his non-compete and non-solicitation covenants.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 167.**

168.     On information and belief, while Dilmas was still employed by Symbria, Callen informed Dilmas that he and the MedRehab Entities, including Chicago Rehab, were soliciting Symbria clients and prospective clients and soliciting Symbria employees and directed Dilmas not to inform Symbria, and Dilmas did not inform Symbria, undermining Symbria's interests.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 168.**

169.     On Dilmas' last date of employment by Symbria Rehab, Dilmas informed Symbria that he was going to work for Callen. ████████████████████ Dilmas then became employed by Chicago Rehab or another of the MedRehab Entities in a similar position as he held at Symbria Rehab. Dilmas, who is now employed by Chicago Rehab and who performs work for Joint & Neuro, MedRehab Alliance, and MedRehab Interstate as VP of Hospital and Outpatient Services, is able to access his personal email account, cdilmas@icloud.com, from his work computer.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 169.**

170.     In the fall of 2019, Rice created a PowerPoint presentation branded with the "MedRehab Alliance" name and logo on the subject of "Respiratory Therapy: Impact on Reimbursement under PDPM." Included in this slide presentation were pages and portions of pages copied out of Symbria's copyrighted "Understanding the Patient Driven Payment Model" slide presentation that Ambrose had emailed to Irvine on January 9, 2019, which Irvine emailed to Dilmas

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

and to her personal email address, and that Dilmas emailed to his personal email address on July 23, 2019. Rice listed herself on the cover page as a presenter, and the document bears the legend "Confidential: MedRehab Alliance, LLC."

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 170.**

171.     Also in the fall of 2019, shortly after Rice began working for MedRehab Interstate and MedRehab Alliance, Rice emailed another employee of MedRehab Alliance a "PDPM Tool" in Excel format. That Excel file contained a "PDPM Predictor Worksheet" with a flow chart of medical diagnoses and conditions to generate nursing case mix indicators, a Section GG functional score calculator, a flow chart demonstrating case mixes for physical therapy and occupational therapy, and a separate flow chart indicating speech and language pathology case mix groups and indices. The Excel document was created at Symbria Rehab in December 2018 in connection with its planning for the implementation of PDPM and last modified in January 2019, when Rice was a Symbria Rehab Regional Director. Rice and another Symbria Rehab director who was heavily involved in Symbria Rehab's PDPM efforts collaborated at Symbria Rehab to create this trade secret document.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 171.**

172.     MedRehab Interstate or one of the other MedRehab Entities successfully solicited away Symbria Rehab's client Lions Gate. On November 1, 2019, Lions Gate's CEO wrote to Symbria's CEO to say that Lions Gate was terminating its contract with Symbria Rehab as of December 31, 2019. Lions Gate informed Symbria that Lions Gate wished to employ employees contractors based on an in-house model. On information and belief, MedRehab Alliance or one of the other MedRehab Entities then entered into a contract with Lions Gate to provide manage Lions Gate's in-house employed therapists.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 172.

173.     On January 10, 2020, Rice sent an email to another MedRehab Alliance employee attaching the "MedRehab Alliance"-branded slides concerning "Respiratory Therapy: Impact on Reimbursement under PDPM." Rice also attached Symbria's copyrighted "Understanding the Patient Driven Payment Model" slide presentation. Rice wrote in her cover email, "the initial [MedRehab Alliance-branded] slides you can use, I 'redid' those ones to be MRA appropriate. I also included another [PowerPoint] I had." That other attached PowerPoint was Symbria's slide presentation.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 173.

174.     On May 4, 2020, Rice sent Miller, from her medrehaballiance.com email account, using a "MedRehab Alliance, LLC" signature block, an email with the subject "Resource ideas," and attached a number of files to her email. One attachment was a draft orientation manual for "MedRehab Alliance" Program Managers at client facilities, which copied nearly verbatim many parts of Symbria Rehab's "Symbria Program Manager Orientation" dated April 2019 and marked "Symbria, Inc. – Confidential." Rice also attached a "Transition Plan," which she commented was "an old version." That document was created by Symbria Rehab. Rice told Miller he might "want Tammy [Buckley] to recreate what would be relevant to our current transition plan."

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 174.

175.     In May 2020, Vic Arellano, an employee of Chicago Rehab and a former employee of Symbria Rehab, sent an email to Miller and Rice at their MedRehab Alliance email addresses, to Ambrose at Chicago Rehab, and to Dilmas at a Joint & Neuro email address on the subject of "Disease Management Models." Arellano used a signature block showing that he was a  Vice President of Joint & Neuro. Attached was Symbria Rehab's Pneumonia Disease Management Model with a © copyright legend showing that Symbria Rehab asserted a copyright in the document.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

The document also bears the following warning on its cover page:

> All rights reserved. THE CONTENTS OF THIS PUBLICATION ARE CONFIDENTIAL AND PROPRIETARY. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, scanning, or any information storage and retrieval system, without permission from [Symbria] Rehab, Inc.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 175.**

176.    On June 4, 2020, Arellano emailed the CEO of Plymouth Place ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████-Arellano wrote to Plymouth Place's CEO that ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████Attached was the same ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ That document was authored for Symbria by Symbria Rehab's former Medical Director.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 176.**

177.    Lowe and UMHS have solicited other organizations providing senior living facilities to form "a new Symbria," that is, a new organization owned by not-for-profit organizations in the same business as Symbria's former owners. The trade name "MedRehab Alliance" is deliberately suggestive of Symbria's former name, Alliance Rehab. Lowe approached Symbria Rehab's client Norwood Crossing in Illinois to promote the concept of "a new Symbria." In addition to Plymouth Place, ███████████████████████████████████████████████████████████

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

████████████████████████

**ANSWER:** **UMHS admits only that Plymouth Place and other clients of Symbria and Affiliates have become investor in IASN, MedRehab Alliance and MedRehab Interstate. Defendant is without information or knowledge sufficient to form a belief as to the truth of whether other clients and prospective clients have become investors in MedRehab Alliance and MedRehab Interstate. Defendant denies all the remaining allegations in Paragraph 177.**

178. On information and belief, Lowe and/or Callen on behalf of UMHS and the MedRehab Entities have solicited other clients of Symbria Rehab and its subsidiaries. These include Lancaster Health Group in Chicago, Smith Crossing in Orland Park, Illinois, Bethesda Home in Chicago, Illinois, Marquardt Manor in Watertown, Wisconsin, Avon Health Center in Hartford, Connecticut, West Hartford Health & Rehab in Hartford, Connecticut, Otterbein Senior Life in Lebanon, Ohio, Duncaster in Bloomfield, Connecticut, and Management Performance Associates, the company that manages DeKalb County Rehab & Nursing Center in DeKalb, Illinois.

**ANSWER:** **Defendant denies the allegations in Paragraph 178.**

179. In June 2020, Symbria Rehab solicited Lions Gate to provide respiratory therapy services to Lions Gate and provided a PDPM-based pricing analysis to Lions Gate for that purpose. Lions Gate, ████████████████████████ provided Symbria Rehab's proposal to an employee of MedRehab Alliance.

**ANSWER:** **Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 179.**

180. On or about December 7, 2020, Bethesda Home, a Symbria Rehab client in Illinois, informed Symbria Rehab that Bethesda Home was terminating the parties' Rehabilitation Services Agreement so that it could enter in a contract with one of the MedRehab Entities associated with Callen to provide management of therapy services. Before Bethesda Home terminated Symbria Rehab's contract, Callen requested Symbria Rehab's current PDPM pricing effective October 1, 2019 from Bethesda Home, which Bethesda Home provided to him, and Callen then underbid Symbria's

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

pricing. Bethesda subsequently entered into a Rehabilitation Services Agreement with Joint & Neuro Chicago effective April 1, 2021 with prices below those of Symbria Rehab.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 180.

181. On or about December 21, 2020, Norwood Crossing, a Symbria Rehab client in Illinois, informed Symbria Rehab that it was terminating the parties' Rehabilitation Services Agreement so that Norwood Crossing could enter into a contract with one of the MedRehab Entities associated with Callen to provide management of therapy services. Norwood Crossing indicated to Symbria that the reason for the change was price, because "we have always been happy with quality/service/people, etc." Before Norwood Crossing terminated Symbria Rehab's contract, Callen requested Symbria Rehab's current PDPM pricing effective October 1, 2019 from Bethesda Home, which Bethesda Home provided to him, and Callen then underbid Symbria Rehab's pricing. Norwood Crossing subsequently entered into a Rehabilitation Services Agreement with Joint & Neuro Chicago effective April 1, 2021 with prices below those of Symbria Rehab.

**ANSWER:** Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 181.

182. On information and belief, Lowe and/or Callen on behalf of UMHS and the MedRehab Entities have also solicited prospective clients of Symbria Rehab and its subsidiaries using Symbria's prospect list. These include:

(a)    Burgess Square in Westmont, Illinois, where an administrator informed a Symbria sales person that the administrator had a business relationship with Callen and that Burgess Square had decided to use an in-house consulting model of providing rehabilitation therapy services;

(b)    Tabor Hill in Naperville, Illinois, where an administrator informed a Symbria sales person that there was another organization that could manage rehabilitation therapy services

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

in-house for Tabor Hill in a manner similar to Symbria Rehab;

(c)        Lions Gate in New Jersey, which Symbria Rehab was soliciting to provide respiratory therapy services at the same time as one of the MedRehab Entities, Joint & Neuro, was also soliciting that business, and while MedRehab Alliance or another one of the MedRehab Entities manages rehabilitation therapy services there;

(d)        Masonic Care in Wallingford, Connecticut, which is a member facility of an organization that is a joint venture partner of Symbria Rehab in Alliance Connecticut;

(e)        LECOM Health in Erie, Pennsylvania, where Callen and Miller traveled to meet with a hospital that refers patients to that facility;

(f)        iCare Health Network in Manchester, Connecticut, where Symbria's former sales leader had made a contact while employed by Symbria before he went to work for one of the MedRehab Entities as a sales executive, and the MedRehab Entities then solicited iCare Health Network after his departure from Symbria;

(g)        Landis Homes in Lititz, Pennsylvania, where an administrator reported to Symbria's sales team that Landis Homes was considering an in-house consulting model  of providing rehabilitation therapy services; and

(h)        Lutheran Community at Telford in Telford, Pennsylvania, where an administrator reported to a member of Symbria's sales team that Lutheran Community at Telford was considering an in-house consulting model of providing rehabilitation therapy services.

**ANSWER: Defendant denies the allegations in Paragraph 182.**

183.        Callen, Miller, Rice, Irvine and/or Dilmas all made contacts with these post-acute care communities while employed by Symbria Rehab. ███████████ of the above-listed solicitations was successful. On information and belief, there are no other companies in the markets where the above post-acute care communities are located that promote an in-house consulting model of

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

providing rehabilitation therapy services managed by an outside consulting firm other than the MedRehab Entities.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 183.**

### **Defendants' Collective Operation as a Single Enterprise and Alter-Ego of Each Other**

184.    Chicago Rehab employees contracted to MedRehab Alliance include Miller, Buckley, Ambrose, and Dilmas. Chicago Rehab also contracts the services of its employees to MedRehab Interstate, including those of Miller, Buckley, Dilmas, and Ambrose. Chicago Rehab acts as an agent for MedRehab Alliance and MedRehab Interstate ███████████████████████ ████████ MedRehab Alliance and Callen make key personnel decisions such as hiring and firing for Chicago Rehab.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 184.**

185.    MedRehab Alliance contracts the services of its employees to MedRehab Interstate, including those of Rice and Watts. MedRehab Interstate has no employees of its own.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 185.**

186.    Chicago Rehab also contracts the services of its employees, including former Symbria Rehab employees Dilmas, Buckley, Miller, and Ambrose, to Joint & Neuro and Joint & Neuro Chicago. Joint & Neuro and Joint & Neuro Chicago have no employees of their own.

**ANSWER: Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 186.**

187.    Irvine, an employee of Plymouth Place, which owns an interest in MedRehab Alliance, performs services for Joint & Neuro and, on information and belief, the other MedRehab Entities. Irvine has a Joint & Neuro email address and uses an email signature block describing her

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

role as "Transition Operations" for Joint & Neuro at the Higgins Road address in Rosemont.

**ANSWER: Defendant admits only that Plymouth Place has an investment interest in MedRehab Alliance. UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 187.**

188.     MedRehab Holdings, MedRehab Therapy, MedRehab Wisconsin, and IASN have no employees.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegation regarding whether MedRehab Therapy has employees. Defendant admits the remaining allegations in Paragraph 188.**

189.     The MedRehab Entities have common and overlapping members, managers, and directors: namely Callen, Lowe, Sharma, Murtaza, and Patel. Despite this, the MedRehab Entities are a mere façade and are dominated by Callen to the exclusion of the other managers and directors. Callen makes hiring and firing decisions for all of the MedRehab Entities. Callen also makes decisions regarding benefits and retirement packages for the MedRehab Entities' employees, including for Chicago Rehab. Callen makes virtually all of the decisions for the MedRehab Entities, with minimal or no input from Lowe, Sharma, Murtaza, and Patel.

**ANSWER:  Defendant denies that the MedRehab Entities have common and overlapping members, managers and directors: namely Callen, Lowe, Sharma, Murtaza and Patel, and further denies that the MedRehab Entities are a façade and dominated by Callen to the exclusion of the other manager and directors.  UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 189.**

190.     Nor do the MedRehab Entities maintain arms-length relationships among themselves. Callen, as the dominant stockholder and manager, controls the MedRehab Entities as a single enterprise. For example, Chicago Rehab "hired" Callen through MedRehab Therapy of Illinois to manage Chicago Rehab employees who are leased to MedRehab Alliance and MedRehab Alliance Interstate, of which Callen is the CEO. Callen is paid a "management fee" by one of the MedRehab Entities through another entity to manage yet another entity.

**ANSWER:  Defendant denies the allegations in Paragraph 190.**

191.    The MedRehab Entities do not maintain corporate formalities. Minority members are not invited to member meetings, not asked to participate in member votes, do not receive minutes from such meetings, or annual reports.

**ANSWER:  Defendant denies the allegations in Paragraph 191.**

192.    Defendants have created this interlocking corporate structure in a deliberate attempt to evade UMHS' contractual covenants in the SPA.

**ANSWER: Defendant denies the allegations in Paragraph 192.**

193.    The following diagram depicts the relationships among all of the Defendants once UMHS and the MedRehab Entities successfully solicited away Symbria and Affiliates' employees:



**ANSWER: Defendant denies the allegations in Paragraph 193.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**COUNT I**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* –**
**Symbria, Symbria Rehab, Alliance Connecticut and Alliance HVA Against All Defendants**

194.     Plaintiffs Symbria and Affiliates incorporate paragraphs 1 through 193 as set forth above as if fully stated herein.

**ANSWER: UMHS incorporates by reference its answers to Paragraphs1 through 193 as if set forth fully herein as its answer to Paragraph 194.**

195.     Symbria and Affiliates are owners of trade secrets that have been misappropriated that relate to products and services used in, and intended for use in interstate commerce.

**ANSWER: Defendant denies the allegations in Paragraph 195.**

196.     Symbria and Affiliates' (a) financial information concerning profits, revenues, costs, margins, efficiencies, productivity, units of patient care, pricing and other financial and patient care metrics used to manage their businesses, (b) PDPM materials, including PDPM Care Guides and other materials that synthesize Symbria, CMS, and industry information for ease of use by Symbria and Affiliates' staff and clients, and (c) PDPM Analysis Software, (d) client- specific information, including client contact and program information, historical patient census data and patient outcomes, and financial details concerning client facilities, (e) roadmap materials for the establishment of an outpatient clinic associated with an in-patient post-acute care facility and associated data, and (f) materials relating to Symbria's unique seven-days-per- week respiratory therapy program for post-acute care facilities (collectively, the "Symbria Information") are trade secrets.

**ANSWER: Defendant denies the allegations in Paragraph 196.**

197.     Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret. At Symbria's headquarters, access is restricted only to those who have stored a fingerprint and whose fingerprint is registered on a reader allowing them access to the company's offices, or to those who are allowed into the offices by a receptionist at the main door. Symbria and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Affiliates store digital information on a shared company drive to which employees have access only on need-to-know basis specific to an employee's position. Symbria and Affiliates assign log-in and password credentials to employees that are required to access the company's computer network and that are available only during the term of their employment. Symbria and Affiliates' employee computers are programmed so that their displays turn off  when employees do not actively use their computers, and employees must enter their log-in credentials to return to network access. Employees are required to log off the Symbria computer network when their computer will be unattended. Hard copy files containing confidential information are stored in secured areas and/or locked cabinets or offices.

**ANSWER: UMHS denies that Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret.  Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 197.**

198.    Symbria and Affiliates have written policies prohibiting the disclosure of confidential information to others, including the Symbria Information, which prohibit its use other than for Symbria and Affiliates, and forbid its misappropriation, both in their Employee Handbook and Code of Conduct. Employees are required to acknowledge that they are aware of these policies when they are offered employment, when they are promoted, and when they leave the employment of Symbria and Affiliates. Executives such as Callen who have employment agreements have the same provisions in those agreements. Certain of the Symbria Information is designated on its face "Confidential – Symbria, Inc.," "Confidential and Proprietary," or "© Symbria."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 198.**

199.    The Symbria Information is not shared with the public, or disclosed to the competitors of Symbria and Affiliates.

**ANSWER: Defendant denies the allegations in Paragraph 199.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

200.     When Symbria and Affiliates share any confidential information with a client, they do so pursuant to written agreements with the clients prohibiting the clients from disclosing the confidential information to third parties and requiring the clients to return that information to Symbria if the agreement terminates.

**ANSWER: Defendant denies the allegations in Paragraph 200.**

201.     The Symbria Information is commercially valuable and gives Symbria and Affiliates advantages over their competitors. Even persons experienced in the business of providing rehabilitation services in senior living communities who wish to compete with Symbria and Affiliates would benefit greatly from having unauthorized access to the Symbria Information. Persons in the business of providing rehabilitation services in senior living communities who do not have access to the Symbria Information are at a competitive disadvantage to Symbria and Affiliates. The Symbria Information has independent economic value, actual and potential, from being kept secret.

**ANSWER: Defendant denies the allegations in Paragraph 201.**

202.     Symbria and Affiliates are the owners of the Symbria Information because they have rightful legal or equitable title to the Symbria Information.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 202.**

203.     The Symbria Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by other persons from the disclosure or use of the Symbria Information.

**ANSWER: Defendant denies the allegations in Paragraph 203.**

204.     Dilmas, Irvine, and Callen used improper means to acquire knowledge of the Symbria Information when Dilmas and Irvine sent that information to their personal email addresses and forwarded that information to Callen in violation of Symbria Rehab's policies and/or their

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

implied duties of good faith and fair dealing. Dilmas', Irvine's, and Callen's conduct constituted theft and breach of a duty to Symbria and Affiliates to maintain secrecy.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 204.**

205. The relationships between and among UMHS and the MedRehab Entities as set forth above have resulted in the Symbria Information being shared and distributed to and among all of the MedRehab Entities and UMHS. Any Symbria Information that was shared with UMHS as a Symbria Rehab client was shared pursuant to the terms of contracts restricting UMHS from divulging the information to others, including the MedRehab Entities, for their own use.

**ANSWER: Defendant denies the allegations in Paragraph 205.**

206. Callen, UMHS, and the MedRehab Entities have acquired the Symbria Information knowing or having reason to know that the Symbria Information was acquired by improper means. In particular, Callen, who is an agent of UMHS and all of the MedRehab Entities, has a contractual obligation not to use the confidential information of Symbria and Affiliates. Callen also knows that Symbria Rehab's clients and former clients have contractual obligations not to disclose Symbria and Affiliates' confidential information to third parties, since Callen signed contracts on behalf of Symbria Rehab containing this restriction. UMHS and the MedRehab Entities directly affiliated with it know or have reason to know that they have acquired the Symbria Information by improper means by virtue of Lowe's former position as Vice Chairperson of Symbria's Board of Directors. Callen and Lowe both know or have reason to know that Dilmas' and Irvine's acquisition of the Symbria Information by Dilmas and Irvine and retention of it following their terminations from Symbria Rehab was improper.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations related to what Callen knows or has reason to know in Paragraph 206. Answering further, Defendant, UMHS denies the remaining allegations in Paragraph 206.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

207.    Callen, UMHS, and the MedRehab entities have used or threaten to use the Symbria Information without the express or implied consent of Symbria and Affiliates. Callen, UMHS and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, persons who used improper means to acquire it. Callen, UMHS, and the MedRehab Entities also knew or had reason to know that the Symbria Information was acquired by them under circumstances giving rise to a duty to maintain its secrecy. Callen, UMHS, and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, who each owed a duty to Symbria and Affiliates to maintain its secrecy.

**ANSWER:  UMHS denies the allegations in Paragraph 204.**

WHEREFORE, plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, and Alliance Rehab HVA, L.L.C. request that the Court enter judgment in their favor and against defendants John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award plaintiffs the following remedies:

a.    a preliminary and a permanent injunction preventing the Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with them from misappropriating, disclosing, or using and from threatening to misappropriate, disclose, or use Symbria and Affiliates' trade secrets, and ordering Defendants to return the Symbria Information to Symbria and Affiliates forthwith;

b.    damages for actual loss caused by misappropriation of Symbria and Affiliates' trade secrets;

c.    damages for unjust enrichment of caused by the misappropriation, disclosure, and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

use of Symbria and Affiliates' trade secrets not addressed in computing damages for actual

loss;

    d.     alternatively, in lieu of damages measured by any other methods, damages caused

by misappropriation, disclosure, and use measured by imposing a reasonable royalty for

the Defendants' unauthorized disclosure or use of Symbria and Affiliates' trade secrets;

    e.     exemplary damages in an amount two times the amount of actual damages for

Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and

Affiliates' trade secrets;

    f.     award Symbria and Affiliates their reasonable attorneys' fees for Defendants'

willful and malicious misappropriation, disclosure, and use of Symbria and Affiliates' trade

secrets;

    g.     award Symbria and Affiliates their costs in bringing this action; and

    h.     such other relief as is just and appropriate in the circumstances.

**ANSWER:**    **UMHS prays that Plaintiffs take nothing by their Complaint, that UMHS be reimbursed for its reasonable costs and attorneys' fees, and for all other just and proper relief.**

## COUNT II
### Violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* –
### <u>Symbria, Symbria Rehab, Alliance Connecticut and Alliance HVA Against All Defendants</u>

    208.    Plaintiffs Symbria and Affiliates incorporate paragraphs 1 through 193 as set forth

above as if fully stated herein.

**ANSWER: UMHS incorporates by reference its answers to Paragraphs1 through 193 as if set forth fully herein as its answer to Paragraph 208.**

    209.    Symbria and Affiliates' (a) financial information concerning profits, revenues, costs,

margins, efficiencies, productivity, units of patient care, pricing and other financial and patient care

metrics used to manage their businesses, (b) PDPM materials, including PDPM Care Guides and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

other materials that synthesize Symbria, CMS, and industry information for ease of use by Symbria and Affiliates' staff and clients, and (c) PDPM Analysis Software, (d) client- specific information, including client contact and program information, historical patient census data and patient outcomes, and financial details concerning client facilities, (e) roadmap materials for the establishment of an outpatient clinic associated with an in-patient post-acute care facility and associated data, and (f) materials relating to Symbria's unique seven-days-per- week respiratory therapy program for post-acute care facilities (collectively, the "Symbria Information") are trade secrets.

**ANSWER: UMHS denies the allegations in Paragraph 209.**

210. Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret. At Symbria's headquarters, access is restricted only to those who have stored a fingerprint and whose fingerprint is registered on a reader allowing them access to the company's offices, or to those who are allowed into the offices by a receptionist at the main door. Symbria and Affiliates store digital information on a shared company drive to which employees have access only on need-to-know basis specific to an employee's position. Symbria and Affiliates assign log-in and password credentials to employees that are required to access the company's computer network and that are available only during the term of their employment. Symbria and Affiliates' employee computers are programmed so that their displays turn off when employees do not actively use their computers, and employees must enter their log-in credentials to return to network access. Employees are required to log off the Symbria computer network when their computer will be unattended. Hard copy files containing confidential information are stored in secured areas and/or locked cabinets or offices.

**ANSWER: UMHS denies that Symbria and Affiliates have taken reasonable measures to keep the Symbria Information secret. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 210.**

211. Symbria and Affiliates have written policies prohibiting the disclosure of confidential information to others, including the Symbria Information, which prohibit its use other

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

than for Symbria and Affiliates, and forbid its misappropriation, both in their Employee Handbook and Code of Conduct. Employees are required to acknowledge that they are aware of these policies when they are offered employment, when they are promoted, and when they leave the employment of Symbria and Affiliates. Executives such as Callen who have employment agreements have the same provisions in those agreements. Certain of the Symbria Information is designated on its face "Confidential – Symbria, Inc.," "Confidential and Proprietary," or "© Symbria."

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 211.**

212.  The Symbria Information is not shared with the public, or disclosed to the competitors of Symbria and Affiliates.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 212.**

213.  When Symbria and Affiliates share any confidential information with a client, they do so pursuant to written agreements with the clients prohibiting the clients from disclosing the confidential information to third parties and requiring the clients to return that information to Symbria if the agreement terminates.

**ANSWER: Defendant denies the allegations in Paragraph 213.**

214.  The Symbria Information is commercially valuable and gives Symbria and Affiliates advantages over their competitors. Even persons experienced in the business of providing rehabilitation services in senior living communities who wish to compete with Symbria and Affiliates would benefit greatly from having unauthorized access to the Symbria Information. Persons in the business of providing rehabilitation services in senior living communities who do not have access to the Symbria Information are at a competitive disadvantage to Symbria and Affiliates. The Symbria Information has independent economic value, actual and potential, from being kept

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

secret.

**ANSWER: Defendant denies the allegations in Paragraph 214.**

215.     Symbria and Affiliates are the owners of the Symbria Information because they have rightful legal or equitable title to the Symbria Information.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 215.**

216.     The Symbria Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by other persons from the disclosure or use of the Symbria Information.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 216.**

217.     Dilmas, Irvine, and Callen used improper means to acquire knowledge of the Symbria Information when Dilmas and Irvine sent that information to their personal email addresses and forwarded that information to Callen in violation of Symbria Rehab's policies and/or their implied duties of good faith and fair dealing. Dilmas', Irvine's, and Callen's conduct constituted theft and breach of a duty to Symbria and Affiliates to maintain secrecy.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 217.**

218.     The relationships between and among UMHS and the MedRehab Entities as set forth above have resulted in the Symbria Information being shared and distributed to and among all of the MedRehab Entities and UMHS. Any Symbria Information that was shared with UMHS as a Symbria Rehab client was shared pursuant to the terms of contracts restricting UMHS from divulging the information to others, including the MedRehab Entities, for their own use.

**ANSWER: Defendant denies the allegations in Paragraph 218.**

219.     Callen, UMHS, and the MedRehab Entities have acquired the Symbria Information

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

knowing or having reason to know that the Symbria Information was acquired by improper means. In particular, Callen, who is an agent of UMHS and all of the MedRehab Entities, has a contractual obligation not to use the confidential information of Symbria and Affiliates. Callen also knows that Symbria Rehab's clients and former clients have contractual obligations not to disclose Symbria and Affiliates' confidential information to third parties, since Callen signed contracts on behalf of Symbria Rehab containing this restriction. UMHS and the MedRehab Entities directly affiliated with it know or have reason to know that they have acquired the Symbria Information by improper means by virtue of Lowe's former position as Chairman of Symbria's Board of Directors. Callen and Lowe both know or have reason to know that Dilmas' and Irvine's acquisition of the Symbria Information by Dilmas and Irvine and retention of it following their terminations from Symbria Rehab was improper.

**ANSWER: UMHS is without information or knowledge sufficient to form a belief as to the truth of the allegations related to what Callen knows or has reason to know in Paragraph 219. Answering further, Defendant, UMHS denies the remaining allegations in Paragraph 219.**

220.    Callen, UMHS, and the MedRehab entities have used or threaten to use the Symbria Information without the express or implied consent of Symbria and Affiliates. Callen, UMHS and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, persons who used improper means to acquire it. Callen, UMHS, and the MedRehab Entities also knew or had reason to know that the Symbria Information was acquired by them under circumstances giving rise to a duty to maintain its secrecy. Callen, UMHS, and the MedRehab Entities knew that the Symbria Information was derived from or through Dilmas and Irvine, who each owed a duty to Symbria and Affiliates to maintain its secrecy.

**ANSWER:    UMHS denies the allegations in Paragraph 220.**

WHEREFORE, plaintiffs Symbria, Inc., Symbria Rehab, Inc., Alliance Rehab of Connecticut, LLC, and Alliance Rehab HVA, L.L.C. request that the Court enter judgment in their

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

favor and request that the Court enter judgment in their favor and against John R. Callen, United

Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago

Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro

Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl

Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois

Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab

Associates of Chicago, LLC, and award plaintiffs award them the following remedies:

   i.     a preliminary and a permanent injunction preventing the Defendants, their officers,

agents, servants, employees and attorneys and those in active concert or participation with

them from misappropriating, disclosing, or using and from threatening to misappropriate,

disclose, or use Symbria and Affiliates' trade secrets and ordering Defendants to return the

Symbria Information to Symbria and Affiliates forthwith;

   j.     damages for actual loss caused by misappropriation of Symbria and Affiliates' trade

secrets;

   k.     damages for unjust enrichment of caused by the misappropriation, disclosure, and

use of Symbria and Affiliates' trade secrets not addressed in computing damages for actual

loss;

   l.     alternatively, in lieu of damages measured by any other methods, damages caused

by misappropriation, disclosure, and use, measured by imposing a reasonable royalty for

the Defendants' unauthorized disclosure or use of Symbria and Affiliates' trade secrets;

   m.     exemplary damages in an amount two times the amount of actual damages for

Defendants' willful and malicious misappropriation, disclosure, and use of Symbria and

Affiliates' trade secrets;

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

n.     award Symbria and Affiliates their reasonable attorneys' fees for

Defendants' willful and malicious misappropriation, disclosure, and use of

Symbria and Affiliates' trade secrets;

o.     award Symbria and Affiliates their costs in bringing this action; and

p.     such other relief as is just and appropriate in the circumstances.

**ANSWER:     UMHS prays that Plaintiffs take nothing by their Complaint, that UMHS be reimbursed for its reasonable costs and attorneys' fees, and for all other just and proper relief.**

**COUNT III**
**Breach of the Stock Purchase Agreement –**
**Symbria, GreatBanc, and the Symbria ESOP Trust Against UMHS**

221.     Plaintiffs Symbria, GreatBanc, and the Symbria ESOP Trust incorporate

paragraphs 1 through 193 as set forth above as if fully stated herein.

**ANSWER: UMHS incorporates by reference its answers to Paragraphs1 through 193 as if set forth fully herein as its answer to Paragraph 221.**

222.     Symbria, GreatBanc, and UMHS are among the parties to the SPA. UMHS is one

of the "Sellers" as defined in the SPA. (SPA at 1 (Preamble).) GreatBanc holds as trustee the assets

of the Symbria ESOP Trust.

**ANSWER: UMHS admits that Argent Trust Company, was identified in the Stock Purchase Agreement as the ESOP Trustee, not in its individual or corporate capacity, but solely in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust. Further, UMHS admits only that Exhibit 1, identified by Plaintiffs as the Stock Purchase Agreement ("SPA"), is a written document and the document is the best evidence of its terms and contents. UMHS admits that it is identified as a Seller in the Stock Purchase Agreement. UMHS further admits that Plaintiffs purport that Great Banc holds as trustee the assets of the Symbria ESOP Trust. Answering further, UMHS is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 222.**

223.     Symbria, GreatBanc, and the Symbria ESOP Trust have substantially complied

with all of the material terms of the SPA.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: Defendant denies the allegations in Paragraph 223.**

224.     UMHS agreed to restrictive covenants concerning competition, solicitation of clients or potential clients, and solicitation of employees, contractors or consultants (the "Restrictive Covenants"). (SPA §§ 5.4(a), (b), (c).) UMHS also agreed to a covenant restricting its use of confidential information. (SPA § 5.3.)

**ANSWER: Defendant admits that it entered into the Stock Purchase Agreement and all obligations imposed upon it by law, but denies having breached any of its terms or restrictive covenants.**

225.     The Restrictive Covenants are in full force and effect during the Noncompetition Period. At all times material herein and continuing to date, and into the foreseeable future, the Noncompetition Period is and will be in effect because each of the Sellers' subordinated notes have not been paid in full. (SPA § 5.4(a).) The confidentiality covenant has no expiration and remains in full force and effect.

**ANSWER: Defendant admits that it entered into the Stock Purchase Agreement and all obligations imposed upon it by law, but denies having breached any of its terms or restrictive covenants. Answering further Defendant denies that it breached the confidentiality covenant in the Stock Purchase Agreement or that the Stock Purchase Agreement includes PDPM Analytics License Agreement. UMHS denies the remaining allegations in Paragraph 225.**

226.     UMHS' Restrictive Covenants prohibit competition and solicitation with respect to the "Company Group." (SPA §§ 5.4(a), (b), (c).) The "Company Group" means Symbria and its subsidiaries. (SPA Art. I, at 3.) Symbria Rehab, Alliance Connecticut and Alliance HVA are each subsidiaries of Symbria.

**ANSWER: Defendant admits that the Restrictive Covenants identified as SPA §§ 5.4(a), (b), (c) are a written document, and are the best evidence of its terms and contents. Defendant denies breaching §§ 5.4(a), (b), (c) of the Stock Purchase Agreement and further denies that Plaintiffs have properly quoted portions of the SPA agreement, and therefore denies the remaining allegations in Paragraph 226.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

227.     UMHS has engaged in, directly or indirectly, and has direct or indirect ownership interests in businesses in the state of Illinois that are engaged, directly or indirectly, in the business of developing, marketing, providing, representing, or selling products or services which are competitive with products or services developed, marketed, provided, sold or under development by Symbria and Affiliates, in violation of Section 5.4(a) of the SPA.

**ANSWER: Defendant denies the allegations in Paragraph 227.**

228.     UMHS has solicited or enticed, or attempted to solicit or entice, directly or indirectly, and through direct or indirect ownership interests in other businesses, clients or customers and potential clients or customers of Symbria and Affiliates for purposes of diverting their business or services from Symbria and Affiliates, in violation of Section 5.4(b) of the SPA.

**ANSWER: Defendant denies the allegations in Paragraph 228.**

229.     UMHS has solicited, directly or indirectly, and through direct or indirect ownership interests in other businesses, the employment or engagement of services of persons who were employed as an employee, contractor on consultant by Symbria and Affiliates on either a full-time or part-time basis, in violation of Section 5.4(c) of the SPA.

**ANSWER: Defendant denies the allegations in Paragraph 229.**

230.     UMHS has divulged, communicated, used to the detriment of Symbria and Affiliates and the Symbria ESOP Trust, for the benefit of companies it has an interest in, or misused confidential information or trade secrets owned by or relating to Symbria and Affiliates, in violation of Section 5.3 of the SPA.

**ANSWER: Defendant denies the allegations in Paragraph 230.**

231.     UMHS' breaches of the SPA have caused Symbria and Affiliates to be damaged.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**ANSWER: Defendant denies the allegations in Paragraph 231.**

232.     UMHS has express indemnification obligations to Symbria under the SPA. With

regard to UMHS' breaches of the SPA, the SPA provides as follows:

> From and after the Closing, each Seller shall severally indemnify, defend, and hold
> harmless the ESOP Trust and the Company against and from all Damages sustained or
> incurred by the ESOP Trust or the Company Group resulting from or arising out of or by
> virtue of . . . (ii) such Seller's breach of any of such Seller's covenants or agreements
> contained in this Agreement or any Transaction Document for the benefit of the ESOP
> Trust or the Company, even if such Damages are caused in whole or in part by the
> negligence (whether sole, joint, or concurrent), strict liability, or other legal fault of any
> Indemnified Person (other than the ESOP Trustee), but excepting in each case Damages
> caused by the gross negligence, willful misconduct or fraud of the Indemnified Person.

(SPA § 7.1(a).)

**ANSWER: Defendant admits that the provision identified as SPA § 7.1 (a) is a written
document, and are the best evidence of its terms and contents. Defendant admits that
Plaintiffs have properly quoted a portion of § 7.1(a), but deny breaching § 7.1 (a) of the Stock
Purchase Agreement or any provision of the Stock Purchase Agreement. Answering further,
UMHS admits that it has certain obligations pursuant to the terms of Stock Purchase
Agreement, but denies that it breached the Stock Purchase Agreement or that it owes
indemnification or damages to Plaintiffs for any alleged breach.**

233.     The SPA has a notice provision concerning claims of indemnification against a

Seller such as UMHS, which provides in pertinent part as follows:

> To make a claim for indemnification under Section 7.1(a) or 7.2, an Indemnified
> Person shall notify the Indemnifying Person of its claim under this Section 7.6 in writing,
> including the specific details of and specific basis under this Agreement for its claim (the
> "Claim Notice").… In the event that the claim for indemnification is based upon an
> inaccuracy or breach of a representation, warranty, covenant, or agreement, the Claim
> Notice shall specify the representation, warranty, covenant, or agreement which was
> inaccurate or breached and a description of the pertinent facts and circumstances associated
> with the breach.

(SPA § 7.1(a).)

**ANSWER: Defendant admits that the provision identified as SPA § 7.1 (a) is a written
document, and are the best evidence of its terms and contents. Defendant admits that
Plaintiffs have properly quoted a portion of § 7.1(a), but deny breaching § 7.1 (a) of the Stock**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**Purchase Agreement or any provision of the Stock Purchase Agreement. Answering further, UMHS admits that it has certain obligations pursuant to the terms of Stock Purchase Agreement, but denies that it breached the Stock Purchase Agreement or that it owes indemnification or damages to Plaintiffs for any alleged breach.**

234.     The SPA also provides a set off procedure as one form of relief available to

Symbria for breach of the SPA. The SPA provides as follows:

> Each Seller agrees that the Company and the ESOP Trust by the ESOP Trustee shall have the right, pursuant to the terms hereof, to set off against the Company's payment of amounts due under this Agreement and under the Subordinated Notes any amounts due to the Company or the ESOP Trust by Sellers under Section 7.1. With respect to any proposed set off, the applicable Indemnified Person shall deliver to the applicable Seller a written notice describing the amount of the proposed set off and the reasons therefor (which notice may be included with a Claim Notice) (a "Set Off Notice"). If a Seller who received such Set Off Notice (the "Notice Recipient") fails to respond, or accepts in writing such Set Off Notice, within thirty (30) days of receipt of the Set Off Notice, the set off amount included in the Set Off Notice shall be binding and conclusive upon the Notice Recipient. In order to dispute a Set Off Notice, the Notice Recipient must deliver written notice to the sender of the Set Off Notice, within thirty (30) days of receipt of such notice, of its disagreement with either its indemnification obligations or the amount of claimed Damages.

(SPA § 7.7(a).)

**ANSWER: Defendant admits that the provision identified as SPA § 7.7 (a) is a written document, and are the best evidence of its terms and contents. Defendant admits that Plaintiffs have properly quoted a portion of § 7.7 (a), but deny breaching § 7.7 (a) of the Stock Purchase Agreement or any provision of the Stock Purchase Agreement. Answering further, UMHS admits that it has certain obligations pursuant to the terms of Stock Purchase Agreement, but denies that it breached the Stock Purchase Agreement or that it owes a right of set off or any damages to Plaintiffs for any alleged breach.**

235.     The Warrant granted by Symbria to UMHS pursuant to the SPA (the "Warrant")

provides for a set off in the event that UMHS is in default of its obligations to Symbria. The

Warrant provides in pertinent part as follows:

> **Right of Set Off.** [Symbria] shall have a right of setoff or recoupment of past due debts, liabilities or other amounts which are undisputed or determined to be owing by a court of competent jurisdiction by [UMHS] or its Affiliates to [Symbria] (whether such amounts arise pursuant to the Stock Purchase Agreement, under various service agreements between [Symbria] and [UMHS] or its Affiliates, or otherwise) against amounts owing from [Symbria] to [UMHS] under this Warrant which are undisputed or determined to be owing

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

by a court of competent jurisdiction.

(Warrant § 20.)

**ANSWER:** **Defendant admits that the provision identified as Warrant § 20 is a written document, and are the best evidence of its terms and contents. Defendant admits that Plaintiffs have properly quoted a portion of § 20, but deny breaching Warrant § 20 or any provisions of the Stock Purchase Agreement. Answering further, UMHS admits that it has certain obligations pursuant to the terms of Stock Purchase Agreement, but denies that it breached the Stock Purchase Agreement or that it owes a right of set off or any damages to Plaintiffs for any alleged breach.**

236. Symbria sent UMHS a Claim Notice and Setoff Notice on December 6, 2019. A true and correct copy of the Claim Notice and Setoff Notice is attached hereto as Exhibit 6. UMHS subsequently notified Symbria that it disagrees with Symbria concerning its indemnification obligations.

**ANSWER:** **Defendant admits that it received the document Plaintiff identifies as Exhibit 12, Claim Notice and Setoff. Answering further Exhibit 12 is a written document and the best evidence of its terms and contents. UMHS denies that it has breached the Stock Purchase Agreement or that Plaintiffs are therefore entitled to indemnification for the alleged breaches. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations.**

WHEREFORE, plaintiffs Symbria, Inc., GreatBanc Trust Company, in its capacity as Trustee of the Symbria, Inc. Employee Stock Ownership Trust, and the Symbria, Inc. Employee Stock Ownership Trust request that the Court enter judgment in its favor and against defendant UMHS and award them the following remedies:

a. a preliminary and a permanent injunction preventing UMHS, its officers, agents, servants, employees and attorneys and those in active concert or participation with it from: (i) competing, directly or indirectly, in any capacity, or from having any direct or indirect ownership interest in any business anywhere in the state of Illinois that is engaged, either directly or indirectly, in the business of developing,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

marketing, providing, representing, or selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period;

(ii) from soliciting or enticing or attempting to solicit or entice any clients of Symbria and Affiliates and other Symbria subsidiaries for purposes of diverting their business or services from Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period; (iii) from soliciting or enticing or attempting to solicit the employment or engagement of services of any person employed as an employee, contractor or consultant by Symbria and Affiliates and other Symbria subsidiaries until the termination of the Restricted Period; and (iv) from using Symbria and Affiliates' confidential information or trade secrets;

b.  a preliminary and a permanent injunction preventing UMHS, its officers, agents, servants, employees and attorneys and those in active concert or participation with it from divulging, communicating, using to the detriment of Symbria and Affiliates for UMHS' benefit or the benefit of any other person, or misusing in any way Symbria and Affiliates' confidential information and trade secrets or relating in any way to Symbria and Affiliates;

c.  award Symbria a set off effective as of December 6, 2019 of all amounts due by Symbria to UMHS under UMHS' Subordinated Note in the amount of ███████████████████████████████████ ███

d.  an equitable accounting of all earnings, profits and other benefits arising

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

       from UMHS' violation of Section 5.4 of the SPA;

    e.   actual damages for UHMS' breaches of the SPA;

    f.   award Symbria its costs in bringing this action; and

    g.   such other relief as is just and appropriate in the circumstances.

**<u>ANSWER:</u>**    **UMHS prays that Plaintiffs take nothing by their Complaint, that UMHS be reimbursed for its reasonable costs and attorneys' fees, and for all other just and proper relief.**

**COUNT IV**

██████████████████ –

**<u>Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA Against Callen</u>**

The allegations contained in Count IV are not directed against Defendant, UMHS and as such no response is made thereto. To the extent that the allegations in Count IV are construed to allege any additional cause of action against UMHS, or any other basis for legal responsibility against this Defendant, said allegations are denied.

**COUNT V**
**Breach of Fiduciary Duty –**
**<u>Symbria Rehab Against Dilmas</u>**

The allegations contained in Count V are not directed against Defendant, UMHS and as such no response is made thereto. Further, pursuant to the Court's Order of January 6, 2022, Count V against Dilmas was dismissed with prejudice. [Dkt. # 402]. To the extent that the allegations in Count V are construed to allege any additional cause of action against UMHS, or any other basis for legal responsibility against this Defendant, said allegations are denied.

**COUNT VI**
**Tortious Interference with the SPA**
**<u>Symbria Against Callen and the MedRehab Entities</u>**

The allegations contained in Count VI are not directed against Defendant, UMHS and as

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

such no response is made thereto. To the extent that the allegations in Count VI are construed to allege any additional cause of action against UMHS, or any other basis for legal responsibility against this Defendant, said allegations are denied.

## COUNT VII
### Tortious Interference with Prospective Business Expectancy
### Symbria Rehab, Alliance Connecticut and Alliance HVA
### <u>Against Callen and the MedRehab Entities</u>

The allegations contained in Count VII are not directed against Defendant, UMHS and as such no response is made thereto. To the extent that the allegations in Count VII are construed to allege any additional cause of action against UMHS, or any other basis for legal responsibility against this Defendant, said allegations are denied.

## COUNT VIII
### Breach of Fiduciary Duty
### <u>Symbria Rehab Against Callen</u>

The allegations contained in Count VIII are not directed against Defendant, UMHS and as such no response is made thereto. To the extent that the allegations in Count VIII are construed to allege any additional cause of action against UMHS, or any other basis for legal responsibility against this Defendant, said allegations are denied.

## COUNT IX
### Tortious Interference with the Symbria Rehab-Dilmas At-Will Employment Contract
### and with the Symbria Rehab – Dilmas Resignation Contract
### <u>Against Callen, the MedRehab Entities, and UMHS</u>

The allegations contained in Count IX are subject to Defendant, UMHS Motion to Dismiss, and as such no response is made thereto. To the extent any answer to the allegations in Count IX is required at this time, UMHS denies the allegations in Count IX, or any other basis for legal responsibility against this Defendant.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**COUNT X**
**Copyright Infringement**
**Symbria Against All Defendants**

292.     Plaintiff Symbria incorporates paragraphs 1 through 193 as set forth above as if fully stated herein.

**ANSWER: UMHS incorporates by reference its answers to Paragraphs1 through 193 as if set forth fully herein as its answer to Paragraph 292.**

293.     Symbria is the exclusive owner of copyrights as set forth in 17 U.S.C. § 106 that are registered with the United States Copyright Office for the following literary works: (a) Symbria Rehab's "Understanding the Patient Driven Payment Model" presentation slides, (b) Symbria Rehab's "PDPM Preparedness Tips" Numbers 1 through 12 and 14 (c) Symbria Rehab's Disease Management Models, and accompanying educational slide presentations accompanying each of its Disease Management Models (the "Registered Copyrighted Works"). A true and correct copy of the unofficial previews of the Certificates of Registration issued by the U.S. Copyright Office for the Registered Copyrighted Works is attached hereto as Group Exhibit 5.[1]

**ANSWER: Defendant denies the allegations of paragraph 293 of the Complaint.**

294.     The Registered Copyrighted Works are literary works and/or pictorial or graphical works within the meaning of 17 U.S.C. §§ 102(a)(1) and (5).

**ANSWER: Defendant denies the allegations of paragraph 294 of the Complaint.**

295.     The Registered Copyrighted Works are original, creative works of authorship fixed in a tangible medium from which they can be perceived, and are subject to full protection under the Copyright Act.

**ANSWER: Defendant denies the allegations of paragraph 295 of the Complaint.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

296.     Symbria is the exclusive owner of all rights, title, and interest in and to the copyrights in the Registered Copyrighted Works, and owns copyright registrations for the Registered Copyrighted Works.

**ANSWER: Defendant denies the allegations of paragraph 296 of the Complaint.**

297.     Defendants Irvine, Dilmas, Joint & Neuro, MedRehab Alliance, MedRehab Interstate, and Chicago Rehab have reproduced and distributed one or more of the Registered Copyrighted Works in connection with the marketing and sale of these companies' services. On information and belief, defendants Callen, UMHS, MedRehab Holdings, MedRehab Wisconsin, IASN, Pearl, MedRehab Therapy, and Joint & Neuro Chicago have also reproduced and distributed one or more of the Registered Copyrighted Works in connection with the sale of these companies' services or those of entities that they control. On information and belief, Defendants have also made documents that are identical and/or substantially similar to the Registered Copyrighted Works.

**ANSWER: UMHS denies that it has reproduced and distributed one or more of the Registered Copyrighted Works in connection with the sale of these companies' services or those of entities that they control. UMHS denies that it has made documents that are identical and/or substantially similar to the Registered Copyrighted Works. Answering further, Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations asserted against the other Defendants in Paragraph 297.**

298.     Defendants have reproduced the Registered Copyrighted Works and/or created derivative works thereof and have displayed, distributed, offered for sale, and/or sold those reproductions and/or derivative works in the United States.

**ANSWER: UMHS denies that it has reproduced the Registered Copyrighted Works and/or created derivative works thereof and have displayed, distributed, offered for sale, and/or sold those reproductions and/or derivative works in the United States. Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations asserted**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**against the other Defendants in Paragraph 298.**

299.     Symbria did not authorize the Defendants to reproduce, prepare derivative works based upon, distribute copies of, publicly perform, publicly display, advertise, promote, market, sell or otherwise use the Registered Copyrighted Works. Symbria has suffered, and will continue to suffer, substantial losses, including but not limited to lost profits and damage to its business reputation and goodwill.

**ANSWER: Defendant denies the allegations in Paragraph 299.**

300.     Defendants committed all of the acts alleged herein without Symbria's permission, license, or consent.

**ANSWER: UMHS denies that it committed any of the acts alleged in Count X and further denies all allegations in Paragraph 300. Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations asserted against the other Defendants in Paragraph 300.**

301.     Defendants knew of, or should have known that, Symbria owned the Registered Copyrighted Works and that Defendants did not have permission to reproduce, prepare  derivative works based upon, distribute copies of, publicly perform, publicly display, advertise, promote, market, sell or otherwise use the Registered Copyrighted Works, or portions thereof, and did not have permission to use copyrightable content from the Registered Copyrighted Works.

**ANSWER: UMHS denies that it committed any of the acts alleged in Count X, and further denies all allegations asserted in Paragraph 301. Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegations asserted against the other Defendants in Paragraph 301.**

302.     Upon information and belief, Defendants have benefited from the infringement of the Registered Copyrighted Works through the profits generated from providing those works and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

services using those works to customers.

**ANSWER: Defendant denies the allegations in Paragraph 302.**

303.     Defendants' wrongful actions continue to deprive Symbria of its rights and benefits in the Registered Copyrighted Works, which include the exclusive right to use, reproduced, distribute, sell, and create derivative works of the Registered Copyrighted Works.

**ANSWER: Defendant denies the allegations in Paragraph 303.**

304.     As a result of their wrongful conduct, Defendants are liable to Symbria for copyright infringement pursuant to 17 U.S.C. § 501.

**ANSWER: Defendant denies the allegations in Paragraph 304.**

305.     Upon information and belief, unless enjoined by the Court, Defendants will continue to wrongfully use and infringe on the Registered Copyrighted Works by continuing to use, distribute, and profit from the infringement of those works.

**ANSWER:  Defendant denies the allegations in Paragraph 305.**

306.     As a direct and proximate result of Defendants' infringement of the Registered Copyrighted Works, Symbria has suffered, and will continue to suffer, monetary damages, and irreparable injury to its businesses, reputation, and goodwill.

**ANSWER:  Defendant denies the allegations in Paragraph 306.**

307.     Symbria is entitled to injunctive relief and an award of statutory damages for Defendants' infringement, or, in the alternative, Symbria is entitled to recover, its actual damages under 17 U.S.C. § 505 whether measured by actual damages or profits direct or indirectly attributable to Defendants' infringement.

**ANSWER: The allegations for award of statutory damages contained in Paragraph 307 were**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

**stricken pursuant to the Court's Order of January 6, 2022. [Dkt. #402] To the extent a response is required to this allegations, Defendant denies the allegations of Paragraph 307.**

308.    Defendants' acts as alleged herein are intentional and willful and will, unless enjoined, damage Symbria, which has no adequate remedy at law.

**ANSWER: Defendant denies the allegations in Paragraph 308.**

309.    Defendants have infringed Symbria's copyrights in the Registered Copyrighted Works.

**ANSWER: Defendant denies the allegations in Paragraph 309.**

310.    Defendants knew their acts constituted copyright infringement.

**ANSWER:  Defendant denies the allegations in Paragraph 310.**

311.    Defendants' conduct was and continues to be willful within the meaning of the Copyright Act.

**ANSWER: Defendant denies the allegations in Paragraph 311.**

312.    Because Defendants' infringement was willful, any award(s) of statutory damages should be enhanced in accordance with 17 U.S.C. § 504(c)(2).

**ANSWER: The allegations for award of statutory damages contained in Paragraph 312 were stricken pursuant to the Court's Order of January 6, 2022. [Dkt. #402] To the extent a response is required to this allegations, Defendant denies the allegations of Paragraph 312.**

313.    As a direct and proximate result of the violations of the Copyright Act, Symbria has sustained, and will continue to sustain, substantial, immediate and irreparable injury for which there is no adequate remedy at law.

**ANSWER:    Defendant denies the allegations in Paragraph 313.**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

WHEREFORE, plaintiff Symbria, Inc. requests that the Court enter judgment in their favor and request that the Court enter judgment in their favor and against John R. Callen, United Methodist Homes and Services, Christos V. Dilmas, MedRehab Alliance Holdings, Inc., Chicago Rehabilitation Collective PLLC, MedRehab Therapy Associates of Illinois, LLC, Joint & Neuro Rehab Associates, LLC, MedRehab Alliance, LLC, MedRehab Alliance Interstate, LLC, Pearl Health Care Services, Inc., d/b/a MedRehab at Home and as Chicago Med Home Health, Illinois Ancillary Services Network, LLC, MedRehab Alliance Wisconsin, LLC, and Joint & Neuro Rehab Associates of Chicago, LLC, and award plaintiffs the following remedies:

(a)     a preliminary and a permanent injunction preventing the Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with them from infringing the Registered Copyrighted Works, pursuant to 17 U.S.C. § 503;

(b)     impoundment during the pendency of this action of all copies of the Registered Copyrighted Works made or used by the Defendants and of records documenting the manufacture, sale, or receipt of things involved in any such violation by the Defendants, pursuant to 17 U.S.C. § 503(a);

(c)     upon the entry of final judgment, ordering the destruction or other reasonable disposition of all copies found to have been made or used in violation of Symbria's exclusive rights, and of all other articles by means of which such copies may be reproduced, pursuant to 17 U.S.C. § 503(b);

(d)     actual damages for loss caused by infringement of Symbria's Registered Copyrighted Works and any additional profits of the infringing Defendants, pursuant to 17 U.S.C. § 504;

(e)     judgment against Defendants for their infringement under the Copyright Act, 17

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

U.S.C. §§ 106 and 501, and for the willful, intentional and purposeful disregard and indifference to Symbria's rights;

(f)     Symbria's reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

(g)     Symbria's costs in bringing this action; and

(h)     such other relief as is just and appropriate in the circumstances.

**ANSWER:** **UMHS prays that Plaintiffs take nothing by their Complaint, that UMHS be reimbursed for its reasonable costs and attorneys' fees, and for all other just and proper relief. Further, Defendant states that the award of statutory damages and attorneys' fees were stricken pursuant to the Court's Order of January 6, 2022.**

## COUNT XI
### Tortious Interference with the Symbria Rehab-Irvine At-Will Employment Contract
### Symbria Rehab Against Callen, the MedRehab Entities, and UMHS

The allegations contained in Count XI are subject to Defendant, UMHS Motion to Dismiss, and as such no response is made thereto. To the extent any answer to the allegations in Count IX is required at this time, UMHS denies the allegations in Count XI or any other basis for legal responsibility against this Defendant.

## COUNT XII
### Tortious Interference with Callen's Severance and General Release Agreement
### Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA
### Against the MedRehab Entities and UMHS

The allegations contained in Count XII are subject to Defendant, UMHS Motion to Dismiss, and as such no response is made thereto. To the extent any answer to the allegations in Count XII is required at this time, UMHS denies the allegations in Count IX, or any other basis for legal responsibility against this Defendant.

## COUNT XIII
### Aiding and Abetting Callen's Breach of Fiduciary Duty

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

### **Symbria Rehab Against the MedRehab Entities and UMHS**

The allegations contained in Count XIII are subject to Defendant, UMHS Motion to Dismiss, and as such no response is made thereto. To the extent any answer to the allegations in Count IX is required at this time, UMHS denies the allegations in Count XIII, or any other basis for legal responsibility against this Defendant.

### **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant, UMHS demands a trial by jury on all counts and matters in the Fourth Amended Complaint triable by jury.

### **AFFIRMATIVE DEFENSES TO FAC**

Comes now Defendant, United Methodist Homes & Services ("UMHS"), by and through its attorneys, O'Hagan Meyer LLC, and for its Affirmative Defenses to Plaintiffs' Fourth Amended Complaint ("FAC"), without waiving any of the denials in its Answer, and in the alternative to its Motion to Dismiss Counts IX, XI, XII and iii of the Fourth Amended Complaint states as follows:

### **AFFIRMATIVE DEFENSES TO ALL PLAINTIFFS COUNTS AGAINST UMHS**

1.      Any allegations not specifically admitted previously by UMHS in this Answer is now denied.

2.      UMHS has not breached any duty owed to Plaintiffs.

3.      To the extent Plaintiffs' claims are based on the conduct of any Defendant, other than UMHS, UMHS cannot be held liable.

4.      To the extent Plaintiffs' claims are based on conduct of any Defendant or Third Party, including Christine Irvine, who was previously a named Defendant in this action and dismissed by Plaintiffs, UMHS cannot be held liable, as UMHS did not ratify or approve the conduct.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## FIFTH AFFIRMATIVE DEFENSE
### (Failure to Maintain Trade Secrecy)

5.      Plaintiffs failed to undertake reasonable affirmative efforts to safeguard its purported confidential information and/or to prevent the confidential information and/or trade secret from falling into the hands of competitors, and therefore no remedy is available to Plaintiffs.

6.      Plaintiffs failed to inform third parties and its clients, including UMHS, that certain information it claims is confidential and a trade secrets, was confidential information and a trade secret.

7.      Plaintiffs failed to provide their purported trade secrets to third parties and clients without designating the materials as confidential, and without notifying the third party and client that the information is to  be treated like a trade secret.

8.      Plaintiffs failed to ensure that its clients, including UMHS, returned, destroyed or agreed not to use confidential information or trade secrets

9.      Plaintiffs' purported trade secrets are also available on the Internet without any password required or other security measure.

10.     The confidential information that Plaintiffs claim is a trade secret is not a trade secret and is shared with the public or disclosed to clients in the normal course of business.

11.     Further, Plaintiffs made their trade secrets publicly available as part of the process of seeking copyright protection.

12.     As such, Plaintiffs failed to take adequate, affirmative steps and measures so as to prevent dissemination and maintain the secrecy of the confidential information and trade secrets.

13.     Plaintiffs failed to act to protect the rights it is now asserting.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

14.     Because Plaintiffs failed to take reasonable efforts to maintain the secrecy of the information, they cannot bring a claim for misappropriation, and as such Counts I and II of the FAC are barred.

## SIXTH AFFIRMATIVE DEFENSE
### Laches

15.     UMHS incorporates the allegations of Paragraphs 5 through 14 of these Affirmative Defenses as though set forth herein

16.     Upon information and belief, prior to the filing of this original Complaint in this action, Plaintiffs claim that UMHS, its client, was using or disclosing certain of Plaintiffs purported trade secrets or other confidential information (which UMHS denies).

17.     UMHS continued to be a client of Plaintiffs, and Plaintiffs took no affirmative steps to protect the purported trade secrets or other confidential information.

18.     Plaintiffs did not exercise reasonable diligence in pursuing its claims against UMHS for legal and equitable relief related to the alleged misappropriation of trade secrets or other confidential information purportedly owned by Plaintiffs.

19.     Plaintiffs delay in pursuing such claims has been detrimental to UMHS and has prejudiced it in the defense of the claims now asserted by Plaintiffs.

20.     In particular, UMHS was adversely affected by Plaintiffs' delay in acting because it was never advised by Plaintiffs what specific information was considered confidential or trade secret information and never required to execute Plaintiffs' PDPM Analytics License Agreements.

21.     Plaintiffs failure to act diligently increased UMHS' liability, if any and which UMHS disputes, for misappropriation of confidential information or trade secrets.

22.     Accordingly, Plaintiffs are not entitled to legal and injunctive relief requested in Counts I and II of the FAC as its claims are barred by the doctrine of laches.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

23. Additionally, upon information and belief, prior to the time that Dilmas resigned from Symbria Rehab, in or around the middle of September 2019, Dilmas was informed by an employee in Symbria's Human Resources department that his Symbria email was being tracked and monitored by Symbria management.

24. Dilmas continued his practice of forwarding certain information related to the PDPM program to his personal email account after receiving this notice that Symbria management was tracking and monitoring his Symbria email account. Yet Symbria Rehab took no action for ten (10) months. No one at Symbria ever objected to Dilmas' practice of emailing certain Symbria information to his home email account.

25. In addition, upon information and belief, at the time Dilmas resigned from Symbria Rehab, he informed Symbria Rehab's CEO, Jill Kreuger, that he was going to work with John Callen. Plaintiffs subsequently offered him the opportunity to buy a waiver of the restrictions in the original offer letter Dilmas received from the company. Dilmas accepted the offer, paid Symbria Rehab the agreed consideration for that waiver, and received a signed written confirmation from Symbria of that waiver.

26. Prior to the filing of this original Complaint in this action, Plaintiffs purportedly were under the belief that Dilmas was using or disclosing certain of Plaintiffs' purported trade secrets and other confidential information that Dilmas had emailed to his personal account, including disclosing such information to certain Defendants, yet Plaintiffs failed to advise those other parties of this belief.

27. As such, Plaintiffs again took no affirmative steps to protect the purported trade secrets or other confidential information.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

28.     Plaintiffs did not exercise reasonable diligence in pursuing its claims against UMHS for legal and equitable relief related to the alleged misappropriation of trade secrets or other confidential information purportedly owned by Plaintiffs.

29.     Plaintiffs delay in pursuing such claims has been detrimental to UMHS and has prejudiced it in the defense of the claims now asserted by Plaintiffs.

30.     In particular, UMHS was adversely affected by Plaintiffs' delay in acting because it was never advised by Plaintiffs what specific information was considered confidential or trade secret information.

31.     Plaintiffs failure to act diligently increased UMHS' liability, if any (and which UMHS denies), for misappropriation of confidential information or trade secrets.

32.     Accordingly, Plaintiffs are not entitled to legal and injunctive relief requested in Counts I, II, IX, XI and XII of the Fourth Amended Complaint a those claims are barred by the doctrine of laches.

### SEVENTH AFFIRMATIVE DEFENSE
### (Estoppel)

33.     UMHS incorporates the allegations of Paragraphs 5 through 32 of these Affirmative Defenses as though set forth herein.

34.     Accordingly, Plaintiffs are barred from and not entitled to the legal or equitable relief requested in the Fourth Amended Complaint as its claims in Counts I, II, IX, XI and XIV are barred by  the doctrine of estoppel.

### EIGHTH AFFIRMATIVE DEFENSE
### (Waiver)

35.     UMHS incorporates the allegations of Paragraphs 5 through 32 of these Affirmative Defenses as though set forth herein

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

36.     Accordingly, Plaintiffs are barred from and not entitled to the legal or equitable relief requested in the Fourth Amended Complaint as its claims in Counts I, II, IX, XI and XIV are barred by the doctrine of waiver.

## NINTH AFFIRMATIVE DEFENSE
### (Readily Ascertainable Information)

37.     UMHS incorporates the allegations of Paragraphs 5 through 32 of these Affirmative Defenses as though set forth herein.

38.     The Defend Trade Secrets Act and the Illinois Trade Secrets Act define a trade secret as information that derives independent economic value from not being readily ascertainable through proper means by anyone who might also be able to obtain value from its use or disclosure.

39.     Plaintiffs' purported trade secrets are based on readily available public and Governmental information.

40.     Because the information that comprises Plaintiffs' trade secrets is readily ascertainable, Plaintiffs' misappropriation claims fail, and Counts I and II are barred.

## TENTH AFFIRMATIVE DEFENSE
### (Not an Owner of Trade Secrets)

41.     UMHS incorporates the allegations of Paragraphs 5 through 32 of these Affirmative Defenses as though set forth herein.

42.     A plaintiff must be the owner of the trade secret in question in order to bring a claim.

43.     Certain of Plaintiffs' purported trade secrets were not created or developed by Plaintiffs.

44.     Because of this, Plaintiffs' misappropriation claims fail and Counts I and II are barred.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## ELEVENTH AFFIRMATIVE DEFENSE
### (Preemption)

45.     Plaintiffs allege one count under the Illinois Trade Secret Act in Count II of the FAC.

46.     Plaintiffs' FAC also alleges counts under common-law causes of action for tortious interference.

47.     Section 8 of the Illinois Trade Secrets Act preempts "conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a).  Under this provision, Illinois has abolished all common law theories of misuse of secret information.  *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992).  State law causes of action that are based on the misappropriation of confidential business information are preempted by the ITSA, even when the information does not rise to the level of a trade secret.  *Abrasic 90 Inc. v. Weldcote Metals, Inc.,* 364 F. Supp. 3d 888, 905 (N.D. Ill. 2019). The cru of the preemption question is whether the claim would lie if the information at issue were not confidential, irrespective of whether it is a trade secret or not.  *Id.*

48.     Here, Plaintiffs' claims for tortious interference are predicated on the same conduct underlying its claims for misappropriation of trade secrets, and thus are preempted.

49.     Consequently, Count IX for tortious interference with the Symbria Rehab-Dilmas At-Will Employment Contract and with the Symbria Rehab- Dilmas Resignation Contract, because it is based upon the alleged misuse of trade secrets or otherwise confidential information, is preempted, in whole or in part, by the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et. seq.*

50.     Similarly, Count XI for tortious interference with the Symbria Rehab-Irvine Employment Contract because it is based upon the alleged misuse of trade secrets or otherwise

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

confidential information, is preempted, in whole or in part, by the Illinois Trade Secrets Act, 765

ILCS 1065/1, *et. seq.*

## TWELFTH AFFIRMATIVE DEFENSE
### (Competitors' Privilege)

51.     UMHS incorporates the allegations of Paragraphs 5 through 32 of these Affirmative

Defenses as though set forth herein

52.     The alleged tortious interference actions and conduct at issue in this case were not

caused by nor taken by UMHS.

53.     Under Illinois law, company officers and directors have a conditional privilege to

make decisions for the company based on their business judgment as to what is in the company's

best interests.

54.     To the extent Plaintiffs' claim Callen was an agent or officer of UMHS, which

UMHS denies, any decision Callen made for the Defendants based on his business judgment, and

not to further his personal goals, or to injure Plaintiffs, or acted contrary to the best interest of the

corporation, then he is protected by the conditional privilege.

55.     To the extent that Plaintiffs attempt to hold UMHS liable, too, for Callen's business

decisions, than they too are protected by the conditional privilege.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (No Viable Claim)

56.     A claim for intentional interference with contract requires that the defendant

intentionally and unjustly induced another to breach a contract with the plaintiff. *See Grund v.*

*Donegan*, 298 Ill.App.3d 1034, 233 Ill. Dec. 56, 700 N.E.2d 157, 160 (1998); *Cohen v. Am. Sec.*

*Ins. Co.* 735 F.3d 601 (7th Cir. 2013) (affirming district court's finding that the plaintiff was unable

to assert a viable breach of contract claim, and holding that a claim for tortious interference with

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

that contract necessarily failed with the failure of the underlying breach of contract claim). Accordingly, a Plaintiff cannot state a viable claim for tortious interference without a viable claim for breach of the underlying contract.

57. The Court previously dismissed Plaintiffs' breach of contract claim against Defendant Dilmas in Count V of the Third Amended Complaint for failure to state a viable claim for breach of contract. Accordingly, Plaintiffs' Count IX for tortious interference with the Symbria Rehab-Dilmas Employment Contract also necessarily fails.

58. Similarly, because the Court dismissed with prejudice the Plaintiff's breach of contract claim against Defendant, Irvine in Count XIII of the Third Amended Complaint, and because Plaintiffs' do not allege any breach of contract claim against Irvine in the Fourth Amended Complaint, Plaintiffs' have not alleged a viable breach-of-contract claim against Defendant, and thus Count XI, where Plaintiffs' claim for intentional interference with contract against UMHS for tortious interference with the Irvine Employment Contract also necessarily fails.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(SPA Restrictive Covenants Are Not Valid & Enforceable)**

59. Plaintiffs allege that on October 31, 20105, UMHS, and others, entered into a Stock Purchase Agreement ("SPA"), pursuant to which UMHS and other owners entering into the agreement sold their stock in Symbria to an ESOP trust in exchange for cash, subordinated notes given by Symbria, and warrants to purchase shares of stock in the future. Plaintiffs purport to attach a true and accurate copy of the SPA to the FAC as Exhibit 1. (FAC, ¶ 28.)

60. Pursuant to the SPA, for its interest in Symbria, UMHS is to have received █████

████████████████████████████████████████████████████████████████

███████████████████████████████ - ██

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

61. Plaintiffs state that UMHS and the other entities selling their stock under the SPA each received a note from Symbria, subordinated to Symbria's debt to its senior lender. Principal and interest under the subordinated notes is due over a ten-year period. (FAC, ¶ 30.)

62. Plaintiffs claim that UMHS and the other entities selling their stock under the SPA also received warrants that may not be exercised until the senior debt holder and subordinated debt holders are paid in full. The higher the value of Symbria's stock at the time the warrants are exercised, the higher the amount that UHMS and the other former owners will realize from exercising the warrants.  (FAC, ¶ 31.)

63. Plaintiffs claim in the FAC, that UMHS agreed to restrictive covenants concerning competition, solicitation of clients or potential clients, and solicitation of employees, contractors or consultants (the "Restrictive Covenants"). (SPA §§ 5.4(a), (b), (c), and that UMHS also agreed to a covenant restricting its use of confidential information. (SPA § 5.3.). (FAC, ¶ 224.)

64. Plaintiffs further claim in the FAC, that the Restrictive Covenants are in full force and effect during the Noncompetition Period, at all times material herein and continuing to date, and into the foreseeable future, the Noncompetition Period is and will be in effect because each of the Sellers' subordinated notes have not been paid in full, nor is payment foreseeable in the future. (SPA § 5.4(a).) (FAC ¶ 225.)

65. The Non-Competition and Non-Solicitation provisions at Section 5.4 of the SPA, state in relevant part:

> (a) Each of Sellers severally covenants that, commencing on the Closing Date and ending on the later of (i) the fifth anniversary of the Closing Date or (ii) the date on which such Seller's Subordinated Note has been paid in full (the "Noncompetition Period"), he, she or it shall not engage in, directly or indirectly, in any capacity, or have any direct or indirect ownership interest in, or any business anywhere in the state of Illinois which is engaged, either directly or indirectly, in the business of developing, marketing, providing,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

representing, or selling any products or services which are competitive with products or services developed, marketed, provided, sold or under development by, any member of the Company Group or its Affiliates as of the Closing Date (the "Restricted Business"). It is recognized that the Restricted Business is expected to be conducted throughout the state of Illinois and that more narrow geographical limitations of any nature on this non-competition covenant (and the non-solicitation covenants set forth in Sections 5.4(b) and 5.4(c)) are therefore not appropriate. Notwithstanding the preceding provisions of this Section 5.4, none of Sellers shall be prohibited from providing services within the definition of the Restricted Business solely to itself.

(b) Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit or entice, or attempt to solicit or entice, any clients or customers of any member of the Company Group or potential clients or customers of the Company Group for purposes of diverting their business or services from the Company.

(c) Each of Sellers severally covenants that, during the Noncompetition Period, he, she or it shall not solicit the employment or engagement of services of any person who is or was employed as an employee, contractor or consultant by any member of the Company Group during such period on a full- or part-time basis.

66. UMHS and Symbria agree that Section 5.4(a) of the SPA limits UMHS's ability to compete within the state of Illinois but permits competition outside of Illinois. This was verified in correspondence from Symbria's counsel dated December 6, 2019, which stated, "Symbria does not dispute that the non-compete covenant set forth in Section 5.4(a) of the SPA is limited to the State of Illinois." A true and correct copy of the December 6, 2019 correspondence from Symbria is attached as Exhibit 6 to the FAC.

67. Plaintiffs accuse UMHS of ongoing violations of Section 5.4 and specifically allege that UMHS is soliciting Plaintiffs' clients and employees and competing in violation of the SPA, which UMHS denies.

68. At all relevant times, there exists a substantial, justiciable controversy between UMHS and Symbria, which have adverse tangible legal interests.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

69.     As such, on December 31, 2019, prior to the filing of the original Complaint in this matter, UMHS sought a declaration by filing an action in the Circuit Court of Cook County, County Department, Chancery Division ("state court action") regarding the interpretation of the Restrictive Covenants, and that the geographic scope of the non-solicitation provision in Sections 5.4(b) and 5.4(c) of the SPA were not nationwide, as claimed by Symbria, but limited to the State of Illinois.  (FAC ¶ 41.)

70.     The state court entered final judgment in favor of UMHS, declaring that the non-solicitation provisions are limited to Illinois.  (See Dkt. No. 113, Notice of Judgment.)  The Order entered by the state court entered a Judgement in favor of UMHS and against Symbria, Inc. thus defeating Plaintiffs' breach of contract claims related to solicitation and competition outside Illinois by declaring:

"A.  Section 5.4(b) of the SPA dated October 31, 2015 is limited to the State of Illinois by the language in Section 5.4(a); and

B. Section 5.4 (c) of the SPA dated October 31, 2015 is limited to the State of Illinois by the language in Section 5.4(a)."

71.     Plaintiffs appealed the ruling, and on March 8, 2022, the Appellate Court of Illinois, First District, reversed this Court's October 20, 2020 Order and held that "the plain language of the SPA provides no geographic limitations to the non-solicitation provisions in sections 5.4(b) and (c)…" *United Methodist Homes & Services v. Symbria, Inc.*, 2022 IL App (1st) 201181-U, ¶ 26. In other words, the First Appellate District found that Sections 5.4(b) and (c), as drafted, apply worldwide.

72.     The Appellate Court overruled the State Circuit Court and also remanded the matter back to the State Circuit Court further proceedings.

73.     UMHS subsequently moved to file its First Amended Complaint for Declaratory

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Judgement, seeking a declaration of its rights under the SPA. The state court action specifically addresses UMHS's rights to solicit and compete in accordance with the Restrictive Covenants of the SPA

74. Because Symbria continues to attempt to enforce the non-solicitation provisions against UMHS, not just in Illinois but worldwide, UMHS by this First Amended Complaint, respectfully requests that the State Chancery Court declare those provisions both unreasonable and unenforceable as a matter of law.

75. Plaintiffs original Complaint, filed after the commencement of the state court action, and each Complaint, thereafter, including the FAC continue to claim that UMHS has breached the SPA by engaging in conduct in violation of the Restrictive Covenants, despite the pending action in the State Court.

76. UMHS has a legally protectable interest in its right to solicit customers, clients and employees in furtherance of its legitimate business interests. Symbria seeks to restrain UMHS's solicitation activities without geographic limitation until the Noncompetition period ends. An actual controversy exists between the parties as to whether the SPA's worldwide non-solicitation provisions in Section 5.4(b) and (c) are reasonable and enforceable under Illinois law.

77. Section 5.4(b) of the SPA is unreasonable and unenforceable for multiple reasons, including but not limited to that it is overbroad. Section 5.4(b) of the SPA is overly broad because it prevents UMHS from soliciting "any clients or customers" of Symbria as well as "any potential clients or customers of" Symbria.

78. Section 5.4(b) of the SPA is unreasonable, overbroad and unenforceable because the SPA does not provide or include a list of Symbria's "customers" or otherwise define what that term means.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

79.     Section 5.4(b) of the SPA is unreasonable, overbroad and unenforceable because the SPA does not state whether its Section 5.4(b) is limited to customers that existed when the SPA was executed or, alternatively, if it applies to new customers Symbria may obtain in the future.  To the extent Section 5.4(b) purports to apply to "future" clients or customers, the SPA provides no means of identifying those entities. UMHS, therefore, has no notice as to whether or not Symbria will contend that any particular solicitation constitutes a violation because the target is a future client of Symbria's.

80.     Section 5.4(b) of the SPA is unreasonable, overbroad and unenforceable because the SPA Section 5.4(b) expressly applies to "potential" clients or customers, but Symbria failed to define that term or provide a list of its potential customers. Further, the SPA does not state whether the definition of "potential clients or customers" applies to only "potential" clients or customers that existed as of the date of the SPA or those who later became "potential" clients or customers.

81.     Section 5.4(b) of the SPA is unreasonable, overbroad and unenforceable to the extent Section 5.4(b) purports to apply to all clients and customers, everywhere, that existed at the time of the SPA's execution, as well as future customers, potential customers at the time the SPA was created, and potential customers that are targeted anywhere in the world in the future, Section 5.4(b) is wildly inconsistent with SPA Section 5.4(a)'s non-competition provision, which is limited to Illinois.

82.     Section 5.4(c) of the SPA is unreasonable and unenforceable as a matter of law for multiple reasons, including but not limited to that it is an overbroad "lock out" provision. Section 5.4(c) prevents UMHS from "soliciting the employment … of any person who is or was employed as an employee, contractor or consultant by" Symbria. This provision is overbroad because, *inter alia*, it includes former employees, contractors, *and* consultants. The terms

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

"contractor" and "consultant" are not defined by the SPA and are unreasonably vague and unenforceable.

83.     Section 5.4(b) and (c) of the SPA are unreasonable and unenforceable in their entirety because their duration is unreasonably long. Their duration (defined as the "Noncompetition period" in Section 5.4(a) of the SPA) is the longer of either five years or the date on which Symbria has paid each Sellers' promissory note ("Notes") "in full."

84.     Under this provision, Symbria has the unilateral power to extend the Noncompetition period indefinitely by refinancing its debt to which the Notes are subordinate.

85.     Since the SPA was executed in 2015, Symbria has refinanced its debt twice, extending the Noncompetition period each time. As of the date of the filing of the FAC, the Noncompetition period has run for more than 7 (seven) years, and has no fixed end date. It is, in effect, of indefinite duration at Symbria's sole discretion.

86.     Sections 5.4(b) and (c) of the SPA are unreasonable and unenforceable in their entirety because Symbria has no legitimate business interest in enforcing them. For example, Symbria has no legitimate business interest in barring UMHS from soliciting its potential or future clients, and has no legitimate business interest in barring UMHS from soliciting its former contractors or consultants.

87.     Section 5.4(b) and (c) of the SPA are unreasonable and unenforceable in their entirety because their scope is disproportionate to and exceeds any possible legitimate business interest that Symbria is entitled to protect.

88.     Section 5.4(b) and (c) of the SPA are further unreasonable and unenforceable in their entirety because such enforcement would impose an undue hardship on UMHS. In particular and for example, Section 5.4(b) and (c) have the practical effect of expanding

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Section 5.4(a)'s non-competition provision to have worldwide effect, because UMHS cannot compete with Symbria outside of Illinois without knowing who Symbria's potential or future clients and customers are. Section 5.4(b) and (c) in effect swallow the geographically-limited Section 5.4(a).

89.    Section 5.4(b) and (c) of the SPA are further unreasonable and unenforceable in their entirety because such enforcement would be injurious to the public. Among other injuries, the SPA prevents, on a worldwide basis, competition in the health care field thereby preventing the public from selecting the best and most cost effective providers. The public is also injured because Symbria's former contractors and consultants are deprived the opportunity to be solicited by UMHS for employment and may be locked into their jobs.

90.    The Restrictive Covenants, which form the basis of the Plaintiffs' FAC, are void and unenforceable, as they continue forever into the future, and are overly broad in scope, duration, geographical limits, and activity, unreasonable, and extend well beyond Plaintiffs' legitimate business interest, and attempt to completely restrain trade which is manifestly injurious to the public.

91.    As such, Plaintiffs Claims in Count III are barred as the restrictive covenants in the SPA are unenforceable.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Material Breach)

92.    UMHS incorporates the allegations of Paragraphs 59 through 66 as though set forth herein.

93.    In consideration of the terms of the SPA, Plaintiffs are obligated to fulfill certain terms, conditions and obligations under the SPA

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

94.     Pursuant to Section 5.9 of the SPA, Plaintiffs agreed to certain Post-Closing Covenants.

95.     Section 5.9 (b) states as follows in pertinent part:

The Company will use its best efforts to have the Management Group commit to renew the terms of their respective employment agreements on an annual or longer basis after the fifth anniversary of the Closing, until the Subordinated Notes and Warrants are no longer outstanding.

96.     The SPA Recitals Section A., define the Management Group collectively as "John Callen, Jill Krueger and Thomas Noesen."

97.     The Management Group is defined because it provided the Sellers, including UMHS, confidence and assurance of the ongoing business success of the Plaintiffs and its ability to fulfill the terms of the SPA.

98.     Further, Provisions 5.9 (b) presumes that the Management Group will remain in place from the Closing Date of the SPA through their existing respective employment agreements, and that Plaintiffs will use its best efforts to keep the Management Group in place by committing to renew the terms of each respective agreement upon expiration or renewal of the employment agreements.

99.     It was material and valuable to UMHS when it entered into the SPA that the Management Group remain in place so that Symbria would have the ability to perform under the SPA.

100.    Yet, on January 12, 2017, Callen's employment was terminated by Plaintiffs, through Jill Krueger.

101.    By terminating John Callen, Plaintiffs terminated Callen's employment agreement, and thus, attempt to circumvent material provisions and obligations of the SPA, specifically Article 5.9(b).

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

102.     Plaintiffs failed to use its best efforts to keep the existing Management Group in place, and thus failed to perform under the terms of the SPA and breached the SPA, in violation of Article 5.9.

103.     The termination of Callen adversely impacted Plaintiffs and decreased the value of the consideration owed to UMHS as a Seller and decreased Plaintiffs ability to pay the note to UMHS.

104.     Further, Plaintiffs failure to keep in place the Management Group had adversely impacted the Plaintiffs, who have demonstrated no ability to fulfill the obligations owed to UMHS pursuant to the SPA.

105.     To date Plaintiffs have failed to provide and fulfill the promised consideration to UMHS  pursuant to the terms and obligations of the SPA.

106.     To date Plaintiffs have failed to extinguish the primary debt and have failed to pay back any principal on the note owed to UMHS.

107.     Plaintiffs failure to abide by the SPA's terms and provisions, constitute a breach of the SPA, and  render it irreparably broken, and defeats the purpose of entering into the SPA in the first place.

108.     Plaintiffs' actions or inactions and failure to perform under the SPA are the cause of any breach of the SPA, and therefore their claim for breach  of contract is void.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Implied Warranty of Good Faith)

109.     UMHS incorporates the allegations of Paragraphs 59 through 67, 83 through 85, and 93 through 107 of its Affirmative Defenses as though set forth herein.

110.     Plaintiffs breached the implied warranty of good faith and fair dealing by acting

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

unreasonably, failing to perform under the SPA and denying benefits of the SPA to UMHS. For example, Plaintiffs terminated members of the management team and Plaintiffs unreasonably failed to provide the promised consideration in order to attempt to enforce restrictive covenants.

111.     UMHS has performed all duties owed under the SPA other than any duties which were prevented or excused, and has not breached the restrictive covenants of the SPA, and therefore did not breach the SPA.

112.     Plaintiffs have not fulfilled its obligation of good faith in its performance and enforcement of the SPA.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Collateral Estoppel)

113.     UMHS incorporates the allegations of Paragraphs 59 through 90 of these Affirmative Defenses as though set forth herein.

114.     Prior to the filing of this lawsuit, and at all relevant times, there exists a substantial, justiciable controversy between UMHS and Symbria, which have adverse tangible legal interests.

115.     As such, on December 31, 2019, prior to the filing of the original Complaint in this matter, UMHS  sought a declaration by filing an action in the Circuit Court of Cook County, County Department, Chancery Division ("state court action") and subsequent filing of the First Amended Complaint regarding the interpretation of the Restrictive Covenants

116.     After the filing of the state court Declaratory Judgment action, Plaintiffs brought forth a breach of contract claim in Count III, seeking damages for alleged breaches of the restrictive covenants of the SPA concerning the competition, solicitation of clients or potential clients and solicitation of employees, contractors or consultants which are the subject of the first filed pending action in State Court.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

117.     The state court, declaratory judgment action  involves the same issues and the same parties,  As such, Plaintiffs are now barred and unable to seek a different result in this case. Accordingly, Count III is barred by the doctrine of collateral estoppel.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
**(Doctrine of *Res Judicata*)**

118.     UMHS incorporates the allegations of Paragraphs 59 through 90 of these Affirmative Defenses as though set forth herein.

119.     Prior to the filing of this lawsuit, and at all relevant times, there exists a substantial, justiciable controversy between UMHS and Symbria, which have adverse tangible legal interests.

120.     As such, on December 31, 2019, prior to the filing of the original Complaint in this matter, UMHS  sought a declaration by filing an action in the Circuit Court of Cook County, County Department, Chancery Division ("state court action") and subsequent filing of the First Amended Complaint regarding the interpretation of the Restrictive Covenants

121.     After the filing of the state court Declaratory Judgment action, Plaintiffs brought forth a breach of contract claim in Count III, seeking damages for alleged breaches of the restrictive covenants of the SPA concerning the competition, solicitation of clients or potential clients and solicitation of employees, contractors or consultants which are the subject of the first filed pending action in State Court.

122.     The state court, declaratory judgment action  involves the same issues and the same parties,  As such, Plaintiffs are now barred and unable to seek a different result in this case. Accordingly, Count III is barred by the doctrine of *res judicata*.

**NINTEENTH AFFIRMATIVE DEFENSE**
**(Unjust Enrichment)**

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

123.    UMHS incorporates the allegations of Paragraphs 59 through 67, 83 through 85, and 93 through 107 of its Affirmative Defenses as though set forth herein.

124.    Plaintiffs have failed to make any payments to UMHS on the principal as obligated under the SPA, nor have  they allowed the warrants to be exercised, as promised to be provided to UMHS by the SPA, and thus Plaintiffs are seeking to recover more than Plaintiffs are entitled to recover, and any award of the judgment sought by Plaintiffs would unjustly enrich the Plaintiffs.

125.    At the same time, Plaintiffs seek to impose restrictive covenants set forth in the SPA on UMHS.

126.    To the extent UMHS has obligations under any restrictive covenants in the SPA agreement, Plaintiffs must also fulfill their obligations under the SPA agreement.

127.    Plaintiffs have failed to perform under the SPA and provide consideration promised under the SPA to UMHS, and therefore, Plaintiffs retain benefit to UMHS' detriment.

128.    As such, no further payment or performance is required by UMHS, and any such payment or performance to the benefit of Plaintiffs is unjust.

129.    Pursuant to the terms of the SPA, Plaintiffs owe money and other valuable consideration to UMHS, and therefore, to the extent that Plaintiffs can prove any damages, which UMHS denies, any resulting damages awarded to Plaintiffs in this case against UMHS should be offset by the outstanding amounts owed to UMHS by Plaintiffs pursuant to the terms of the SPA.

130.    Further, UMHS asserts that even if Plaintiffs' allegations for breach of contract are true, which it hereby denies, Plaintiffs did not suffer any damages or economic loss.

### TWENTIETH AFFIRMATIVE DEFENSE
### (Unclean Hands)

131.    UMHS incorporates the allegations of Paragraphs 59 through 67, 83 through 85, and 93 through 112 of its Affirmative Defenses as though set forth herein.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

132.     Plaintiffs material breach of terms of the SPA constitute a wrongdoing.

133.     Further, Plaintiffs breached the SPA by failing to perform and by breach of the Post-Closing Covenants.

134.     Plaintiffs have made no efforts to fulfill its obligations owed to UMHS by failing to satisfy the outstanding note and warrants issued to UMHS.

135.     Plaintiffs have not fulfilled their obligations under the SPA because by failing to satisfy its obligations pursuant to the SPA, Plaintiffs seek to enforce the Restrictive Covenants without limitation or end to the detriment of UMHS.

136.     Plaintiffs further seek to benefit from and profit by failing to provide the promised Consideration under the SPA to UMHS, while still attempting to enforce Restrictive Covenants on UMHS.  Accordingly, Plaintiffs are barred from attempting to benefit from its wrongdoing under the doctrine of unclean hands.

137.     UMHS has substantially complied with the terms of the SPA, and Plaintiffs have not,  and therefore any recovery under Count III is barred.

## TWENTY FIRST AFFIRMATIVE DEFENSE
### (SPA Contractual Limitations)

138.     UMHS incorporates the allegations of Paragraphs 59 through 66 as though set forth herein.

139.     Plaintiffs claim that the SPA provides for indemnification obligations owed to it by UMHS, which UMHS denied and continues to deny.

140.     In the event that indemnification is determined to be owed to Plaintiffs, the SPA provides for limitation to indemnification pursuant to SPA, Section 7.5(a)(b) and (c).

141.     Any potential indemnification owed to Plaintiffs would be limited pursuant to the terms of the SPA, which states that:

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Sellers will not have any liability for indemnification under Section 7.1(a); unless and until the aggregate Damages for which Claim Notices for claims are delivered by the ESOP Trust or the Company under this Agreement exceed Six Hundred Sixty-Five Thousand Dollars ($665,000) in the aggregate, at which time Sellers will have liability for Damages in excess of Three Hundred Thirty-Two Thousand Five Hundred Dollars ($332,500). (SPA§ 7.5(a).)

142.    Any potential indemnification owed to Plaintiffs would be limited pursuant to the

terms of the SPA, which states that:

No seller will be required to indemnify the ESOP Trust or the Company under Section 7.1(a) hereof (other than with respect to breaches of any Fundamental Representation or claims based on fraud) for aggregate Damages in excess of Seventeen and one-half percent (17.50)% of such Seller's Proportionate Share, and in any event no Seller will be required to indemnify the ESOP Trust or the Company for aggregate Damages in excess of such Seller's Proportionate Share of the ESOP Purchase Price.

(SPA§ 7.5(b)(i).)

143.    Any potential indemnification owed to Plaintiffs would be limited pursuant to the

terms of the SPA, which states that:

The amount of any Damages for which an Indemnified Person is entitled to indemnity under this Article 7 will first be reduced by the amount of any insurance or indemnification proceeds from a third party realized by the Indemnified person or its Affiliates with response to such Damages (net of any collection costs)

(SPA§ 7.5(b)(ii).)

144.    Any potential indemnification owed to Plaintiffs would be limited pursuant to the

terms of the SPA, which states that:

In no event will any Indemnified Person be entitled to duplicate compensation with respect to the same Damage under more than one provision of this Agreement and the other agreements and documents to be executed in connection with the Transaction

(SPA§ 7.5(b)(iii).)

145.    To the extent Plaintiffs are entitled to any damages or indemnification, which

UMHS denies, such indemnification would thus be limited by the SPA.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## TWENTY-SECOND AFFIRMATIVVE DEFENSE
### (Advice of Counsel)

146.     UMHS incorporates the allegations of Paragraphs 59 through 66 of these

Affirmative Defenses as though set forth herein.

147.     Section 8.10(b)(B) of the SPA says in pertinent part that each party to the SPA had

counsel who "reviewed and negotiated the terms and provisions of this Agreement (including any

Exhibits, Schedules and Disclosure Schedule attached hereto) and have contributed to its revision

. . ."

148.     The Sellers, including UMHS, as a Seller in the SPA, collectively, retained counsel

during the negotiation and through the execution of the SPA.

149.     During this process counsel provided advice to the Sellers, including UMHS, on

the construction and interpretation of the SPA, including UMHS' obligations under the restrictive

covenants identified in Section 5.4 (a)(b) and(c).

150.     In the Fall of 2017, UMHS contacted said counsel and retained counsel individually

to provide legal advice regarding the effect of the SPA on potential investment opportunities, and

specifically with regard to whether its participation in Joint Ventures would violate the provisions

of Section 5.4 of the SPA.

151.     Since said counsel had negotiated the SPA on behalf of the Sellers, including

UMHS, and was familiar with the intent of the SPA and its provisions, it was logical that UMHS

would seek advice from the same counsel who negotiated the SPA in this regard.

152.     UMHS counsel provided a legal opinion regarding its obligations under the SPA

agreement, and concluded that it could take equity positions in joint ventures doing business in

states outside of Illinois, and that such action would not violate or breach the SPA.  UMHS'

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

counsel advised that there are no restrictions in the ESOP Stock Purchase Agreement related to states other than Illinois.

153.    On December 6, 2019, Symbria sent a cease-and-desist letter to UMHS, allegation that UMHS's investment in joint ventures violated Section 5.4 (b) and (c) of the SPA by conducting business outside of the state of Illinois, and alleging these violations caused monetary harm to Symbria.

154.    UMHS relied upon this legal advice and counsel at all relevant times.  As such, UMHS acted in a reasonable fashion, with appropriate intent and acted in good faith reliance on the advice of its counsel.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Fair Use- Copyright Infringement)

155.    UMHS's use of the protected works in question, if it occurred at all, was a legally protected fair use of the allegedly infringed work pursuant to Section 107 of the 1976 Copyright Act.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
### (Lack of Ownership)

156.    Plaintiffs' did not have copyright ownership of the protected works at the time of the alleged violations, and thus, Plaintiffs' claims for copyrights are invalid and/or unenforceable.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Lack of Originality)

157.    The Protected Works are not original works of authorships, but instead compilations of publicly available information that lack even a minimal degree of creativity.

158.    Plaintiffs' did not have copyright ownership of the protected works at the time of the alleged violations, and thus, Plaintiffs' claims for copyrights are invalid and/or unenforceable.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## TWENTY-FIFTH AFFIRMATIVE DEFENSE
### (Misuse of Copyright)

159**.**    UMHS's use of the protected works in question, if it occurred at all, was not in violation of the Copyright Act because Plaintiffs authorize, impliedly or explicitly, Defendant's alleged infringing use of the work, and its claims are therefore barred by the doctrine of implied license.

160.    Plaintiffs' know or knew that its allegations attempting to enforce copyright protection on alleged protected works that it knew or know are invalid, unenforceable, and/or not infringed, and thus the claims are barred by the doctrine of misuse of copyright.

161.    Plaintiffs' claims are barred because UMHS's acts and use of the protected works in question, if it occurred at all, were in good faith and without any intent to infringe on Plaintiffs' work, and thus UMHS is an innocent infringer.

162.    Because Plaintiffs' know or knew that its allegations attempt to enforce copyright protection on alleged protected works that it knew or know are invalid, unenforceable, and/or were not infringed, Defendants are entitled to recover their reasonable attorneys' fees pursuant to 17 U.S.C.A. § 505.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

163.    Plaintiffs have failed to identify what trade secrets UMHS allegedly Misappropriated, how UMHS misappropriated each trade secret, or how UMHS improperly used each trade secret.

164.    Section 5 of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* authorizes the Court to award attorneys' fees to the prevailing party if a trade secret misappropriation claim is made in bad faith.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

165.    To the extent Plaintiffs' claims against UMHS for trade secret misappropriation are made in bad faith and/or Plaintiffs are unable to prove its trade secret misappropriation claims against UMHS, UMHS, as prevailing party against Plaintiffs is presumptively entitled to an award of fees pursuant to 17 U.S.C. § 505.  See also *Riviera Distrib., Inc. v. Jones,* 517 F. 3d 926, 928 (7th Cir. 2008).

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

166.    To the extents Plaintiffs are able to establish its damages claims (although evidence does not support such contention), Plaintiffs' claims or recovery, if any, are reduced or barred by its failure to timely and reasonably mitigate damages.

167.    Plaintiffs did not suffer any damages or loss as proximate or legal result of any alleged action or inaction on the part of UMHS, the existence of which is denied.  Plaintiffs' alleged damages are pure speculation.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Setoff)

168.    To the extent Plaintiffs are able to establish any of its damages claims against UMHS, Plaintiffs' claims or recovery, if any, are reduced or barred by a setoff of the amounts of UMHS is entitled to recover as prevailing party on Plaintiffs' Copyright Act claims against UMHS and as prevailing party on Plaintiffs' Illinois Trade Secrets Act claims against UMHS and on the amount that Plaintiffs owe to UMHS under the note and the value of the warrants as set forth in the SPA.

### ADDITIONAL AFFIRMATIVE DEENSES

169.    Without admitting that Plaintiffs has sustained any injury or damages and without admitting any liability whatsoever, Defendant alleges that the injuries complained of and the

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

damages sought by Plaintiff in the FAC and each such separate claim for relief asserted therein was the direct and proximate cause of certain independent actions of third parties over whom Defendant, UMHS, has no control. Therefore, Defendant is not liable for any damage that may have resulted therefrom.

170. UMHS reserves the right to amend its affirmative defenses or assert additional affirmative defenses as warranted by its investigation and the discovery in this case up through trial.

WHEREFORE, the Defendant, United Methodist Homes & Services, prays that this Honorable Court enter judgment in its favor and against Plaintiffs on each of its Affirmative Defenses, denying and dismissing Plaintiffs' claims in the Fourth Amended Complaint, with costs and attorneys' fees assessed against the Plaintiffs and for UMHS as prevailing party, and any other relief to which this Court deems equitable and just.

Respectfully Submitted,

*/s/ Paige Manley Canepari*
One of the Attorneys for United Methodist Homes & Services

Kevin M. O'Hagan (6211446)
Paige Manley Canepari (6274052)
Sean G. Rohan
O'Hagan Meyer, LLC
One East Wacker Street, Suite 3400
Chicago, Illinois 60601
312.422.6172
kohagan@ohaganmyer.com
pcanepari@ohaganmyer.com

## COUNTER-CLAIM FOR BREACH OF CONTRACT

Comes now Defendant/Counter-Plaintiff, UMHS, by and through its attorneys, and for its Counter-Claim against Plaintiffs/Counter-Defendants, states as follows:

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## PARTIES AND FACTS

1.       Defendant/Counter-Plaintiff, United Methodist Homes & Services ("UMHS") is an Illinois not-for profit corporation that is a provider of services and residences for older adults. Until October 31, 2015, UMHS was one of the owners of Symbria.

2.       Plaintiff/Counter-Defendant, Symbria, Inc. ("Symbria") is the parent company of businesses that provide clinical health services for senior living and post-acute care providers, including therapy, pharmacy services, and wellness programs.  Symbria is an Illinois corporation with its principal place of business in Warrenville, Illinois.

3.       On October 31, 2015, UMHS, as Seller, entered into a Stock Purchase Agreement ("SPA") with other sellers, including but not limited to Jill Krueger and John Callen, with Symbria, identified as the "Company" and Argent Trust Company as the as Trustee of the Symbria, Inc. Employee Stock Ownership Trust (the "Trustee") to facilitate the sale of 100% of the shares of Symbria stock from the Sellers (including UMHS) to the Trustee.  Dkt #604, Exhibit 1.

4.       Plaintiff/Counter-Defendant have brought a Fourth Amended Complaint ("FAC") against UMHS, alleging among other counts, Violation of Trades Secrets (Counts I and II), Breach of the SPA (Count III) Copyright Infringement (Count X) and Tortious Interference with Symbria Rehab-employee contract against various other Defendants, and UMHS.  Dkt. #604.

5.       Plaintiffs/Counter-Defendants have identified that Great Banc Trust Company ("GreatBanc") is the current Trustee of the Symbria, Inc. Employee Stock Ownership Trust.

6.       Plaintiff/Counter-Defendants' Fourth Amended Complaint ("FAC") that is brought on behalf of Symbria, Symbria Rehab, Alliance Connecticut, and Alliance HVA are referred to herein collectively as "Symbria and Affiliates." Symbria, Symbria Rehab, Alliance Connecticut,

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

Alliance HVA, GreatBanc, and the Symbria ESOP Trust are referred to collectively as "Plaintiffs.". Dkt. #604, ¶ 8. Symbria, Inc. is also identified in the SPA as "Company". As such, these Plaintiff/Counter-Defendant are referred to collectively herein as Plaintiffs/Counter-Defendants and as "Company".

## JURSIDICTION AND VENUE

7.      Jurisdiction in this Court is proper because Plaintiff/Counter-Defendant have submitted to the jurisdiction of this Court by the filing of the FAC and the Counterclaims are so related to the claims asserted by Plaintiff/Counter-Defendant in this action that they form part of the same case or controversy and arise out of the common facts, transactions, or occurrences.

8.      This Court has personal jurisdiction over Plaintiff/Counter-Defendant, as Plaintiff/Counter-Defendant availed itself of this Court's jurisdiction by bringing this action in this District.

9.      Venue is proper in this Court because Plaintiff/Counter-Defendant have submitted to this judicial district in the filing of the FAC.

## FACTUAL ALLEGATIONS

10.     On October 31, 2015, UMHS sold its stock in Symbria pursuant to the terms of the SPA for certain consideration. For its interest in Symbria, UMHS was to receive ███████████

███████████████████████████████████████████████

██████████████████████████████████

11.     In exchange the SPA provides that the Symbria will fulfill certain terms, conditions and obligations.

12.     Plaintiff/Counter-Defendant entered into certain Agreements, including the Employment Agreement with John Callen ("Agreement") in connection with the purchase of all

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

of the Company's issued and outstanding stock by the Symbria., Inc. Employee Stock Ownership Trust under the Symbria, Inc. Employee Stock Ownership Plan to become the sole shareholder of the Company's issued and outstanding stock. Dkt. #604, Exhibit 2.

13.     Specifically, the Agreement, which became effective the same date as the SPA referred to the sale and purchase of all the Company's issued and outstanding stock by the Symbria, Inc. Employee Stock Ownership Trust, which is the subject of the SPA as the "Transaction". Ex.2, Recital A.

14.     The Agreement was entered into with Callen as a condition to consummate the Transaction, which was set forth in the SPA. Specifically, the Agreement states in pertinent part:

> "This Agreement is being entered into in connection with the purchase of all of the Company's issued and outstanding stock by the Symbria, Inc. Employee Stock Ownership Trust (the "Trust") under the Symbria, Inc. Employee Stock Ownership Plan (the "Plan") to become the sole shareholder of the Company's issued and outstanding stock (the "Transaction"). Dkt. #604, Ex. 2, A.

15.     Symbria recognized in the terms, that as a condition to consummation of the Transaction, the Company was to enter into this Agreement ~~with Callen~~.

16.     The Agreement provided that the Company agrees to continue to employ Callen to serve as the Company's President, and Executive. Plaintiffs entered into this Agreement in order to provide confidence to the sellers of its ability to fulfill the obligations it agreed to in the SPA, and to thus, induce them to enter into the SPA.

17.     Specifically the Agreement stated,

> "As a condition to consummation of the Transaction, the Company and the Executive desire to enter into this Employment Agreement to set forth the terms and the conditions of the employment relationship between the Company and the Executive." Dkt. #604, Ex. 2, D.

18.     The initial term of the employment period was identified as a term commencing on October 31, 2015, the same date as the SPA Closing Date, and ending on the fifth (5th) anniversary.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

The Agreement further provided that the employment period shall automatically extend for two successive two year periods following the expiration of the initial five year term, unless each party provided the other party with advance written notice.

19.     Similarly, the SPA identified that John Callen was part of the Management Group.

20.     In order to provide the Sellers, including UMHS, with confidence to enter into the SPA, Symbria entered into the Agreement with Callen as a condition and consideration of the SPA. Symbria further agreed to maintain the Management Group and employment of Callen as a Post-Closing Covenant.

21.     In consideration of the terms of the SPA, Plaintiffs are obligated to fulfill these certain terms, conditions and obligations under the SPA.

22.     Further, after the initial term of employment of Callen, which was agreed to as a condition to consummation of the SPA, Plaintiffs further agreed, pursuant to Section 5.9 of the SPA, to certain Post-Closing Covenants.

23.     Section 5.9 (b) states as follows in pertinent part:

**Post-Closing Covenants.** The Company will use its best efforts to have the Management Group commit to renew the terms of their respective employment agreements on an annual or longer basis after the fifth anniversary of the Closing, until the Subordinated Notes and Warrants are no longer outstanding.

24.     UMHS entered into the SPA in consideration of Plaintiffs obligations. The Management Group is defined in the SPA because, the employment of the Management Group was a condition of the SPA, and it provided confidence and assurance of the ongoing business success of the Plaintiffs and its ability to fulfill the terms of the SPA.

25.     Provisions 5.9 (b) presumes that Plaintiff/Counter-Defendant will fulfill its obligation, and that the Management Group will remain in place from the Closing Date of the SPA through their existing respective employment agreements, and that Plaintiffs will use its best

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

efforts to keep the Management Group in place by committing to renew the terms of each respective agreement upon expiration or renewal of the employment agreements.

26. It was material and valuable to UMHS when it entered into the SPA that the Management Group remain in place so that Symbria would have the ability to perform under the SPA.

## COUNT ONE
## MATERIAL BREACH OF CONTRACT

27. UMHS incorporates paragraphs 1 through 26 by reference as though fully set forth herein.

28. Yet, on January 12, 2017, Callen's employment was terminated by Plaintiffs/Counter-Defendants, through Jill Krueger.

29. By terminating John Callen, Plaintiffs/Counter-Defendants terminated Callen's employment agreement, which it entered into as a condition to consummate the SPA, and thus breached its obligations under the SPA. Plaintiffs/Counter-Defendants further attempt to circumvent material provisions and obligations of the SPA, specifically Article 5.9(b) by terminating the Agreement before the end of the initial employment period.

30. Plaintiffs/Counter-Defendants failed to use its best efforts to keep the existing Management Group in place, thereby breaching its obligations under the SPA.

31. The termination of Callen adversely impacted Plaintiffs/Counter-Defendants and decreased the value of the consideration owed to UMHS as a Seller and decreased Plaintiffs/Counter-Defendants ability to pay the note to UMHS.

32. Further, Plaintiffs/Counter-Defendants failure breach of the SPA, adversely impacted the Plaintiffs/Counter-Defendants, who have demonstrated no ability to fulfill its obligations owed to UMHS pursuant to the SPA.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

33.     To date Plaintiffs/Counter-Defendants have failed to provide and fulfill the promised consideration to UMHS  pursuant to the terms and obligations of the SPA.

34.     To date Plaintiffs/Counter-Defendants have failed to pay their insubordinated debt and have failed to pay back any principal on the note owed to UMHS.

35.     Upon information and belief, Plaintiffs/Counter-Defendants failure to retain the Management Group and termination of Callen caused its value to be reduced significantly, including decrease in its share price, resulting in significant decrease in value of the warrants and making it impractical for Plaintiffs/Counter-Defendants to satisfy the note under the current Management Group. Plaintiffs/Counter-Defendants failure to abide by the SPA's terms and provisions, constitute a breach of the SPA, and  render it irreparably broken, and defeats the purpose of entering into the SPA in the first place.

36.     Plaintiffs/Counter-Defendants breach of the SPA has impacted its solvency and ability to fulfill its obligations under the SPA, resulting in harm and damages to UMHS.

37.     Plaintiffs/Counter-Defendants breach of the SPA directly impacts its ability to satisfy its obligations under the SPA.

38.     Plaintiffs/Counter-Defendants breach of the SPA has caused UMHS to be damaged.

WHEREFORE, Defendant/Counter-Plaintiff, UMHS prays for Judgment against Plaintiffs/Counter-Defendant as follows:

a.   Specific Performance and enforcement on all contractual terms of the SPA;

b.   Compensatory damages in an amount to be determined;

c.   Costs, including attorney's fees;

d.   Other such relief as the Court deems equitable and/or appropriate.

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## COUNT II
## UNJUST ENRICHMENT

39.     UMHS incorporates paragraphs 1 through 36 by reference as though fully set forth herein.

40.     To date Plaintiffs/Counter-Defendants have failed to provide and fulfill the promised consideration to UMHS  pursuant to the terms and obligations of the SPA.

41.     Further, and despite its breach, Plaintiffs/Counter-Defendants attempt to impose the restrictive covenants, pursuant to Article 5.4 of the SPA agreement, to its benefit without providing the promised consideration to UMHS.

42.     Plaintiffs/Counter-Defendants claim that in exchange for the consideration in the SPA, UMHS must abide by certain restrictive covenants concerning competition, solicitation of clients or potential clients, and solicitation of employees, contractors or consultants (the "Restrictive Covenants"). (SPA §§ 5.4(a), (b), (c), and that UMHS also agreed to a covenant restricting its use of confidential information.

43.     Plaintiffs/Counter-Defendants failure to perform under the terms of the SPA constitutes a breach of the SPA or provide the agreed upon consideration.

44.     Despite this breach, Plaintiffs/Counter-Defendants retain the benefit of Restrictive Covenants of the SPA.

45.     Plaintiffs/Counter-Defendants have failed to provide the promised consideration in exchange to UMHS for its obligations under the Restrictive Covenants.

46.     Plaintiffs/Counter-Defendants breaches of the SPA have caused UMHS  to be damaged and continue to cause UMHS to be damage.  As a result of these breaches Plaintiffs/Counter-Defendants have failed to satisfy the outstanding owed note and warrants, and

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

at the same time continue to restrict UMHS's ability to compete and solicit with Plaintiffs/Counter-Defendants. As such, Plaintiffs/Counter-Defendants have not satisfied the agreed consideration under the SPA in exchange for the obligations set forth in the restrictive covenants in Article 5.4.

47. Plaintiffs/Counter-Defendants have thus, been unjustly enriched to the detriment of UMHS.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counter-Plaintiff, UMHS prays for Judgment against Plaintiffs/Counter-Defendant as follows:

a. Specific Performance and enforcement on all contractual terms of the SPA;

b. Compensatory damages in an amount to be determined;

c. Costs, including attorney's fees;

d. Other such relief as the Court deems equitable and/or appropriate.

Dated: January 17, 2023                    Respectfully Submitted,

                                        /s/ Paige Manley Canepari
                                        One of the Attorneys for United Methodist Homes &
                                        Services

Kevin M. O'Hagan (6211446)
Paige Manley Canepari (6274052)
Sean G. Rohan
O'Hagan Meyer, LLC
One East Wacker Street, Suite 3400
Chicago, Illinois 60601
312.422.6172
kohagan@ohaganmeyer.com
pcanepari@ohaganmeyer.com
srohan@ohaganmeyer.com

CONTAINS PROTECTED INFORMATION SUBJECT TO CONFIDENTIALITY ORDER

## <u>CERTIFICATE OF SERVICE</u>

We certify that on January 17 2023, we caused the foregoing document to be filed electronically with the Clerk of the Court via CM/ECF, which will notify all parties in this matter who are registered with the Court's CM/ECF filing system of such filing.


/s/ <i>Paige Manley Canepari</i>
Paige Manley Canepari
